## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                                        )
MEYER GROUP, LTD.,                      )
                                        )
                  Plaintiff,            )
                                        )
          v.                            )          Civil Action No. 19-1945 (ABJ)
                                        )
JAMES M. RAYBORN, et al.,               )
                                        )
                  Defendants.           )
_____ )
```

### MEMORANDUM OPINION

Plaintiff The Meyer Group, Ltd. ("TMG") is a commercial real estate company providing brokerage and advisory services to tenants in the Washington, D.C. metropolitan area.  Compl. [Dkt. # 1] ¶ 7.  Defendant James M. Rayborn is a real estate salesperson and a former employee of TMG.  *Id.* ¶¶ 3, 8–9.  During his employment with plaintiff, Rayborn was charged with maintaining existing client relationships and following leads for potential new clients.  Aff. of James Rayborn, Ex. A to Def. James M. Rayborn's Mot. to Dismiss [Dkt. # 9-5] ("Rayborn Aff.") ¶¶ 17–19.  In January of 2019, TMG terminated Rayborn's employment, and he later began working for Broad Street Realty, another real estate brokerage firm providing services in the District of Columbia area.  Compl. ¶¶ 10, 19–20.  Plaintiff alleges that Rayborn misappropriated TMG's confidential client data, disclosed it to Broad Street Realty, and persuaded TMG's clients to terminate their contracts with TMG and move to Broad Street.  *Id.* ¶ 21.

On June 28, 2019, plaintiff filed a complaint against Rayborn and Broad Street Realty alleging violations of the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and the D.C. Uniform Trade Secrets Act, D.C. Code § 36–401.  Compl. ¶¶ 34–49.  It also alleged that defendants

tortiously interfered with TMG's contracts with its clients, and that Rayborn breached his employment agreement. *Id.* ¶¶ 24–33.

On September 20, 2019, defendant Rayborn filed a motion to dismiss, or in the alternative, a motion for summary judgment. Def. Rayborn's Mot. to Dismiss or Alternatively Mot. for Summ. J. [Dkt. # 8] ("Def.'s Mot."); Def. Rayborn's Errata Mem. in Supp. of Def.'s Mot. [Dkt. # 9-3] ("Def.'s Mem."). He argued that the "confidential information" that was allegedly misappropriated from TMG is not a trade secret, and that the information was his property. Def.'s Mem. at 10–12. He also argued that plaintiff failed to state a claim for tortious interference or breach of contract. *Id.* at 12–20. Defendant Broad Street Realty later joined Rayborn's motion. Def. Broad Street Realty, LLC's Mot. to Dismiss [Dkt. # 11] ("Broad St. Mot.").

For the following reasons, the Court will grant in part and deny in part defendants' motions.

## BACKGROUND

Rayborn started working for The Meyer Group in 1994 as a real estate salesperson specializing in tenant representation. Compl. ¶¶ 8, 11. According to the complaint, Rayborn ignored directives from the president of the company, William Meyer, and "engage[d] in disruptive behavior" during the course of his employment. *Id.* ¶ 11. Rayborn also allegedly damaged the company's relationships with its clients by "harassing and ceaselessly calling and emailing" them. *Id.* In May of 2018, Rayborn was terminated for cause. *Id.*

Soon after he was terminated, Rayborn insisted that he be reinstated. Compl. ¶ 12. Plaintiff agreed to bring him back under a different arrangement, and on May 29, 2018, TMG and Rayborn executed an Independent Contractor Agreement ("ICA"). *Id.* Pursuant to the ICA, Rayborn would assist current TMG clients in locating premises and negotiating lease agreements, and he would assist TMG in acquiring new clients. *Id.* The agreement provided that Rayborn would be paid

75% of any commissions paid to TMG, net of any other expenses. *Id.* The ICA also contained a confidentiality provision, in which Rayborn "recognized and acknowledged that TMG would be granting Rayborn access to confidential or proprietary information, including information concerning TMG's clients and prospective clients, the identity of clients and prospective customers, the identity of key purchasing personnel in the employ of customers and prospective clients, and client lists." *Id.* ¶ 14. He agreed to not disclose this confidential information to others, to abstain from soliciting any client or potential client of TMG, and to return any confidential information in his possession to TMG prior to the termination of the contract. *Id.* ¶ 15. The ICA also stated that either party could terminate the ICA at any time upon notice to the non-terminating party. *Id.* ¶ 13.

