### Page 1

```
                UNITED STATES DISTRICT COURT

                OR THE DISTRICT O  COLUMBIA

                                  x
THE MEYER GROUP, LTD,      :

        Plaintiff,         : Case No.

    v.                     :  : 9 cv 0 945 ABJ

JAMES RAYBORN, et al.,     :

        Defendants.        :

                                  x

            Deposition of WILLIAM MEYER

              Conducted Virtually

              Thursday, July 8, 202

                0:05 a.m. EST




     Job No.: 383447

     Pages:    259

     Reported By: Paul P. Smakula; Kelly Walters, CVR
```

### Page 2

```
     Deposition of WILLIAM MEYER, conducted

virtually:




    Pursuant to notice, before Paul P. Smakula,

Notary Public in and for the State of Maryland.


    Pursuant to agreement, before Kelly Walters,

CVR, Court Reporter and Notary Public in and for

the State of Ohio.
```

### Page 3

```
                A P P E A R A N C E S


ON BEHAL  O  PLAINTI  S:

     SERINE CONSOLINO, ESQUIRE

     BRANDEN LEWISTON, ESQUIRE

     AEGIS LAW GROUP, LLP

     80  Pennsylvania Avenue Northwest

     Suite 740

     Washington, D.C. 20004

     (202) 737 3500


ON BEHAL  O  DE ENDANTS:

     DENISE CLARK, ESQUIRE

     JEREMY GREENBERG, ESQUIRE

     CLARK LAW GROUP, PLLC

       00 Connecticut Avenue Northwest

     Suite 920

     Washington, D.C. 20036

     (202) 293 00 5
```

### Page 4

```
        A P P E A R A N C E S   C O N T I N U E D


ON BEHAL  O  DE ENDANT BROAD STREET:

     LANE HORN ECK, ESQUIRE

     SHULMAN, ROGERS, GANDAL, PORDY & ECKER, PA

      2505 Park Potomac Avenue

     6th  loor

     Potomac, Maryland 20854

     (30 ) 230 5200


ALSO PRESENT:

     Porter McHenry, Clark Law Group
```

**5**

C O N T E N T S

EXAMINATION O  WILLIAM MEYER                    PAGE

By Ms. Clark                              7, 235

By Ms. Hornfeck                          53, 228

By Ms. Consolino                            227

E X H I B I T S

(Attached to transcript.)

MEYER DEPOSITION EXHIBITS                    PAGE

Exhibit    Amended Complaint                 6

Exhibit 2  ICA                               6

Exhibit 3  Access Database                   6

Exhibit 4  Access Database PD               65

Exhibit 5  4/26 Demand Letter               80

Exhibit 6  Integral Exclusive Agreement     87

Exhibit 7  /29 Email                        88

Exhibit 8  /30 Email Chain                  92

Exhibit 9  3/ 2 Letter                      94

CERTI IED QUESTIONS

Page 97, Line 8

   Q  Did you consult with a lawyer about suing

the McBride Real Estate Group?

**6**

E X H I B I T S

(Attached to the transcript)

MEYER DEPOSITION EXHIBITS                    PAGE

EXHIBIT  0  Amended Depo Notice             38

EXHIBIT   0  4 20 Meyer Deposition          44

EXHIBIT  2  NENA Card                       62

EXHIBIT  3  NENA CoStar Report              68

EXHIBIT  4  TMG Co Brokerage Agreement      85

EXHIBIT  5  Ned Goodwin Deposition          92

EXHIBIT  6  TMG List of Client              20

EXHIBIT  7  Plaintiff s Response to         25

           Second Interrogatories

**7**

PROCEEDINGS

WILLIAM MEYER,

having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANTS

BY MS. CLARK:

Q  Good morning, Mr. Meyer.

Have you ever been deposed before?

A  Yes.

Q  So just very briefly I'm going to go over

the basic rules.  I'll be asking you questions.

If you don't understand my question, just ask me

to rephrase it.  If you start answering the

question, I'll ask that you complete your answer

because I'm going to assume that you understood

the question.  Please allow your counsel time to

raise an objection, but after her objection has

been raised you must answer the question unless

she directs you not to.

Did you meet with anyone before this

deposition today?

A  Yes.

Q  And who was that?

**8**

A  My counsel?

Q  Did you review any documents in

preparation for this deposition?

A  Yes.

Q  Can you tell me the documents you

reviewed?

A  The things related to the case,

interrogatories, that kind of thing.

Q  So you reviewed your interrogatories.  Did

you review your complaint in this case?

A  I reviewed a lot of documents.  I'm sure I

did.

Q  Did you review any of the discovery

responses from Mr. Rayborn or from Broad Street?

A  You'd have to be more specific.

Q  Well, they were asked to produce cards,

they were asked to produce agreements, they were

asked to produce --

A  No, I did not see any cards.  It's my

understanding there was discovery that was

considered privileged between the lawyers that I

was not allowed to see, so I never saw any of

9

1  that.
2      Q  And besides your counsel, Ms. Consolino,
3  was there any other attorney at the Aegis Law
4  Group that you speak with?
5      **A  Yes.**
6      Q  Can you tell me who else you spoke with?
7      **A  Branden.**
8      Q  Lewiston; is that correct?
9      **A  Yes.  And neither of them are sitting in**
10 **my office with me today.**
11     Q  All right.  On the screen I think you
12 should be able to see the complaint, the amended
13 complaint from 2021 and the actions of The Meyer
14 Group and William Meyer versus Jim Rayborn and
15 Broad Street Realty.
16        Can you see that okay?
17     **A  Yeah, but I don't have any control over**
18 **seeing the document.**
19     Q  Yeah, we're going to get to that.  I just
20 want to make sure, is this too large or should I
21 reduce it a little bit?
22     **A  No, it's fine.**

10

1      Q  All right.  I'm going to give you remote
2  control so that you can scroll through this.  It
3  should be coming in just a second.
4      **A  Take your time.**
5      Q  You should have it now.
6      **A  Okay.  It's moving really slow.**
7      Q  Understood.  Do your best to scroll with
8  it.  I believe a copy has been put into the chat.
9        MS. CLARK:  Is that correct, Jeremy?
10       MR. GREENBERG:  Yeah.
11     Q  So if you want to try to look at that
12 copy, Mr. Meyer, can you open the chat?
13     **A  So if you want to walk me through how to**
14 **do that, I'd be happy to try.**
15     Q  Yeah.  No problem.
16     **A  Would you like me to read this document?**
17     Q  You can go ahead and scroll on through
18 that and I'm going to ask you some questions about
19 it.  Just let me know when you've had a chance to
20 look at it?
21     **A  So I should read it first.  Got it.**
22       MS. CLARK:  Court Reporter, I just wanted

11

1  to note for the record while he's completing his
2  review that the witness is reviewing the amended
3  complaint that was filed in this action as I
4  previously identified.
5      Q  Have you had a chance to review it,
6  Mr. Meyer?
7      **A  I am still reviewing.  There's quite a few**
8  **pages, I guess, as well as —**
9      Q  It's a 21-page document.
10     **A  I mean, am I expected to read the whole**
11 **thing?**
12     Q  Well, I want to -- have you had a chance
13 to get through this document in terms of reviewing
14 it, familiarizing --
15     **A  The answer is I'm on page 9, if that helps**
16 **you.**
17     Q  Are you familiarizing yourself with the
18 document?
19     **A  Well, how do you -- what's the definition**
20 **of familiarize?  Am I supposed to read it or just**
21 **glance at it?**
22     Q  Have you seen this document before,

12

1  Mr. Meyer?
2      **A  Well, this is the amended complaint so I'm**
3  **going through it.  If there's a specific item then**
4  **I probably — maybe —**
5      Q  We will get to a specific item.
6        Mr. Meyer, my question is this, before it
7  was filed did your counsel show you this amended
8  complaint?
9      **A  Yes, I'm sure they did.**
10     Q  You're sure they did.  Do you recall going
11 over it in terms of the allegations that are
12 raised in here with your counsel?
13       MS. CONSOLINO:  I'm going to object and
14 instruct the witness not to answer.
15       MS. CLARK:  On what basis, Counsel?
16       MS. CONSOLINO:  Privilege.
17       MS. CLARK:  I didn't ask what you told
18 him.  I asked if he went over it with you.  The
19 action, not the statement.
20       MS. CONSOLINO:  That's a distinction
21 without a difference.  I'm going to object and
22 instruct.  He already answered that he saw it

3

1 before it was filed.  You can t ask any more
2 questions.
3      MS. CLARK:  We re going to do this today.
4 If you re going to speak through this whole thing,
5 we re going to have a big problem, and that is
6 clearly a talking objection.  There s no question
7 about that.  So I m going to ask my question.
8      Q  Mr. Meyer, I m not asking you to tell me
9 anything you told your counsel or anything or that
10 she told you.  My question about this complaint,
11 and you ve said that you at some point you think
12 your counsel showed this to you; is that correct?
13      **A  Yes.  My counsel I'm sure showed it to me.**
14      Q  That s not telling me whether or not you
15 actually recall your counsel showing it to you.
16 So do you recall your counsel showing it to you?
17      **A  Ms. Clark, you don't need to yell at me.**
18      Q  I m not trying to, but I would like for
19 you not to be evasive.  So I ll try to ask my
20 question again.
21      Mr. Meyer, do you recall your counsel
22 showing you this document?

4

1      **A  I am sure they did.  I am not denying that**
2 **I haven't seen it or they didn't show it to me.**
3      Q  Does that mean you recall your counsel
4 showing it to you?
5      **A  There's a lot of documents that have been**
6 **part of this litigation.  This is a complaint, and**
7 **what I read in the beginning was that it was**
8 **amended.  I'm not sure I've hit the amended part**
9 **yet because I'm only on page 9.  So I believe I've**
10 **answered your question.**
11      Q  Actually, I don't.
12      **A  Okay.  You can keep asking again.**
13      Q  We can do that.
14      Mr. Meyer, do you recall that this
15 document was placed in front of you before it was
16 filed?  Do you recall that?
17      **A  Yes.**
18      Q  Thank you.
19      **A  I mean, I don't remember the date or the**
20 **time or specifically when.**
21      Q  I didn't ask you a date or time.  If you
22 listen to any question, I never said do you

5

1 remember the date, and I never said do you
2 remember the time.
3      **A  I don't believe my lawyers would just file**
4 **a complaint without me reviewing it with me.**
5      Q  And I didn't ask a question.  There was no
6 question pending.
7      Mr. Meyer, if you could turn to page 4 of
8 the document.  You see paragraph 17 here?
9      **A  Yes.**
10      Q  And before I continue, does anyone need me
11 to continue to share this on the screen?  Because
12 I know it's in the chat.  I'm assuming you're able
13 to pull this up.
14      Mr. Meyer, one of the allegations here is
15 that your confidential information included client
16 lists, contact information for clients that are
17 not publicly disclosed.
18      Does that mean for you that if any of the
19 information is publicly disclosed you do not
20 consider it to be confidential?
21      MS. CONSOLINO:  Object to form of the
22 question.

6

1      **A  Can you ask me the question again, please?**
2      Q  Do you consider information about your
3 clients that is publicly disclosed to be
4 confidential?
5      MS. CONSOLINO:  Object to the form of the
6 question; calls for a legal conclusion.
7      **A  I don't think that we publicly provide**
8 **information.  There may be pieces that are public,**
9 **but we never would go out and give all our**
10 **information publicly.**
11      Q  If your clients provide information about
12 themselves publicly do you consider the
13 information you might have -- let me restate that.
14      If there's information that you have about
15 your clients that they on their own disclose
16 publicly to say, for example, Costar, do you
17 consider that information to be confidential?
18      MS. CONSOLINO:  Object to form.
19      You can answer if you understand the
20 question.
21      **A  You're asking me whether or not my clients**
22 **would go to Costar and make their information**

7

1 public and whether or not I consider that to be
2 public?
3     Q  Well, does that mean that your information
4 that you have is now -- is still confidential?
5         MS. CONSOLINO:  Object to the form of the
6 question.
7     A  We don't -- in my office we don't give
8 Costar information about any of our clients.
9     Q  Mr. Meyer, please don't change my
10 question.
11     A  I'm answering your question.
12     Q  You're not, actually.  It's clear that you
13 don't understand it --
14     A  Well, then you're asking me something
15 that's misleading or I don't understand.
16     Q  I'm going to try to restate it.  Let's try
17 not to talk over each other.
18         Do you agree that your clients can speak
19 to Costar on their own to provide information?
20     A  No.
21     Q  You don't think your clients have the
22 ability to call up Costar and say whether or not

8

1 they're looking -- what space they're looking for,
2 what's --
3     A  Clearly you don't know how Costar works.
4 No, they don't.
5     Q  You tell me how Costar works, Mr. Meyer.
6     A  It's a subscription service.
7     Q  How do they gather their information, do
8 you know?
9     A  You'd have to ask Costar how they gather,
10 but I can assure you that it's not from my clients
11 calling Costar and --
12     Q  (Inaudible.)
13     A  You're talking over me.
14     Q  Okay.
15     A  Do you want me to finish my answer?
16     Q  Go right ahead and finish your answer,
17 Mr. Meyer.
18     A  Costar is a subscription service.  The
19 customers of Costar are typically real estate
20 organizations that pay monthly fees.  It's very
21 similar actually to Westlaw where attorneys pay a
22 fee.  It is not something that is generally

9

1 accessible by the public, as you say, or tenants,
2 my clients, to engage with Costar.  I don't know
3 what Costar's practices are as far as how they get
4 information on specific tenants or organizations,
5 but it's not coming from my office and I'm pretty
6 sure it's not coming from our clients.
7     Q  But you don't know; is that correct?
8     A  I do know.  I did this for 30 years.
9     Q  Mr. Meyer, you don't know -- you might
10 know about whether or not you give out information
11 to Costar; correct?  You just stated that you do
12 not give out information to Costar; correct?
13     A  Nobody in my office is supposed to.  I
14 gave a very firm directive on that.
15     Q  All right.  But you don't know whether
16 your clients respond to Costar calls, do you?
17     A  I don't believe Costar calls them.
18     Q  Well, you don't know what their practice
19 is; correct?
20     A  I do because my clients would call me
21 telling me that Costar called them.
22     Q  Okay.  So you just admitted that you know

20

1 that a client received a call from Costar?
2     A  Which they haven't, because I never got
3 the phone call.  I would know about it if they did
4 because the client would call me.
5     Q  Would a client call you about every single
6 phone call they received?
7     A  If they got a call from Costar they would
8 probably call me and let me know.  Maybe they
9 didn't, but I'm pretty sure they would say, why
10 are they calling me?
11     Q  You agree that your clients can publish
12 their contact information on their Internet;
13 right?  If they have a website they can put their
14 contact information on that website; right?
15     A  No.
16     Q  You're telling me that your clients, if
17 they have a website they can't put their general
18 phone number on the website?
19     A  Is that what you were asking me?
20     Q  That's exactly what I'm asking you.
21     A  So can a client put a phone number on
22 their website, yes.

2

1    Q  They can?

2    **A  I think that's pretty common.**

3    Q  Okay.  And you would agree that that's

4  public; correct?

5    **A  A portion of it's public, their phone**

6  **number.**

7    Q  A portion of --

8    **A  Not their lease terms.**

9    Q  I didn't ask about the lease terms.

10  Please don't --

11   **A  Ms. Clark, quit screaming at me.**

12   Q  I won't yell at you if you will please

13  just answer the question I'm asking --

14   **A  You don't need to yell.**

15   Q  -- and stop adding facts to my question --

16   **A  Stop yelling, please.**

17   Q  -- (inaudible) a very long, day Mr. Meyer.

18   **A  I'm here.**

19   Q  All right.

20   **A  But if you yell at me, I'm going to**

21  **object.**

22   Q  You don't get to object.  You're the

22

1  witness.

2        Now, do you agree when your clients put a

3  phone number on their website that that phone

4  number is public?

5        MS. CONSOLINO:  Object to the form of the

6  question.

7        You can answer.

8    **A  I would say yes, but --**

9    Q  Do you agree --

10   **A  Do you want to let me finish or do you**

11  **want to keep talking over me?**

12   Q  You answered the question.

13   **A  I wasn't done talking, but do what you**

14  **want to do.**

15   Q  I am.  You answered my question.

16       My next question is do you agree that when

17  they put their address on their website that that

18  is a public -- that that's public information?

19       MS. CONSOLINO:  Objection to form of the

20  question.

21       You can answer.

22   **A  I would say that if they put their -- if,**

23

1  **because not everybody does, then yes, it would be**

2  **generally public information.**

3    Q  Do you agree that because that information

4  is public that anyone can use that information to

5  contact your client to get additional information?

6        MS. CONSOLINO:  Object to the form of the

7  question.

8        You can answer.

9    **A  I would say that if somebody has a name of**

10  **a tenant and a phone number, that they would be**

11  **able to call, yes.**

12   Q  Do you know whether Costar employs

13  individuals to make calls to tenants to get

14  information about their leases?

15   **A  I've never heard of that before.**

16   Q  Do you know how Costar gathers the

17  information that it has in its subscription?

18   **A  I'm not intimately familiar.  I do know**

19  **that from time to time that Costar researchers, if**

20  **that's if correct title for them, would call us**

21  **asking us for information about particular**

22  **transactions that had closed that we had done.**

24

1    Q  Okay.  So you're not the only broker in

2  town.

3        Would you agree that Costar would call

4  other brokers to get information?

5    **A  They would call and try.  Maybe they would**

6  **get it, maybe they wouldn't.  I don't know, you'd**

7  **have to ask Costar.**

8    Q  I probably would ask Costar, but I'm

9  asking you since your experience --

10   **A  I don't work at Costar, so I can only give**

11  **you my experience.**

12   Q  I understand that.  And your experience,

13  as I understand your testimony, is that Costar has

14  called you in the past; is that correct?

15   **A  Yes, they have called me many times.**

16   Q  And have you ever provided information to

17  Costar?

18   **A  I provide information regularly, but not**

19  **about our clients.**

20   Q  What type of information do you provide to

21  Costar?

22   **A  We would have -- the foundation of Costar**

25

1  is not about tenants. The foundation of Costar is
2  about office space availability, similar to
3  residential MLSs, what spaces are available in
4  buildings by each particular landlord or in our
5  case, because we don't represent buildings, we
6  represent tenants, The Meyer Group would have
7  certain subleases listed, and Costar would call us
8  asking if there's any updates on the listings.
9      Q  So you would provide information about
10 subleases?
11     A  I would provide information on the
12 listing, typically sublease listing that we had
13 with Costar.
14     Q  Okay. And do your sublease listings
15 reference who is the holder of the lease?
16     A  No, they do not.
17     Q  Do they list the building address where
18 the sublease is?
19     A  Yes, they would have to or they wouldn't
20 know where to go or what building it was for.
21     Q  Would they list the floor?
22     A  We would have -- the general information

26

1  would be what is the asking rent for the sublease,
2  how big the space is, and what the -- what
3  building it's in and maybe a floor plan.
4      Q  Would it show the square footage in
5  Costar?
6      A  I thought I just said that, yes.
7      Q  If you did, I did not here it clearly. So
8  you're saying that it does; is that correct?
9      A  Yes. And that's about it.
10     Q  Whose telephone number would be listed as
11 the contact for Costar?
12     A  Whoever the agent is that's representing
13 the space, but not the tenant.
14     Q  So you're describing information that you
15 would give regarding your subleases; is that
16 correct?
17     A  Okay. You're --
18     Q  I'm just confirming, Mr. Meyer, that you
19 have just provided me with information that you
20 would give to Costar about subleases; is that
21 correct?
22     A  Yes.

27

1      MS. CONSOLINO: Objection to the form of
2  the question.
3      THE WITNESS: Pardon me? I'm sorry, I
4  didn't hear what you said, Serine.
5      MS. CONSOLINO: I just said objection;
6  form.
7      A  I just gave you the information that I or
8  any agent would give Costar regarding their
9  listing information.
10     Q  When you say any agent, do you mean any
11 salesperson that works for The Meyer Group or are
12 you saying any agent in the city -- in the city of
13 the District of Columbia?
14     A  Well, again, we don't handle buildings, so
15 I don't know if the information if you were
16 representing a building would be different than
17 the sublease listings that I was referring to. So
18 I would say certainly for the sublease listings,
19 which is what The Meyer Group would have, that
20 would be the case.
21     Q  Costar could call other brokers in the
22 city; correct?

28

1      A  I didn't hear you.
2      Q  Do you agree that Costar could call other
3  brokers in the city?
4      A  Yes, they can call whoever they want.
5      Q  And those brokers can provide different
6  information; is that correct?
7      A  There's -- Costar has -- it's kind of like
8  a fill in the form, building name, space that
9  you're marketing, floor, size, what the asking
10 rent would be, when is it available, and for how
11 long would it be available, at least on a
12 sublease. And if it was a building broker they
13 would have obviously more spaces because they're
14 marketing a whole building and they would have,
15 here's the spaces square footage wise we have on
16 certain floors, and here's the asking rent that
17 the landlord is asking, and here's how long the
18 term is available and here's when is it available.
19 And that's pretty much it. And there may be -- as
20 I mentioned earlier, there may be floor plans
21 attached with each of those listings.
22     Q  And that information wasn't published by

29

1  Costar, would you agree, is public?
2      A  No.
3      Q  Why?
4      A  You have to pay for it.
5      Q  Well, what I mean -- yeah, if I -- but
6  anybody who's got the money can buy a subscription
7  to Costar, would you agree?
8      A  Assuming Costar would allow them to, yes.
9  I don't know if they have restrictions, you can
10 only be a real estate organization, I don't know
11 what their subscription requirements are.  I don't
12 know, for example, if I could subscribe to
13 Westlaw, I have no clue.
14     Q  I'll tell you, Westlaw will take your
15 money if you want to give it to them.
16        So you're not aware of any restrictions
17 that Costar has on who in the public can purchase
18 their subscription; correct?
19     A  I don't know what the rules are, no.
20     Q  So it's possible that anyone in the
21 public, if they desire to spend their money that
22 way, could purchase a subscription to Costar?

30

1      A  Probably, from what you're telling me.
2      Q  You would also agree that all subscribers
3  to Costar would have all the information that
4  Costar has then provided to -- provided to its
5  subscription; correct?
6      MS. CONSOLINO:  Object to form of the
7  question.
8        You can answer.
9      A  Costar has -- even though I've spent a lot
10 of money with Costar, I'm not intimate with all
11 their products and their services, but there's
12 different jurisdictional areas that you have to
13 pay extra for.  I don't know all the additional
14 services they provide.  I just know with most
15 people, most companies, rather, subscribe to and
16 got.  So I'm not sure what your question is about
17 additional services.
18     Q  I didn't ask about additional services.
19 All I asked was if you pay for the subscription,
20 you get all the information that you pay for;
21 correct?
22     A  Again, no, actually, you don't.

3

1      Q  So my subscription says that -- let me --
2  let me ask my question.  You just said you don't.
3  So my question now is if I pay for a subscription
4  for -- to be able to access all the information
5  that Costar has gathered about buildings and
6  spaces available to lease in the District of
7  Columbia, and as long as I pay the subscription
8  price that I will have access to whatever
9  information that they have gathered for all the
10 buildings and leases that are available, spaces
11 that are available to lease in the District of
12 Columbia; correct?
13     A  I think you said it better because Costar
14 misses a lot of information, so anything that
15 Costar is sending me is, it's available to any
16 other subscriber.
17     Q  Okay.  And so as a subscriber I'm a member
18 of the public; correct?
19     MS. CONSOLINO:  Objection to form of the
20 question.
21        But you can answer.
22     A  I wouldn't characterize it that way.

32

1      Q  You don't think subscribers are members of
2  the public?
3      A  Not necessarily.
4      Q  Why is that?
5      A  Because it's a finite group of people that
6  have access to a database that Costar is
7  providing.
8      Q  The finite group is limited to the people
9  that pay for the subscription; correct?
10     A  What is the definition of public?
11     Q  I didn't ask -- I'm not answering your
12 question.
13     A  Well, you asked me a question and I don't
14 understand it.
15     Q  You've already answered that question.  I
16 asked a new question, okay?
17        My question is, the information that
18 Costar has is available to the subscribers that
19 pay for it; correct?
20     A  Yes, I've already said that.
21     Q  All right.  And my other question is that
22 subscribers can also be members of the public,

---

**33**

1 can't they?

2     MS. CONSOLINO: Object to the form of the

3 question.

4     You can answer.

5   **A I believe so, yeah.**

6   Q Great. Making some progress. Okay.

7     And do you know whether a subscription to

8 Costar prevents any subscriber from disclosing the

9 information they got online to anyone else either

10 in their office or outside their office? Do you

11 know if there are any kind of restrictions like

12 that?

13   **A I don't know.**

14   Q Okay. Well, as a subscriber to Costar

15 have you ever read anything to suggest that you

16 have limits on the information -- limits on who

17 you can disclose the information you receive on

18 Costar?

19   **A I really don't know.**

20   Q Okay. Go to paragraph 18. TMG's

21 confidential information included a Microsoft

22 database containing information on past

---

**34**

1 transactions with clients. This database included

2 information and data on each client such as the

3 date of the lease expiration, notes on client

4 preferences, and up-to-date contacts at each

5 client company.

6     Mr. Meyer, what was this Microsoft

7 database that was referenced here in paragraph 18?

8   **A I think paragraph 18 speaks for itself.**

9 **That's what it was.**

10   Q Well, Microsoft has a lot of different

11 software, so what software were you using for this

12 database?

13   **A I believe it was Microsoft Access.**

14   Q And can you tell me who created the

15 database on Microsoft Access?

16   **A Well, I had an intern create the form, not**

17 **the specific database, I had him put together the**

18 **-- the right term is the -- if I use if word**

19 **database, I had him put it together but he didn't**

20 **have any content for it, he just set it up. And**

21 **then Jessica McGunnigle was helping put in the**

22 **content, the confidential information.**

---

**35**

1   Q Was there anyone else besides

2 Ms. McGunnigle who put the content into the

3 database?

4   **A Not to my knowledge.**

5   Q And you're sure that no one prior to

6 Jessica McGunnigle put information into the

7 database?

8   **A I don't recall anyone else because no one**

9 **else had access to it.**

10   Q And the intern who set up the form, did

11 they set up the form at your direction?

12   **A No, I told him what I was trying to do and**

13 **he ran with it and he put it together and showed**

14 **it to me. And I believe we probably made some**

15 **adjustments on the form and he was done.**

16   Q So you supervised the intern who created

17 the form?

18   **A No, I didn't -- well, I don't know about**

19 **supervise. He pretty much ran with it on his own**

20 **and came back to me and said, okay, here's what I**

21 **put together. Does this work?**

22     **This was a long time ago so I don't**

---

**36**

1 **remember specifically my review of it, but he did**

2 **what I asked him to do.**

3   Q But he did -- you did review it and

4 approve it; is that correct?

5   **A Yes.**

6   Q Has anyone other than Jessica McGunnigle

7 put information into that Access database?