Plaintiff alleges that by virtue of this arrangement, Rayborn had access to or created confidential client lists, which included information that was not publicly known. *See* Compl. ¶ 16. Plaintiff alleges that the confidential data on each client included such information as "the date of lease expiration, notes on client preferences, and up-to-date contacts at each client company." *Id.* ¶ 17. Some of the confidential information was stored on a Microsoft database and other information was recorded by Rayborn on a set of "TMG index cards." *Id.*

In January of 2019, plaintiff learned that Rayborn was corresponding with competing real estate firms, including Broad Street Realty about employment opportunities. Compl. ¶ 19. Meyer asked Rayborn if he intended to continue working with TMG under the ICA, and Rayborn indicated that he intended to seek employment elsewhere. *Id.* On January 24, 2019, TMG notified Rayborn that the ICA was terminated. *Id.* At some point after the termination of the ICA, Rayborn joined Broad Street Realty as a Senior Vice President. *See id.* ¶¶ 8, 20.

After Rayborn's departure, plaintiff learned that he had taken a number of the index cards that contained client information with him.  Compl. ¶ 21.  Plaintiff alleges that Rayborn "disclosed and misappropriated TMG's Confidential Information by contacting and actively soliciting TMG's clients while working at Broad Street."  *Id.*  As a result, a number of TMG's "longtime" clients terminated their agreements and switched to Broad Street Realty.  *Id.* ¶ 21(a)–(g).  For example, Barnes Vanze Architects, Inc. was TMG's client for over eight years, and on February 25, 2019, it notified TMG that it was terminating its exclusive agreement with TMG and would be working with Broad Street Realty instead.  *Id.* ¶ 21(b).  Plaintiff alleges that Rayborn even set up meetings and calls with its clients to persuade them to move their business to Broad Street Realty while he was still working at TMG.  *Id.* ¶ 21(f)–(g).

On April 26, 2019, plaintiff sent Broad Street Realty a cease-and-desist letter demanding that it stop using TMG's confidential information.  Compl. ¶ 22.  Broad Street refused to comply, and plaintiff alleges that Broad Street and Rayborn continue to utilize TMG's confidential information today.  *Id.* ¶¶ 22–23.

On June 28, 2019, plaintiff filed a complaint in this Court against Rayborn and Broad Street, alleging: (1) Rayborn breached the ICA by misappropriating and disclosing confidential information, Compl. ¶¶ 24–27; (2) Rayborn and Broad Street tortiously interfered with the contracts between TMG and its clients by actively soliciting TMG's clients and encouraging them to terminate their contracts with TMG, *id.* ¶¶ 28–33; (3) Rayborn and Broad Street violated the D.C. Uniform Trade Secrets Act, D.C. Code § 36-403, when they misappropriated TMG's confidential information, Compl. ¶¶ 34–40; and (4) Rayborn and Broad Street violated the Defend Trade Secrets Act, 18 U.S.C. § 1836, when they willfully acquired, misappropriated, and disclosed TMG's confidential information for their own economic benefit.  Compl. ¶¶ 41–49.  Defendants

4

have moved to dismiss the complaint, or alternatively, for summary judgment.  Def.'s Mem.; Broad St. Mot.

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  556 U.S. at 678, citing *Twomby*, 550 U.S. at 555.  And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id*. at 679, citing *Twombly*, 550 U.S. at 556.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*, quoting *Twombly*, 550 U.S. at 556.  A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

When considering a motion to dismiss under Rule 12(b)(6), the Court is bound to construe a complaint liberally in the plaintiff's favor, and it should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), citing *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are

unsupported by facts alleged in the complaint, nor must the Court accept the plaintiff's legal conclusions.  *See id.*; *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In ruling upon a motion to dismiss for failure to state a claim, the Court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice."  *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citations omitted).

## ANALYSIS

**I.    The Court will deny the motion for summary judgment as premature.**

Defendants have moved, in the alternative, for summary judgment on plaintiff's trade secrets claims, and they attach exhibits to the motion for the Court to consider.  *See* Def.'s Mem.; Broad St.'s Mot.  For the following reasons, the Court will not consider a motion for summary judgment at this stage, and thus it will not review plaintiff's or defendants' exhibits in deciding the motion to dismiss, unless they are specifically incorporated into plaintiff's complaint.