8   **A I thought I already asked and answered**

9 **that.**

10   Q And your answer was?

11   **A Jess is the only one, I believe, that had**

12 **put information in besides maybe myself, but I**

13 **don't remember. I didn't -- I tried to have her**

14 **help me with it.**

15   Q Okay. So there's yourself and

16 Ms. McGunnigle who put data into the database, the

17 actual information into the database, yourself and

18 Ms. McGunnigle; is that correct?

19   **A Yes.**

20   Q Okay. And would you provide

21 Ms. McGunnigle the information that you wanted her

22 to put into the form?

---

37

1    A  I don't know if I would do it every time.
2  I'm sure she did it on her own.  We'd close a
3  transaction and she'd enter it.
4    Q  Okay.
5    A  I'm going to -- when you're done, maybe in
6  the next 5 or 10 minutes I'd like to take a quick
7  break.
8    Q  Okay.  Let me -- I think I have a couple
9  of questions, we'll tie up this issue on the
10 database.
11    How frequently did you print out the
12 database?
13    A  Not very frequently.
14    Q  Did you provide copies of the database to
15 the salespersons working at The Meyer Group?
16    A  The only person that got a copy in paper
17 was Jim Rayborn because he had asked for it to
18 update his canvas cards because it was important
19 for him to be able to know when tenants' leases
20 were terminating, if they had options to
21 terminate, how many square feet.  He uses those
22 cards also as a reminder to follow-up on certain

---

38

1  periods of time down the road.  And also as a
2  reminder if people, for example, had lease
3  terminations.  So he had all the relevant
4  information in there about the client and he
5  stored it away in his system so that it would be
6  able to look at it in future dates.
7    Q  Did you ever ask for a paper copy to be
8  printed out for you?
9    A  No.
10    Q  So the only paper copy you're aware of
11 that was ever printed out was one that Mr. Rayborn
12 asked for?
13    A  I physically gave it to him.
14    Q  I'll ask my question again.
15    Is that the only paper copy that you're
16 aware of that was ever printed of that database?
17    A  The only other time was when I engaged
18 with Ned Goodwin.
19    Q  You gave Mr. Goodwin a paper copy or an
20 electronic copy?
21    A  I certainly believe I gave him an
22 electronic.  I may or may not have given -- we had

---

39

1  a meeting with Ned and his team to go through that
2  list because Ned was working with me at that point
3  on following up with Meyer Group clients.  So we
4  had a meeting, and I know at the meeting there was
5  a printed -- I don't know if Ned's office printed
6  it or we did, but hopefully that answers your
7  question.
8    Q  Okay.  So to be clear, there are only two
9  times that you are aware that this database was
10 printed.  One was at the request of Jim Rayborn,
11 and the other was a version that you remember
12 seeing printed during a meeting you had with Ned
13 Goodwin; is that correct?
14    A  I may have given Jim more than once a
15 printed copy, but it wasn't more than maybe two or
16 three times, because this was over a long period
17 of time.  This was -- I'm not sure what date the
18 database started, but between then and his
19 departure, he was given it at least once, maybe
20 two or three times because it was updated.
21    Q  I understand.  And did you ever print out
22 a copy for your own use?

---

40

1    A  No.  I didn't need it because I could just
2  go in the computer and look at it.
3    Q  Why don't we take the break that Mr. Meyer
4  had asked for previously at this time.
5    How much time do you need, sir?
6    A  Just run to the washroom.
7    Q  Fine.  So three minutes?  Five minutes?
8    A  I'll go as fast as I can, how's that?
9    MS. CLARK:  We'll take a five-minute break
10 here.  We're off the record.
11    (Off the record from 10:48 a.m. to
12 10:57 a.m.)
13 BY MS. CLARK:
14    Q  Mr. Meyer, do you have any other documents
15 with you today?
16    A  No.
17    MS. CONSOLINO:  Are we on the record?
18    MS. CLARK:  Are we back on the record?
19    THE COURT REPORTER:  Yeah.
20    Q  You have no other documents with you
21 today?
22    A  No.

4

1    Q  Paragraph 19, still looking at the
2  complaint, in there your counsel alleged that the
3  confidential information of The Meyer Group
4  included index cards where Mr. Rayborn recorded
5  client information, including client contact
6  information, details regarding lease terms, notes
7  on client preferences, and other valuable
8  information regarding TMG's clients and
9  perspective clients.
10       Mr. Meyer, just to be clear, we are
11  talking about the information on the index cards
12  as being confidential; is that correct?
13    A  The index cards are property of The Meyer
14  Group, so that is confidential.  Everything on the
15  index cards, including the index cards, is
16  confidential and property of The Meyer Group.
17    Q  So I just want to be clear, you're saying
18  the physical index cards, if it had absolutely
19  nothing on them, is confidential information?
20       MS. CONSOLINO:  Object to the form of the
21  question.
22       But you can answer.

42

1    A  The index cards -- I don't -- are you
2  asking me are blank index cards confidential?
3    Q  That's my question.
4       MS. CONSOLINO:  Same objection.
5    A  I never really -- I would say yes, if it's
6  property of The Meyer Group and it's in my office,
7  everything is confidential and it is what it is.
8    Q  Okay.  So a blank index card that is in
9  your office is considered confidential
10  information?
11       MS. CONSOLINO:  Object to the form of the
12  question.
13       You can answer.
14    A  I would say a blank card really -- I don't
15  know what information is on it.  I wouldn't call a
16  blank card information.
17    Q  I didn't say is a blank card information.
18  My question was in response to your response
19  because I had asked you if a blank index card --
20  whether you considered a blank index card to be
21  confidential information?
22       MS. CONSOLINO:  Object to the form of the

43

1  question.
2       If you understand the question, you can
3  answer.
4    A  I think what you're saying is if there's
5  an index card that's blank am I considering it to
6  be confidential?
7    Q  Correct.
8    A  I guess not.  But the blank card has The
9  Meyer Group on it, so it's property of The Meyer
10  Group.
11    Q  Okay.  So --
12    A  I'd have to look at the card and decide I
13  guess.
14    Q  Well, you -- Mr. Meyer, did you purchase
15  card stock that had The Meyer Group logo at the
16  bottom of it?
17    A  Yes, for the purpose of the fact that it
18  was property of The Meyer Group and I told
19  Rayborn, who's the only one that really used the
20  cards, that this is property of The Meyer Group.
21    Q  So --
22    A  It stays with The Meyer Group, it does not

44

1  go with you.
2    Q  Okay.  So in paragraph 19 you don't talk
3  about the card as being property of The Meyer
4  Group.  What you talk about or what you counsel
5  has alleged on your behalf is that the
6  confidential information included the index cards
7  where Mr. Rayborn recorded client information.  So
8  I just want to be clear, are you saying now that
9  this might be what your attorney alleged on your
10  behalf, but that you also believe that the index
11  card, without any information, is confidential?
12       MS. CONSOLINO:  Object to the form of the
13  question.
14       If you understand the question, you can
15  answer.
16    A  I would say yes because it's property of
17  The Meyer Group.
18    Q  Can you tell me what economic value a
19  blank index card has to The Meyer Group?
20       MS. CONSOLINO:  Object to the form of the
21  question.
22       You can answer.

45

1    A  I don't know what economic value.  I don't
2  know.  I could tell you the economic value of the
3  ones that weren't blank.
4    Q  Well, I'll ask you about those, but we're
5  just talking about the blank ones right now.
6    A  I don't know what blank cards you're
7  referring to.
8    Q  The ones you purchased that have The Meyer
9  Group logo at the bottom that have no information
10  on them written by anybody.
11    A  The one that Jim was using -- he was -- he
12  was cultivating information on.
13    MS. CONSOLINO:  Same objection.
14    Q  Let us be clear about what we're talking
15  about, so I'll take a step back.
16    Did you purchase card stock with The Meyer
17  Group logo on the bottom of it?
18    A  Yes.
19    Q  Okay.  And did you purchase that card
20  stock solely for the use of Jim Rayborn?
21    A  Yes.
22    Q  Okay.  So before Jim Rayborn recorded

46

1  information on it, did you consider the card stock
2  itself to be confidential information?
3    MS. CONSOLINO:  Same objection.  Do you --
4    A  I'm not following this question very well
5  because the --
6    MS. CONSOLINO:  You've asked the same
7  question five times, Denise.  I suggest you move
8  on.
9    Q  Until I get an answer, I guess we'll have
10  to keep going.
11    A  It's property of The Meyer Group, so it's
12  confidential.
13    Q  So are you considering all property of The
14  Meyer Group to be confidential?
15    MS. CONSOLINO:  Same objection.
16    You can answer.
17    A  I would have to decide, but those index
18  cards, absolutely.
19    Q  So, Mr. Meyer, did you in any document to
20  any of your employees say that index cards, blank
21  index cards are property of The Meyer Group?
22    MS. CONSOLINO:  Same objection.  Object to

47

1  form.
2    A  Ms. Clark, we just finished a lawsuit --
3    Q  Could you just answer the question?
4    A  I don't have any employees.  So why do you
5  keep referring to employees?
6    Q  Anyone working for you, sir, if that's the
7  only objection you have.
8    A  I'm just trying to be clear.
9    Q  You could just say, I don't have
10  employees, I have people who work for me?
11    A  I have independent contractors who work
12  for me, as you know.
13    Q  Well, Mr. Meyer, let's agree on people.  I
14  think we can agree on that.  That has no legal
15  context to it.
16    A  Okay.
17    Q  So the people that work for you, did you
18  ever put in writing to them that index cards are
19  property of The Meyer Group?
20    A  I believe that Mr. Rayborn is the only one
21  in his agreement that had specific, any
22  confidentiality clause index cards, because no one

48

1  else used index cards for the most part.
2    Q  Okay.  But does that document say the card
3  is property of The Meyer Group?
4    MS. CONSOLINO:  Same objection.  I would
5  ask if you're going to be referring to a specific
6  document that you actually present the document,
7  otherwise you're just asking questions to the
8  witness about a document that's not there.
9    MS. CLARK:  Again, I'll ask that you stop
10  with the speaking objections.
11    MS. CONSOLINO:  It's not a speaking
12  objection.  I'm just pointing out for the record
13  that the document -- you're asking a witness about
14  a document --
15    MS. CLARK:  The document is not here.
16    Q  Mr. Meyer, would you like to have the
17  document in front of you --
18    A  Sure.
19    Q  -- to answer the question?
20    A  That would be great.
21    MS. CLARK:  Mr. Greenberg, would you
22  please drop the 2018 ICA into the chat.

49

1    A  I didn't know I was allowed to ask for
2 documents.
3    Q  You're allowed to ask for anything you
4 want.  Doesn't mean you'll always get it, but you
5 can ask for anything you want.
6    A  Okay.  Well, I'll start asking for
7 documents then to help make it easier.
8    Q  Okay.
9    A  So I have the first document you gave me,
10 do I have to make that go away to see the next
11 one?
12    Q  I don't think so.
13    A  Here it is.  Okay.  So is there a specific
14 area you want me to look at on this agreement?
15    Q  You have said to me several times now that
16 the cards are property of The Meyer Group.  So if
17 you could look at this four-page document and
18 point out to me where you say the cards are the
19 property of The Meyer Group?
20    A  Outside of the fact that the cards have
21 The Meyer Group on it?
22    Q  Yes, sir.  I asked about this document,

50

1 where in this document does it say that --
2       MS. CONSOLINO:  Counsel, if you could hold
3 on a minute.  I haven't finished downloading it.
4 Sorry.
5    Q  Again, I'll restate my question so
6 Mr. Meyer understands the question I'm asking.
7       In the 2018 ICA that we are discussing,
8 can you please tell me where there's language that
9 says that the index cards are property of The
10 Meyer Group?
11       MS. CONSOLINO:  Object to form.
12    A  Top of page 3, contractor agrees that
13 confidential information is property of TMG.
14    Q  Confidential information?
15    A  And the index cards are confidential
16 information.
17    Q  Okay.  But it doesn't say that anywhere,
18 does it, that the actual index cards are
19 confidential information?
20       MS. CONSOLINO:  Object to form.
21    Q  Can you please show me where it says that?
22    A  Well, I just thought I did.  Top of

5

1 page 3.  In the confidential section at the bottom
2 of page two, paragraph 6, it says, contractor may
3 require information which could include in whole
4 or in part information concerning TMG's clients.
5 That's what those canvas cards were.  Mr. Rayborn
6 cultivated information, put the information about
7 Meyer Group clients on the card which had The
8 Meyer Group name on it, and so any information
9 that is on anything, whether it's a card or
10 something else, is considered property of The
11 Meyer Group.  And that --
12    Q  Okay.  Does the card --
13    A  Hold on.  And that's what the agreement
14 says.
15    Q  Mr. Meyer, does the card itself say
16 property of The Meyer Group?
17    A  Yes.  I believe you have a copy of the
18 card.  Maybe you would like to put one up so I can
19 see it.  That's why it had The Meyer Group on it,
20 to make sure it was crystal clear that it's
21 property of The Meyer Group.  And Mr. Rayborn --
22 is --

52

1    Q  So --
2    A  You're talking over me.  Mr. Rayborn was
3 aware of that, by the way, many times.
4    Q  Okay.  Mr. Meyer, here's the way this
5 works, I ask a question; you answer the question.
6 Please do not testify.  This is just a deposition.
7    A  I answered your question.
8    Q  You're telling me all the thoughts
9 rambling through your head --
10       MS. CONSOLINO:  You can't cut off the
11 witness just because he starts testifying about
12 something you don't like.  You have to let him
13 finish his answer.
14    Q  Look, just answer the question asked,
15 Mr. Meyer, otherwise I am just going to cut you
16 off.
17       Now, just to be clear, your testimony here
18 today is that the individual canvas cards that you
19 purchased that Mr. Meyer used while at The Meyer
20 Group had a logo at the bottom that said property
21 of The Meyer Group, is that your testimony?
22    A  I believe you used my name instead of

53
1 using Mr. Rayborn's.
2    Q  Yes.  I'm asking if you, Mr. Meyer,
3 purchased card stock that says at the bottom,
4 property of The Meyer Group?
5    **A  I don't know if it says property of, but**
6 **it certainly has The Meyer Group on it with the**
7 **company logo.**
8    Q  So it has the company logo on it but it
9 does not say it is the property of The Meyer
10 Group, would you agree?
11   **A  It says The Meyer Group with a logo.  I**
12 **don't recall if it says property of.**
13   Q  Right.  Thank you.  And going back to the
14 ICA, there is nothing in this document that says
15 expressly that the canvas cards are the property
16 of The Meyer Group?
17     MS. CONSOLINO:  Object to the form of the
18 question.
19     You can answer.
20   **A  I'll take your word for it.  I don't see n**
21 **anything -- I told you, top of page 3, it says,**
22 **confidential information is property of TMG.**

54
1 **What's on those cards is property of TMG, whether**
2 **or not it has the logo or The Meyer Group name on**
3 **it.**
4    Q  All right.  So now we're getting
5 somewhere.  Mr. Meyer, you're saying today that
6 the information on the cards is what you consider
7 to be confidential; correct?
8      MS. CONSOLINO:  Objection to the form of
9 the question.  That's not what the witness
10 testified to.
11     You can answer.
12   **A  I've already said it before, that the**
13 **property -- those cards are property of The Meyer**
14 **Group.**
15   Q  Okay.  Not my question.
16   **A  The information on the cards is property**
17 **of The Meyer Group.**
18   Q  Not my question.
19     Again, my question, Mr. Meyer, is the
20 information on the card the confidential
21 information that you are referencing here in the
22 ICA?

55
1     MS. CONSOLINO:  Object to the form of the
2 question.
3     You can answer.
4    **A  I thought I already did.  Top of page 3,**
5 **contractor agrees confidential information is**
6 **property of TMG.  It's in the contract.  I don't**
7 **know why we're going through this over and over.**
8 **The document -- it speaks for itself.**
9    Q  If you answer my question, we'll stop
10 talking about it.
11     So again, do you consider the information
12 as opposed to the card to be confidential?
13   **A  Both.**
14   Q  And so your testimony today is that blank
15 cards are confidential information?
16     MS. CONSOLINO:  Object to the form.
17   **A  Yes, I mean, go ahead, Serine, I'm sorry.**
18     MS. CONSOLINO:  Object to form.  I think
19 this question has been asked --
20     MS. CLARK:  Stop with the talking
21 objections.  You objected to form.
22     MS. CONSOLINO:  At some point it

56
1 becomes --
2    Q  Here's my question, Mr. Meyer.  Again, do
3 you consider the card that has nothing on it to be
4 confidential information --
5    **A  The blank card --**
6    Q  -- yes or no?
7      MS. CONSOLINO:  Object to form of the
8 question.
9    Q  It's a yes or no question.  Yes or no,
10 Mr. Meyer, do you consider the blank card that
11 just has the logo at the bottom to be confidential
12 information?
13     MS. CONSOLINO:  Object to the form of the
14 question.
15   **A  It does not -- okay.  Ms. Clark, should we**
16 **pull a card up so we can look it up?  Pull a blank**
17 **one, if you'd like, because there's more than just**
18 **The Meyer Group name on the card, the blank card.**
19 **When you refer to blank card you're acting like**
20 **there's absolutely nothing on it except The Meyer**
21 **Group name and logo.  There's other --**
22   Q  I'm not acting like anything.

57

1     A  All right.  Let's pull a card up.  If it's
2  that important, let's pull one up and I'll go
3  through it with you.
4     Q  I don't know why you need to have that in
5  order to answer my question.
6     A  Because I just told you there's
7  information --
8     Q  Mr. Meyer --
9        MS. CONSOLINO:  Counsel, you are harassing
10  the witness.  You asked your question 50 times.
11  I'm going to terminate this deposition if you keep
12  harassing him.
13        MS. CLARK:  Go ahead, girlfriend.  Let's
14  do it.  Because your client is being --
15        MS. CONSOLINO:  (Indiscernible.)
16        MS. CLARK:  -- look, Serine, he's being
17  evasive.  He's not answering the question.
18        MS. CONSOLINO:  He said yes 50 times.  He
19  said yes over and over again.
20        MS. CLARK:  No, he hasn't.  He keeps
21  qualifying it.  So I want a yes or no answer.
22        MS. CONSOLINO:  I suggest you go back and

58

1  look at the transcript.
2        MS. CLARK:  I suggest that maybe you
3  listen -- open your ears and listen.
4     Q  Again, Mr. Meyer, yes or no, do you
5  consider a blank canvas card with the logo of The
6  Meyer Group at the bottom to be confidential
7  information?
8        MS. CONSOLINO:  Object to the form.
9     Q  I'm not asking about whether you consider
10  it to be property of The Meyer Group, just whether
11  you consider it to be confidential information?
12        MS. CONSOLINO:  Object to the form of the
13  question.
14     A  The blank card has other information on it
15  besides The Meyer Group logo, so it is
16  confidential.
17     Q  And what other information does a blank
18  card have on it besides the logo?
19     A  I think if you'd pull the card up it will
20  speak for itself.  I don't have one in front of
21  me.
22     Q  Why are you testifying that it does?  What

59

1  is it you believe it has besides The Meyer Group
2  logo?
3     A  I don't want to -- Ms. Clark, I don't have
4  a card in front of me.
5     Q  I understand that you don't.
6     A  And I brought no documents to this
7  deposition because you're not supposed to, and --
8     Q  I'm not supposed to do what?
9     A  -- the cards have lines on them to fill in
10  notes.  It asks -- and I'm going to guess now,
11  like the tenant name, lease, square footage,
12  expiration, things that you would use as a tool to
13  fill in to help you cultivate information about a
14  specific tenant.  So when you say blank, there's
15  no tenant information on there, but there's --
16  there's things printed on the card that help
17  trigger when you're cold calling to ask and get
18  that information on it.
19     Q  So you consider the form on the card to be
20  confidential information?
21        MS. CONSOLINO:  Object to form.
22     A  Yes, it's work product of The Meyer Group.

60

1     Q  Okay.  So your testimony here today is
2  that the form on a blank card is confidential
3  information?
4        MS. CONSOLINO:  Object to form.
5     A  Yes, it's Meyer Group work product.
6     Q  And did you receive an email identifying
7  the phrase work product from anyone on your legal
8  team?
9        MS. CONSOLINO:  Excuse me, I'm going to
10  object to the question and instruct the witness
11  not to answer about communications he's received
12  from his legal team on the grounds of
13  attorney/client privilege.
14     Q  Are you receiving emails from your legal
15  team during this deposition, Mr. Meyer?
16     A  I didn't hear you.  I'm sorry.
17     Q  Are you receiving emails from your legal
18  team during this deposition?
19     A  No.  I don't have email on this computer.
20     Q  Are you receiving -- do you have a phone
21  with you today, sir?
22     A  No, I do not.

6

1    Q  Do you have an iPad with you today?

2    A  I have no communication devices except

3  this computer.

4    Q  Okay.

5       MS. CLARK:  Mr. Greenberg, can you please

6  put the Access database Excel document into the

7  chat?

8    A  Ms. Clark, may I step one second —

9    Q  Sure.  That'll give some time for the

10  document to upload.

11    A  Thank you.

12      MS. CLARK:  We'll stay on the record just

13  because -- Mr. Court Reporter, the documents that

14  have gone into the chat so far, which would be the

15  amended complaint, that should be marked as

16  Exhibit 1, and the ICA should be marked as

17  Exhibit 2.

18      THE REPORTER:  Okay.

19    Q  Mr. Meyer, we have placed into the chat

20  the Access database.

21    A  I'm pulling it up.

22    Q  Thank you.

62

1    A  Okay.  So this is in Excel and it's asking

2  me for login credentials or something.

3    Q  That must be something to do with your

4  software.

5    A  I'm not on my computer, I'm on somebody

6  else's because I don't have a camera on mine, so I

7  can't see this.

8    Q  In that case I'll share my version of the

9  document.

10      Can you see the database, sir?

11    A  Yes.

12    Q  Over here it says lease number.  Is this a

13  number that you randomly assign to these various

14  client leases?

15    A  I didn't assign any of those numbers.  I

16  don't know how they became the numbers.

17    Q  So this is a feature that the intern

18  created but you're not sure how it populates

19  particular the numbers?

20    A  Yes.

21    Q  And then when you worked with the intern,

22  you confirm that these were the columns that you

63

1  wanted to have which included so far on the screen

2  the client name, the contact name, contact number,

3  contact email, contact fax, the property name --

4  is that the building, sir?  Is that normally the

5  building where it's listed?

6    A  The building where it's listed is the

7  address next to it.

8    Q  No, under column G where it says property

9  name, is that the name of the building?

10    A  Yeah.  I would say so.  Sometimes

11  buildings have name, sometimes they don't.

12    Q  Yeah.  That's why I was asking the

13  question.

14    A  Sometimes we have nicknames.

15    Q  This would be the address, the -- I guess

16  the second address would be the suite, city,

17  state, ZIP, and then you confirm with the intern

18  that you wanted to have square feet, the initial

19  annual base rent, the initial base rent per square

20  foot, lease commencement, lease expiration.  Those

21  were all things that you confirmed that the intern

22  should include; is that correct?

64

1    A  Yes, because that's the crux of the

2  database, the lease expirations, the lease

3  commencements, the square footage, the base rent.

4  That's the meat of the database.

5    Q  Proposed/actual, what does that mean?

6  True or false in this column?

7    A  I don't remember.

8    Q  You don't know what --

9    A  I don't remember, I said.  I didn't say I

10  didn't know, I said I don't remember.  I was not

11  -- as I already testified, I wasn't the person

12  that did a lot of input on this.

13    Q  Do you know what proposed/actual means?

14    A  As it relates to this database form?

15    Q  Yeah.  Column --

16    A  I said I don't recall.  I don't remember.

17    Q  So you don't recall the purpose of this

18  column at all?

19    A  That's what I've said.

20    Q  What is lease type?

21    A  I don't -- is that next to the -- it's --

22  I have everybody's pictures on the right side of

65

1 the --
2     MS. CONSOLINO: You can scroll --
3   **A You can slide it? I see.**
4   Q Do you see it now?
5   **A Yes. Lease type is referring to the type**
6 **of lease rent, whether it's a full service lease**
7 **and whether it's a sublease or a prime lease.**
8     MS. CLARK: Mr. Greenberg, can you please
9 drop into the chat the PDF version of the Access
10 database.
11   Q Mr. Greenberg has now dropped a PDF
12 version of this document into the chat. You
13 should be able to open that.
14   **A Yeah, I have it up.**
15   Q Great.
16     Mr. Meyer, on March 21st, 2019, Jessica
17 McGunnigle sent a copy of what appears to be the
18 Access database we're looking at to Ned Goodwin,
19 and you were also copied on that email.
20     Did you direct her to send that to him?
21   **A Yes.**
22   Q And this would have been the database as

66

1 it existed on March 21st, 2019; correct?
2   **A I would hope so. I mean, I would have**
3 **asked Jess to send the most updated file.**
4   Q And did the database at that time include
5 all of The Meyer Group's existing clients?
6     MS. CONSOLINO: Object to the form of the
7 question.
8     You can answer.
9   **A I'm sure that there was some that we**
10 **missed or forgot to put in. We had a lot of**
11 **clients.**
12   Q Are you saying that you intended that all
13 the clients be on the list, but it's possible you
14 may have failed to include some?
15     MS. CONSOLINO: Object to form.
16   **A This list was mainly for myself and Jim**
17 **because these were -- the majority at least, if**
18 **not all, were clients of Jim and mine. And so the**
19 **list was -- this whole database was designed as a**
20 **-- and cultivated for the benefit of Jim and I so**
21 **that we could keep track of -- after so many years**
22 **you have a lot of clients, and this was the best**

67

1 way I thought to make sure that we didn't forget
2 about anybody.
3   Q Okay. So I -- on March 21st, 2019,
4 Mr. Rayborn was no longer with The Meyer Group; is
5 that correct?
6   **A That's correct.**
7   Q Okay. And on March 21st, 2019, you were
8 sending this to Ned Goodwin; is that correct?
9   **A Yes.**
10   Q Okay. So on March 21st, 2019, any clients
11 of The Meyer Group that you failed to include on
12 the list would have been The Meyer Group clients;
13 correct?
14   **A Sorry, I didn't hear you.**
15   Q You mentioned that this list may not have
16 included all of The Meyer Group clients; correct?
17   **A Yeah, I said there may be some that didn't**
18 **make it on because we forgot or didn't do it.**
19 **Slipped through the cracks.**
20   Q Okay. And are you saying that they
21 slipped through the cracks in March of 2019 or at
22 some other time period?