A motion for summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining whether to grant summary judgment, the court must analyze the evidence in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  To defeat summary judgment, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 248 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment.  *Id.* at 247–48.  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation.  *Id.* at 248;

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

Here, there are more disputed facts than undisputed facts, and there are even more facts that are as yet unknown.  There is little or no evidence in the record as to what information was recorded on the index cards; whether that information was confidential; who created and owned the index cards; where and how they were stored; who had access to them; and what efforts were taken to maintain the secrecy of the information they contained.  Defendants attach a sworn statement by Rayborn insisting that he created the index cards from commercially available information.  Rayborn Aff. ¶¶ 3, 16.  But that information is contested by the declaration of TMG's president, William J. Meyer, who states that some of the information on the cards was confidential and nonpublic.  Decl. of William J. Meyer, Ex. A to Pl.'s Opp. to Def.'s Mot. to Dismiss [Dkt. # 13-3] ("Meyer Decl.") ¶ 12.  Defendants also point to emails sent by Rayborn to potential clients, which transmit a list of existing clients as references.  *See* Ex. D to Def.'s Mem. [Dkt. # 9-8]; Ex. F to Def.'s Mem. [Dkt. # 9-10].  They argue that this shows that TMG client information was not confidential, but it is not clear whether the information on the client lists is identical to what was stored on the index cards.  Finally, defendants attach a "sample of the canvass cards" that Rayborn took with him, Def.'s Mem. at 12, citing Ex. E to Def.'s Mem. [Dkt. # 9-9], but it is not clear whether this sample is representative of all the index cards in Rayborn's possession.  Defendants' "sample" index cards are marked, "Property of James M. Rayborn," but plaintiff avers that it purchased index cards labeled "The Meyer Group" and that Rayborn had used those for recording client data.  Meyer Decl. ¶ 14.

In other words, not only are key facts disputed, but the facts that have not yet been fully illuminated will bear on the determination of whether the index cards constitute trade secrets and whether defendant Rayborn violated federal and D.C. trade secrets laws when he took the cards with him.  Given the many disputes of fact and the need for further discovery, the Court will deny, without prejudice, the alternative motion for summary judgment under Federal Rules of Civil Procedure 56(d) and (e).  With that, the Court will evaluate the motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), and that assessment must be based on the face of the complaint, assuming the truth of plaintiff's allegations for now.

## II.   The Defend Trade Secrets Act & D.C. Uniform Trade Secrets Act claims in Counts III and IV will move forward.

To bring a claim under either the Defend Trade Secrets Act or the D.C. Uniform Trade Secrets Act, a plaintiff must demonstrate the existence of a trade secret that has been misappropriated.  18 U.S.C. § 1836(b)(1); *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 77 (D.D.C. 2007), citing D.C. Code § 36–401 (to state a claim for a trade secret claim, a plaintiff must show "(1) the existence of a trade secret; and (2) acquisition of the trade secret by improper means, or improper use or disclosure by one under a duty not to disclose").  Defendants argue that plaintiff has failed to plausibly plead the existence of a trade secret or, if it existed, that it was misappropriated.  Def.'s Mem. at 7–12.

### A.  Whether the Index Cards are Trade Secrets

"The 'threshold inquiry' in every trade secret case is 'whether or not there [is] a trade secret to be misappropriated.'"  *DSMC*, 479 F. Supp. 2d at 77, quoting *Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*, 350 F. Supp. 2d 1, 8 (D.D.C. 2004).  Under both the federal and D.C. laws, a "trade secret" is defined as information that "derives independent economic value . . . from not

being generally known" when "the owner . . . has taken reasonable measures to keep such information secret."  18 U.S.C. § 1839(3); *see* D.C. Code § 36–401(4) (defining a "trade secret" to be information that "(A) Derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and (B) Is the subject of reasonable efforts to maintain its secrecy.").

"Although the question of whether a piece of information is a trade secret is typically a question of fact, information is not a trade secret as a matter of law if it is 'easily ascertainable by the public or generally known within an industry.'"  *Econ. Research Servs., Inc. v. Resolution Econ., LLC*, 208 F. Supp. 3d 219, 232–33 (D.D.C. 2016).   But even if individual elements are known to the public, a trade secret can exist in a unique combination of those otherwise publicly available elements.  *Catalyst*, 350 F. Supp. 2d at 9; *see also Elm City Cheese Co. v. Federico*, 752 A.2d 1037, 1047 (Conn. 1999) (finding that "plaintiff's ability to combine these elements into a successful . . . process, like the creation of a recipe from common cooking ingredients is a trade secret entitled to protection") (internal quotation marks and citations omitted).