68

1   **A As it relates to the list, on or before**
2 **March 21st.**
3   Q Did you have any reason to believe that
4 before 2019 that there were clients missing from
5 the database?
6   **A I don't understand your question.**
7   Q Well, I'm trying to understand, Mr. Meyer,
8 you've said that the database that was sent on the
9 21st of March may not have included all of The
10 Meyer Group's clients; is that correct?
11   **A Yes. I represented that there's probably**
12 **some that we missed that slipped through the**
13 **cracks. I'm not really sure that I put a lot of**
14 **clients from the other guys in the office because**
15 **again, this was more designed for Jim and I.**
16   Q So this may not have been a complete list
17 of all of The Meyer Group's clients, that's your
18 testimony today; is that correct?
19   **A Yes. My testimony is that we may not have**
20 **had every Meyer Group client on that database**
21 **list.**
22   Q And can you confirm for me today that the

69

1  Excel spreadsheet you were looking at earlier is
2  the same document as the one that was sent to
3  Mr. Goodwin?
4      MS. CONSOLINO:  I'm going to object to the
5  form of the question.
6      A  This is what -- you know, I produced
7  everything I was asked to produce.  And I'm going
8  to say that it should be.  There's no reason it
9  wouldn't be.
10     Q  All right.  So your testimony today is
11 that the document that we've been looking at for a
12 few months now, the Access database, in the two
13 formats, the Excel spreadsheet and the PDF
14 spreadsheet, may not have included all of The
15 Meyer Group's clients as of March 21st, 2019?
16     A  Yes.  And I don't know anything about the
17 PDF file.  I don't know where or who created that
18 or how it was done.  I don't remember.
19     MS. CONSOLINO:  I'll represent for the
20 record that that was created during document
21 processing for production purposes by our vendor.
22     Q  Since you produced this document to your

7

1  was a lot of things that were confidential and so
2  the only things I know about are that this
3  database was asked, we produced.  This is part of
4  Jim's, you know -- this is part of the lawsuit.
5      Q  Mr. Meyer, you did see all the documents
6  you produced to your counsel; is that correct?
7      A  Yes.
8      Q  And so --
9      A  I don't remember them all.
10     Q  I'm not asking you if you remembered them
11 all.  When you produced the database to your
12 counsel, did you represent to your counsel --
13 strike that.
14     A  And, Ms. Clark, it's starting to get
15 muffled.  It's hard to hear you.
16     Q  Let's go back to the complaint.  Go to
17 paragraph 20.
18     A  This is the amended complaint?
19     Q  Yes.  It's the only complaint that we're
20 looking at for purposes of this deposition.  So at
21 this point in time it is now Exhibit 1 to your
22 deposition.

70

1  counsel, have you added any Meyer Group clients to
2  the database?
3      A  No.
4      Q  And can you tell me why?
5      A  Why didn't I?
6      Q  Yes.
7      A  I haven't gotten to it yet.
8      Q  There have been a number of documents that
9  have been produced in this case.
10     Can you tell me if there was one single
11 document that contains all of The Meyer Group's
12 clients?
13     MS. CONSOLINO:  Object to the form of the
14 question.
15     You can answer if you understand.
16     A  I don't think there's one document that
17 has -- it's the be all end all of every Meyer
18 Group client.  And in fairness, I believe Wayne in
19 one of the depositions mentioned there was 55,000
20 documents, which I had no clue of.  I have seen
21 very few documents regarding things that were --
22 well, I haven't seen any documents because there

72

1      A  Okay.  I've got it up.
2      Q  Okay.  So paragraph 20 says that The Meyer
3  Group took all reasonable efforts and precautions
4  to maintain the confidentiality of its
5  confidential information, including but not
6  limited to confidentiality provisions set forth in
7  the ICA.
8      We've already looked at the ICA.  What
9  other precautions and efforts did you employ to
10 keep your confidential information confidential?
11     A  Well, I made it very clear in the office
12 to the different agents and staff that we do not
13 share information about clients outside the office
14 to anybody, Costar or any other brokers.  I think
15 there was testimony from somebody during a
16 deposition from Broad Street that there was group
17 meetings and stuff and that he's right, there's a
18 lot of people that will take client information
19 and go to scoop meetings.  At The Meyer Group we
20 don't do that.  I think Broad Street said they
21 don't do it either.
22     I had locks -- electronic locks on the

73

1  front door so no one can just come in and try to
2  steal files. I even had cameras in the office to
3  prevent anybody from trying to steal or walk out
4  the door.
5      I hope that answers your question.
6  Q  The cameras in the office, how many did
7  you have?
8  A  Two or three.
9  Q  And where were they located?
10  A  Do you mean where in the office?
11  Q  Yes.
12  A  Front door, hallway, back file room.
13  Q  Do you have a camera in your office?
14  A  On my computer.
15  Q  But it was only activated when you were
16  using the computer; is that correct?
17  A  It wasn't designed to be a security
18  camera.
19  Q  And I think we've been talking about
20  efforts to maintain confidentiality. So the
21  cameras that we're talking about, are they -- they
22  are security cameras; is that correct?

74

1  A  Yes.
2  Q  So -- and this was the case in your new
3  office that you maintained in early 2019; is that
4  correct?
5  A  The new office in 2019 was a temporary
6  office before we went -- we were going to go to
7  our bigger regular office. It was a segue. It
8  was like a very short-term lease.
9  Q  For how long?
10  A  I believe two months. I don't remember
11  exactly.
12  Q  The security cameras that you were
13  describing were in the old office; is that
14  correct?
15  A  Yeah. I mean, besides the office building
16  security cameras.
17  Q  So you had no security cameras in the
18  office you maintained in January or February of
19  2019?
20  A  No. Not in my office. Not in the suite
21  of The Meyer Group. Had I known Jim was going to
22  steal everything, I probably should have.

75

1  Q  There's no question pending, Mr. Meyer.
2  You can save it for the trial.
3  A  I will.
4  Q  I'm sure you will.
5      Did salespersons have their own personal
6  computers to use for work?
7  A  I don't know if they had personal
8  computers, but my office had computers for
9  everybody to use.
10  Q  Did you put any limits on -- strike that.
11      Did you own the Microsoft software that
12  your salespersons would use?
13  A  That's kind of a technical question. We
14  used or subscribed, and still do, to Microsoft
15  365. So I don't know necessarily know if we own
16  the software or if we just lease it.
17  Q  Okay. You have a subscription with
18  Office 365?
19  A  Yes, we've had it for quite a while.
20  Q  And do your salespersons, are they added
21  to the user list for the Office 365 or do they
22  have to purchase their own individual license?

76

1  A  No, The Meyer Group purchased a license
2  for everybody to be able to use.
3  Q  So they could use the Microsoft software
4  on any device like an iPhone or on an iPad or on a
5  personal computer; is that correct?
6  A  Yes.
7  Q  Did you have any policy about the access
8  to the Office 365 subscription and its use on
9  personal devices or mobile devices?
10      MS. CONSOLINO: Objection to the form of
11  the question.
12  A  My understanding of the Microsoft 365
13  product is what you just said, we can use it on
14  multiple devices, phone, personal computers. I
15  certainly know that most everybody in the office
16  had the company email on their phone. As far as
17  personal computers or home computers, they
18  certainly would be able to have the Microsoft
19  products put on it based on the subscription I had
20  paid for with Microsoft. I don't know if they
21  did. I think it's fair to say everybody had it on
22  their phones.

---

**77**

1  Q  And when they used the Microsoft software
2  on their phones or on computers through, for
3  example, email they could be emailing leases back
4  and forth; is that correct?
5  **A  Yes.**
6  MS. CONSOLINO: Object to form of the
7  question.
8  THE WITNESS: Sorry, Serine.
9  **A  Yes.**
10  Q  Could they be emailing proposals for
11  retaining The Meyer Group as a broker?
12  MS. CONSOLINO: Same objection. Objection
13  to form.
14  **A  It's email. They can send pretty much**
15  **whatever email they want to send.**
16  Q  And they can attach documents; is that
17  correct?
18  **A  That's how email works, yes.**
19  Q  And at any point in time did you tell your
20  -- the individuals who worked for The Meyer Group
21  that they needed to delete emails that contained
22  the confidential information?

---

**78**

1  MS. CONSOLINO: Object to form of the
2  question.
3  **A  Under what scenario, I guess? I don't**
4  **understand what you're asking me.**
5  Q  Did you ever ask them to delete from their
6  personal devices emails, business emails after --
7  after a transaction was completed?
8  **A  While working at the The Meyer Group?**
9  Q  Yes, while working at the The Meyer Group.
10  **A  No, I don't believe so.**
11  Q  Did you ever ask them to allow you to
12  inspect any personal computer that they used while
13  working at the The Meyer Group to ensure that no
14  confidential information remained on that laptop?
15  **A  Are you saying while working at The Meyer**
16  **Group?**
17  Q  While working at The Meyer Group.
18  **A  No.**
19  Q  Did you ask to inspect any phone, mobile
20  device, or laptop when someone was departing from
21  The Meyer Group?
22  **A  So besides what their contract said, I**

---

**79**

1  would ask them to either delete or return files to
2  The Meyer Group, period.
3  Q  And do you have emails to the individuals
4  to whom you made that request?
5  **A  Well, I did it, you know, generally people**
6  **would have a conversation with me that they're**
7  **leaving, and so we would have an adult**
8  **conversation about next steps and I would see --**
9  Q  The answer is no?
10  **A  I'm talking.**
11  Q  Mr. Meyer, my question is yes or no. Did
12  you send --
13  **A  I don't think it works like that.**
14  Q  Mr. Meyer, I didn't ask the question --
15  MS. CONSOLINO: Let the witness finish the
16  answer.
17  Q  I get to ask the question. The question
18  is a yes or no. Yes or no, Mr. Meyer, did you
19  send an email to the individuals who were leaving
20  The Meyer Group instructing them to delete
21  information or to allow you to inspect the mobile
22  devices or laptop they had been using?

---

**80**

1  MS. CONSOLINO: I'm going to object to
2  form.
3  You can answer.
4  **A  I don't recall.**
5  Q  Thank you.
6  Mr. Meyer, there's been testimony in this
7  case about pitch meetings. There have been a
8  number of individuals who testified that various
9  client lists of The Meyer Group are provided to
10  potential clients.
11  Did you ever ask the potential clients to
12  return the pitch books at the close of a pitch
13  meeting?
14  **A  Marketing material -- you're talking about**
15  **the client lists in the marketing materials we**
16  **provided during our pitch meeting?**
17  Q  That's what I'm talking about.
18  **A  No.**
19  Q  Okay.
20  **A  What time are we doing lunch today?**
21  MS. CLARK: Mr. Greenberg, could you
22  please drop into the chat the 4/26 demand letter?

---

81

1    A  Did you hear my question, Ms. Clark?
2        MS. CLARK:  I'm going to answer you.  I
3  think what we can do is do a break at 12:30, if
4  that works for everyone?
5        MS. CONSOLINO:  That works for us.  Does
6  that work for you?
7        THE WITNESS:  Sure.  I may need to do a
8  bathroom break before then, though.
9        MS. CLARK:  Would you like to do that now,
10 sir?
11       THE WITNESS:  If it's good for you, it's
12 good for me.
13       MS. CLARK:  That's fine.
14       (Off the record from 11:48 a.m. to 11:55
15 a.m.)
16 BY MS. CLARK:
17    Q  In the chat there's a demand letter.  If
18 you could open that up, please.
19    A  Okay.
20    Q  Is Andrew Schulwolf one of your attorneys?
21    A  Yes.
22    Q  If you could take a look at this document,

82

1  it's two pages.  Let me know if you recall this
2  document?
3    A  I do.
4    Q  All right.  Did Mr. Schulwolf review this
5  document with you before it was mailed?
6    A  I -- it's been a few years.  He and I
7  certainly spoke about it.
8        MS. CONSOLINO:  Sorry, I was on mute.  I'm
9  objecting on privilege grounds.  Please don't
10 discuss your conversations with Mr. Schulwolf.
11       You can answer whether you have reviewed
12 it and when you've reviewed it, but please do --
13 I'm instructing you not to talk about your
14 conversations with Mr. Schulwolf.
15       THE WITNESS:  I understand.
16    A  I did review this.
17    Q  Did you provide any changes to him?
18       MS. CONSOLINO:  Again, instruct the
19 witness not to answer.  That's communication.
20    Q  Did you approve this letter before it was
21 mailed?
22    A  That I don't remember.

83

1    Q  Take a moment and look at it so I can ask
2  you some questions about it.
3    A  Do you want me to read it?
4    Q  Yeah.
5    A  Okay.  Okay.  I've read it.
6    Q  Thank you.
7        At the time that this was sent on
8  April 26th, 2019, had you been made aware of
9  certain TMG clients who had left or informed you
10 that they were leaving TMG?
11    A  Yes.
12    Q  Can you identify the clients as of
13 April 26th, 2019, if you remember?
14    A  I don't remember.
15    Q  Do you remember how many?
16    A  I don't remember.
17    Q  Had you spoken to every one of the
18 individual TMG clients about their departing TMG
19 and seeking services elsewhere?
20       MS. CONSOLINO:  Objection to form.  You
21 can answer.
22    A  I remember I had a conversation with the

84

1  gentleman from Integral.
2    Q  And who was that?
3    A  Who at Integral?
4    Q  Yes.
5    A  Chris.
6    Q  Do you have a last name?
7    A  Gosh, do you want me to hold -- I don't
8  have any document in front of me, so I can't --
9    Q  You don't remember the names of your
10 clients?
11    A  I do.
12    Q  Okay.  So you don't remember Chris's last
13 name?
14    A  I'm having a senior moment.  Sorry.  I
15 apologize.
16    Q  So you talked to Chris you said at Barnes
17 Vanze -- sorry, Integral.
18       Did you speak to anyone else?
19    A  At Integral?
20       MS. CONSOLINO:  Object to form.
21    Q  Did you speak to anyone else at Integral?
22 That's fine.

85

```
1      A  I don't remember anyone else.
2      Q  Okay.  Was there another entity that you
3  were aware of as of April 26, 2019?
4      A  I think I already answered that.
5      Q  How did you become aware that clients were
6  being retained by Broad Street?
7      A  Because Jim would send them an email
8  saying cancel your exclusive with The Meyer Group,
9  and then I'd get an email from them.
10     Q  How did you learn that TMG clients
11 terminated their relationship with TMG?
12     MS. CONSOLINO:  Object to form.
13     You can answer.
14     A  I would get an email from the client
15 saying that they're no longer going to work with
16 The Meyer Group or something along those lines.  I
17 don't have any documents in front of me.
18     Q  So when you received that email from the
19 client, did you reach out to them?
20     MS. CONSOLINO:  Object to form.
21     A  I know I did maybe a couple of times.
22 Like, I know you just -- Ms. Clark, you mentioned
```

86

```
1  Barnes Vanze.  I remember I sent them an email
2  saying, you know, what's going on or who did you
3  go with and they told me Broad Street.
4      Q  Who at Barnes Vanze did you send an email
5  to?
6      A  Either Mr. Vanze or Mr. Barnes, I don't
7  remember.  Or both maybe, could have been.  It's
8  been a while.
9      Q  Did you just correspond with them by
10 email?
11     A  I think so.
12     Q  Is there any reason why you didn't
13 correspond with them or talk to anyone on the
14 phone?
15     A  I don't remember if I called or spoke to
16 them by phone.  I may have or tried.  I do recall,
17 as I'm trying to answer, I do remember I did send
18 them an email after they had sent me something via
19 email.  And I'm sure you have it as part of the
20 production.
21     Q  Are your clients free to terminate their
22 relationship with you?
```

87

```
1      MS. CONSOLINO:  Object to form.
2      You can answer the question.
3      A  I believe so.
4      Q  In fact, isn't there a provision in your
5  agreements that allows them to give notice to you
6  when they want to terminate the agreement?
7      A  I believe so.  I don't have the document
8  in front of me, but I believe so.  Every
9  agreement, by the way, is not necessarily the same
10 as the next.
11     Q  Understood.  Let's take a few minutes and
12 talk about Integral.
13     MS. CLARK:  Mr. Greenberg, could you drop
14 the exclusive that was produced into the chat.
15     A  Okay.  Got it up.
16     Q  Okay.  So, Mr. Meyer, this appears to be
17 May 2nd letter on the letterhead of Integral
18 addressed to you where it's appointing
19 representatives both you and Jim Rayborn as
20 exclusive real estate brokers for a period of
21 12 months.
22     Does this document look familiar to you?
```

88

```
1      A  Yes.
2      Q  And is this your signature at the bottom
3  of the page -- second page of the document?
4      A  Yes.
5      Q  Do all of The Meyer Group -- you've
6  testified that not all documents are the same, but
7  do the documents usually identify the two
8  representatives at The Meyer Group or does it just
9  identify The Meyer Group?
10     A  We've changed the forms over the years.
11 This is from 2011.
12     Q  Were there any other follow-up documents
13 to this one executed between The Meyer Group and
14 Integral?
15     MS. CONSOLINO:  Object to form.
16     A  I believe we produced everything we had,
17 so I don't recall.  We have worked with Integral
18 before, so I don't remember if there were
19 subsequent documents.
20     MS. CLARK:  Mr. Greenberg, would you
21 please drop into the chat the January 29th email
22 from Mr. Meyer to Barrett and McGunnigle.
```

89

1    Q  Mr. Meyer, let me know when you have that.
2    A  I have it.
3    Q  So it appears that in -- it appears that
4 you had an email exchange with this gentleman,
5 Christopher Barrett, is that who you recall?
6    A  Yes.
7    Q  And in this email exchange it looks like
8 in or around the 28th, so this would be page 2 --
9 in or around the 28th you were trying to confirm a
10 meeting with him.  You informed him that you had
11 to terminate your reborn last week.
12     Did you mean to say Jim Rayborn?
13    A  Yes, I believe it was a typo.
14    Q  And you told him that you realized you had
15 an appointment to look at his space.  Was that an
16 appointment on the next day, the 29th?
17    A  I believe it was.
18    Q  And you told him you that weren't aware
19 that Jim had put together, I guess -- was that
20 putting together the showing?
21    A  Jim had put together a tour, which I was
22 aware that Jim was -- Jim and I -- this was a

90

1 client of Jim and myself.  I was aware that Jim
2 had -- was talking to them about trying to put a
3 tour together for a specific property in the
4 building.  I wasn't aware of the exact date or
5 time, and this is why I had sent the email.
6    Q  So you had offered to send Jessica to
7 tour?
8    A  Yes, that's what the email says.
9    Q  Can I ask why you didn't say you'd meet
10 with Barrett and take him on the tour?
11    A  Because of what the email says, I wasn't
12 in town.
13    Q  Where were you at that time?
14    A  I don't remember.  I wasn't there.  I
15 wasn't able to do it.  Jessica is a licensed agent
16 that works in my office and she offered to do it.
17    Q  Your email actually states you were coming
18 back in town tomorrow, but would not be able to do
19 to the tour?
20    A  Then I wouldn't have been back in time,
21 that's all.
22    Q  Well, it doesn't say that.  Is that your

91

1 testimony today?  The email does not say that you
2 would not be back in time.
3    A  Well, in writing the email, and since I'm
4 the author of the email, that's what it would've
5 inferred to me and him.
6    Q  That's what you meant that you would not
7 be back in time; is that correct?
8    A  I would not be back in time to do the
9 tour.
10    Q  So you offered Jessica as an alternative;
11 is that correct?
12    A  Yes.
13    Q  If we scroll up, the next morning you see
14 Mr. Barrett's response.
15    A  Yes.
16    Q  So here he said that he made arrangements
17 with Jim to go on the tour.
18    A  He made arrangements with Jim while Jim
19 was at The Meyer Group, yes.
20    Q  Well, he doesn't say that.
21    A  The notes do.
22    Q  Well, you --

92

1    A  You don't make tours on the same day.
2    Q  Given Jim made the arrangements and set up
3 the tour, we feel it would be best to see the
4 space as planned with him.  Should we decide
5 that's not a good space for us -- and then he
6 identifies three, himself, Kevin, and Jim
7 Emlett -- will regroup and discuss what they want
8 to do next.  So they're making it clear they don't
9 say anything other than they're just going to go
10 forward and see the space with Jim.
11     Did you talk to Mr. Barrett on the phone
12 that day, on the 29th?
13    A  I've already answered that question.  I
14 believe I spoke with him or made an attempt, I
15 just don't remember now.  But I -- as I said,
16 there was definitely email communications as well.
17     MS. CLARK:  Mr. Greenberg, can you please
18 drop into the chat the January 30th email chain.
19    Q  Mr. Meyer, let me know when you see it.
20    A  I don't see it yet.  Do you?
21    Q  Yes.  I do now.
22    A  Just came in now.  Hold on.

**93**

1     **Okay. It's up.**

2   Q  Okay. Do you recall this email exchange?

3   **A Okay.**

4   Q  Do you recall this email exchange?

5   **A Yeah, I remember getting the email.**

6   Q  So Mr. Barrett wrote you at approximately

7 1:44 in the afternoon on January 30th, the subject

8 line says change of representation, and he

9 indicate he's cancelling -- Integral is cancelling

10 all its agreements with The Meyer Group?

11   **A Yes.**

12   Q  Okay. And do I understand that the top of

13 the document, the first page is your response to

14 that email?

15   **A Yes.**

16   Q  Did he call you back as you requested?

17   **A I believe he did.**

18   Q  And do you recall what that conversation

19 was?

20   **A Yes. A little bit. Not fully.**

21   Q  And what did he -- what did you discuss

22 with him?

**94**

1   **A I said that it's sad that you're not**

2 **letting me help you. I mean, I was the person**

3 **that had done all their transactions, not Jim. I**

4 **understood that he felt an obligation to Jim since**

5 **Jim started setting up everything when he was at**

6 **The Meyer Group, and I explained to him that, you**

7 **know, I didn't want him to get in the middle of my**

8 **issues with Jim and Broad Street, but you're still**

9 **a Meyer Group client because this was all done**

10 **while at The Meyer Group and Jim's license was**

11 **still at The Meyer Group when it was done and Jim**

12 **toured the space with his license under The Meyer**

13 **Group.**

14   **And so there was a procuring cause**

15 **element, but I wasn't going to discuss it further**

16 **with him, and I said I'll let the attorneys do**

17 **what they have to do. And here we are.**

18   MS. CLARK: Mr. Greenberg, could you drop

19 into the chat the March 12th letter from The Meyer

20 Group to Mr. Ayers.

21   Q  It's now in the chat.

22   **A Okay. Thank you.**

**95**

1   Q  Are you familiar with this letter?

2   **A Yes.**

3   Q  This is a letter you drafted; correct?

4   **A Yes.**

5   Q  Who is Mr. Roy Ayers?

6   **A He is the managing director of McBride**

7 **Real Estate.**

8   Q  What is McBride Real Estate?

9   **A The listing agent for the building that**

10 **Integral was looking at signing a lease in.**

11   Q  So they listed the 1350 Connecticut Avenue

12 building?

13   **A Yes.**

14   Q  Is it fair to say they represent the

15 landlord?

16   **A Yes, that's what I just said.**

17   Q  But you said the listing agent?

18   **A That's the same thing.**

19   Q  I understand that you understand that to

20 be the same thing, I was just clarifying for the

21 record.

22   Why did you send this letter to Mr. Ayers?

**96**

1   **A Because I have a procuring cause issue**

2 **here.**

3   Q  What role does he have regarding the

4 procuring cause issue?

5   **A I'm sorry, I couldn't hear you.**

6   Q  What role does he play as it relates to

7 your procuring cause issue?

8   **A He's the agent for the owner and I'm**

9 **putting him on notice that The Meyer Group**

10 **maintains that it's the procuring cause in the**

11 **event of a lease being signed by Integral because**

12 **we, you know, initially introduced Integral to the**

13 **property.**

14   Q  So does that trigger some obligation on

15 his part regarding there being a procuring cause?

16   **A I don't know what obligations Mr. Ayers**

17 **feels he has.**

18   Q  No, I'm asking what obligations you think

19 he has. You sent this letter. What did you

20 expect him to do?

21   **A I expected to put him on notice and the**

22 **landlord.**

97

1    Q  Okay.  So he's on notice.  Do you expect
2  him to do something regarding your notice about
3  The Meyer Group entitled to be paid a market rate
4  real estate commission in connection with any such
5  transaction?
6    **A  Well, I know what I would do if I was**
7  **Mr. Ayers, but I can't speak for him.**
8    Q  Well, you wrote this letter putting him on
9  notice.  And let's say he ignored the letter, what
10 happens then, Mr. Meyer?
11   **A  Well, I already know what happened.  He**
12 **didn't do anything.  He ignored it.**
13   Q  And so what do you do under those
14 circumstances, when a landlord representative
15 ignores a notice letter like this?
16   **A  Well --**
17       MS. CONSOLINO:  Object to the form of the
18 question.
19       THE WITNESS:  I'm sorry, Serine, I didn't
20 mean to interrupt.
21   **A  In this specific case if this happened to**
22 **me with another client, I would be suing for**

98

1  **procuring cause with the landlord and the tenant.**
2    Q  Why didn t you do that here?
3        MS. CONSOLINO:  Object to the question and
4  instruct the witness not to answer to the extent
5  it reveals attorney work product, legal strategy,
6  etcetera.
7    **A  I won't be answering.**
8    Q  Did you consult with a lawyer about suing
9  the McBride Real Estate Group?
10       MS. CONSOLINO:  Same objection.
11 Instruct the witness not to answer.
12   Q  You can answer the question to the extent
13 that you talked to a lawyer.  I m not asking you
14 to discuss what you talked to the lawyer about.
15       Did you consult a lawyer with regard to
16 that?
17       MS. CONSOLINO:  I think that goes into the
18 realm of asking what he talked about.
19       I m instructing him not to answer.
20       MS. CLARK:  The question that he s been --
21 could you please, Court Reporter, mark the
22 question that he s been instructed not to answer

99

1  the question about whether or not he consulted a
2  lawyer.
3        MS. CONSOLINO:  If you have -- Denise, if
4  you have case law that you can show me that says
5  he s allowed to answer --
6        MS. CLARK:  I could go around and around
7  today about this.  I m just going to mark the
8  question.
9        MS. HORNFECK:  Can I just interject
10 briefly?  This is very similar to your exact
11 question to Mr. Jacoby about whether he consulted
12 a lawyer in drafting his letter or email to
13 Mr. Rayborn about the contract and what it said.
14 The fact of consulting an attorney is not
15 privileged, what was communicated is.
16       MS. CONSOLINO:  Is there a case that you
17 can send me that says the fact of consulting an
18 attorney about a particular topic is not
19 privileged?
20       MS. HORNFECK:  I m not going to give you a
21 case right now, but if you think it s proper for
22 you to ask a question of my witness, it is very

00

1  much proper for Denise to ask the question of
2  yours.
3        MS. CONSOLINO:  Different question,
4  different circumstances.
5        MS. HORNFECK:  He was asked, did you
6  consult a lawyer?  That s all she s asking.
7        MS. CLARK:  That s all I ve asked.  You ve
8  instructed him not to answer.
9        Again, Court Reporter, please mark the
10 question, certify the question that he s been
11 instructed not to answer.
12   Q  We can go back to the exclusive agreement
13 with Integral dated May 2nd, 2011.  Mr. Meyer, can
14 you please pull that up?  Go to page 2 of that
15 document.
16   **A  I'm back to it.**
17   Q  Thank you.
18       So this first paragraph of this document,
19 is this the procuring cause provision between The
20 Meyer Group and Integral?
21       MS. CONSOLINO:  Object to form of the
22 question.