Client lists or customer information can be considered trade secrets, but this is an inherently fact dependent question.  *Hedgeye Risk Mgmt., LLC v. Heldman*, 412 F. Supp. 3d 15, 29–30 (D.D.C. 2019); *see Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 76 (holding that customer lists of a financial-services firm deserve trade secret status and that plaintiff had a likelihood of success on the merits on its trade secrets claim).   Courts in this district that have considered the question have relied on six factors to determine whether a client information can be considered a trade secret:

> (1) [T]he extent to which the information is known outside of [the] business;
> (2) the extent to which it is known by employees and others involved in
> [the] business; (3) the extent of measures taken by [the employer] to guard
> the secrecy of the information; (4) the value of the information to [the
> employer] and to his competitors; (5) the amount of effort or money
> expended by [the employer] in developing the information; [and] (6) the
> ease or difficulty with which the information could be properly acquired or
> duplicated by others.

*Ruesch v. Ruesch Int'l Monetary Servs., Inc.*, 479 A.2d 295, 296 (D.C. 1984), quoting 4

Restatement of Torts § 757, cmt. b (1939). In *Ruesch*, the D.C. Court of Appeals examined these

factors keeping in mind the distinction between a customer list which has on it "likely prospects,"

which may be more difficult to find in the public domain or may take money and time to compile,

and a "wholesale" customer list that is public and shared between those in the industry, such a

trade publication. *Id*. at 297. The former is more likely to be a trade secret; the latter is less likely

to be a trade secret. *Id.* That court also considered the industry in question in determining whether

the information could be considered a trade secret – it observed that courts are less likely to protect

customer lists when the industry is impersonal and where customer loyalty in the industry, to the

extent it exists, is to "the company rather than to a particular employee." *Id.* at 300.

Another court in this district has observed that while client contact information, such as the

information printed on business cards, may not be confidential by itself, "a collection of business

cards might, in some circumstances, capture the same information contained in a confidential

customer list." *Hedgeye Risk Mgmt.*, 412 F. Supp. 3d at 29. For example, the customer

information "might reflect information that is confidential and difficult to find, such as information

about the identity of key decisionmakers at a firm or those persons' private email addresses." *Id.*

at 29–30.

The issue before the Court is whether the complaint states a plausible claim that the information contained on the index cards qualifies as a trade secret.[1]  The parties agree that the information has economic value, but defendants maintain that the information was in the public domain or readily ascertainable.  Plaintiff alleges that the index cards contained valuable confidential information regarding each client, including not only the clients' contact information, but also notes on individual client preferences, and the dates their leases expired.  Compl. ¶¶ 16–7. It argues that while some of the information on the cards may be public, the act of pulling it all together renders the index cards to be trade secrets.  Pl.'s Opp. to Def.'s Mot. to Dismiss [Dkt. # 13] ("Pl.'s Opp.") at 10–11.

The Court finds, assuming the truth of the allegations in the complaint, and resolving all inferences in favor of plaintiff as it is required to do at this stage, that plaintiff has plausibly alleged that the information on the cards was nonpublic and not readily ascertainable from public sources.[2]

Another factor to be considered in the trade secret analysis is whether the owner of the secret took reasonable steps to ensure the secrecy of the information.  18 U.S.C. § 1839(3)(A); D.C. Code § 36–401(4)(B).  Defendants contend that the complaint is devoid of allegations regarding the steps plaintiff took to ensure the secrecy of the information on the index cards.  Def.'s Mem. at 9–10.  They argue that "requiring Rayborn to agree to the confidentiality provision

---

1     While plaintiff alleges that it maintained confidential information in a Microsoft database, there is no allegation in the complaint that Rayborn accessed this database and took any of the information from it to his next position.  The only allegation of misappropriated information involves the index cards that Rayborn took with him.  Compl. ¶ 17.

2     The question may be raised again at the summary judgment stage, when the content of the cards is a matter of record,  and one can assess whether the information was available in the public domain, or as in *Hedgeye*, the contact information included private information such as "the identity of key decisionmakers at a firm or those persons' private email addresses."  412 F. Supp. 3d at 29–30.