**0**

1    You can answer.
2    **A  I'm not an attorney so I don't want to**
3    **give you my legal opinions.  I think the document**
4    **speaks for itself on a variety of issues,**
5    **procuring cause being one of them.**
6    Q  So the sentence that says, we shall also
7    recognize The Meyer Group as the procuring cause
8    of -- and the said transaction.  Is that what you
9    mean by procuring cause?
10   **A  What paragraph are you on, please?**
11   Q  Top of page 2, first paragraph.
12   MS. CONSOLINO:  Same objection.
13   **A  So what was the question, please?**
14   Q  Do you understand that this sentence
15   here -- is this the sentence that would identify
16   The Meyer Group as the procuring cause of said
17   transaction?
18   **A  Well, it's one of them.**
19   Q  That Integral was entering into?
20   MS. CONSOLINO:  Objection to form.
21   You can answer.
22   **A  It's one of them.**

**02**

1    Q  Okay.  And we can go to the third
2    paragraph of that page.  Third paragraph reads
3    that any controversy or claim arising out of or
4    related to this contract or breach thereof shall
5    be settled by arbitration administered by the
6    American Arbitration Association in Washington,
7    D.C. in accordance with its applicable rules and
8    judgment on the award -- and judgment on the award
9    may be entered in any court with jurisdiction
10   thereof.
11   Do you understand what this paragraph
12   means, Mr. Meyer?
13   **A  Yes.**
14   Q  What does it mean to you?
15   **A  It means that if we have an issue we can**
16   **go to arbitration over it.**
17   Q  Did you consider the failure to recognize
18   The Meyer Group as the procuring cause of any
19   transaction at 1350 Connecticut to be a dispute
20   under the Integral agreement?
21   MS. CONSOLINO:  Object to form.
22   THE WITNESS:  I'm sorry, I didn't hear

**03**

1    you, Serine.
2    Q  Did you consider --
3    MS. CONSOLINO:  You didn't hear me or you
4    did hear her?
5    THE WITNESS:  I didn't hear you, Serine.
6    MS. CONSOLINO:  I just said object to
7    form.
8    Q  If you heard my question, if you could
9    please answer?
10   **A  Would you mind repeating or ask the**
11   **reporter to repeat?**
12   Q  My question, Mr. Meyer, is did you
13   consider the failure of The McBride -- of McBride
14   Real Estate to recognize a commission being owed
15   to The Meyer Group in connection with any
16   transaction Integral had at 1350 Connecticut to be
17   a controversy or claim arising out of the Integral
18   contract that would be subject to arbitration?
19   MS. CONSOLINO:  Object to form.
20   **A  I feel both Integral and McBride failed.**
21   Q  Okay.  And so would that failure be a
22   controversy or claim that would be subject to this

**04**

1    paragraph, paragraph 3 of the Integral
2    agreement -- or the agreement between Integral and
3    The Meyer Group?
4    MS. CONSOLINO:  Object to form.
5    **A  That's calling for a legal conclusion, I**
6    **believe.**
7    Q  I'm asking factually, did you understand
8    this paragraph to allow you to assert a claim that
9    would go to arbitration?
10   MS. CONSOLINO:  Same objection.
11   **A  That's asking legal advice.**
12   Q  I'm not asking you to give legal advice.
13   I'm asking you factually --
14   **A  What does factually mean?**
15   Q  I'm getting there.  Factually you signed
16   this document.  You've already testified it's your
17   signature here.
18   Did you understand that a claim or
19   controversy would be settled or go through
20   arbitration?
21   MS. CONSOLINO:  Same objection.
22   MS. CLARK:  How about this, let me strike

05

1   that the question.
2       Q  Mr. Meyer, could you please read aloud of
3   the third paragraph of the agreement that you
4   signed?  Just read it aloud, please?
5       A  Any controversy or claim arising out of or
6   relating to this contract or the breach thereof
7   shall be settled by arbitration administered by
8   the American Arbitration Association in
9   Washington, D.C.  And in accordance with the
10  applicable rules, a judgment on the award may be
11  entered in any court with jurisdiction thereof.
12      Q  Had you read this paragraph before you
13  signed this document?
14      A  It's part of our standard form at the
15  time.
16      Q  So it's part of The Meyer Group's standard
17  form?
18      A  Yes.  We changed the form, as I said, over
19  the years.
20      Q  So as part of standard form, did you
21  understand what that paragraph meant?
22      A  Yes.

06

1       Q  And can you say -- can you tell me now
2   today what that paragraph means to you?
3       A  It means that if there's a dispute you go
4   to arbitration.
5       Q  If you go to the March 12th, 2019, letter.
6       A  Which one?
7       Q  Your letter dated March 12th to Roy Ayers.
8       A  Okay.  What's — on my chat, which one
9   would that be?
10      Q  That would be --
11      A  The email chain?  Email from — Let me
12  pull that up.
13      Q  It's the last document on the list.
14      A  All right.  I have it up.
15      Q  Is this a claim that you could have taken
16  to arbitration?
17      MS. CONSOLINO:  Object to form.
18      But you can answer.
19      Q  Under the terms of your agreement?
20      A  Yes, I believe.
21      Q  Okay.  Thank you.
22      MS. CLARK:  It is now 12:33.  Earlier we

07

1   talked about a lunch at 12:30.  Is this an
2   appropriate time to break for lunch and for how
3   long do you want it to be?
4       MS. CONSOLINO:  Sure.  Can we do
5   40 minutes?
6       MS. CLARK:  I have no objection to that.
7       Lane, do you have any issue with that?
8       MS. HORNFECK:  I don t.
9       MS. CLARK:  So do you want to make it
10  1:15?
11      MS. HORNFECK:  Let s do that.
12      (Off the record at 12:33 p.m.)
13
14
15
16
17
18
19
20
21
22

08

1            P R O C E E D I N G S
2   BY MS. CLARK:
3       Q  Mr. Meyer, were you in the office the
4   day that Mr. Rayborn left?
5       A  No.
6       Q  Can you tell me who was in the office
7   the day he left?
8       A  No.
9       Q  So do you know what documents he had in
10  his office the day before he left?
11      A  Going back to your last question, I
12  don't specifically remember who was in the office
13  when Mr. Rayborn was terminated.  I'm going to,
14  hopefully, presume that at least the admins were
15  there.  And that would be —
16      Q  When you say the admins, who expressly
17  do you mean?
18      A  The broker assistants, Sarah Religa, and
19  Lauren, and also Jessica.
20      Q  And what is Lauren's last name?
21      A  Freligh.
22      Q  But you don't know for certain that all

09

1 three of them were there that day?
2     A   For certain?  I believe they were all
3 three there that day.  Were they there at the time
4 that Mr. Rayborn was terminated and left?  I don't
5 know if all three were there at the same time.
6     Q   Did any of them report to you about
7 things that Mr. Rayborn walked out of the office
8 with?
9     A   At what point in time?
10    Q   On the day that he left, did they ever
11 report to you about anything they saw?
12    A   Here's -- here's what I remember:  When
13 I had a phone conversation with Jim and I told him
14 he was terminated, I had told him that he needs to
15 leave everything that's not his personal
16 belongings at the office, he needs to delete his
17 e-mails, and then I spoke to one of the broker
18 assistants and said, you know, Jim's not to take
19 anything with him except obviously his personal
20 belongings.  And when I spoke to -- and I don't
21 know if it was the same day or not, but when I
22 spoke to Jess, she said, oh, yeah, I saw Jim

1 to at what time, who called me, or who I -- if I
2 called them.  I don't -- I don't remember, but I
3 do remember that Jess told me that she saw Jim
4 leaving with a bunch of cards -- boxes of cards.
5     Q   When did she say that?
6     A   Pardon me?
7     Q   When did she tell you that?
8     A   After he took the cards.
9     Q   That day, the next day, three days
10 later?  When did she tell you that?
11    A   On or around the same -- on or around
12 the day that he departed.  I can't remember
13 specifically when.
14    Q   Did she call you from the office and
15 tell you this?
16    A   You're -- you're not coming through
17 clearly.
18    Q   All right.  Did she call you from the
19 office to tell you this?
20    A   I don't remember if I spoke to her -- I
21 called her or if she called me.  I'm not -- I just
22 remember having a conversation with her.

0

1 leaving with cards and things.  And I don't
2 remember if it was the same day or if it was
3 before that, but clearly she saw him do it.
4     Q   Well, which assistant did you speak to
5 that day because you just said you spoke to one of
6 the assistants, which one?
7     A   One or both.  I -- you know, I don't
8 know if it was both Lauren and Sarah or if it was
9 just one of them.  I don't remember.
10    Q   Do you remember if all three were there
11 that day?
12    A   I don't remember.  But I'm pretty sure
13 they were.  I'm paying them to be there.
14    Q   Did Ms. McGunnigle call you directly to
15 tell you that Jim was walking out of the office
16 with items?
17    A   I don't recall that.
18    Q   Did Ms. Religa call you directly to say
19 that Mr. Rayborn was walking out of the office
20 with items?
21    A   I talked to them very, very frequently,
22 all three of them, so I don't remember who I spoke

2

1     Q   Was she in the office when you had that
2 conversation?
3     A   I believe so.
4     Q   Okay.  Was it in the afternoon, in the
5 morning?  What time of day; do you remember?
6     A   I'm not -- I don't remember.  I'm not
7 sure why that would matter, but I'm trying to
8 answer your question.
9     Q   Were you --
10    A   I don't remember what time I terminated
11 Jim, whether it was in the morning or in the
12 afternoon.
13    Q   Were you in the city or outside of the
14 District of Columbia at the time?
15    A   I was outside the city.
16    Q   Okay.  Were you in Miami at the time?
17    A   Maybe.  Good chance.  I don't remember.
18    Q   Besides the administrative folks, did
19 you talk to any of the salespeople the day that
20 Jim left?
21    A   I don't recall.
22    Q   When was the last time you were in the

**3**

1 office before Jim left?

2    A    Oh, wait a minute.  I'm sorry, I got a

3 termination notice from Mr. Flenner by e-mail.

4    Q    On what day?

5    A    On or around the same time I terminated

6 Jim.  And I asked Jim, hey, I got a termination

7 notice from Ed, and I did speak to Ed eventually,

8 and I don't remember if it was before or after I

9 terminated Mr. Rayborn.

10   Q    When was the last time you were in the

11 office before the day that Jim left and you

12 received a notice from Mr. Flenner that he was

13 terminated?

14   A    When was the last time I was in the

15 office for when?

16   Q    Prior to Mr. Rayborn leaving?

17   A    I don't -- offhand, I don't recall.

18   Q    Was it several days, or was it the week

19 prior?

20   A    If -- I don't -- I can't answer your

21 question.  I don't know.  I'd have to try to piece

22 it together.

**4**

1    Q    So according to my iPhone calendar for

2 January 2019, the 29th was a Tuesday.  So were

3 you in the office on the 28th that day, which

4 would have been a Monday; do you recall?

5    A    I don't recall.

6    Q    You don't recall?  So sitting here

7 today, you don't recall the last day you were in

8 the office in January of 2019 before Jim left?

9    A    I'm in the office quite frequently.

10 Specifically, if I was gone for the weekend, maybe

11 I was coming back on the 29th.  I -- I just

12 don't remember.  But as we all work remotely now,

13 I was working a lot remotely because I travel a

14 lot.  So I just don't remember specifically my ins

15 and outs of the office.  That's the best I can

16 answer for you, I'm sorry.

17   Q    Did you ever inspect Mr. Rayborn's

18 office?  Did you ever go in and look at it?

19        MS. CONSOLINO:  Object to form.

20        THE WITNESS:  Go ahead.

21        MS. CONSOLINO:  Object to form.  You can

22 answer.

**5**

1    A    From time to time, yes.

2    Q    In January of 2019, did you look into

3 his office and inspect it to see what kind of

4 items were in there?

5    A    Probably at some point.  I mean, it was

6 -- it was all glass.  I mean, I don't -- did I

7 have to go in the office physically, or could I

8 look through the window?

9    Q    Tell me how you would inspect his

10 office.  Did you just look through the window?

11   A    Well, is looking through the window

12 inspecting the office?  I don't know what the --

13   Q    You tell me how you would go about

14 looking or inspecting your (indiscernible) office.

15   A    The times I would -- I wouldn't

16 necessarily go in for a formal inspection.  I

17 would -- if I had something I wanted to leave on

18 his chair or desk, I would do that, and obviously

19 I would see what's going on there from -- I mean,

20 I could see through that glass what was -- if he

21 was working or what was going on just like anybody

22 else in the office.

**6**

1    Q    How often did you look at Jim's cards?

2    A    How often did I look at his cards?

3        MS. CONSOLINO:  Object to form.

4    A    I'm not sure by -- what do you mean by

5 looking at them?

6    Q    Picking one up and looking at it.

7    A    You're -- I cannot hear you, Ms. Clark.

8    Q    Pick up a card and look at it, how often

9 did you do that?

10   A    You know, fairly regularly.

11   Q    What does fairly regularly mean?  Every

12 month, every week?

13   A    Sure, every month.

14   Q    Every month you went into Jim's office

15 and looked at his cards?

16   A    Or he gave me some cards to look at.

17   Q    Okay.  So he give you cards to look at?

18   A    He'd say -- you know, he'd say, do you

19 know any of these people?  You know, do you recall

20 these people?  I don't know.  He gave -- he gave

21 me cards all the time.

22   Q    So he gave you cards all the time for

7

1  you to keep?
2      A  Well, everything in the office is mine,
3  so I can keep what I want.
4      Q  Well, Mr. Meyer, when he would give you
5  cards, would you return them back to him to put
6  back in the boxes or would you keep the card?
7      A  It depends.  Sometimes he says, hey, I
8  need this back.
9      Q  Okay.  But other times he wouldn't and
10 you would keep the card; is that correct?
11     A  Or I would throw it away.
12     Q  Okay.  So there were times when you
13 might have thrown the card away?
14     A  Maybe.
15         MS. CONSOLINO:  You need to speak up.  I
16 can't hear you.
17         THE WITNESS:  You can't hear me?
18         MS. CONSOLINO:  No, I can't hear Denise.
19 She's breaking up.  I didn't hear the last
20 question.
21     Q  I said so sometimes you would throw a
22 card away; is that correct?

8

1          MS. CONSOLINO:  Object to form.  You can
2  answer.
3      A  Yes, from time to time.
4  BY MS. CLARK:
5      Q  And just to be clear, you are saying
6  fairly regularly means monthly?
7      A  I would say, yeah, at least monthly.  I
8  mean, I would go by his office routinely.  I would
9  see what's going on in there.  I would see the
10 stacks of cards on his desk.  He was fairly much a
11 creature of, you know, doing the same thing every
12 day, so -- and as I said, I would go into his
13 office certainly from time to time and see his
14 cards on his desk.  Sometimes I'd look at them
15 occasionally to see if, you know -- maybe I was
16 looking for a contact that we were talking to and
17 I couldn't find him in my computer system.
18     Q  Your computer system, you mean the
19 Access database?
20     A  My computer, my Microsoft Outlook, my --
21 the data -- the Microsoft Access database was done
22 for completed transactions mostly, not ongoing

9

1  transactions.
2      Q  Okay.  So you had data in other places;
3  is that correct?
4          MS. CONSOLINO:  Object to form.
5      A  Yes.
6      Q  Okay.  So you would be looking for data
7  in e-mails, or in other documents, or other
8  software where you would keep the data?
9          MS. CONSOLINO:  Object to the form of
10 the question.
11     A  If I'm -- we're working with a client, I
12 would typically have them in my contacts and in my
13 e-mail.
14     Q  Okay.  You mean the contacts, the phone
15 contacts?  Is that what you mean?
16     A  My Microsoft Outlook contacts.
17     Q  Okay.  And those would include phone
18 numbers --
19     A  And my e-mail.
20     Q  -- e-mails, correct?
21     A  It would include their e-mail and their
22 -- their name.

20

1      Q  Okay.  And so did you ever put your --
2  did you ever sync your Microsoft Outlook contacts
3  with the database?
4      A  No.  I don't -- I mean, I don't believe
5  that was how it works.
6      Q  Do you remember -- strike that.  You
7  said that Ms. McGunnigle told you that Mr. Meyer
8  [sic] walked out of the office with cards.  Did
9  she say how many cards he walked out of the office
10 with or how many boxes he walked out of the office
11 with?
12     A  I believe she said, you know, several
13 boxes, which is -- which is way more than the 250
14 he's represented that he took.
15     Q  Did you -- did she look into his office
16 to see what items were left to let you know what
17 was there?
18     A  I -- you'd have to ask Jess.
19     Q  Well, we have.
20     A  Okay.  Then why are you asking me?  I
21 don't -- I don't know what the answer is.
22     Q  Well, because you -- you are -- there's

21

1  a reason why, and your attorney can explain it.
2  Besides the cards, did Ms. McGunnigle tell you
3  what else -- if there was anything else that
4  Mr. Rayborn walked out of the office with?
5      **A  I don't recall anything else.**
6      Q  And when you returned from wherever you
7  were back to the office, did you notice if
8  anything else was missing?
9      **A  Yes.**
10     Q  And what was that?
11     **A  The Microsoft Access database**
12 **information that I had given to him personally.**
13     Q  You had personally given him Microsoft
14 Access database when?
15     **A  As I already testified earlier today I**
16 **had given him hard copies, at least, maybe two**
17 **times, maybe three, upon his request so he could**
18 **take the information and put it on to his canvas**
19 **cards.**
20     Q  Well, when was the last time you gave
21 him a copy of it?
22     **A  I -- if I gave you an answer I'd be**

22

1  merely guessing.
2      Q  So you don't know when he last had a
3  copy of it?
4      **A  I can't hear you. What?**
5      Q  You don't know the last time he had a
6  copy of the database; is that correct?
7      MS. CONSOLINO: Object to the form of
8  the question.
9      **A  As I already said, I don't recall the**
10 **last time I gave it to him.**
11     Q  And you don't (indiscernible) how far --
12     **A  It was within -- probably it was in --**
13 **within the last 12 months of his working at The**
14 **Meyer Group.**
15     Q  Okay. So during that entire year, how
16 frequently did you see a copy of that database in
17 his office?
18     **A  I don't -- I don't recall. I didn't --**
19 **sometimes I would see it out because he was**
20 **looking at it, and sometimes, I guess, I didn't**
21 **see it out. But I wasn't going into his office**
22 **looking for it.**

23

1      Q  Ms. McGunnigle didn't report to you that
2  he walked out of the office with it, did she?
3      **A  I don't remember her saying anything**
4  **about it.**
5      Q  And so it's possible it could have been
6  thrown away anytime in the 12 months before he
7  left, isn't it?
8      **A  No.**
9      Q  Why?
10     **A  Because this is the good or the bad part**
11 **about Mr. Rayborn --**
12     Q  Well, Mr. --
13     **A  He's a hoarder.**
14     Q  -- I'm going to stop you. My question
15 is really simple.
16     **A  My answer was simple.**
17     Q  Let me -- it's a document. How many
18 pages is the document, Mr. Meyer?
19     **A  We would have to pull up the Excel**
20 **spreadsheet and count them. I don't know.**
21     Q  Well, it's in the chat. We can look at
22 it.

24

1      **A  Okay.**
2      Q  The version of it, the PDF version of it
3  is Access database 2019-3.
4      **A  Well, I didn't have the Access -- the**
5  **PDF at the time. I only had the Excel, which I**
6  **cannot pull up.**
7      Q  Well, the document -- when you printed
8  it out, did you print it out on 8 1/2 by 11 pages?
9      **A  Yeah, I believe so.**
10     Q  Okay.
11     **A  Legal size.**
12     Q  If you printed out on 8 1/2 by 11 pages,
13 then you would have printed it out --
14     **A  Legal sized.**
15     Q  I'm sorry?
16     **A  It was legal size paper.**
17     Q  So that's 8 1/2 by 14.
18     **A  Okay.**
19     Q  All right. So it did not come out to
20 the 77 pages that you e-mailed to Mr. Goodwin; is
21 that correct?
22     **A  I don't know how Jess formatted it.**

25

1    Q    The PDF version of this document, which
2  you have a copy of -- the PDF version of the
3  document is 77 pages.
4    A    So how is that relevant to what I'm —
5  what you're asking me?
6    Q    Well, I'm about to get there.  So it's
7  likely that the version that -- if it's printed
8  out on 8 1/2 by 14, it would have allowed you to
9  capture more of the columns, and it would be fewer
10 pages.  So did you ever see a document -- let's
11 say it was maybe 30 pages, 8 1/2 by 14, did you
12 see that document?
13   A    I saw the document that I gave
14 Mr. Rayborn in his office.
15   Q    Uh-huh.
16   A    And he had it out, and he was using it.
17 And he —
18   Q    When did you see it, Mr. Meyer?
19   A    It — it was not something that I had to
20 give him routinely because he kept the version,
21 but he didn't —
22   Q    That was not my question.  My question

26

1  again --
2         MS. CONSOLINO:  Let him finish answering
3  the question.  You --
4         MS. CLARK:  That wasn't the question, so
5  I'm asking him to stop talking.
6         COURT REPORTER:  Okay.  I'm --
7         MS. CLARK:  Only answer the question I
8  have asked, please, Mr. Meyer.
9         COURT REPORTER:  I would just ask that
10 we try to take a pause between the question and
11 the answer just so I can get all the testimony.
12 Thank you so much.
13 BY MS. CLARK:
14   Q    When did you see the Access database in
15 Mr. Rayborn's office, Mr. Meyer?
16   A    When I went into his office.
17   Q    In what year?
18   A    All the years when we — when he asked
19 for a copy of it.  I mean, I —
20   Q    Is that --
21   A    I guess to be clear — just let me
22 finish, please, because I need to explain

27

1  something.  Every time I go into Mr. Rayborn's
2  office, I don't have the mission of going to look
3  for the Microsoft Access database.  I would go
4  into his office because I needed to go into his
5  office for a particular reason, but that was never
6  the reason when he was working there.
7         So if you want to ask me how many times
8  I saw it or how long ago did I — did I start
9  seeing it, I'm not going to be very clear on that.
10 But he was given the database at least two or
11 three times as I've already testified in a written
12 form.
13   Q    Okay.  And when is the last time you
14 gave it to him in the written form?
15   A    And as I've already mentioned, because
16 you've asked me this question several times, I
17 don't recall, but certainly within the last year.
18   Q    Okay.
19   A    And that's the last time I'm going to
20 answer that one because you keep asking me.
21   Q    And during the last year of his
22 employment -- when you say last year, you mean

28

1  between January 2018 and January 2019?
2    A    Fair enough.
3    Q    So during that calendar -- that 12-month
4  period, when is the last time you saw him with the
5  database?
6    A    During the 12 months.  I don't remember
7  how many times I went into his office.  And out of
8  those times, I'm not sure how many times I
9  remember seeing the database.  But I can tell you
10 that I saw the database there certainly within the
11 last month or two of his working at The Meyer
12 Group.
13   Q    Okay.  And what was he doing with the
14 database when you saw him -- saw the database in
15 his office?  Was he using it, was it just sitting
16 on his desk, how did you see it, where was it
17 sitting?
18   A    He was just — it was probably just —
19 it was sitting on his desk —
20   Q    It was just sitting —
21   A    — or — or in his office somewhere.
22   Q    In his office.  Okay.  And that's the

29

1  last time you saw the database?
2      **A     In his office.**
3      Q     Earlier we were looking at the Intregal
4  agreement between the Meyer Group and Integral,
5  and I had asked you about the arbitration
6  provision.  You had testified that that is a form
7  provision for your agreements with clients; is
8  that correct?
9      **A     With some of them, yes.**
10     Q     Not all of them?
11     **A     I believe the form changed over time.**
12     Q     So did you remove arbitration from your
13 standard agreements with your clients?
14     **A     Possibly.  I mean, some clients would**
15 **not agree to it, too, by the way.  So as I have**
16 **mentioned several times, that the exclusive**
17 **agreement form not only changed from our side**
18 **where we modified it, but also clients, they would**
19 **also modify it.**
20     Q     Earlier I asked you if you had commenced
21 any action against Integral under that provision.
22 I'm not really sure if you were clear, but my

30

1  understanding is that you have not; is that
2  correct?
3      **A     I did not.**
4      Q     Okay.  Have you commenced any actions
5  against any of the clients that you notified Broad
6  Street or that Mr. -- that you had your attorney
7  notify Broad Street that they were interfering
8  with or inappropriately securing through Jim?
9          MS. CONSOLINO:  Objection.  You can
10 answer.
11     **A     It's -- that's a real long question.**
12 **Did I notify any of the clients of The Meyer Group**
13 **that I was going to take action against him?**
14     Q     I'll restate my question because it's
15 clear you didn't hear me.  My question is:  Have
16 you commenced any actions against any of your
17 former clients that you allege Broad Street and
18 Mr. Rayborn have now, I guess, interfered with
19 since the --
20     **A     No.**
21     Q     -- your allegation?  You have not?  Is
22 that because your agreements with them prohibit

3

1  you from doing so?
2          MS. CONSOLINO:  Object.  Privileged.
3  Instruct the witness not to answer.
4      Q     In the complaint starting at paragraph
5  24 A through D.
6      **A     A through where?**
7      Q     A through D, 24 A through D.  Under that
8  paragraph, there are a number of entities that are
9  identified in the complaint.
10     **A     Okay.**
11     Q     The allegation is that Mr. Rayborn had
12 used confidential information to solicit these
13 individual clients.  Do you see which paragraph --
14 paragraph 24 is on page 5 --
15     **A     Yes.**
16     Q     -- A through D.  It runs all the way
17 through to page 11.  Okay.  Have you commenced any
18 actions against any of those entities?
19     **A     No.**
20     Q     Have you made any effort to attempt to
21 regain those entities as clients?
22     **A     Well, these clients -- I think most of**

32

1  **them signed leases.  There was nothing for me to**
2  **do.**
3      Q     In paragraph 25 you identified Voorthuis
4  Opticians, Incorporated as an entity that you
5  believe Mr. Rayborn used information to secure as
6  a client; is that correct?
7      **A     Which number are you on?**
8      Q     25 on page 13 of the complaint.
9      **A     That Voorthuis was a client of The Meyer**
10 **Group?**
11     Q     Yes.  And you alleged that Mr. Rayborn
12 used confidential information to secure Voorthuis
13 as a client; is that correct?
14     **A     Yes.**
15     Q     Okay.  Did you commence any action
16 against Voorthuis in connection with the
17 transaction that Mr. Rayborn represented them on?
18     **A     No.**
19     Q     Okay.  Have you since spoken to
20 Voorthuis to secure them as a client for any of
21 their other locations?
22     **A     When you say have I -- as you know, Ned**

33

1 is helping me with Meyer Group clients at this
2 stage.  So when you ask if I have personally, the
3 answer is no.  Has Ned?  Maybe, I'm not sure.
4     Q    Mr. Meyer, so let me make sure I
5 understand what's happening now since Mr. Flenner
6 and Mr. Rayborn are departed.  Are there any
7 salespersons that work for The Meyer Group and not
8 under the Cushman & Wakefield agreement?
9     A    Yes.
10    Q    Okay.  And do those individuals work
11 with you as it relates to any of the entities that
12 have been identified in this litigation by your
13 lawyers?
14    A    I don't understand that question.
15    Q    Okay.  In this case your lawyers were
16 asked to give a list of all of The Meyer Group
17 clients.  There's over 400 of them on the list.
18 My question to you is whether any of the
19 individual salespersons who work only for The
20 Meyer Group, not at Cushman & Wakefield, whether
21 they are working with you on transactions for any
22 of those clients?