contained in his ICA is not sufficient by itself to demonstrate efforts to maintain secrecy," and that therefore, plaintiff has failed to allege "any policy, procedure, or conduct by TMG to maintain the secrecy of the alleged confidential information." *Id.*  But the existence of the ICA is a significant allegation.  The courts have identified the confidentiality agreement as a method for preserving secrecy that is consistent with trade secret protection.  *See Catalyst*, 350 F. Supp. 2d at 10–11, *aff'd sub nom. Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*, 173 F. App'x 825 (Fed. Cir. 2006) ("Maintaining trade secret status thus requires only reasonable efforts, such as implementing confidentiality agreements.").  Thus, at this stage, the allegation is enough to show that TMG took reasonable steps to maintain the confidentiality of the information on the index cards.

At the summary judgment stage, plaintiff will have to come forward with evidence regarding the confidentiality of the information on the cards and the efforts that it took to ensure its secrecy.  But for now, plaintiff has plausibly alleged the existence of trade secrets.

### B.  Whether the Index Cards were Misappropriated

Under the Defend Trade Secrets Act and the D.C. Uniform Trade Secrets Act, "misappropriation" means either "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person." 18 U.S.C. § 1839(5)(A)–(B); D.C. Code § 36-401(2)(A)–(B).  The term "improper means" is defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty

to maintain secrecy, or espionage through electronic or other means."  18 U.S.C. § 1839(6)(A);

D.C. Code § 36-401(1).

The "disclosure or use" category of misappropriation further requires that the discloser or

user:

> (i) used improper means to acquire knowledge of the trade secret;
>
> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>
> > (I) derived from or through a person who had used improper means to acquire the trade secret;
> >
> > (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> >
> > (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (iii) before a material change of the position of the person, knew or had reason to know that—
>
> > (I) the trade secret was a trade secret; and
> > (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5); *see* D.C. Code § 36-401(2)(B).

In its complaint, plaintiff alleges that the confidential information on the index cards belonged to it, Rayborn knew and understood this, and that Rayborn retained these index cards after he was terminated and disclosed the information on them to Broad Street Realty, in violation of the Independent Contractor Agreement.  Compl. ¶¶ 14–15, 21.  While defendants insist that Rayborn created the index cards and that they were his own property, Def.'s Mem. at 10–12; Broad St. Mot., this is something that they will have to prove in the next phases of litigation.  At this

point, plaintiff has plausibly alleged that defendants misappropriated TMG's trade secrets, and the Court will not dismiss these claims.

### III.   Count II – Tortious Interference with a Contract – will be dismissed without prejudice.

The elements of a claim of tortious interference with business relations or a contract are: (1) existence of a contract; (2) knowledge of the contract; (3) intentional interference causing the breach of the contract, and (4) damages.  *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 (D.C. Cir. 2015).  The D.C. Court of Appeals has held that a breach *per se* is not required to satisfy the third element; a "failure of performance" will suffice.  *CASCO Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003).

Plaintiff alleges the existence of contracts with several clients.  Compl. ¶ 21.  It also alleges that Rayborn had knowledge of these contracts and actively contacted and solicited TMG's clients to obtain their business.  *Id.*  Plaintiff further alleges that certain clients moved their business to Broad Street Realty, Compl. ¶ 21(a), (f); others "terminat[ed] [their] exclusive agreement with TMG," *id.* ¶ 21(b), (c); and some notified TMG that they were no longer interested in its services. *Id.* ¶ 21(d).

Critically, what is missing from plaintiff's complaint is any allegation that Rayborn induced any client to not perform a term of a contract with TMG or to breach an existing contract with TMG.  Plaintiff does not specify the terms of any of the contracts at issue – they could have been terminable at will.  Nor does it allege that at the time any client terminated its agreement or retained Broad Street Realty, it was in breach of or failing to perform a pre-existing obligation.

Without any factual allegations regarding a breach or failure of performance, plaintiff has not alleged the third element of the claim.  *See Econ. Research Servs., Inc.*, 208 F. Supp. 3d at

14

229–30 & n.9 (dismissing tortious interference claim where plaintiff failed to allege breach or failure of performance of the contract).   Thus, TMG has failed to state a claim for tortious interference with a contract, and the Court will dismiss it without prejudice.[3]

## IV.    Count I – Breach of Contract – will move forward in part.

To prevail on a breach of contract claim in the District of Columbia, "a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009), citing *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *see also Jia Di Feng v. See–Lee Lim*, 786 F. Supp. 2d 96, 104 (D.D.C. 2011) (citations omitted).