34

1     A    I am not currently working with the
2 existing agents at The Meyer Group on any
3 transactions.
4     Q    Okay.  Thank you.
5         Mr. Meyer, what is Wiencek & Associates?
6     A    What do you mean what is it?
7     Q    What does the entity do?
8     A    They are an architectural design firm.
9     Q    Are they a tenant client of The Meyer
10 Group?
11    A    Yes and no.  They used to be and then
12 they said they were working with Jim.
13    Q    So they have signed on with Broad
14 Street; is that correct?
15    A    I don't know if they signed on with
16 Broad Street.  They — they just told me in an
17 e-mail that he was working with Jim.
18    Q    Okay.  And did you ask him whether he
19 had any interest in continuing with The Meyer
20 Group?
21    A    Probably.  I don't — I don't — they
22 have a long time left on the lease.  I just

35

1 thought it was kind of weird that they were
2 working with Jim because it really wasn't much of
3 a deal at that point I thought they could do.  You
4 know, The Meyer Group was the group that put them
5 in the space initially.  I worked on the
6 transaction.  I'm a little surprised the were
7 entertaining trying to do something because they
8 are in a contract.
9     Q    Well, tenants can always be presented
10 with opportunities even while they are in a
11 contract; isn't that correct?
12    A    If they want to pay for them, sure.
13    Q    Okay.  It's not uncommon for a landlord
14 to offer a tenant an opportunity to extend their
15 lease in exchange for improvements in the suite;
16 isn't that true?
17    A    That's true but not -- not after they've
18 only been there for four or five years.
19    Q    Well, as a tenant I can tell you that's
20 been offered to me for the last five years.
21    A    Well, the less time you have on your
22 lease, the more able you're -- you're to do things

36

1 with the landlord.
2     Q    And what makes you think that at longer
3 time periods that you couldn't do more with the
4 landlord?
5     A    The more lease liability you have, the
6 less it's easy to be able to work a transaction.
7     Q    It's not just the lease liability.
8 Isn't it true that it also could be how much space
9 you have in the building that could be at issue in
10 terms of the kinds of deals that you go about with
11 (indiscernible)?
12    A    No.
13    Q    You don't --
14    A    I don't -- I don't think so.
15    Q    Okay.
16    A    But, you know, Jim's famous for offering
17 people the sun and the moon, and that's what got
18 me in trouble a lot of times because it's -- it's
19 a math question.  You have a contract which states
20 here's how much rent is owed through the term, and
21 you want to take less space or you want to try to
22 extend.  There has to be a good value for both

---

37

1  sides, not just one.  I don't know when your lease
2  is up.  Maybe I should look at it.
3      Q  I'm fine with my broker.  Thank you.
4      A  Hopefully it's not Jim —
5      Q  Well, I usually (indiscernible) not the
6  broker.
7      A  -- or you'll be paying double.
8          MS. CLARK:  Mr. Greenberg, could you
9  please drop into the chat the -- I think the
10 amended notice to this deposition, please?
11         Are you having some trouble with that,
12 Jeremy?
13         MR. GREENBERG:  Yeah, I am.  Hold on one
14 second.  Sorry.  You mean the one that is just for
15 today's date, or are you referring to the Broad
16 Street amended notice of deposition?
17         MS. CLARK:  Yeah, that's true.  Yeah,
18 could you -- it's the amended notice of deposition
19 that went to Broad Street, correct.
20         MR. GREENBERG:  Okay.  Thank you.
21         MS. CONSOLINO:  I have to admit I was
22 wondering what questions you were possibly going

---

38

1  to ask Mr. Meyer about his own deposition notice.
2          MS. CLARK:  Okay.  It s there now.  It s
3  the first document under the court reporter s
4  phone number.
5          THE WITNESS:  Yep, I got it.  I m
6  pulling it up.
7          MS. CONSOLINO:  Bill, once there is no
8  longer a question pending, if you need to take a
9  break, just let Ms. Clark know.
10         THE WITNESS:  Yeah, maybe in ten minutes
11 or so.
12     A  Okay.  What would you like me to do with
13 this document?
14         (Exhibit 10 marked for identification
15 and attached to the transcript.)
16 BY MS. CLARK:
17     Q  Yeah, this is a document that was sent
18 by your counsel to Ms. Hornfeck s firm on behalf
19 of -- to conduct the 30(b)(6) deposition.  At the
20 end of this document is a Schedule A, and my
21 question to you has to do with these entities on
22 the Schedule A.

---

39

1          After all of the discovery that's been
2  conducted in this case, can you tell me whether
3  the focus on these entities means that you are
4  seeking damages as it relates to these entities?
5          MS. CONSOLINO:  Object to the form of
6  the question.  You can answer if you understand.
7      A  Yes, if any -- if any of these
8  transactions come to fruition, I will be seeking
9  damages.
10     Q  All right.  Did you have exclusives for
11 all of these entities?
12     A  I had exclusives for a lot of them.  I
13 don't know if it was for every one, but we, I
14 believe, produced documents to you of what we had.
15     Q  Okay.  So with regard to the ones that
16 you didn't have exclusives, can you tell me what
17 the basis for seeking damages would be?
18         MS. CONSOLINO:  Object to the form of
19 the question.  If you understand, you can answer.
20     A  All of these clients were cultivated and
21 worked on by Jim and myself at The Meyer Group.
22 So I had felt that was confidential information

---

40

1  that he had, obviously, on his index cards that he
2  rolled out the door with.  And the only reason he
3  even knows about them is because he had the index
4  cards; otherwise there would be no way for him to
5  recall or know who to call.
6      Q  Okay.  So let me make sure I understand.
7  The Meyer Group did not have exclusives for every
8  single entity on the Schedule A.  The basis of the
9  claim is that you and Mr. Rayborn cultivated these
10 entities as clients for The Meyer Group?
11         MS. CONSOLINO:  Object to the form of
12 the question.
13         MS. CLARK:  I didn't state a question.
14 I'm recounting what I think I have just heard.
15     Q  So the first thing I think I heard is
16 that The Meyer Group does not have exclusives for
17 all of the entities on the Schedule A.  Is that
18 correct, Mr. Meyer?
19         MS. CONSOLINO:  Objection to the form of
20 the question.
21     A  I believe we do not have exclusives for
22 everybody.

---

4

1     Q    That second thing I thought I heard you
2 just say is that you and Mr. Rayborn cultivated
3 these clients while Mr. Rayborn was at The Meyer
4 Group; is that correct?
5     A    Yes.
6     Q    The next thing I thought I heard you say
7 is that Mr. Rayborn had confidential information
8 on his cards about the entities on the Schedule A;
9 is that correct?
10    A    Yes.
11    Q    And that Mr. Rayborn took those cards
12 regarding these entities and the confidential
13 information on those cards, he took those with him
14 when he left in January of 2019. Is that what you
15 are also testifying?
16    A    Well, he took those plus thousands more.
17    Q    Well, I understand he may have taken
18 thousands more, but with regard to this case, I
19 just want to make sure I understand. The damages
20 you are seeking are related to these entities and
21 any transactions that occurred; is that correct?
22         MS. CONSOLINO: Objection to the form of

42

1 the question. You can answer if you understand.
2     A    Well, there's these plus more. There's
3 ones that he's currently working on that may or
4 may not be clients of The Meyer Group. I believe
5 that as things progress we will be updated on
6 those transactions. But this list are [sic] Meyer
7 Group clients that we were either trying to
8 develop relationships with or had exclusives with,
9 and they were all on Jim's cards.
10    Q    Okay. When you say that there are
11 others, do you mean others that were identified
12 during depositions of Broad Street salespersons
13 where they indicated that maybe there had been no
14 deal yet, but there had been discussions; is that
15 what you mean?
16    A    Yes. Due to the confidentiality
17 requirements that were provided, I have -- there
18 has not been a lot of documents regarding Broad
19 Street transactions. As a matter of fact, I don't
20 think there's been any documents of Broad Street
21 transactions that I've been -- really seen or made
22 aware of. I'm basically counting on counsel to

43

1 kind of go through those with you all because I
2 was told I'm not allowed to see anything.
3     Q    The Schedule A here -- I just have, I
4 think, only one other question, that I have. To
5 the extent that you had an exclusive that would
6 allow you to pursue these clients if they entered
7 into an agreement with another broker, have you
8 done so?
9     A    I didn't understand your -- can you --
10 I'm sorry.
11    Q    I'll restate it. I'm not trying to
12 trick you. Have you commenced any action, whether
13 it's an arbitration, an action in Superior Court
14 in D.C., or in a state court, or in federal court
15 against any of these entities that are on Schedule
16 A?
17    A    No, as I already testified.
18         MS. CLARK: Jeremy, can you drop that
19 deposition into the chat, please? Probably do the
20 condensed because it might be smaller -- small
21 enough.
22         THE WITNESS: Are we done with the one

44

1 you showed me?
2         MS. CLARK: Yeah, you can close that
3 document.
4         (Whereupon, a discussion was held off
5 the record.)
6     Q    Okay. There is a document that we just
7 put into the chat. It's a deposition, Mr. Meyer,
8 from October 2020.
9         (Exhibit 11 marked for identification
10 and attached to the transcript.)
11    A    Okay.
12    Q    Are you able to open it up?
13    A    Yep.
14    Q    Okay. Great. I just have a couple
15 questions about this. Do you recall that we had
16 this deposition last October?
17    A    Who could forget? I remember.
18    Q    Thank you. If you could confirm for me,
19 your attorney at the time was Howard Hoffman; is
20 that correct?
21    A    Yes.
22    Q    Okay. And if you could scroll to -- I

45

1  know this is the condensed version of that
2  document, so I'm just trying to make sure.
3        MS. CONSOLINO: The version I'm looking
4  at is the full, not the condensed.
5        MS. CLARK: Is it? Okay.
6     Q   But if you have got the full, if you
7  don't mind just scrolling to --
8     **A   Mine says 43 pages.**
9     Q   You've got the full?
10       MR. GREENBERG: Denise, I apologize, I
11  may have misunderstood your instruction. Were you
12  referring -- did you want them to see the one that
13  had the selective pages?
14       MS. CLARK: No, I do not. I just wanted
15  him to have a full version of his document,
16  whether it's the condensed version, you know,
17  where they try to put four pages on a page.
18       MR. GREENBERG: My apologies, let me get
19  that in there.
20       MS. CLARK: Thank you. So, Court
21  Reporter, the one that's currently in the chat, I
22  guess -- or that you have in the chat is not an

46

1  exhibit. The full size is now in the chat.
2     **A   Okay. I have it.**
3  **BY MS. CLARK:**
4     Q   Great.
5     **A   And I remember it.**
6     Q   Once you get it open, if you could just
7  scroll down to page 180.
8        MS. CONSOLINO: If you could give me a
9  minute, it's downloading for me, too.
10       MS. CLARK: Yeah, okay. Let me know
11  when you got it, and then --
12       THE WITNESS: Is there a quick way to
13  get to that page?
14       MS. CLARK: Probably not.
15       THE WITNESS: You have to use your
16  fingers and just keep pushing?
17       MS. CLARK: Yeah.
18       THE WITNESS: I'll be here forever.
19    **A   180 what?**
20  **BY MS. CLARK:**
21    Q   Just 180.
22    **A   Page 180, I'm here.**

47

1     Q   Okay. Great. All right. So,
2  Mr. Meyer, this is the transcript of your
3  deposition on October 14th, 2020. It was a
4  deposition, and you can see, if you want to go
5  back to the first page, which you certainly can
6  do, you took this deposition under oath.
7        On page 80 [sic], I just want to direct
8  your attention to the fact that --
9     **A   I have to go to page 80 now or -- I'm on**
10 **180.**
11    Q   180, I'm sorry. 180, sorry. On page
12  180 after Mr. Hoffman says nothing further, and I
13  say okay, Mr. Hoffman said, we'll read and sign.
14  Do you recall reading and signing this deposition
15  after October 14th, 2020?
16    **A   I'm sure -- aren't I required to sign**
17 **it?**
18    Q   No, you don't have to sign it.
19    **A   Because I don't -- I don't remember -- I**
20 **don't remember signing it. I remember reading it.**
21    Q   Yeah, okay. And the next page, 181, is
22  an acknowledgment of the deponent. It is neither

48

1  dated nor signed, but you do remember reading it?
2     **A   Yes.**
3     Q   Okay. And if you had changes, did you
4  let your attorney know that you had changes?
5        MS. CONSOLINO: Object. Instruct the
6  witness not to answer on grounds of privilege.
7        MS. CLARK: I'm not asking what changes
8  that he gave to his attorney. I'm just asking if
9  he informed his attorney that he had changes.
10       MS. CONSOLINO: There's a way you can
11  ask that question without asking what he informed
12  Mr. Hoffman.
13    Q   Mr. Meyer, did you have changes to this
14  deposition?
15    **A   I spoke with my attorney about --**
16       MS. CONSOLINO: No. Hey, don't tell
17  them what you talked about with your attorney.
18  Come on.
19    **A   I'm not answering.**
20    Q   I didn't ask what you told your
21  attorney. I asked if you had changes to this
22  deposition?

49

1     A   I'm not answering.
2     Q   You have got to answer that question.
3         THE WITNESS:  Serine, do I need to
4  answer that question?
5         MS. CONSOLINO:  If you can answer the
6  question without divulging the conversations that
7  you had with Mr. Hoffman, then you must answer.
8     A   So when you're asking if I had changes
9  to the deposition --
10    Q   Uh-huh.
11    A   -- is that -- are you referring -- did I
12 have any questions or anything like that?
13    Q   No, did you have any changes to your
14 testimony that's in this document?
15    A   I don't -- I don't remember.
16    Q   Okay.  I can represent to you today that
17 we called the court reporter's office.  They have
18 no record of a signed errata sheet from you.
19    A   Okay.
20    Q   Okay.  So if that is the case, if they
21 don't have a record, does that mean that you did
22 not turn in an errata sheet?

50

1     A   I would've been surprised if we hadn't
2  turned in an errata sheet.
3     Q   They have no record of it.
4     A   Okay.
5     Q   And did you, yourself, personally give
6  an errata sheet to someone?
7     A   Well, I wouldn't have prepared the
8  errata sheet.
9     Q   Well, it's a form that would have come
10 with a copy of the document.
11    A   Okay.  But that would've been something
12 -- if I had done it, that I would've discussed
13 with my lawyer.
14    Q   Mr. Meyer, do you stand by your
15 testimony on October 14th, 2020?
16        MS. CONSOLINO:  Object to the form of
17 the question.
18    A   I think the majority of my testimony is
19 true and accurate.  I'd -- I'd have to go back and
20 reread the whole deposition if I had any issues.
21 It's been almost a year.
22    Q   Well, if you read and signed it in the

5

1  timely fashion in 2020 and completed an errata
2  sheet that you -- do you believe you gave that
3  errata sheet to the court reporting service or to
4  your attorney?
5     A   Well, I didn't sign it.  You just told
6  me I didn't sign it.
7     Q   I said -- I know you didn't sign the
8  document here, but you think that you -- you said
9  you would be surprised if no errata sheet was sent
10 in.  That was your testimony.
11    A   I mean, this is stuff that the lawyers
12 do.  I'm not -- you know, I -- I don't --
13    Q   Attorneys only do what their clients ask
14 them to do.  So do you remember having Mr. Hoffman
15 complete an errata sheet for this deposition?
16    A   I -- I told you I don't remember.
17    Q   Very good.  And for this deposition you
18 had two counsel on page 3 here.  Mr. Hoffman and
19 Mr. Liew, both with the Hoffman Employment Law
20 Group.  And on page 5 of this deposition it says
21 that William Meyer, being first duly sworn and
22 affirmed to testify to the truth, the whole truth,

52

1  and nothing but the truth, was examined and
2  testified as follows.  And then our Q&A begins.
3  So you see here on page 5 that you were sworn in
4  to testify that day, correct?
5     A   Yes.
6     Q   And your testimony is under oath,
7  correct?
8     A   Yes.
9     Q   All right.
10        THE WITNESS:  Can we take a break?
11        MS. CLARK:  Yeah, I was going to just
12 say, why don t we take a five-minute break?  Is
13 that enough time for you, Mr. Meyer?
14        THE WITNESS:  Yeah.
15        MS. CLARK:  Okay.  Because I don t think
16 I have very many questions.
17        THE WITNESS:  Five is all I need.
18        MS. CLARK:  Okay.  Great.
19        (Whereupon, a recess was had.)
20 BY MS. CLARK:
21    Q   Mr. Meyer, I just want to confirm one
22 thing and then Ms. Hornfeck can go forward.  Today

53

during your testimony at different times you have
2  said that you have not    I want to make sure I
3  heard you correctly  You have not been provided
4  any of the cards that have been produced by the
5  defendants in this case?
6      A  I haven't seen anything.
7      Q  Any of the cards?  Okay
8      A  Nothing.
9          MS  CLARK: All right  I have no
0  further questions at this point
           MS  HORNFECK:  Thank you
2  EXAMINATION BY COUNSEL FOR THE DEFENDANT, BROAD
3                  STREET
4  BY MS  HORNFECK:
5      Q  Hi, Mr  Meyer  How are you?
16     A  Finally we meet.
7      Q  We get to talk  I know we have seen
8  each other through many depositions  How are you
9  doing?
20     A  Good.  Hold on.  I'm trying to put you
21 up here on the screen.  Well, that was a chat.  I
22 don't need to chat with you.  There we go.  Are

54

1  those real flowers in the background because I see
2  the same ones all the time?
3      Q  That's a background screen.
4      A  Oh.
5      Q  My older son's bedroom.  You don't
6  really want to see what it looks like, so -- he's
7  in college, so it's kind of a mess.
8          I just have some questions for you.
9  Hopefully it won't be too long.  I think -- I'm
10 guessing about an hour.  So hopefully that still
11 works for your schedule.
12         You had testified earlier about the
13 independent contractor agreement that you had with
14 Mr. Rayborn in 2018.  And in that document you
15 have language that references -- I can find it.
16     A  I clicked something here.
17     Q  It's Exhibit 2 if you want to look at
18 it.  I'm just going to ask you about it because I
19 think there are things you know.  So if you feel
20 like you need to reference it, it is Exhibit 2
21 that Ms. Clark used.
22         In paragraph 6A it references canvas

55

1  cards.  We have talked about index cards, we have
2  talked about canvas cards.  I just want to make
3  sure when we are talking about index cards and
4  canvas cards, are we talking about the same thing?
5      A  Yes.
6      Q  What is a canvas card?
7          MS. CONSOLINO:  Object to form.
8      A  Versus what is an index card?
9      Q  Yeah, what do you understand a canvas
10 card to mean?  I'm just trying to understand the
11 concept or context of the word canvas in terms of
12 this document, the 2018 independent contractor
13 agreement that you had with Mr. Rayborn?
14         MS. CONSOLINO:  Object to form.
15     Q  What do you understand a canvas card to
16 be?
17         MS. CONSOLINO:  Object to form.
18     A  This was actually a term that, I
19 believe, Mr. Rayborn used.  These were the index
20 cards in his office that he used to keep track of
21 clients, prospective clients, and it was his
22 information base that he cultivated during the

56

1  time of his (indiscernible) so that he could
2  solicit business.
3      Q  So it's a card that he would use to
4  gather information or canvass for information?
5  And I'm just trying to understand what canvas card
6  means because it just -- something he's using to
7  write down information he gets from a client that
8  he calls on the telephone; is that correct?
9          MS. CONSOLINO:  Objection to the form of
10 the question.
11     A  The -- the -- the canvas cards/index
12 cards are the foundation of what he used to
13 cultivate his business relationships on behalf of
14 The Meyer Group.  So as we've gone through lots of
15 testimony, there's very proprietary confidential
16 information on those cards that certainly Jim
17 wouldn't want anybody else to get, nor would I
18 want anybody outside the Meyer Group to have
19 access either.
20         The information on the cards includes a
21 lot of what Jim had used from the Microsoft Access
22 database.  The name of the tenant, how many square

57

1 feet, what -- what are they paying in rent, when's
2 their lease -- most importantly, when does their
3 lease expire, when -- you know, termination option
4 language, if there is any, any special notes --
5 client - call the client after 8:00 o'clock, they
6 don't like it in the morning, you know, just
7 whatever notes Jim felt were relevant for him when
8 he was doing his marketing, and cold calling, and
9 follow-up. Jim did a lot of marketing, too. So
10 he would call existing clients, and that's his way
11 of staying in touch.
12 Q Did anyone else at The Meyer Group at
13 any time use these canvas cards?
14 MS. CONSOLINO: Object to form.
15 A Jim would go down the hall and give
16 cards to me, or he'd give cards, perhaps, to other
17 agents in the office if he was feeling like there
18 was -- they would have a better success in getting
19 a hold of somebody than -- than perhaps he was.
20 Other agents in the office did not use the canvas
21 card system. Jim was primarily the one that --
22 that used it. So if they had canvas cards in

58

1 their office, it generally came from Jim.
2 Q You had testified earlier that Jess
3 McGunnigle was primarily the person who entered
4 information about clients into the Access
5 database; is that correct?
6 A Yes.
7 Q Where would she get the information that
8 she entered into the database?
9 A When we are putting together invoices,
10 for example, that would be a good start. So if
11 we've completed a deal -- and she oftentimes
12 helped putting invoices together.
13 Q So would she get the information from a
14 signed lease? Where would she get the
15 information, from what documents?
16 A I mean, the invoice had a lot of the
17 information you needed. You didn't have to go
18 through a hundred-page lease to -- to pull it.
19 Q Who put together the invoices?
20 A Jess and myself or --
21 Q Where would you --
22 A -- primarily Jess and myself.

59

1 Q Where would you or she get the
2 information to generate an invoice?
3 A Once the lease is completed, we would
4 work on a worksheet to calculate the -- we get
5 paid based on the aggregate lease value. So we'd
6 have to put together a worksheet on what the
7 aggregate lease value is so we can determine what
8 to bill for commission.
9 Q So once you invoiced a customer, was
10 there a practice or protocol to have every client
11 for which you sent an invoice to the landlord to
12 then be entered into the database?
13 A I'm kind of glad you corrected yourself.
14 Because the landlord is not our customer, the
15 tenant is, but even though we get paid by the
16 landlord or the landlord's listing broker.
17 So if we generated an invoice we would
18 -- hopefully, but it always didn't happen, we
19 would enter that information into the database
20 because it had most of the relevant information on
21 it. How many square feet, the aggregate lease
22 value, when the lease starts and ends, those kinds

60

1 of things.
2 Q So you had testified earlier that a
3 blank canvas card has confidential information on
4 it. Did I hear you correctly?
5 A I said that it's a work product of.
6 The Meyer Group and therefore it's confidential,
7 and that's what Jim's agreement said.
8 Q I'm not asking you to give me a legal
9 interpretation of the provision. I'm asking you
10 about the card itself, the canvas card, which is a
11 preprinted form. I'm asking to make sure I
12 understood you correctly earlier that you
13 testified that the preprinted canvas card contains
14 confidential information; is that correct?
15 MS. CONSOLINO: Object to form.
16 A Yes.
17 THE WITNESS: Go ahead, Denise -- or
18 Serine.
19 MS. HORNFECK: They look so much alike.
20 Q I am going to drop an example card into
21 the chat that is not blank because I don't believe
22 I have seen a blank one. But this is just an

---

**6**

1   example. Let me see if I can do this. Can you
2   open up the attachment that says NENA card?
3       A   It says direct message from Lane. Does
4   anybody else see it? It's coming from you.
5       Q   Yeah, so it should say NENA card to
6   everyone?
7       A   Do I hit file or something? Am I --
8       Q   You should just be able to click it and
9   open it.
10      A   This is a different than what I was --
11  been getting when Jeremy was sending them in. So
12  I can't --
13      MS. HORNFECK: Can everyone else open
14  it?
15      THE WITNESS: I can't.
16      COURT REPORTER: I can see it. Are you
17  looking in the chat?
18      MS. HORNFECK: Uh-huh.
19      THE WITNESS: Yes.
20      MS. HORNFECK: I'll do file --
21      THE WITNESS: Oh, wait a minute. I got
22  one.

**62**

1       MS. HORNFECK: Okay.
2       THE WITNESS: It came -- it said
3   downloaded. Okay.
4       MS. HORNFECK: This should be, I guess,
5   Exhibit 12. I'm not sure if we made the
6   deposition that was provided earlier, just the
7   second one, the full-size Exhibit 11, so this will
8   be Exhibit 12.
9       (Exhibit 12 marked for identification
10  and attached to the transcript.)
11  BY MS. HORNFECK:
12      Q   This is the NENA card. I'm not going to
13  ask you about the handwritten notes on it. I'm
14  just asking about the preprinted words including
15  date, building, company, contact, title, phone,
16  square foot, and expiration date, and I think
17  title is preprinted as well.
18      Is it your position that these words in
19  this format is confidential?
20      MS. CONSOLINO: Object to form. You can
21  answer.
22      A   This is a form -- this is a Meyer Group

**63**

1   form. Any forms of The Meyer Group are
2   confidential. I've -- I mean, Ms. Clark asked me
3   20 ways to Sunday on this. I'm not sure what
4   she's -- I keep answering the question, and it's
5   being asked and asked and [sic] over again.
6       Q   So I'm just trying to understand. So
7   your position is the form itself blank is
8   confidential, yes or no?
9       A   It's Meyer Group work product, yes.
10      Q   And is this form with the logo at the
11  bottom that says Corporate Real Estate Services,
12  The Meyer Group Limited, is that the reference you
13  made earlier about The Meyer Group's name on the
14  index or canvas card?
15      A   That's the reference that I made that
16  it's property of The Meyer Group.
17      Q   How did it come about that you printed
18  these cards?
19      A   I don't understand your question.
20      Q   Did someone ask you to print the cards?
21      A   Yes, Jim.
22      Q   So Jim asked you to make or have canvas

**64**

1   cards made for him?
2       A   Yeah, he needed cards to use for
3   canvassing.
4       Q   So if he used a notepad of his own and
5   wrote down similar information, would you consider
6   that to be the property of the Meyer Group?
7       A   Yes, but he didn't.
8       Q   Because he asked for these cards to be
9   preprinted?
10      A   The cards were his notepad.
11      Q   They were like a notepad?
12      A   And there's been testimony, I think,
13  from several people that he -- he used them as
14  scratch paper as well because he was too lazy to
15  use a notepad.
16      Q   And now I'm looking at the content on
17  the card. Do you believe the name Brian Fontes is
18  confidential?
19      A   I believe everything on the card is
20  confidential.
21      Q   So if NENA has a website and it
22  identifies Brian Fontes as the CEO and provides

65

1  his number, would you still consider this
2  information confidential?
3       MS. CONSOLINO: Object to form. You can
4  answer.
5       A   Yes because it's on Meyer Group -- what
6  he -- what someone can find independently on the
7  Internet is different than what they can find on
8  Meyer Group property in my office.
9       Q   So if this information is available on
10 their website and in CoStar, do you still consider
11 this information to be confidential?
12      MS. CONSOLINO: Object to form. You can
13 answer.
14      A   CoStar doesn't have this information.
15 And I don't know why yesterday Mr. Jacoby
16 referenced that it did because he's completely
17 wrong. CoStar does not carry information on this.
18      Q   Do you have a CoStar account for
19 The Meyer Group?
20      A   No.
21      Q   Do you have a CoStar account for
22 yourself, individually?