Both parties agree that a valid contract existed between the parties – the Independent Contractor Agreement.   The dispute centers on whether plaintiff has sufficiently pled facts to plausibly allege Rayborn's breach of his duties under the ICA and whether those duties are enforceable.

Plaintiff alleges that Rayborn violated the confidentiality provision of the ICA.   Compl. ¶ 27.   That provision states that "Confidential Information" includes, in whole or in part, "information concerning TMG's clients and prospective clients, the identity of clients and prospective customers, identity of key purchasing personnel in the employ of customers and

---

3       Defendants also argue that plaintiff failed to allege that they engaged in egregious conduct to secure TMG's client, Def.'s Mem. at 13–14, but TMG is not required to allege egregious conduct. *Banneker*, 798 F.3d at 1136 ("Contrary to [the defendant's] position, [the plaintiff] need not allege inducement through egregious means, such as libel, slander, coercion, or disparagement.").   The D.C. Circuit has explained that inducement "may be any conduct conveying to the third person the actor's desire to influence him not to deal with the other," *id.*, citing Restatement (Second) of Torts § 766, comment k (1979), and while such conduct can include intimidation, it also includes persuasion. *Id.*

prospective clients, TMG's manuals, client lists, canvas cards, formulae, processes, methods, ideas, improvement, [and] inventions . . . ."   Independent Contractor Agreement, Ex. B to Def.'s Mem. [Dkt. # 9-6] ("ICA") ¶ 6(a).[4]   The ICA specifies that the confidential information is TMG's property, and that the Contractor – Rayborn – "agrees not to disclose the Confidential Information to others or use the Confidential Information to his own advantage or the advantage of others."   *Id.* The provision goes on to state that Rayborn will be restrained "from soliciting any client or potential client of TMG" and that, upon termination of the agreement, he must turn over all of TMG's properties, including customer lists and any other confidential information.   *Id.* ¶ 6(b)–(c). In addition, he promised to not retain any copies of TMG's property and/or confidential information.   *Id.* ¶ 6(c).

Plaintiff alleges that Rayborn breached the ICA by (1) "misappropriating and disclosing confidential proprietary information concerning TMG's clients and prospective clients" and (2) "actively soliciting clients and potential clients of TMG."   Compl. ¶ 27.

As to the first breach, Rayborn argues that the claim must fail, because the allegedly purloined index cards did contain confidential information as defined by the ICA.   Def.'s Mem. at 20.   He points to the introductory clause in the provision, which states:   "Contractor recognizes

---

4       A motion to dismiss under Rule 12(b)(6) must rely solely on matters within the pleadings, *see* Fed. R. Civ. P. 12(d), which includes statements adopted by reference as well as copies of written instruments joined as exhibits.   *See* Fed. R. Civ. P. 10(c).   Documents that a defendant attaches to a motion to dismiss are "part of the pleadings" under Rule 10(c) if they are referred to in the complaint and their authenticity is undisputed.   *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46–47 (D.D.C. 2009).   The Court may thus consider those materials on a motion to dismiss without treating the motion "as one for summary judgment under Rule 56."   Fed. R. Civ. P. 12(d); *Marshall v. Honeywell Tech. Sols., Inc.*, 536 F. Supp. 2d 59, 65 (D.D.C. 2008).   Here, the ICA is referred to extensively in the complaint and both parties attach it to their pleadings, and so the Court may review it without converting the motion to dismiss to one for summary judgment.

and acknowledges that in the course of Contractor's performance hereunder, Contractor may acquire information which could include . . . client lists, canvass cards . . . ("Confidential Information.")" Def.'s Mem. at 20–21, citing ICA ¶ 6(a) (emphasis omitted). Rayborn argues that the modifier "hereunder" means that any information acquired before the execution of the Contract on May 29, 2019 is not confidential information; since according to the defense, Rayborn developed relationships with the clients over his years of employment with TMC, anything noted on the index cards prior to the execution of the ICA "was not gathered 'hereunder.'" *Id.*

The Court finds that accepting the allegations in the complaint as true and resolving all inferences in favor of plaintiff, the complaint plausibly alleges that Rayborn misappropriated information that was "confidential" as that term is defined in the Agreement, even if one were to adopt the temporal limitation proposed by defendant, since it alleges that Rayborn had access to confidential client information "under" the Agreement for a period of approximately six months.