66

1       A   No.
2       Q   Who at TMG has a CoStar account?
3       A   Nobody.
4       Q   So what is your -- have you ever had a
5  CoStar account, either The Meyer Group or yourself
6  personally?
7       A   Yes, the company had one. Just so we
8  don't have to do 20 questions on this, the --
9  CoStar works as a subscription for the company,
10 okay. And then everybody in the company gets
11 their own, I guess, account --
12      Q   Under the account name.
13      A   -- and I keep saying this the entire
14 deposition. It's very similar. And so I can't
15 exclude an agent from having it because they won't
16 let me. They make me buy it for everybody, and
17 the fee goes up based on how many users.
18      Q   So you had, at some point, a CoStar
19 account with --
20      A   I had it -- I had it -- I had it for
21 eons. But then when the pandemic came and this
22 and that, I got rid of it because, you know, it

67

1  was too expensive. And because I'm working with
2  -- with Ned, I use their CoStar if we need it.
3       Q   When is the last time you logged into
4  CoStar?
5       A   Pardon me?
6       Q   When is the last time you logged into
7  CoStar?
8       A   I think the better question is when did
9  I get rid of it because I -- I don't -- even when
10 I had it, I didn't use it very much. So it's
11 probably been over a year, maybe. Maybe less than
12 a year, I don't know.
13      Q   So would you have someone else log into
14 Costar when you needed information about a tenant?
15      A   We don't use CoStar for information
16 about a tenant. That's the -- that's the tug
17 here.
18      Q   What did you use it for?
19      A   As I testified earlier today, the
20 foundation of CoStar is to find available office
21 space. It's similar to an MLS system. It's not
22 used primarily to use as a marketing or canvassing

68

1  method to find clients.
2       Q   Is that your purpose or use of it, or is
3  that your understanding that all people use CoStar
4  just to find property, not potential clients?
5       A   If you solely use CoStar as an agent for
6  marketing purposes to find tenants, you would
7  quickly fail and go broke. The reason you hire
8  CoStar and subscribe to it is for -- to find
9  available office space.
10      Q   I dropped in the chat the NENA CoStar
11 report which has been produced in this case. Can
12 you see that?
13      A   Yeah. I'm trying to download it.
14      COURT REPORTER: Will this be Exhibit
15 13, Ms. Hornfeck?
16      MS. HORNFECK: Yes, please. Thank you.
17      COURT REPORTER: Thank you.
18      (Exhibit 13 marked for identification
19 and attached to the transcript.)
20      A   Is there a date on here?
21      Q   It is on the bottom of the page when it
22 was printed, but there's also -- if you just take

69

1  your time and look at it, it shows you when it was
2  last updated in terms of research and other
3  things.  I'm just saving this into the --
4        MS. CONSOLINO:  Ms. Hornfeck, you
5  described it as the Nena CoStar report.  Can you
6  clarify if this is Broad Street's internal
7  document?
8        MS. HORNFECK:  No, it's the report from
9  CoStar.  It was printed from CoStar.  Look at the
10  bottom of the document.
11    **A    Okay.  When was the transaction that Jim**
12  **did with NENA completed?**
13    Q    I'm not answering questions right now,
14  but thank you very much.  I am looking at this
15  document, I'm asking you to take a look at it, and
16  the research update, it says 7-10-2019.  Do you
17  see that?  It's right above the second straight
18  gray line.  It says, contact, title, and phone.
19  It's on the left.
20    **A    Okay.**
21    Q    It says first verified on the right,
22  9-26-2003.

70

1    **A    Got it.**
2    Q    And do you see it has contact
3  information?
4    **A    I see the whole thing.**
5    Q    Yeah, so there's contact information in
6  the upper right corner.  You had testified earlier
7  that you thought CoStar only had information --
8  contact information for landlords.  Did I hear you
9  correctly?  Is that what you testified to before?
10    **A    No.  No, you did not hear me correctly.**
11    Q    So do you know if this contact
12  information is for NENA or for the landlord?
13    **A    The landlords don't typically need this.**
14  **They -- they already know who their tenants are,**
15  **so this would probably be, and I'm merely**
16  **guessing, that it came from CoStar tenants.**
17    Q    And it's okay if you don't know.  I'm
18  just asking if you happen to know if this phone
19  numbers on here --
20    **A    I mean, I'm just looking --**
21    Q    -- let me finish my question.  I'm just
22  asking if you know if the phone number on here in

7

1  the upper right corner as well as in the contact
2  information bar close to the center, if that
3  number, (202)466-4911, if that's the number of
4  NENA, National Emergency Number Association?
5    **A    I don't know.**
6    Q    And do you know if Brian Fontes is the
7  CEO or --
8    **A    Yes.**
9    Q    -- chief executive officer of NENA?
10    **A    Yes.**
11    Q    And do you see where it says lease
12  expiration date?
13    **A    Yes.**
14    Q    And also when the lease began?
15    **A    Yes.**
16    Q    So did you not know before right now
17  that CoStar, for some tenants, has information
18  about the lease expiration date?
19        MS. CONSOLINO:  Object to form.  And I'm
20  also objecting to any characterizations that
21  Ms. Hornfeck has made about what this document
22  purports to be.

72

1        MS. HORNFECK:  Ms. Consolino, I can
2  count how many times you have directed me not to
3  make a speaking objection.  Please refrain from
4  it, or we will get the judge involved.  Objection,
5  form is all you need to say.
6  BY MS. HORNFECK:
7    Q    You can answer, Mr. Meyer.
8    **A    Would you be kind enough to repeat?**
9    Q    Did you know before right now when you
10  looked at this document that for some tenants
11  there is lease expiration date included in CoStar?
12        MS. CONSOLINO:  Object to form.  You can
13  answer.
14    **A    Yes.  However, generally the information**
15  **in there is a very -- it's -- it's incorrect.  So**
16  **I don't know the validity of the information that**
17  **you are showing me.  But -- well, for example, I**
18  **think on Jim's canvas card it said 5,800 feet, and**
19  **here it says 6,093.**
20  **So there's a lot of misinformation on**
21  **CoStar about tenants or there's no information on**
22  **CoStar about tenants.  A name and a phone number,**

73

1 if that's correct, that -- you're doing well.
2      Q    I am going to share my screen with you.
3  Do you see the NENA.org website?
4      A    Yes.
5      Q    Do you see it lists Brian Fontes as its
6  CEO?
7      A    Yes.
8      Q    Do you see that it lists its address and
9  phone number?
10     A    Yes.
11     Q    Do you believe this is public
12 information, or do you believe this information is
13 confidential?
14         MS. CONSOLINO: Object to the form of
15 the question.
16     A    I think that some people choose to put
17 their phone number on their websites, others may
18 not. Some people choose to put their phone
19 numbers on their e-mail and choose not, but pieces
20 of public information don't disqualify something
21 from being confidential.
22     Q    So what is the basis of your

74

1  understanding that information that is taken from
2  public sources can be made confidential by putting
3  it on your canvas card?
4      A    If Jim didn't have the canvas cards
5  there would be no way for him to recall or
6  remember the clients of The Meyer Group and the
7  terms of who to call, what their phone, when their
8  lease expires, how many square feet they have.
9  There would be no way for him to do it. And he
10 would have to recreate, in whatever way he could
11 do it, all of The Meyer Group clients. Go out and
12 reget [sic] their phone numbers, which we know he
13 didn't do, and start piecing together all the
14 information that he has cultivated in my office at
15 The Meyer Group for the last 20, 30 years.
16     Q    Let me ask the question again. What is
17 the basis for your understanding that taking
18 information from public sources and putting it on
19 your canvas card makes it confidential?
20         MS. CONSOLINO: Object to form.
21     A    I thought I just answered that, I'm
22 sorry.

75

1      Q    I don't believe you did. You told me
2  about what you think Jim could or couldn't do.
3  I'm asking you, what is your understanding and
4  basis for your position that taking information
5  from public sources and writing it onto your
6  canvas card makes it confidential?
7      A    That's the basis. That's what his
8  contract said. That's what -- that's --
9      Q    Okay. Okay. You're saying it's the
10 contract. It's the interpretation -- your
11 interpretation of what his contracts says --
12     A    Any -- anything he did --
13     Q    -- let me finish -- that was signed in
14 2018. I just wanted make sure I understand. I'm
15 trying to make sure I understand it. So your
16 statement is that the basis for your position that
17 information that is obtained from public sources
18 and written onto a canvas card is confidential is
19 the language in your contract with Mr. Rayborn in
20 2018; is that correct?
21         MS. CONSOLINO: I'm going to object to
22 the form of the question and --

76

1          MS. HORNFECK: Just don t make a
2  speaking objection.
3          MS. CONSOLINO: I m not making a
4  speaking objection. My objections have been
5  solely limited to form objections and objections
6  about the documents that you were presenting. So
7  I want to make sure the record is clear about what
8  documents you are actually showing versus what
9  documents --
10         MS. HORNFECK: Ms. Consolino, I m not
11 presenting a document. I m asking a question.
12         MS. CONSOLINO: I m just --
13         MS. HORNFECK: So please stop telling
14 your -- directing your client to ask for an
15 argument. I m asking a question. Stop making
16 speaking objections, or we are going to get the
17 judge involved. You raked me over coals for every
18 single question I asked telling me I made a
19 speaking objection. When I said the word
20 speculative when you started a question with the
21 word hypothetically, that makes it speculative.
22 Please limit your objections to appropriate

**77**

1 objections.
2 BY MS. HORNFECK:
3    Q   So let me ask again, Mr. Meyer, can you
4 please answer the question?  What is your basis or
5 is your basis that information taken from public
6 sources and written onto a canvas card is rendered
7 confidential by the language in the 2018
8 independent contractor agreement with Mr. Rayborn;
9 is that correct?
10      MS. CONSOLINO:  I'm going object to the
11 form of the question.  You can answer.
12    A   **Anything cultivated under the roof of**
13 **The Meyer Group is confidential.**
14    Q   I'm going to ask you to look at your
15 screen.  Do you see right now CoStar.com?
16    A   **Yes.**
17    Q   Do you see this tab, tenants?  Have you
18 ever -- when you used CoStar, did you ever go into
19 this tab?
20    A   **No, very rarely.**
21    Q   So can you read what this says for me,
22 please, out loud for the record, please?

**78**

1    A   **Access 7.3 million tenant profiles,**
2 **including key contacts, space occupied, and much**
3 **more.  Identify the right prospects for your space**
4 **or find new clients.**
5    Q   I'm assuming based on the way you have
6 testified that you have never used CoStar for that
7 purpose; is that correct?  To find new tenants and
8 find new clients?
9    A   **That wasn't typically my role.  I**
10 **would -- if I used CoStar tenant it would be just**
11 **to maybe look up somebody if we were going to have**
12 **a meeting, maybe there would be some info on**
13 **there.  But as I mentioned before -- and -- and by**
14 **the way, I appreciate you giving me the little**
15 **picture of the marketing gig from CoStar, but**
16 **it's -- it's really false.  The -- if you go**
17 **through CoStar, there is very few -- there is a**
18 **very few [sic] information about clients.  I have**
19 **directed everybody in my office, as I testified**
20 **before, not to talk to CoStar.  So if you look at**
21 **Meyer Group clients through CoStar I think you'll**
22 **see very clearly that there's really not a lot of**

**79**

1 **information about them.  That said, I don't know**
2 **who the 7.3 million tenants are.  I'm kind of**
3 **laughing.  It sounds to me like I'd want to sign**
4 **up based on that.  Wow, 7.3 million tenants, I**
5 **better sign up quick, look at all the deals I can**
6 **get, which is false.  And I think if you have**
7 **access to CoStar then you can probably find out**
8 **for yourself.  I don't.**
9    Q   How do you know in 2018 that Mr. Rayborn
10 was looking to leave The Meyer Group?
11      MS. CONSOLINO:  Objection to form.
12    A   **I'm sorry, what in '18 about Jim**
13 **leaving?**
14    Q   How did you know in 2018 that
15 Mr. Rayborn was looking to leave The Meyer Group?
16    A   **I think Mr. Rayborn was looking to leave**
17 **The Meyer Group for a long time.  I don't know**
18 **about '18.  I fired him, I believe, in '18.**
19    Q   Were you ever aware in either 2018 --
20 late 2018 or early 2019 that Mr. Rayborn was
21 looking to leave The Meyer Group?
22    A   **Yes.  As I said, I think he was always**

**80**

1 threatening to leave.
2    Q   So are you saying he verbalized to you,
3 either in person, or through an e-mail, or on the
4 phone, that he was looking to leave The Meyer
5 Group?
6    A   **Both.  Both.  He would threaten.**
7    Q   And when did you come to learn that he
8 was interviewing with other firms?
9    A   **I don't remember specifically the time**
10 **frame or the date.**
11    Q   Were you monitoring Mr. Rayborn's
12 e-mails?
13    A   **I had access to them.  I wouldn't say I**
14 **was monitoring them.**
15    Q   Did you or someone at your direction
16 monitor his e-mails in 2018 or 2019?
17      MS. CONSOLINO:  Objection to the form of
18 the question.  You can answer.
19    A   **There -- that's kind of a weird**
20 **question.  I had access if I wanted to go look at**
21 **his e-mails.  Did I routinely monitor them, no.**
22 **Did other people in the office have the ability to**

**8**

1  access and look at his e-mails, yes.
2      Q   Did you or anyone else in The Meyer
3  Group access and review Mr. Rayborn's e-mails in
4  2018 or 2019 before he left --
5      A   I can't --
6      Q   -- or was terminated?
7      A   I can't tell you what other people did
8  that had access.  I can only tell you what I did,
9  and I said -- and I told you I had -- I had
10 periodically looked at e-mails.
11     Q   And did you have a written policy
12 regarding an independent contractor's right to
13 privacy or lack thereof on your servers, or
14 e-mail, or systems?
15     A   Anything on Meyer Group servers is not
16 private.
17     Q   Do you have a written policy regarding
18 the privacy or lack of privacy on The Meyer Group
19 servers?
20     A   I don't -- I don't remember if I do have
21 something in writing about privacy.  When you say
22 privacy, are you referring to the fact that I'm

**82**

1  not allowed to go look on his e-mails, or are you
2  talking about -- what does privacy --
3      Q   I'm asking if you have a written policy
4  notifying your employees or independent
5  contractors that their use of e-mails through the
6  Meyer Group's e-mail servers were not private and
7  that you would or could access them?
8      A   I don't think I had anything in writing
9  telling them that.
10     Q   Why did you enter into a co-brokerage
11 agreement with Ned Goodwin at Cushman & Wakefield?
12     A   Because I wanted help managing and doing
13 my group client transactions.
14     Q   Why didn't you just hire another sales
15 agent?
16     A   Because I had a long-standing working
17 relationship with Ned who also knew a lot of the
18 clients, and I felt that was a better process than
19 trying to bring somebody in or train someone.
20     Q   Do you have to manage Ned?
21     A   No.
22     Q   Do you have to supervise or oversee

**83**

1  anything he does?
2          MS. CONSOLINO:  Object to the form of
3  the question.
4      A   Well, if we're working on transactions
5  together, we discuss what's going on.  I don't
6  need to sit over his shoulder and watch him do
7  what he -- what Ned does since he is a broker.
8      Q   Who are the remaining sales agents that
9  are performing real estate services under your
10 broker's license?
11     A   Mike Crosman and Will Schwartz.
12     Q   And is there anyone else?
13     A   Performing real estate services, no.
14     Q   Correct.  And you had testified earlier,
15 I think what you said is you are not doing any
16 work with them on any transactions currently?
17     A   No, I'm working with Ned.  But I
18 typically don't do a lot of work with them on
19 transactions.  They have their own clients, and
20 they -- they don't need me to be involved.
21     Q   Are they licensed real estate brokers?
22     A   They're agents, licensed.

**84**

1      Q   Are they working under your brokerage
2  license?
3      A   Yes.
4      Q   What are your duties in supervising
5  agents who are using your license to perform real
6  estate services?
7      A   I'd have to pull out the D.C. real
8  estate commission book to give you the specifics,
9  but the broker is responsible for the agents, and
10 the agents hang their license with the broker, and
11 I'm the manager.  And if there's issues that come
12 up, then they would discuss it with me and I would
13 direct them.
14     Q   Should you be involved at all in any of
15 the deals that they are servicing?
16     A   Very rarely.
17     Q   When was the last time you spoke with
18 them about any of the work that they are doing
19 pursuant to or through your three-year license?
20     A   I've asked both of them in the last few
21 months, you know, do they have any current clients
22 they're working with or, you know, what's going on

85

1 with -- I mean, with the pandemic, everything kind
2 of changed dramatically. So I wanted to find out
3 if they had any clients, what's going on.
4     Q    Can you take a look at the document I
5 just dropped in the chat?
6     A    Okay.
7         MS. HORNFECK: For the record, Kelly,
8 the NENA card should be 12, the Nena CoStar report
9 should be 13, and this co-brokerage agreement
10 should be 14.
11         COURT REPORTER: Got it. Thank you.
12         MS. HORNFECK: It's called co-broker
13 agreement, technically.
14     Q    Can you take a look at it, Mr. Meyer,
15 and confirm for me if this appears to be an
16 accurate and true copy of the co-broker agreement
17 that TMG signed with Cushman & Wakefield?
18         (Exhibit 14 marked for identification
19 and attached to the transcript.)
20     A    Yes.
21     Q    Yes, you can look at it, or, yes, it is
22 a true and accurate copy of the co-brokerage

86

1 agreement you signed with Cushman & Wakefield on
2 behalf of TMG?
3     A    It's a true and accurate document.
4     Q    Thank you.
5         THE WITNESS: I don t know when the last
6 time we had a break is, but I just wanted to get
7 some water. It will take me less than two
8 minutes.
9         MS. HORNFECK: We took a break at 2:15
10 and we came back at 2:30, so we have been going
11 for about 38 minutes. Do you need to take a break
12 right now?
13         THE WITNESS: I just want to get water.
14 I don t need to go the bathroom or anything.
15         MS. HORNFECK: Okay. Let s take a
16 30-second break to grab some water. We will be
17 back.
18         (Whereupon, a recess was had.)
19 BY MS. HORNFECK:
20     Q    Do you know or can you please tell me
21 where in this agreement it provides that
22 representatives of Cushman & Wakefield must keep

87

1 the client list of The Meyer Group confidential?
2     A    In that agreement, I don't believe it's
3 anywhere, but there is confidentiality.
4     Q    What requires the Cushman & Wakefield
5 firm to keep the names of The Meyer Group clients
6 confidential?
7     A    All right. Well, first of all, Ned told
8 me he would keep it confidential. Secondly,
9 there's no reason Ned wouldn't keep it
10 confidential because if he didn't, he'd be hurting
11 himself because he wouldn't want everybody else in
12 the office to have information on Meyer Group
13 clients with lease expirations and everything
14 else. And thirdly, like most real estate
15 companies, including The Meyer Group,
16 Cushman & Wakefield, and even -- and even Broad
17 Street that we heard yesterday from Mr. Jacoby,
18 this is a very normal thing. That they would have
19 confidentiality provisions in their agreement, and
20 that's what Ned had told me as well.
21     Q    Was Mr. Jacoby talking about an
22 agreement with an employee or with a brokerage

88

1 agreement with a competing broker?
2     A    As I said, every real estate company
3 that I'm aware of has confidentiality agreements
4 with their -- both contractors and staff. And
5 Cushman & Wakefield has confidentiality agreements
6 with their agents. So whatever I give Ned also is
7 confidential.
8     Q    So are you testifying that the basis for
9 your belief or understanding that Cushman &
10 Wakefield would keep The Meyer Group's list
11 confidential was the agreements that
12 Cushman & Wakefield had with its own employees or
13 contractors; is that correct?
14         MS. CONSOLINO: Object to form. You can
15 answer.
16     A    Well, I also said that Ned told me he
17 would keep it confidential, and I believed that.
18 I had --
19     Q    Did Ned tell you that he was putting the
20 entire Meyer Group client list into Salesforce?
21         MS. CONSOLINO: Objection. Foundation.
22 Form.

Case 1:19-cv-01945-ABJ   Document 56-6   Filed 11/30/21   Page 48 of 65
Transcript of William Meyer
Conducted on July 8, 2021                                    48 (189 to 192)

89

1      A   I don't know anything about Salesforce.
2      Q   Did you know that Ned Goodwin testified
3  under oath in this case that the entire Meyer
4  Group list was entered into Salesforce in the
5  program that Cushman & Wakefield has a license
6  for?
7          MS. CONSOLINO:  Objection.  Foundation.
8  Form.
9      A   Okay.  So that doesn't mean that
10 everybody in the office of Cushman & Wakefield can
11 see it.
12     Q   Let me break that down.  I'm going to
13 ask the question again because you didn't answer
14 it.  Did you know that Ned Goodwin testified under
15 oath in this case that the entire list of
16 The Meyer Group clients that was provided to him
17 in March of 2019 was entered into
18 Cushman & Wakefield's application in Salesforce?
19         MS. CONSOLINO:  Same objection.
20     A   No, I didn't, but I'm glad he did.
21     Q   What is your basis to believe that not
22 everyone at Cushman & Wakefield has access to the

90

1  client list of Cushman & Wakefield in the
2  application in Salesforce?
3          MS. CONSOLINO:  Objection.  Form.
4      A   Okay.  So I don't know a lot about
5  Salesforce.  We have talked about it in different
6  depositions.  I know Broad Street has some form
7  that they use with their -- managing their clients
8  and data.  But I believe what I heard Ned say is
9  that not everybody has access to all of the
10 information.  They may only have access to pieces
11 of the information.
12         Now, I may be wrong.  I'm not a
13 Salesforce software expert.  I don't use
14 Salesforce.  I've never bought it.  So I'm really
15 flying under the -- on -- on the wings here.
16     Q   So you are guessing, correct?
17     A   I know that Ned would not put
18 information in that has confidential lease terms,
19 lease expirations, and whatnot into a company
20 platform that everybody could see.  At best, I
21 think he would probably say here's the clients
22 that I'm working with.  Do not call them.

9

1      Q   What's your basis for that assumption?
2      A   That's what I heard him say.
3      Q   That's your understanding of how he
4  testified?
5      A   I believe so.
6      Q   Did you hear him when he testified that
7  the eight people on his team have access to the
8  list?
9      A   I didn't know he had eight people on his
10 team.  I know that --
11     Q   So is your answer no?  (Indiscernible)
12 --
13     A   -- there's -- there's three -- there's
14 three people that I deal with -- I'm sorry, we're
15 talking over each other, I apologize.
16     Q   Well  because you didn t answer my
17 question.  So I'm asking you:  Is your answer, no,
18 you did not hear him testify that the eight people
19 he has working on his team have access to the
20 list?
21     A   And I testified I don't -- I didn't know
22 he had eight people.  I work with primarily three

92

1  or four people on -- on the team, Ned being one of
2  them.  And those three or four I do know have
3  access.
4      Q   I just dropped in the chat his
5  deposition.  If you could open it, I would
6  appreciate it.
7      A   Okay.
8      Q   Marked as Exhibit 15.
9          (Exhibit 15 marked for identification
10 and attached to the transcript.)
11     A   Where would you like me to look?
12     Q   I'm getting there.  Let's start at page
13 36.
14     A   My water glass is sweating all over the
15 table here.
16     Q   You have glasses?  Do you need glasses
17 to read or -- oh, water glass, I'm sorry.  Are you
18 able to look at the deposition transcript?
19     A   Are you waiting for me?
20     Q   Yeah, have you looked at -- look at --
21 starting at page 36?
22         Do you see on page 38, line 14 I asked:

93

1  So, ask it again, have you entered or has someone
2  in your office entered all of the clients that are
3  on the list that Ms. Clark showed you, have those
4  all been entered into your Cushman & Wakefield
5  database?
6     A  I can't hear you.  Lane, I can't hear a
7  word you're saying.
8     Q  Line 14 on page 38.  Do you see that --
9     A  I don't hear -- for some reason
10 something happened here.  Hold on.
11       (Whereupon, a discussion was held off
12 the record.)
13    Q  So going back to what is Exhibit 15, I'm
14 looking at pages 37 and 38.
15    A  This is the transcript of Ned Goodwin?
16    Q  Correct.  The June 15, 2021, transcript.
17    A  Page 15?
18    Q  Pages 37 and 38.
19    A  Oh, sorry.
20    Q  It's okay.
21    A  Okay.  My Ned Goodwin is a condensed,
22 and it only goes to page 30.  So --

94

1     Q  Exhibit 15 that I dropped into the chat?
2     A  Okay.  So you want me to go to page 30
3  on the deposition?  It's a condensed version, so
4  I'm looking on --
5     Q  Well, do you understand that in the
6  condensed version there are pages -- I'm not
7  talking about the page number of the PDF.  I'm
8  talking about the page number in the transcript.
9     A  Now I do, yeah.
10    Q  It's in the right corner.
11    A  Now I do, yeah.
12    Q  It has --
13    A  Now I do.
14    Q  Okay.  So I'm looking at --
15    A  Page 30.
16    Q  -- the transcript pages 37, 38, 39, and
17 40.  Do you see that?  So it's actually page 10 --
18    Q  Through 11 actually and --
19    A  Yeah, I got it.  I'm on 37.
20    Q  Okay.  Great.  So if you look at page
21 38, line 4, did you enter any of the clients that
22 you contacted or worked on deals with Mr. Meyer

95

1  into  your Cushman & Wakefield database?  Answer:
2  Yes.  Do you see that?
3     A  Okay, yes.  I see that.
4     Q  I then asked, did you add all of them
5  into your Cushman & Wakefield database?  I tried
6  to add.  And then I asked again at line 14, so,
7  ask it again, have you entered or has someone in
8  your office entered all of the clients that are on
9  that list that Ms. Clark showed you, have those
10 all been entered in your Cushman & Wakefield
11 database?  Answer:  I believe we have tried to add
12 all of those.  Do you see that?
13    A  Yes.
14    Q  And then at the bottom of 39, the top of
15 40 I asked, do all of the other eight sales
16 agents, it should say, referenced, Ned, Scarlet,
17 Reid, Art, Kurt, Conan, Gwen, and Greg, do they
18 all -- do they have all credentials to the local
19 Cushman & Wakefield database?  Answer:  I believe
20 they do.  Do they use it?  I don't know.
21       And then I asked, how many brokers or
22 agents do you have at the local

96

1  Cushman & Wakefield office that you work in?
2  There are, I don t know, somewhere around 100 in
3  the region.  Do you see that?
4     A  Yes.
5     Q  And then I asked, and do all of the 100
6  brokers or agents have access to this database,
7  and his answer is, I can t speak to that.  I also
8  asked at 39, and do you have any type of indicator
9  in there that they are subject to a co-brokerage
10 agreement?  Let me ask that better.  Do you have
11 anything in the database listing that we are
12 talking about, anything in there that indicates
13 they are subject to a co-brokerage agreement with
14 The Meyer Group.  Answer:  I don t believe we do.
15 Question:  So if -- and who has access to
16 Cushman & Wakefield local client list?  And his
17 answer is, I m not exactly sure how all of the
18 permissions work.  I m not really fluent in the
19 database, honestly.
20       So he doesn t even know who has access
21 to The Meyer Group list that he s added into the
22 Cushman & Wakefield database in Salesforce.  Do

97

1  you realize that?
2        MS. CONSOLINO:  I'm going to object to
3  the question as to form and foundation.
4      A   That's not how I read it.
5      Q   Okay.
6      A   There's -- there's no reason.
7      Q   There's no question pending.  You don't
8  have to expoud upon it.
9      A   But I'd like to.
10     Q   I don't want you to, so thank you very
11 much.
12        You live in Florida; is that correct?
13     A   Yes, that's my residence.
14     Q   So you file state tax returns in
15 Florida; that's correct?
16     A   No.
17     Q   Where do you file state tax returns?
18     A   Nowhere.
19     Q   You don't file tax returns?
20     A   I do.
21     Q   So where do you file your state tax
22 returns?