Moreover, the Court is not persuaded that it should conclude as a matter of law at this stage of the proceedings that the Agreement should be given the strained interpretation advanced by the defense. The clause at issue introduces the confidentiality provision, but it is not a part of the definition of the term "Confidential Information," and there is nothing in the definition that limits that category of information based upon when the information was first gathered by TMG or one of its employees. The Agreement states that Rayborn, referred to as "Contractor," "recognizes and acknowledges that *in the course of Contractor's performance hereunder, Contractor may acquire information* . . . concerning TMG's clients . . . ." *Id.* ¶ 6(a) (emphasis added). So the paragraph plainly pertains to information to which *Rayborn* gained access by virtue of the contractual relationship. Rayborn submits that he collected some or all of that information and recorded it on the index cards during the course of his previous employment, so he takes the

position that the data is not covered.  Def.'s Mem. at 21.  But what he omits is the fact that the complaint alleges that he was *terminated* from his employment in May of 2018, so it is a plausible inference that after that, any access he gained to information written on the cards, no matter when it was first recorded, was acquired in the course of his performance under the new contractual relationship.  Indeed, the complaint alleges, upon information and belief, that he sought reinstatement for just that purpose.  Compl. ¶ 12.

Further, since plaintiff disputes defendants' interpretation of the contract, if the Court finds it to be ambiguous, an examination of extrinsic evidence may be necessary to determine its meaning.  This requires a "deeper factual analysis than is permitted at the motion-to-dismiss stage."  *Pernice v. Bovim*, 183 F. Supp. 3d 84, 87–88 (D.D.C. 2016) (denying a motion to dismiss a breach of contract claim premised on an ambiguous contractual term), citing *District of Columbia v. D.C. Pub. Serv. Comm'n*, 963 A.2d 1144, 1155–56 (D.C. 2009) ("[W]here a contract is ambiguous, . . . the meaning of the language must be evinced from extrinsic evidence on the intent of the parties—a factual determination.").  So the breach of contract claim will not be dismissed on its face due to a failure to allege the misappropriation of "confidential" information.

Rayborn also argues that plaintiff has failed to allege any specific damages arising from the breach, but the complaint alleges that TMG was harmed and suffered damages when its clients decided to terminate their contracts as a result of Rayborn's misappropriation of the confidential information.  *See* Compl. ¶ 21.  And, "[u]nder District of Columbia law, . . . Plaintiffs are not required to allege the damages caused by a breach of contract to survive a Rule 12(b)(6) motion to dismiss.  At this stage, 'it is enough for the plaintiff to describe the terms of the alleged contract and the nature of the defendant's breach.'"  *Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 207, quoting *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015) (internal citation omitted).

As to the second alleged breach of contract – the solicitation of clients and potential clients – Rayborn argues that this provision of the contract is unenforceable because it unreasonably restrains trade.  Def.'s Mem. at 16.

In the District of Columbia, "[a] promise is unenforceable on grounds of public policy if it is unreasonably in restraint of trade."  *Ellis v. James V. Hurson Assocs., Inc.*, 565 A.2d 615, 618 (D.C. 1989), citing Restatement (Second) of Contracts § 186 (1981).  A promise is "unreasonably in restraint of trade if (a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public."  *Id.*, citing Restatement (Second) of Contracts § 188.  "The extent of the restraint is a critical factor in determining its reasonableness.  The extent may be limited in three ways: by type of activity, by geographical area, and by time."  Restatement (Second) Contracts § 188 cmt. d.  Where "the restraint is too broad to be justified by the promisee's need, a court may hold it to be unreasonable without the necessity of weighing the countervailing interests of the promisor and the public. What limits as to activity, geographical area, and time are appropriate in a particular case depends on all the circumstances."  *Id.*

The non-solicitation provision of the ICA states:  "Contractor further recognizes and acknowledges that it is essential for the proper protection of the business of TMG that Contractor be restrained . . . (iii) from soliciting any client or potential client of TMG."  ICA ¶ 6(b).  It goes on to state that the provision "shall survive the termination or expiration of this Agreement."  *Id.* ¶ 6.  The provision does not specify a geographical location, a time period, or type of activity, and it restrains solicitation to all "potential clients" of TMG without defining that term.  The plain language of the provision would effectively lock Rayborn out of the real estate business indefinitely.