98

1      A   I don't.
2      Q   Who files your state tax returns?
3      A   We can go around on this, but Florida
4  doesn't have state tax.
5      Q   So you don't file any state tax returns?
6      A   There is none to file.  Florida does not
7  do state income taxes.
8      Q   Do you have any residences in any other
9  states in the United States?
10     A   Residences?
11     Q   Uh-huh.
12     A   I have properties, but not res -- I
13 mean, is that the same?  If I have a property
14 somewhere and I --
15     Q   Do you reside --
16     A   -- it's my second home.  Is that a
17 residence?
18     Q   A second home.  Do you reside or have a
19 second home in any other state in the United
20 States?
21        MS. CONSOLINO:  Object to the form of
22 the question.

99

1      A   Yes, currently as we speak today or in
2  the past?
3      Q   Currently.
4      A   Okay.  Yes.
5        MS. CONSOLINO:  Same objection.
6      Q   And in 2019 did you reside in the State
7  of Florida?
8        MS. CONSOLINO:  Same objection.
9      A   As well as other places.
10     Q   In 2019 did you file state tax returns
11 anywhere?
12     A   No.
13     Q   And did you consider the State of
14 Florida to be your permanent residence?
15     A   Yes.
16     Q   How often do you return to the D.C. area
17 for work?
18     A   At what point in time?
19     Q   I'm talking about currently.
20     A   Less than I did in 2019.  Everybody kind
21 of went virtual, so there was less opportunities
22 to meet personally with clients and things.  Most

200

1  of the things that I had to do were just, like, I
2  think, has been said -- has been through Zoom
3  meetings and that kind of thing.
4      Q   Did I hear you correctly in 2019, was
5  that what you were describing?
6      A   No, now.  You asked me about now.
7      Q   And -- okay.  So now you are primarily
8  in Florida, correct?
9      A   Well, I'm not primarily, but I think as
10 far as my business goes, most of the things we are
11 doing are virtual, just like this litigation.
12     Q   And in 2019 were you primarily residing
13 in Florida and working remotely?
14     A   No, I had a residence in Florida -- or
15 in D.C.  I had an apart -- I had a residence in
16 D.C. that I used, and I would go back and
17 forth to Florida and other places.
18     Q   Hold on one second.  But in 2019 you did
19 not file state tax returns in D.C., or Maryland,
20 or Virginia, correct?
21     A   No, I'm a Florida resident, and it's in
22 my complaint that I'm a Florida resident.  I don't

201

1  know why we keep talking about it.
2      Q   I'm going to ask you about --
3          MS. HORNFECK:  This should be
4  Exhibit 16; is that correct?
5          COURT REPORTER:  Yes.
6          (Exhibit 16 marked for identification
7  and attached to the transcript.)
8      Q   Can you open that document?
9      A   Okay.  So when I rebooted the chat thing
10 got weird.  So I have none of the previous chats.
11 I only have the one now.  I can just put --
12     Q   That's okay.  I'm asking about the one
13 that's there now.  If you need to look back at
14 something, I'll put it back in.
15     A   Okay.
16     Q   Exhibit 16, that should say 2021-04-28
17 TMG List of Clients with E-mails.  Do you see
18 that?
19     A   Yes.
20     Q   Did you assist your counsel in putting
21 together this list?
22         MS. CONSOLINO:  Object to form.  You can

202

1  answer.
2      A   Some of it.
3      Q   Some of it.  Where did the names that
4  are on this list come from?
5      A   Through different sources of documents
6  within The Meyer Group.
7      Q   Do you know how many clients are on the
8  Access database that you sent to Ned Goodwin or
9  that Jessica McGunnigle sent to Ned Goodwin in
10 March 2019?
11     A   No, I don't remember how many.
12     Q   I'll represent to you that there are 331
13 entities on the Access database list that you sent
14 to -- or that Jess McGunnigle sent to Ned Goodwin.
15 I can open it if you'd like, or I can drop it back
16 in and you can look at it.
17         This list, it's 11 pages, has roughly 55
18 to 57 entities per page.  So there are roughly 600
19 or more entities on this list.  Can you please
20 explain to me why there are an additional 269
21 entities listed as clients on this list that do
22 not appear on the Access database list?

203

1      A   Sure.  That's easy.  These were groups
2  that we may not have done a transaction with that
3  we were -- that had been cultivated at
4  The Meyer Group that we were -- were staying in
5  touch with, or -- or trying to work with, or
6  currently working with.
7      Q   Have you produced exclusive agreements
8  for every entity listed on Exhibit 16?
9          MS. CONSOLINO:  I'm going to object.
10 You can answer if you know.
11     A   I don't know.
12     Q   Do you have --
13     A   I don't even know what Exhibit 16 is.
14     Q   The 2021-04-28 TMG List of Client Names
15 with E-mails that I just asked you to look at.
16     A   Is this the one that we are looking at
17 currently?  That's Exhibit 16?
18     Q   Yes.
19     A   Okay.  It doesn't say -- on my thing it
20 doesn't say that, so -- all right.  So the
21 question was:  Do I have exclusives from every --
22 for every name on Exhibit 16?

204

1      Q   Yes.
2      A   No, we don't have exclusives for
3  everybody on here.  Some of these -- some of these
4  folks we're currently still trying to work with.
5      Q   So are these prospective clients on this
6  list or actual clients?
7      A   Any -- any -- anybody on this list was a
8  -- is considered a client of The Meyer Group
9  because they -- it was cultivated from The Meyer
10 Group and the relationships were cultivated from
11 The Meyer Group, hence Jim's index cards and
12 e-mails.
13     Q   So is it accurate to say that this list
14 of names that your counsel submitted to
15 Broad Street on behalf of The Meyer Group is a
16 list of clients that you have closed deals with
17 and then clients whom you are looking to do
18 business with but you haven't actually done
19 business with; is that accurate?
20     A   Or that we are doing business with.  You
21 forgot that one.
22     Q   Or -- so this list includes entities

Case 1:19-cv-01945-ABJ Document 56-6 Filed 11/30/21 Page 52 of 65
Transcript of William Meyer
Conducted on July 8, 2021                    52 (205 to 208)

205

1  that you have not closed deals with; is that
2  correct?
3      A   Yes.
4          MS. CONSOLINO:  I don't know if that was
5  consistent with Judge Jackson's order.
6      Q   Do you understand that Broad Street went
7  to great expense to search for every one of these
8  entities as potential entities that Mr. Rayborn
9  communicated with or someone that Broad Street
10 communicated with?
11         MS. CONSOLINO:  Object to form.
12     A   What am I supposed understand?
13     Q   Do you understand that we searched
14 documents and produced documents based upon the
15 entities that are on this list?
16     A   That's what you were supposed to do.
17     Q   Is the answer yes?
18     A   Yes, I hope so.  That's -- you -- you --
19 I mean, you better have.  That's what you are
20 required to do, and that's why I spent so much
21 time putting the list together.
22         MS. HORNFECK:  And for the record,

206

1  depending upon how this case goes, we will be
2  seeking to recover the cost that we incurred to
3  search for all of these entities that are clearly
4  not all clients of The Meyer Group, Serine.
5          MS. CONSOLINO:  Lane, I suggest you go
6  look back at the transcript from the hearing
7  before Judge Jackson.
8          MS. HORNFECK:  I think you should, too.
9          MS. CONSOLINO:  She was very clear about
10 what needed to be on that list.
11         MS. HORNFECK:  And have you produced
12 documents that show that The Meyer Group was
13 trying to do business with all of these entities?
14         MS. CONSOLINO:  I think --
15         MS. HORNFECK:  I hope you did because if
16 you haven t, you better do it really quick because
17 tomorrow is the deadline.
18         MS. CONSOLINO:  We have produced what
19 has been required of us.  And we will also be
20 seeking attorney s fees for all the motions that
21 we had to file to get basic documents that we
22 couldn t -- that we should have gotten from you in

207

1  January of 2020.
2          MS. HORNFECK:  Do you really want to do
3  this on the record, Serine?
4          MS. CONSOLINO:  You started it.  You
5  brought it -- you opened this line of questioning.
6          MS. HORNFECK:  Serine, calling the Court
7  and setting up a conference call, you are going to
8  ask for those fees?
9          MS. CONSOLINO:  Oh, absolutely.  We are
10 going to ask for all of the fees for all the work
11 we had to do to get basic information that you
12 refused to produce to us for over six months.
13         MS. HORNFECK:  Because you wouldn t
14 produce a list and then you generated what is
15 essentially a marketing list for e-mails.
16         MS. CONSOLINO:  I suggest you go back
17 and look at Judge Jackson s order.
18         THE WITNESS:  You could have saved
19 yourself a lot of time and just gone in Jim s
20 office and gone through the canvas cards.
21 BY MS. HORNFECK:
22     Q   Do you know if Advanced Science and

208

1  Technologies is on the Access database list that
2  you have produced in this case?
3      A   I -- I don't know.  You just said
4  there's -- there's 300 names on there.
5      Q   Do you know if American Osteopathic
6  Association, which you claim is a client, is on
7  the Access database that you sent to Ned Goodwin?
8      A   That I don't know, actually.  I'm going
9  to guess.  I don't know.
10     Q   Do you know if Arms Control Association
11 is on that list?
12     A   Well, that was a completed transaction,
13 so it should be.  But it may not.
14     Q   Do you know if the APAICS, Asian Pacific
15 American Institute for Congressional Studies, is
16 on the list that was sent to Ned Goodwin that's
17 supposed to be reflective or representative of
18 The Meyer Group list of clients?
19     A   I don't recall.  I don't remember.
20     Q   What about --
21     A   The American Osteopathic, that's a --
22 that's a good one.

209

1    Q    What about AT&T?

2    A    **Again, I don't remember.  I mean, we**

3 **have -- you know, we're a business --**

4    Q    I'm asking for your knowledge.  I'm just

5 asking for your knowledge --

6    A    **And if I'm being short on the answers,**

7 **it's because I can't remember --**

8    Q    You don't have to have a narrative.

9    A    **-- the specifics on every single name of**

10 **a single deal.**

11    Q    Do you know if AT&T is on the list that

12 was provided to Ned Goodwin?

13    A    **I don't know.**

14    Q    Do you know if Bond Dealers of America

15 is on the list provided to Ned Goodwin?

16    A    **I -- you're talking about the Microsoft**

17 **Access list, correct?**

18    Q    Correct, as of March 2019.  That's

19 (indiscernible) --

20    A    **I mean, if you pull it up -- if you --**

21 **if I pull it up, I can go through it and tell you.**

22 **That would be the easier way to do it than --**

2 0

1 versus from my (indiscernible) --

2    Q    Do you know if Bond Dealers of America

3 was considered a client as of March 2019?

4    A    **Yes.**

5    Q    What about Business Council for

6 International Understanding?

7    A    **Is it on the Exhibit 16, or whatever,**

8 **list?**

9    Q    Was Business Council for International

10 Understanding considered to be a client as of

11 March 2019?

12    A    **Let me look it up.**

13    Q    What are you looking at, Mr. Meyer?

14    A    **The document that you --**

15    Q    I'm not asking about that document.  I'm

16 asking about the Access database.

17    A    **Oh.**

18    Q    That was provided --

19    A    **That -- that I don't -- don't -- that I**

20 **don't remember or know.  I'd have to go look at**

21 **the Access database.**

22         COURT REPORTER:  Pardon the

2

1 interruption.  I need everyone to be really

2 careful about speaking over each other because

3 there is some testimony that I'm just not getting.

4 Actually, when you speak over each other, it's

5 blanking the other person out, so I'm just not

6 getting it.  So just be really careful for me,

7 please.

8    Q    When was the Access database created?

9    A    **I believe I answered that with Ms. Clark**

10 **already.**

11    Q    I don't think you did because I never

12 heard an answer.  When was it created?  When was

13 it first created?

14    A    **Probably seven, eight years ago, at**

15 **least.  I don't remember specifically, but I -- I**

16 **did say that I had an intern help put the format**

17 **together.**

18    Q    So would that have been 2012?

19    A    **I -- I would be guessing.**

20    Q    Would the intern have taken all closed

21 deals up until that time and entered them into the

22 Access database?

2 2

1    A    **I've already testified on that.  That he**

2 **did not have any -- did not do any input.  He just**

3 **put together the structure of the database.**

4    Q    Who inputted the information?  Jess

5 McGunnigle, correct?

6    A    **For the most part, to my knowledge,**

7 **yeah.**

8    Q    Did she take closed deal -- and when did

9 Jess McGunnigle work for you?

10    A    **The start and end dates?**

11    Q    Correct.

12    A    **I don't recall.  She was there for --**

13    Q    Was she there when the database was

14 created?

15    A    **That's a good point.  I don't --**

16 **probably.  I don't -- I don't -- good question.  Probably.**

17    Q    You don't seem to know based on --

18    A    **Well, because I -- you know, when I**

19 **first started, I -- you know, I did a little bit**

20 **of it, and I gave it to her to kind of work on it.**

21 **I think there may have been even a lapse where I**

22 **didn't put stuff in because I was too busy doing**

23

1 other things.
2    Q    According to her LinkedIn profile, I'll
3 represent to you that it shows that she began in
4 2015; is that correct?  Does that refresh your
5 memory?
6    A    No, but I'll go with it.
7    Q    So did you enter data in 2012 when your
8 intern created the database?
9    A    A little bit.
10   Q    Did you take closed deals that you had
11 up until that point and enter them into the
12 database?
13   A    Some.  I mean, the reality is is that I
14 was really busy, and I didn't have time to do
15 the -- do that function, and it wasn't something
16 that was intimate [sic] and having to be done
17 right away.  It wasn't critical because these were
18 closed deals already.  And it only became, I
19 think, more on my radar when I had somebody that I
20 felt confident that could sit there and do it, and
21 I had more help in the office at that point.
22        So the broker assistants were fairly

24

1 stretched.  It wasn't something that I wanted to
2 give them or put in their -- put on their plate.
3    Q    So when did this list become important
4 to enter information about clients into it?
5        MS. CONSOLINO:  Object to form.
6 Foundation.
7    A    You know, like, it -- it was a long time
8 ago.  But, I mean, there was a need to be able to
9 keep track of all the clients besides Jim's index
10 cards.  So we started -- we had a -- I guess it
11 was 2015 or whenever, we got Microsoft 365.  I
12 felt like we needed to kind of move into the new
13 age here of having things electronic and being
14 able to, in some fashion, start cataloging our
15 clients.
16   Q    So when did you first have the Microsoft
17 Access database software?
18   A    I believe when we got 365, but I don't
19 remember the exact date.
20   Q    You just said 2015; is that correct?
21   A    Well, I -- that's when you said Jess
22 started at The Meyer Group.  We may have had it

25

1 before that, probably, because that's when the
2 intern did it, and I think the intern was there
3 before '15.  I had a bunch of interns.
4    Q    So prior to 2015 did you have a list of
5 clients?
6        MS. CONSOLINO:  Object to form.
7    A    I guess.  What do you mean by a list?
8 Did I have a Microsoft Access list of clients?
9    Q    I'm assuming you did have Microsoft
10 Access because you are saying you got that in 2015
11 roughly when you got 365.  How did you --
12   A    I mean, it --
13   Q    -- document your clients?  Did you ever
14 have another type of list in Word, or Excel, or
15 some other software program?
16   A    Not with, you know, start and -- like,
17 start dates of leases, and lease expirations, and
18 that kind of thing, no.  That's why we kind of put
19 it together.  It was very -- I'd have to go -- I'd
20 have to go to the filing cabinet and pull leases
21 and go through it to see information that I was
22 interested in.  So I wanted something that was a

26

1 little bit easier to reference than me going back
2 and digging in the filing cabinets.
3    Q    Have you considered selling
4 The Meyer Group?
5    A    No.  I mean, I did during my divorce
6 back 20 years ago.
7    Q    So you have not talked to anyone about
8 selling The Meyer Group?
9    A    I've had people ask me about it, and
10 I've said no.
11   Q    Have you ever talked with anyone about
12 what you would need to do in order to sell
13 The Meyer Group or its assets?
14   A    We don't really have assets.  We are --
15 we are a brokerage firm.  The knowledge we have
16 and the clients we have are kind of -- the money
17 in the bank, I guess, is what we're worth.
18   Q    Do you not consider your client list an
19 asset?
20        MS. CONSOLINO:  Object to form.
21   A    It -- it absolutely is an asset, but the
22 asset is the clients and me because I have the

27

1 relationships.
2    Q   Did you ever talk with anyone about what
3 you needed to do in order to sell or essentially
4 make money off of your client list?
5        MS. CONSOLINO:  Object to form.
6    A   The only time that type of conversation
7 went [sic] was with Ned, where I said, you know, I
8 have these clients, I need help.
9    Q   Why did you need help?
10   A   Because I don't have time to sit on the
11 phone and cold call or follow up with people, and
12 Ned, who had worked with me for probably ten
13 years, knew a lot of the clients, and so it was an
14 easy segue for Ned and I to work together because
15 the clients also knew Ned and were comfortable
16 with him.
17   Q   Very active dog.  So -- hold on the
18 second.  The joys of working from home.
19       So let me just understand this.  So you
20 needed help in 2019, and instead of hiring or
21 retaining a new sales agent, you decided to enter
22 into a co-brokerage agreement with Ned Goodwin at

28

1 Cushman & Wakefield; is that correct?
2    A   Or -- or use the existing agents that I
3 have in the office.
4    Q   Mr. Crosman and Mr. Schwartz, correct?
5    A   I decided to go with Ned.
6    Q   But you have testified that you don't
7 really work with them anymore; is that correct?
8    A   Well, I didn't -- I never really worked
9 with them ever.  They had their own clients.  They
10 did their own transactions.  Jim and I were
11 business partners, for lack of a better sense, and
12 we worked together on a variety of the
13 transactions that we did.  I'd say the majority of
14 them.
15   Q   And you testified earlier, and I think
16 many people have testified, that Jim is a prolific
17 cold caller; is that correct?
18   A   That was his job at The Meyer Group.  He
19 got paid to cold call.  That's why he got pieces
20 of commissions for that role.
21   Q   And to find --
22   A   To get meetings --

29

1    Q   -- prospective clients, correct?
2    A   Yes, to get meetings to find prospective
3 clients.
4    Q   So he would sit on the phone all day
5 long making calls to prospective clients, correct?
6    A   Right.  Using the index cards that I
7 provided him, and the telephone, and the computer,
8 and the Internet service, and the CoStar, and
9 everything else that goes along with a brokerage
10 office.
11   Q   Would you say that Jim would harass your
12 clients?
13   A   I had several complaints from clients
14 that Jim was calling too much, or please don't
15 have Jim call me, or we're -- you know, we are
16 already working with The Meyer Group, we're --
17 Bill, you don't need to have Jim keep following up
18 like this.  And I would constantly have to tell
19 him to back off, or we'd be in the middle of a
20 deal and Jim would start harassing brokers and
21 clients.
22   Q   So, in your experience, and based upon

220

1 complaints from clients and former clients in
2 The Meyer Group, would you say that Jim would wait
3 until the lease expiration date to call your
4 clients or former clients?
5    A   I think Jim was always calling people
6 way ahead of their lease expirations.  No one --
7 no one would wait until the lease was up to call
8 the client.  That's -- that's too late.  So you'd
9 have to do it at some point, you know, probably a
10 year, year and half out, and Jim would probably
11 start three years out or something.
12   Q   Or in the middle of a deal before the
13 deal is even closed, based on what you just
14 testified to, correct?
15   A   Well, he's not calling them to solicit
16 their business if we're already working on a deal.
17   Q   Would you say that there are standard
18 terms for leases?
19       MS. CONSOLINO:  Object to form.
20   A   Terms being lease term?
21   Q   Yes.
22       MS. CONSOLINO:  Same objection.

22

1     A     Five to ten years would be kind of, I
2  guess, if we want to call it a standard.
3     Q     So if you knew the start date of a lease
4  for a tenant, could you pretty much guess that the
5  lease term is either a five or ten year?
6         MS. CONSOLINO: Object to form.
7     A     Well, and that -- if that's kind of
8  where you're going with the question, you know,
9  I'd say the minimum is usually, like, three years.
10 It could be a five, seven, or ten.  Kind of, like,
11 almost mortgages, you know.  But you don't need to
12 guess.
13    Q     But it's pretty standard, right?  In the
14 DMV area, there's a standard?  Five, ten, 15 -- do
15 you ever see long-term leases in this area?
16    A     Yeah, we've done 15-year leases before.
17    Q     Do you ever do ground leases, like,
18 20-year plus ground leases?
19    A     No.
20    Q     It's very rare, right?
21    A     That's not something in D.C. we would
22 experience a lot of.

222

1     Q     So at the most, it might be 15 years,
2  correct?
3     A     At the most.  Or it would be a ten with
4  a five-year option.
5     Q     Option to extend, correct?
6     A     Yeah, option to renew.
7     Q     Would it be a renew of the original
8  term, or would it be an extension of the
9  additional five-year term?
10    A     I missed your question.
11    Q     What do you mean by renewal?
12    A     Their lease is up and they exercise the
13 renewal option for another five or -- five years
14 or whatever the renewal option says.  And I think
15 extension kind of is the same thing.  But an
16 option to renew gives the tenant a right.  An
17 extension may not.
18    Q     So I just want to make sure we are
19 talking about the same thing.  So you have an
20 option to renew or extend.  We are talking about
21 the same thing.  This is the additional period --
22    A     If the lease --

223

1     Q     Let me just finish the question, make
2  sure we are saying the same thing.  It would be an
3  extension or renewal of a term that's already been
4  discussed included in the existing lease, correct?
5     A     Yes, and some leases will call it an
6  option -- option to extend, meaning -- the code
7  word is option, or option to renew.  But if a
8  tenant decides to extend their lease, it may not
9  be through exercising an option.  Or if a tenant
10 decides to renew, it may not be through the
11 exercise of extending an option.
12    Q     What has your experience been during
13 COVID of the need for tenants to renegotiate the
14 terms of their lease and/or reduce their space
15 usage?
16    A     My phone rang off the hook.
17    Q     Would you consider it a lot of work to
18 work with the landlords to obtain favorable terms
19 to enable the tenants to remain in their spaces?
20        MS. CONSOLINO: Object to the form of
21 the question.
22    A     The tenants are under contract, and

224

1  unless there's some magic pill that somebody can
2  take to change the contract, there's not -- there
3  hasn't been a lot of interest in owners to modify
4  tenants' lease terms unless, of course, their
5  leases are expiring.
6     Q     Have you ever had an experience where a
7  tenant has threatened to file for bankruptcy?
8     A     I'm -- probably, I'm sure.  I'm not a
9  bankruptcy lawyer, and I don't offer advice to
10 tenants on defaulting on their leases.
11    Q     Are you familiar with the assumption of
12 rejection of a lease as a bankruptcy?
13    A     (Indiscernible) --
14    Q     I didn't hear your answer.  I think you
15 just shook your head.
16    A     No, I have not.  I don't know much about
17 bankruptcy.
18    Q     So what was your approach for different
19 tenants to renegotiate terms during the pandemic?
20    A     I mean, it's -- it's a case-by-case
21 basis.  You'd have to evaluate the lease
22 liability, and what they're paying, and what --

225

1  what can we offer the landlord that would entice
2  the landlord to want to modify the lease contract.
3      Q    Would you ask for the termination fee?
4      A    There's only a termination fee if
5  there's a termination option.  If there's not a
6  termination option, then it would be up to the
7  landlord to decide whether they'd accept a
8  termination fee; otherwise, I guess the
9  termination fee would be the remaining lease
10 liability.
11     Q    And in your experience during the
12 pandemic and helping tenants continue to remain in
13 their leased spaces, did landlords want to have
14 tenants who paid something or nothing and have
15 empty spaces?
16     A    I -- I'm a little confused with your
17 question.  It's not my job to make sure that
18 tenants can stay in their -- in their space and
19 pay their lease.  I don't manage tenants'
20 businesses.  That's a financial issue that the
21 tenant has with the landlord.  The only help that
22 I can assist with is trying to -- if even

226

1  possible, to restructure their lease contract.
2      Q    And I'm just trying to ask you how many
3  tenants did you help do that during the pandemic?
4      A    Very few.
5      Q    Typically, do you get a commission when
6  you reduce the value of the lease for the
7  landlord?
8      A    Typically, you get a commission on any
9  added value to the lease, so I don't know what you
10 are asking.
11     Q    So if the tenant needs to restructure
12 the lease and pay less or reduce their space,
13 would you get a commission?
14     A    It depends on the -- it's too
15 hypothetical for me.  I -- I would need specifics.
16 But you get paid on added value of the lease.  So
17 if the tenant has a million-dollar liability and
18 you restructure it so they only have an $800,000
19 liability, I don't think there would be any
20 commissionable rent applicable.
21     Q    That answered my question.  Thank you.
22 I'm just going to go off the record for five