Without any limitations to this restrictive covenant, the provision is not tailored narrowly to protect the promisee's interests, and it places an unreasonable restraint on Rayborn's ability to work in the real estate industry.  It is therefore invalid and unenforceable pursuant to public policy. *See Erikson v. Hawley*, 12 F.2d 491, 494 (D.C. Cir. 1926) ("Where, by restrictive clauses, unconscionable advantages have been taken of dependent employees in their contracts of employment, the courts have always carefully scrutinized them, and have had no hesitancy in declaring them invalid, where the restriction was not limited as to time and territory, and where, by their terms, great hardship was placed upon the employee.")[5]; *Cf. Morgan Stanley*, 150 F. Supp. 2d at 74–75 (finding a non-solicitation covenant reasonable and enforceable where it restricted competition for one year, unless the defendant worked more than 100 miles outside of Washington, D.C.); *Deutsch v. Barsky*, 795 A.2d 669, 677 (D.C. 2002) (finding that a two-year, five-mile radius restriction of contract was not invalid on its face).

Plaintiff argues that the Court should invoke the "equitable reformation doctrine" and impose reasonable durational and geographical limits on the non-solicitation provision without dismissing plaintiff's claim.  Pl. Opp. at 23.  The D.C. Court of Appeals adopted this doctrine in *Steiner v. Am. Friends of Lubavitch (Chabad)*, 177 A.3d 1246, 1257–59 (D.C. 2018), and it sets forth that a court may make reasonable modifications to an overly broad restrictive covenant.  In adopting this doctrine, though, the Court of Appeals expressed some reluctance.  It contrasted the equitable formation doctrine with another approach – the "blue-pencil" rule, "which allows courts only to sever overbroad terms where the severable character of the restriction is evident from the

---

5       Rayborn takes the position that even after he executed the "Independent Contractor Agreement," he was still very much an employee of TMG. Def.'s Mem. at 5 n.2. The Court need not resolve that issue to rule on the particular issues presented in the motion to dismiss.

terms of the agreement." *Id.* at 1256 (internal quotation marks omitted).  The equitable formation doctrine allows courts to enforce a covenant "to the extent that its terms are reasonable, regardless of grammatical severability."  *Id.*  Ultimately, the Court was "persuaded to adopt equitable reformation more by the argument that the blue-pencil doctrine can be too rigid and technical an approach than by any suggestion that courts should be at liberty to wholesale rewrite overbroad clauses." *Id.* at 1258.

In adopting this doctrine, the Court remained "cognizant of the judicial reluctance to 'rewrite' contracts between parties . . . and [of] the argument which suggests that partial enforcement rewards employers who have everything to gain from writing overbroad covenants." *Id.*, quoting *Ellis*, 565 A.2d at 617.  It also noted that many courts "review with stricter scrutiny a decision to reform an agreement to make it reasonable where doing so would require a substantial rewrite of the contract or where the Court would be called upon to supply essential terms."  *Id.*

In this case, the Court would need to modify the provision to include a geographical scope, a time limit, a definition of "potential client," and a more specific delineation of what sort of conduct is prohibited.  This would require the Court to add a number of essential terms to the existing provision, which would constitute a substantial revision, and neither party has suggested or agreed to what those terms should be.

The Court also notes that the adoption of the equitable formation doctrine arose in the unique context of a preliminary injunction.  In *Steiner*, the question before the Court was whether a noncompete and noninterference clause could be enforced by preliminary injunction after employment was terminated, and in fashioning a preliminary injunction precluding the promisor from engaging in certain activity, the trial court modified the noncompete provision.  *Id.* at 1256. The D.C. Court of Appeals found that the provision could be modified in this context under the

equitable reformation doctrine, but that the revision was overly broad and remanded the case to the trial court.  *Id.* at 1257–59, 1262–63.  No court in the District of Columbia has modified a restrictive covenant within a contract to supply a proper foundation for a breach of contract claim against a former employee.

Thus, the Court finds that it would be improper "to reform a covenant that was not drafted to properly protect [the employer's] interest in the first place," *id.* at 1259, and it will dismiss the breach of contract claim to the extent that it is based upon the non-solicitation provision.  But, to the extent the breach of contract claim is based upon the misappropriation and disclosure of confidential information, the Court will deny defendants' motion to dismiss.

## CONCLUSION

For all the reasons stated above, defendants' motion to dismiss is granted in part and denied in part: Count I will move forward to the extent that it is based on the misappropriation and disclosure of confidential information.  Count II will be dismissed.  And defendants' motion to dismiss Counts III and IV will be denied.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 28, 2020

22