227

1  minutes.  I don't think I have any more questions,
2  but I just want to check my notes and my documents
3  and I'll be right back.  So off the record for
4  five minutes, Ms. Walters, please.  Thank you.
5          (Whereupon, a recess was had.)
6          MS. HORNFECK:  Thank you, Mr. Meyer, I
7  have no further questions.
8          MS. CONSOLINO:  I think I just have two
9  questions.
10     EXAMINATION BY COUNSEL FOR THE PLAINTIFF
11 BY MS. CONSOLINO:
12     Q    Mr. Meyer, you have alleged in the
13 complaint -- or the amended complaint, rather,
14 that Mr. Rayborn absconded with a printed-out list
15 of clients and client information from the
16 Microsoft Access database.  What is the basis of
17 that allegation?
18     A    As I had testified, I had personally
19 given Jim written, printed-out copy of the list.
20 It was in his office, he used it to transcribe
21 onto the index cards what he needed, cultivated
22 those clients and relationships through that list

228

1  onto his canvas cards.  And when I came back to
2  the office to inspect his office, Jim's office, it
3  was no longer there.
4      Q    Thank you   And then my second question
5  is, a couple of times you used the phrase mine and
6  Jim's clients   Do you mean to say that the
7  clients are Jim's clients, or do you mean to say
8  that they are The Meyer Group's clients?
9      A    They are The Meyer   every   everybody
10 is a client of The Meyer Group, and Jim and I
11 would work with these clients of The Meyer Group.
2      Q    So what do you mean when you use the
3  phrase mine and Jim's clients?
14     A    It's people that Jim and I had worked
15 with in the past or had met with.
6          MS CONSOLINO:  Thank you   I have
7  nothing further
8          MS HORNFECK:  I have a couple of
9  follow up questions
20 RE EXAMINATION BY COUNSEL FOR THE DEFENDANT, BROAD
2                    STREET
22 BY MS HORNFECK:

229

1    Q    How many cards did you actually --
2 canvas cards or index cards did you actually
3 review yourself that Jim created?
4        MS. CONSOLINO:  Object to form.
5    A    Over when, or what period of time, or
6 what --
7    Q    Ever.
8    A    Pardon me?
9    Q    Ever.
10        MS. CONSOLINO:  Object to form.
11    A    Jim had five or six boxes, so he
12 probably had -- I don't even know, four or 5,000
13 cards somehow organized in different fashions.
14        Generally, if I looked at his cards, it
15 would be the stacks of cards that were not in the
16 boxes that he was using to call from because we
17 were either working on a deal or these were people
18 that he was calling.  Sometimes I would get calls
19 from clients, would you have Jim stop calling me,
20 blah, blah, blah, or I'd get e-mails, quit calling
21 us, you're harassing us, and I would have to go in
22 and pull the cards because he would -- he wouldn't

230

1 follow directions, or I came in to look at the
2 cards because I needed information about somebody.
3    Q    Did you personally see him look at the
4 Access database list and write out a card?
5    A    I saw him personally look at the Access
6 database and go through it with me, and we talked
7 about specific clients on it.
8    Q    Did you ever watch him looking at the
9 database list and writing out a card based on
10 something that was on the list?
11    A    You mean physically sit there and --
12 next to him and watch him transcribe onto the
13 index cards from the database; is that what you're
14 asking me?
15    Q    Didn't you say he has a glass wall?  Did
16 he have a glass wall in your office?
17 (Indiscernible) --
18    A    To the hallway -- to the hallway, not --
19 okay.  When you're done, I'll talk because we're
20 talking over each other.  Go ahead and ask me your
21 question, please.
22    Q    Did he have glass demising walls for his

23

1 office?  Did he have any glass demising walls?  Do
2 you understand that word means?
3    A    Well, you know, I was in real estate for
4 30 years.
5    Q    So you should know what that means.
6    A    Well, I don't think you do, actually.
7    Q    So does he have glass walls in his
8 office, or did he when he was in your office?
9    A    Yes.  He had one glass wall that went
10 out to the hallway.
11    Q    Was the glass opaque or clear?
12    A    It was clear.
13    Q    Did you ever see him writing out a card
14 while looking at the Access database and using
15 information on the Access database to write out a
16 card?
17    A    While walking by his office, no.
18    Q    Ever?
19    A    He asked me for the list, so I came in
20 and gave it to him.  And we went through the list
21 together and talked about specific clients.
22    Q    You testified earlier that he used the

232

1 Access database to generate cards.  I'm trying to
2 understand the basis for that testimony.
3    A    That's --
4    Q    Did you ever see him fill out an index
5 card using the Access database list that you claim
6 to have provided him?
7    A    I remember seeing cards that came from
8 the Access database, but I don't remember seeing
9 him physically write it out.
10    Q    In your complaint, paragraph 24, that
11 Ms. Consolino just referenced, paragraph 24 says,
12 immediately after Rayborn's departure from TMG,
13 TMG discovered that Rayborn had taken a
14 substantial number of index cards containing TMG's
15 confidential information, period.  Rayborn also
16 absconded with a printout of client information
17 directly procured from TMG's Microsoft database.
18    A    That's correct.  He did.
19    Q    Who procured the printout from TMG's
20 Microsoft database?
21    A    What do you mean who procured?  I told
22 you -- I've said it ten times.  I had -- I had it

233

1  printed out.  I brought it in and hand-delivered
2  it to Mr. Rayborn.
3      Q    And you don't remember exactly when that
4  was?  You said it was a couple of times over a
5  period of years --
6          MS. CONSOLINO:  Objection.
7      Q    -- right?
8      A    It -- I mean, I gave them the most --
9  the most recent copy I gave him within the last
10 six or 12 months of him being at The Meyer Group.
11     Q    What is the basis for your allegation in
12 testimony that he took the list with him?
13     A    Because it was in his office.  It was a
14 regular part of his office just like his canvas
15 cards were.  And as I tried to testify earlier but
16 I got interrupted by Ms. Clark, Jim doesn't throw
17 away anything.  As a matter of fact, he's kind of
18 a mini hoarder, so it was there.  And when I left
19 the office -- or when he was fired, and I came
20 back to his office, and I instructed my staff to
21 close his office, nobody go in and do anything, it
22 was no longer there.  And that's why it's in the

234

1  allegations.
2      Q    So your basis is that he had a copy and
3  when he was fired, you couldn't find the copy in
4  his office; is that correct?
5      A    Correct.  And he used -- he -- he may
6  not have needed it anymore because he already put
7  the information on the index cards.  That's why he
8  asked for the list, so he could put it into his
9  card system.
10     Q    Although you testified you never
11 personally saw him write out a card while looking
12 at the list?
13     A    I can testify that I don't remember a
14 lot of times where I sat and watched him write out
15 cards.  I don't -- that's not how I spend my day,
16 but he did, and I saw him scribbling on the cards.
17 I don't know what he was writing.
18     Q    Wasn't he normally on a phone call
19 talking to a client or prospective client when
20 doing that?
21     A    I don't know how Jim works all day.
22 Yes, he could be doing that, or he could just be

235

1  writing the cards, or he could be on his computer
2  e mailing, or he could just be on the phone
3  without writing the cards.  But I don't have a
4  glass wall between my office and his to sit there
5  and monitor what Jim's doing all day.
6          And demising walls are categorized as
7  the outside walls of your office between adjacent
8  tenants, not adjacent office colleagues.  Those
9  are partition walls.
10         MS. HORNFECK:  Thank you, Mr. Meyer.  I
11 have no further questions.
12         MS. CLARK:  I actually do now based on
13 this line of questioning.
14         THE WITNESS:  Welcome back, Denise.
15         MS. CLARK:  I've been here the entire
16 time.
17     RE EXAMINATION BY COUNSEL FOR THE DEFENDANTS
18 BY MS. CLARK:
19     Q    So, Mr. Meyer, there's a couple things
20 you just said in your Q&A here with Ms. Hornfeck.
21 The first, you indicated that Mr. Rayborn put the
22 data from the Access database on the card.  When

236

1  did you see him do that?
2          MS. CONSOLINO:  Object to form.
3  Actually, strike that.  No objection.  Sorry.
4      A    I don't believe I testified that I
5  physically saw him do it.  What I testified is
6  that he asked for it so that he could update his
7  cards.
8      Q    Okay.  Well, then if you didn't actually
9  see him do it, how do you know that he ever used
10 the database to update his cards?
11     A    I think it's fair to say that when you
12 give somebody lease expiration dates and square
13 footages that that's kind of the meat of what any
14 leasing agent in the world would want to have in
15 order to prospect and follow up with clients.
16     Q    Okay.  So your assumption is now because
17 of the data that's on your Access database is
18 something that you think is most useful to a
19 salesperson, that he must have put that
20 information on his cards?
21     A    That's why he asked --
22     Q    -- is that your testimony?

237

1     A    That's why he asked for it because he
2 didn't have all the lease expirations for
3 everybody.
4     Q    Did he tell you that's what he wanted it
5 for?
6     A    Yes.
7     Q    And when did he tell you that?
8     A    Over the course of our working
9 relationship.  He needed -- he needed to know when
10 we closed deals.  He needed to know if there was
11 lease terminations.  He -- you know, he was aware
12 of the Access database because he was the only
13 person besides myself, and obviously Jess, that
14 really needed it.
15     Q    Well, wasn't Jim part of the pitch to
16 the clients?  Didn't he go to pitch meetings with
17 you?
18     A    Yes, we went together.
19     Q    Okay.  And then after you secured the
20 client, didn't Jim continue to communicate with
21 the client as you were working through deals for
22 the clients?

238

1     A    He was instructed not to.
2     Q    Well, my question is:  Did he do it
3 anyway?
4     A    Sometimes.
5     Q    Okay.  So couldn't he be aware that the
6 client was looking to have a particular term for a
7 lease and know when that lease would end and
8 understand what the square footage would be?
9     A    No, he would know that, though, when he
10 -- when the deal closed and he got a check.
11     Q    Okay.  So he didn't really need the
12 Access database to know that information.  He
13 would get it when he got his commission check,
14 right?
15     A    He wasn't that organized.  He didn't --
16 he didn't transcribe from his commission
17 statements to the index cards.  Because if he did,
18 he wouldn't need the Access database.  All the
19 tenants on the Access database were primarily
20 clients that we had already completed transactions
21 with and invoiced landlords for.
22         MS. HORNFECK:  Did Denise just leave?

239

1         THE WITNESS:  I think -- I think she's
2 done with me.  I'm going on the record to say that
3 she's done with me.
4         MR. GREENBERG:  Hold on one second.  Let
5 me find out what's going on.
6         (Whereupon, a discussion was held off
7 the record.)
8         MS. CLARK:  Can you read back the
9 question before I got dropped off here because of
10 the Internet?
11         COURT REPORTER:  Yes, ma'am.
12         (The reporter read the record as
13 follows:  So he didn't really need the Access
14 database to know that information.  He would get
15 it when he got his commission check, right?)
16         MS. CLARK:  Was that answered?
17         (Whereupon, a discussion was held off
18 the record.)
19         COURT REPORTER:  Did you say you needed
20 that answer?
21         MS. CLARK:  Yes, please.
22         COURT REPORTER:  Okay.

240

1         (The reporter read the record as
2 follows:  He wasn't that organized.  He didn't --
3 he didn't transcribe from his commission
4 statements to the index cards.  Because if he did,
5 he wouldn't need the Access database.  All the
6 tenants on the Access database were primarily
7 clients that we had already completed transactions
8 with and invoiced landlords for.)
9 BY MS. CLARK:
10     Q    Okay.  And this is your opinion.  You
11 don't know exactly -- you don't know whether or
12 not he put anything on the database from his
13 commission check on his cards.  You don't know, do
14 you?
15         MS. CONSOLINO:  Object to form.
16     A    I don't know if he did what?  You're
17 not --
18     Q    You don't know -- yeah, the question is:
19 You don't know exactly whether or not Jim filled
20 out a card when he got a commission check?
21     A    I don't -- no, I don't know.
22     Q    Okay.  You don't know how many cards Jim

241

1   might have created for a particular entity, do
2   you?
3       MS. CONSOLINO: Object to form.
4       A   I'm sorry, a particular what?  Your last
5   couple words --
6       Q   Do you know many cards he may have
7   created for a particular organization?
8       A   How many cards would Jim have created
9   for a particular client or organization?
10      Q   Do you know many cards he created for --
11  let's say for NENA.  Do you know many NENA cards
12  he had?
13      A   No.
14      Q   Do you know what data was on each of the
15  cards?
16      A   I do not.
17      Q   Okay.  So you never really sat down with
18  him to go over his cards or his process, did you?
19      MS. CONSOLINO: Object to form.
20      A   No, I have no need to do that.
21      Q   Okay.  And why was that?
22      A   Because that's Jim's -- Jim's stuff that

242

1   he uses to canvas and market.  There's no reason
2   for me to tell him how to do it, and the only time
3   I would sit down with him on the cards -- well,
4   not the only, but one of the times is because he
5   was either harassing people and -- and I had to
6   come in and say, hey, we need to do -- we need to
7   get the cards resolved.
8       You -- you could -- actually, once upon
9   a time, I had to have some people come in with Jim
10  and go through his cards because he -- he had
11  duplicate cards of the same organization multiple,
12  multiple times.  So they basically helped Jim
13  organize his cards better so he didn't have repeat
14  client names and tenants on it.
15      Q   Who did you have come in and help him do
16  that?
17      A   I think Ned once upon a time did it and
18  maybe one of the other interns or somebody.  It
19  was more of an administrative -- administrative
20  thing, but it was something I asked because it was
21  causing a problem.
22      Q   Okay.  So no one that you can identify

243

1   with a name, since we don't have names of interns,
2   but you also think that Ned may have helped him at
3   one point?
4       A   Yeah, when Ned was working at
5   The Meyer Group.
6       Q   Uh-huh.  You testified that you sat down
7   to discuss the cards with Jim.  And during the
8   last 12 months of his employment, can you tell me
9   what time periods you sat down to discuss the
10  cards with him?
11      A   I don't --
12      MS. CONSOLINO: Object to the form of
13  the question.
14      THE WITNESS: So do I.  I think it's
15  misleading or something.
16      A   I don't remember -- in what context
17  would I sit down with Jim about his cards?
18      Q   Well, this is your testimony.  You said
19  that --
20      A   Well, yeah, but it came under -- it came
21  with something else to it, not just --
22      Q   I think you --

244

1       A   I don't come in with a cup of coffee and
2   sit down with Jim and his cards.
3       Q   So you did not just have a normal,
4   routine sit-down with Jim to go over his cards?
5       MS. CONSOLINO: Object to the form of
6   the question.
7       A   The meetings of Jim and I, as it relates
8   to his cards, would be Jim going through his cards
9   and we'd be talking about specific clients that we
10  were either working with or that we were still
11  pursuing, and Jim would hold the cards and go
12  through them with me.
13      Q   So this was a routine meeting that you
14  had with him?
15      A   Yeah.
16      MS. CONSOLINO: Objection.
17      THE WITNESS: Go ahead, Serine.
18      MS. CONSOLINO: Object to form.  You can
19  answer.
20      A   Yeah, on a -- on an as-needed basis.  We
21  didn't have a standing meeting or something.  It
22  was very informal.

245

1    Q    So no standing meeting, very informal.
2  Can you tell me the frequency?
3    A    When Jim needed to talk.  He would -- he
4  would approach me about it more than I would
5  approach him.
6    Q    Okay.  So from your perspective, you did
7  not have a need to go and speak with him about the
8  cards unless a client called you to complain that
9  Jim was harassing?
10       MS. CONSOLINO:  Object to form.
11    A    No, not necessarily.  I may go in his
12  office and say, what's the status with these
13  people that we met with?  What's the status with
14  this group that you called that we had a meeting
15  and it got canceled?
16    Q    And how frequently did you do that?
17    A    Fairly often.
18    Q    Every day?
19    A    At least once or twice a week by phone
20  or by -- in person.
21    Q    By phone or in person you met with Jim
22  at least once or twice a week about clients that

246

1  he had on his cards?
2    A    Yes.
3    Q    And how did you know those clients were
4  on his cards?  Did you have a copy of the card?
5    A    No.
6    Q    Okay.
7    A    I mean, Jim -- as I just said -- I feel
8  like we're going around in a circle here.  Jim
9  would pull his cards out and go through and ask me
10  questions about either existing ongoing
11  transactions or people that we had met with and
12  followed up with, and --
13    Q    How -- I'm sorry.
14    A    And hold on.  Can I finish?  Because I
15  know you like to ask me questions.  I also would
16  occasionally call Jim or meet with Jim in his
17  office and ask him about transactions that we were
18  working on that we had yet [sic] been hired by
19  The Meyer Group.  Because I don't need to ask Jim
20  about transactions I'm working on.  I need to ask
21  him about things that we were pursuing together.
22  Those cards -- those cards were the nucleus of our

247

1  marketing efforts.
2    Q    Well, if they were the nucleus of your
3  marketing efforts, why didn't you take control of
4  the cards?
5       MS. CONSOLINO:  Denise, you are breaking
6  up.  I did not hear the question.
7    A    I don't know.
8    Q    I said if this was the nucleus of your
9  marketing effort, why didn't you take control of
10  it?
11       MS. CONSOLINO:  Object to the form of
12  the question.
13    A    I object, too.  I'm not sure what you
14  mean by control of it.
15    Q    You didn't make any efforts to control
16  it, to make sure it was in a particular format.
17  You didn't make sure to lock it up at night.  If
18  it was the nucleus of The Meyer Group's marketing
19  efforts, it doesn't look -- it doesn't appear as
20  if you took any steps to control it and protect
21  it.
22    A    Well, obviously -- obviously, that's

248

1  your opinion, but I testified earlier I had
2  security locks on our front door.  I had cameras.
3  It was not something --
4    Q    Did you lock up Jim's boxes of cards?
5    A    -- hello, I'm speaking.
6    Q    Did you lock up Jim's boxes of cards?
7    A    I don't -- I can't hear you.  Somehow
8  you're --
9    Q    Did you lock up Jim's boxes of cards?
10    A    Did I or did Jim?
11    Q    Yes, you.
12    A    Both of us.
13    Q    Where did you lock up his cards?
14    A    In the filing cabinet.
15    Q    Where?
16    A    In the office.
17    Q    In what part of the office?
18    A    The file room or we would lock his
19  office door.
20    Q    You had a file room?
21    A    Okay.  You -- this isn't working for me
22  because I can't hear you, and you're -- I'm trying

249

1   to talk and then you talk over me.
2       Q   I'm just trying to clarify what you are
3   saying.  You locked up the cards in the file room
4   of the office that you maintained before
5   December -- or before January 2019; is that
6   correct?
7       A   Every office of The Meyer Group has a
8   lock, and we locked the door, okay?  Jim's office
9   also had a lock, and my office had a lock.
10  Actually, both offices, the one we had moved from
11  and the one that he was in when he was terminated.
12          So I did do an exceptional job of
13  securing the office, not just for Jim's cards but
14  for everything.  So if you want to paint the
15  picture that I just didn't make any efforts to
16  keep the cards secure or confidential, I'm sure
17  that's what you're going to try to do, but that's
18  not the case.
19      Q   Right.  Mr. Meyer, where in the office
20  that you maintained in January 2019 did you lock
21  up Jim's cards?
22      A   Through his office door.

250

1       Q   So you did not lock it anywhere other
2   than in his office?
3       A   In January of 2019?
4       Q   That was my question.
5       A   No, not in January of 2019, just his
6   office door and, of course, the front door lock.
7           MS. CONSOLINO:  Denise, if you are going
8   to be much longer, can we take a ten-minute break?
9           MS. CLARK:  Do you need ten minutes?
10          MS. CONSOLINO:  I'd like a --
11          MS. CLARK:  We can take a break, but do
12  you need ten minutes?
13          MS. CONSOLINO:  I mean, probably five
14  minutes is fine.  I mean, if you are going to be
15  done soon, then we can just go through, but --
16          MS. CLARK:  We can take a five-minute
17  break.
18          MS. CONSOLINO:  Let's take a break.
19          (Whereupon, a recess was had.)
20          MS. CLARK:  Jeremy, can you go ahead and
21  drop that Plaintiff's objections and responses to
22  Defendant Rayborn, the second set of

25

1   interrogatories in the chat, please?
2   BY MS. CLARK:
3       Q   Mr. Meyer, I'm going to first go to the
4   complaint.  If you could pull that up onto page 5
5   of 21, paragraph 24?
6       A   Can we just wait till he drops it and
7   then we can go there?
8           COURT REPORTER:  Are we marking this as
9   Exhibit 17?
10          (Exhibit 17 marked for identification
11  and attached to the transcript.)
12      Q   In this paragraph --
13      A   I just got it.
14      Q   -- it states that TMG discovered Rayborn
15  had taken, among a number of things, that he
16  absconded with a printout of client information
17  directly procured from TMG's Microsoft database.
18  So first I want to be clear that this is not
19  something he was able to printout himself; is that
20  correct?
21      A   Yes.
22      Q   Were you able to hear my question?

252

1       A   Yes --
2       Q   Okay.
3       A   -- I responded.
4       Q   I didn't hear your response.  What was
5   it?
6       A   I said -- I said yes.
7       Q   That he could not print it out himself?
8       A   Correct.
9       Q   Thank you.
10      A   Are you asking me to look at something
11  on this document?
12      Q   Yeah, now we have got this other
13  document I would like for you to look at.  So on
14  June 3rd, there was a status call in your case
15  with the judge, during which I will represent the
16  defendant had asked to inspect your server which
17  the judge denied and said that we could ask
18  interrogatory.
19          On that date, however, the
20  representation was made that the complaint should
21  have indicated that the database was taken from
22  your office.  So if you see here interrogatory 14

Case 1:19-cv-01945-ABJ   Document 56-6   Filed 11/30/21   Page 64 of 65
Transcript of William Meyer
Conducted on July 8, 2021                                    64 (253 to 256)

253

1 on June 3rd, 2021, counsel for Plaintiffs
2 represented to the Court that Mr. Rayborn
3 supposedly took a printout of Plaintiff s database
4 from Mr. Meyer s office.  We ask that you identify
5 all persons with knowledge about facts surrounding
6 the allegation that Mr. Rayborn took the printout
7 of Plaintiff s database from Mr. Meyer s office.
8         The representation is, as it was stated
9 that day, we understood that the database was
10 taken from your personal office.  The response
11 here just says that you and Mr. Rayborn would be
12 the persons with knowledge about the printout --
13 about Mr. Rayborn taking the printout containing
14 client information from The Meyer Group s offices.
15        So I want to be clear here today.  Your
16 testimony today is that Mr. Rayborn had a copy of
17 the database that you personally gave him at some
18 point during the 12 months before he left.  But
19 that document, according to you and your testimony
20 today, was in Mr. Rayborn s office, and that it s
21 your testimony today that it s that document that
22 Mr. Rayborn took from The Meyer Group s offices;

254

1 is that correct?
**2     A   Yes, and to be clear, we're talking**
**3 about the printed document I gave him.**
4     Q   I haven't suggested anything but a
5 printed document.  No one's --
**6     A   Yes.**
7     Q   Mr. Meyer, I made it clear that the
8 representation -- and if you look at the document
9 I asked you to look at -- look at it.
**10    A   Let me stop for a minute.  Let me pull**
**11 it up.**
12    Q   It is a printout.  I have not said that
13 it was in any other format other than a printout,
14 okay?
15        So I just want to be clear here today
16 that we are -- that of the three representations
17 between the complaint, the representation in
18 court, and your testimony today, that it is your
19 testimony that is accurate about your allegation
20 that Mr. Rayborn took a printout of the database
21 from The Meyer Group's offices; is that correct?
22        MS. CONSOLINO:  Object to the form the

255

1 question.  You can answer.
**2     A   Yes, he did.**
3     Q   Again, my question, there have been
4 three representations, one in the complaint, okay,
5 one by your counsel, which is documented here in
6 interrogatory 14, and one from you.  Which of the
7 three should we say is the correct one?  Your
8 testimony, or your counsel's representation, or
9 the complaint; which of the three?
10        MS. CONSOLINO:  Object to the form
11 question.  You can answer.
**12    A   Are we going on a technical perspective**
**13 from the interrogatory that it says Mr. Meyer's**
**14 office, meaning not The Meyer Group's offices, but**
**15 Mr. Meyer's office, is that --**
16    Q   That's exactly right.  The
17 representation was it came from your individual
18 office.  The answer we got in response is
19 The Meyer Group's offices, and your testimony
20 today has been that the actual printout was in
21 Jim's office.
22        So where -- which of the three

256

1 representations should we understand to be
2 accurate?
3        MS. CONSOLINO:  Object to the form of
4 the question.  You can answer.
**5     A   It was in Mr. Rayborn's office that it**
**6 was removed from by Mr. Rayborn.**
7        MS. CLARK:  I have no further questions.
8        MS. HORNFECK:  I have no questions.
9        MS. CONSOLINO:  Looks like you are done,
10 Bill.
11        (Off the record at 4:50 p.m.)
12
13
14
15
16
17
18
19
20
21
22

Transcript of William Meyer
Conducted on July 8, 2021

65 (257 to 260)

257

1     ACKNOWLEDGMENT OF DEPONENT
2        I, WILLIAM MEYER, do hereby acknowledge
3   that I have read and examined the foregoing
4   testimony and the same is a true, correct and
5   complete transcription of the testimony given by
6   me and any corrections appear on the attached
7   errata sheet signed by me.
8
9
10   (SIGNATURE)          (DATE)
11
12
13
14
15
16
17
18
19
20
21
22

259

1     CERTIFICATE OF REPORTER - NOTARY PUBLIC
2        I, KELLY WALTERS, the officer before
3   whom the foregoing deposition was taken, do hereby
4   certify that the foregoing transcript is a true
5   and correct record of the testimony given; that
6   said testimony was taken by me and thereafter
7   reduced to typewriting under my direction; that
8   reading and signing was not requested; and that I
9   am neither counsel for, related to, nor employed
10   by any of the parties to this case and have no
11   interest, financial or otherwise, in its outcome.
12        IN WITNESS WHEREOF, I have hereunto set
13   my hand and affixed my notarial seal this 11th day
14   of JULY, 2021.
15
16
17   My Commission Expires: August 25, 2024
18
19
20
21
22

258

1     CERTIFICATE OF SHORTHAND REPORTER NOTARY PUBLIC
2        I, PAUL P  SMAKULA, the officer before whom
3   the foregoing deposition was taken, do hereby
4   certify that the foregoing transcript is a true
5   and correct record of the testimony given; that
6   said testimony was taken by me stenographically
7   and thereafter reduced to typewriting under my
8   direction; that reading and signing was requested;
9   and that I am neither counsel for, related to, nor
0   employed by any of the parties to this case and
     have no interest, financial or otherwise, in its
2   outcome
3
4   IN WITNESS WHEREOF, I have hereunto set my hand
5   and affixed my notarial seal this   3th day of
6   July, 202
7   My commission expires:  June  8, 2023
8
9
20   NOTARY PUBLIC IN AND FOR
2   THE STATE OF MARYLAND
22