**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE MEYER GROUP, LTD.,          )
and WILLIAM J. MEYER,           )
                                )
    *Plaintiffs*,                 )     Case No. 19-cv-1945-ABJ
                                )
v.                              )
                                )
JAMES RAYBORN and BROAD         )
STREET REALTY, LLC,             )
                                )
    *Defendants*.                 )
_____ )

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 3

ARGUMENT ......................................................................................................... 11

I.   TMG IS ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY ON ITS
     BREACH OF CONTRACT CLAIM.............................................................. 11

     A.   Because There Is No Genuine Dispute of Material Fact That Rayborn Breached The
          ICA, TMG Is Entitled To Summary Judgment ........................................... 11

     B.   Rayborn Breached The Plain Language of the ICA by Taking And Using the Canvass
          Cards............................................................................................................... 12

     C.   Rayborn's Breach of the ICA Caused TMG To Lose Clients ..................... 13

     D.   Rayborn's Attempts To Avoid Liability for His Breach Are Meritless........ 15

II.  NUMEROUS ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON TMG'S
     TRADE SECRETS CLAIMS .......................................................................... 23

     A.   The Meyer Group's Most Valuable Client Information Is Contained on The Canvas
          Cards and the Access Database ..................................................................... 24

     B.   The Meyer Group's Client Information Is Not Publicly Available .............. 26

     C.   The Meyer Group Took Great Pains to Keep its Trade Secrets Confidential ............. 33

     D.   Broad Street Knew That Rayborn Breached the ICA By Taking The Cards .............. 40

     E.   Rayborn and Broad Street Won Commissions Using TMG'S Trade Secrets ............. 40

III. NUMEROUS ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON TMG'S
     TORTIOUS INTERFERENCE CLAIM ........................................................ 41

     A.   The D.C. Court of Appeals Has Held That "Terminable at Will" Contracts Can Be The
          Basis of Tortious Interference With Contract Claims .................................. 42

     B.   TMG Had a "Reasonable Expectancy" of Representing The Tenants At Issue—Nearly
          All of Whom Were Former TMG Clients ..................................................... 43

     C.   The Record Abounds With Evidence of Defendants' Intent To Interfere .................. 44

     D.   Defendants Have Not Shown That Their Interference Was Not Wrongful................. 45

     E.   By Definition, A Tortious Interference With Contract Claim Involves an Underlying
          Contract ......................................................................................................... 46

IV.  RAYBORN'S STATEMENTS THAT MEYER HAS "RETIRED" ARE
     INTENTIONALLY FALSE AND DEFAMATORY ....................................... 47

 V.  DEFENDANTS' DAUBERT ARGUMENTS ARE MERITLESS ................... 48

CONCLUSION...................................................................................................... 50

## INTRODUCTION

This is a straightforward case.  In January 2019, Defendant James Rayborn was fired from Plaintiff The Meyer Group, Ltd. ("TMG"), and walked out with a collection of canvass cards containing extensive TMG client information.  He did so in violation of his independent contractor agreement with The Meyer Group, which states quite clearly that the "canvas[s] cards" are "property of TMG" and that Rayborn cannot take them and cannot use them.  Use them, he did: four days after leaving TMG, Rayborn joined Defendant Broad Street Realty LLC ("Broad Street")—a TMG competitor—and Rayborn and Broad Street wasted no time in attempting to poach TMG's clients.  Sixteen TMG clients ultimately left TMG for Broad Street; none of them had previously used Broad Street as their broker.

Defendants lodge every conceivable argument to excuse their misconduct.  All of them fail.  First, Rayborn denies that he breached his agreement with TMG by pretending that the agreement does not mean what it plainly says.  Defendants also attempt to argue that the canvass cards do not warrant trade secret protection because they are neither "valuable" nor "confidential." The canvass cards, however, contain a wealth of the most valuable and exclusive types of information a real estate broker could have: details about key contacts, including personal cell numbers and email addresses; private lease terms, such as square footage, price, and expiration dates; and notes on client preferences.  None of this information is publicly available, but even if it were, it is well-established that compilations of publicly available information can be trade secrets where the information is the product of significant effort—and *in Rayborn's own words*, the canvass cards took ***"many years"*** to compile.  Regardless, whether the canvass cards are valuable and contain non-public information are plainly questions of fact that cannot be resolved

on summary judgment.  Likewise, Defendants' motion for summary judgment on TMG's tortious

interference claim relies on highly-disputed factual assertions, and so must be denied.

For these reasons and as further described below, Plaintiffs respectfully request that the

Court grant partial summary judgment as to liability on TMG's breach of contract claim against

Rayborn (Count I)  and deny Rayborn's motion for summary judgment on that claim, and deny

Defendants' Motion for Summary Judgment on TMG's claims for tortious interference with

contract and/or prospective economic advantage against (Count II), misappropriation of trade

secrets against (Counts III and IV), and defamation (Count V).

## STATEMENT OF FACTS

TMG is a commercial real estate brokerage firm based in Washington, D.C.  It was founded

in 1994 by William J. Meyer, and since its founding, TMG has focused exclusively on tenant-side

representation.  *See* Defendants' Joint Statement of Facts ("DSOF") ¶¶ 15, 16.  Though TMG has

remained small—in terms of personnel, it has never had more than seven or eight licensed agents

at a time—over the years, TMG has managed to successfully compete against brokerage firms

several times its size.  *See* Plaintiffs' Statement of Material Facts ("PSOF") ¶ 1.  TMG's success

can be attributed, in no small part, to the quality of its tenant information: information that—much

like targeted advertising—allows TMG to approach clients with the right proposals at the right

time.  *See* PSOF ¶ 2.  TMG has spent many years compiling this highly valuable and confidential

tenant information.  *See id.*

## I.      Compiling High-Quality Tenant Information Is the Cornerstone of a Successful Tenant-Side Commercial Real Estate Broker Practice

Tenant-side commercial lease brokers represent tenants—businesses, non-profits, and

other organizations—in identifying, negotiating, and securing short and long-term leases of

commercial space, which can often be complex and expensive.  *See* PSOF ¶ 3.  Though prospective

tenants hire commercial lease brokers directly to represent them in connection with these transactions, in the D.C. metropolitan area, commercial lease brokers are not paid by the tenants for this service, but by the tenants' landlords in the event a lease agreement is consummated. *See* PSOF ¶ 4. Brokers and tenants often sign brokerage agreements—referred to in the industry as "exclusive representation agreements"—which require tenants to identify brokers to their landlord as the "procuring cause" of any leasing transaction consummated for a particular space identified by the broker to the tenant, so that the landlord knows who to pay. *See* PSOF ¶ 5.

Tenant-side commercial lease brokers generate business both by cold-calling new clients, and also by contacting tenants who they have represented in the past. *See* PSOF ¶ 7. A broker's ability to compete in the highly competitive D.C. real estate market is the direct result of the quality and breadth of their tenant information. *See* PSOF ¶ 8. A tenant's particular financial or business circumstances dictates its future space needs. Information about, for example, a tenant's desired lease term, growth plans, key decision-makers, line of business, annual revenue or number of employees enables brokers to build relationships with key tenant representatives, understand their space needs, and better market themselves to prospective tenants. *See* PSOF ¶ 9. It also allows brokers to be better advocates for tenants once leasing negotiations begin. *See id*.

A tenant's current lease also contains highly valuable information. The duration, square footage and price of a tenant's current lease, as well as information about concessions and early termination, expansion, and renewal options allows brokers to better pitch to clients through targeted market analyses. *See* PSOF ¶ 10. Knowing a lease's early termination, expansion, and renewal options is critical information for brokers, because these options typically must be exercised during a specific period of time, creating a narrow window of opportunity. *See id*.

Finally, one of the most valuable pieces of information for a broker to know about a prospective tenant is the date of the expiration of its current lease.  *See* PSOF ¶ 11.  The expiration date of a tenant's current lease tells the broker when to reach out to a prospective tenant to inquire about whether it wants to renew its current lease, extend its duration, or seek a different space altogether.  *See id*.  The timing of a broker's outreach is critical: if a broker approaches a tenant too early, the tenant's current lease expiration will be too remote for the tenant to be in a position to make decisions about its long-term space needs.  *See* PSOF ¶ 12.  On the other hand, if the outreach comes too late, the tenant may have already engaged another broker.  *See id*.  Because identifying space and negotiating a lease is a time-intensive process, beginning the search for space between twelve to eighteen months before the expiration of a tenant's current lease allows enough time for the tenant to evaluate different spaces, negotiate a lease, and perform any necessary renovations or repairs before move-in.  *See* PSOF ¶ 13.

## II.    TMG's Tenant Information Is The Product of Many Years of Consistent Effort

The above-described information can take years to compile—and in the case of TMG, it has.  *See* PSOF ¶¶ 2, 14.  Brokerage firms like TMG hire agents—such as Rayborn—to cold-call prospective tenants for the express purpose of acquiring and compiling this type of tenant information and, in turn, generating clients for the firm.  *See* PSOF ¶ 15.  Though Rayborn insists that tenant information is only a "phone call" away, this refrain is deceptive: it often takes agents several years to develop the necessary relationships and compile the necessary information to bring in a client.  *See id*.  In recent years, TMG has used a secure Microsoft Access Database (the "Access Database") to compile its clients' lease information once a deal is completed.  *See* PSOF ¶ 16.

Shortly after its formation, TMG hired Rayborn to be an agent.  *See* DSOF ¶ 17. Throughout his tenure at TMG, Rayborn's primary job function was to generate potential leads for

TMG, which he did through cold-calling clients and compiling their information.  *See* DSOF ¶ 18; PSOF ¶ 17 (Rayborn testifying that his job responsibilities at both TMG and Broad Street "are to canvass and to secure leads of tenant[s]. . . to win business.").   Though Rayborn would occasionally participate in office tours and accompany William Meyer to pitch meetings, Rayborn's client involvement generally ended there: once a tenant hired TMG as its broker, William Meyer became the tenant's exclusive point of contact at TMG, and handled all leasing negotiations.  *See* PSOF ¶ 18 (Rayborn testifying that he "very rarely" handles leasing negotiations).  For his canvassing work, Rayborn was paid handsomely: by the time Rayborn left TMG in 2019, he was earning a 75% commission split for any tenant he brought to TMG— amounting to an income of more than $800,000 in his last full year at TMG.  *See* PSOF ¶ 19.

### III.    Rayborn Compiled TMG's Client Data on a Set of Handwritten Index Cards

Rayborn maintained and organized TMG's client information on a set of handwritten index cards, which he and Meyer referred to as "canvass cards" (the "Canvass Cards").  *See* PSOF ¶ 20. Rayborn used the Canvass Cards to record information collected from cold-calling both potential and past TMG clients.  *See id*.  The Canvass Cards compiled everything from information about a tenant's key decision makers—for example, noting that a key decision maker at a particular tenant was a "Republican"—to notes about tenants' businesses, the type of space they were searching for, information about their current leases, and, notably, their lease expiration dates.  *See* PSOF ¶¶ 21, 22, 23.  When he ran out of space on one card, Rayborn would use additional cards to record tenant information, sometimes resulting in multiple cards for one client.  *See* PSOF ¶ 24.

TMG custom ordered the Canvass Cards specifically for Rayborn's use; no other agent used Canvass Cards extensively to record client information.  *See* PSOF ¶ 25.  Each card contained on the bottom right-hand corner a field specifically for recording lease expiration dates and on the

bottom left-hand corner a field specifically for recording a tenant's square footage, and each card was imprinted with TMG's name and logo. *See* PSOF ¶ 26. Rayborn organized the Canvass Cards by lease expiration date, which would tell him when to follow up with tenants about leasing a new space or renewing or extending their existing lease. *See* PSOF ¶ 27.

The tenant information compiled in the Canvass Cards was—in Rayborn's own words— the product of "many years" of consistent effort. *See* PSOF ¶ 14. Throughout that time, there was never any dispute that the Canvass Cards were the property of TMG: TMG ordered them, paid for them, and provided them to Rayborn to use in his work generating clients ***for TMG.*** *See* PSOF ¶¶ 25, 26.

### IV.    TMG Fires Rayborn For Unprofessional Conduct With Clients

In May 2018—after several clients complained of Rayborn's inappropriately aggressive tone and various other instances of unprofessional conduct—Meyer decided to terminate Rayborn from TMG. *See* PSOF ¶ 28. A few weeks later, however, Rayborn approached Meyer, asked for his job back, and promised to improve his demeanor with clients. *See id.* Concerned that Rayborn was seeking reinstatement for the express purpose of accessing TMG's client information—the Canvass Cards had remained with TMG after Rayborn's departure—Meyer asked Rayborn, as a condition of his reinstatement, to sign an updated Independent Contractor Agreement ("ICA"). *See* PSOF ¶ 29. On May 23, 2018, Meyer emailed Rayborn a draft. *See id.* The ICA provided that "Confidential Information"—which the ICA expressly defined to include "canvas[s] cards"— "is the property of TMG," and that "Contractor agrees not to disclose the Confidential Information to others or use the Confidential Information for his own advantage or the advantage of others." Ex. 9. *See* DSOF ¶ 35. Though the language of the ICA is unmistakable—there were no other "Canvass Cards" that the parties had ever discussed or used—Meyer explicitly informed Rayborn

- 6 -

that the scope of the ICA's confidentiality provision included the Canvass Cards containing Rayborn's notes on clients and prospective clients.  *See* PSOF ¶ 30.

Upon receiving the draft ICA, Rayborn consulted two different attorneys—both of whom, Rayborn has testified, advised him "against signing [the] agreement"—and also sought the advice of a colleague at TMG.  *See* PSOF ¶ 31.  Despite, apparently, being counseled not to sign the ICA, Rayborn decided to proceed, and the parties executed the ICA on May 29, 2018—six days after Rayborn received the draft.  *See* DSOF ¶ 30.  At his deposition, Rayborn confirmed that when he signed the ICA, he understood "***that the named items [in the ICA] were confidential in nature***"— including, of course, the Canvass Cards.  *See* PSOF ¶ 32.  Rayborn would later tell Michael Jacoby—Broad Street's CEO—that Meyer "***added to the new agreement*** . . . ***that the canvass cards belonged to him***" but that Rayborn signed the ICA nonetheless, because he "***felt it was better***" to "***fight for the issues in court***."  *See* PSOF ¶ 33.

## V.     Rayborn Leaves For Broad Street, Taking the Canvass Cards With Him

Unbeknownst to Meyer, by January 2019, Rayborn was actively job hunting.  *See* PSOF ¶ 34.  In mid-January, Rayborn interviewed with Broad Street, and on January 21, Michael Jacoby— Broad Street's CEO—sent Rayborn an email attaching Broad Street's standard Independent Contractor Agreement ("Broad Street's ICA").  *See* PSOF ¶ 35.  Notably, Broad Street's ICA also contained a confidentiality provision prohibiting the contractor from divulging or using the "names of clients and customers or prospective customers and clients, public relations matters, or any other aspect of Broad Street's business."  *See* PSOF ¶ 36.  Upon receiving Broad Street's ICA, Rayborn added the following clause:

> Broad Street and Contractor expressly agree that contact cards developed or created by Contractor based on Contractor's independent work, prior to or during Contractor's employment by Broad Street covered by this Agreement, will remain the sole and exclusive property of Contractor both during the term of this

> Agreement and after termination of this Agreement, and said contact cards shall be specifically excluded from the scope or definition of Broad Street's proprietary information, Confidential Information, records, files and/or documents.

*See* PSOF ¶ 37.   Broad Street accepted Rayborn's proposed revision.  *See* PSOF ¶ 38.

Meyer came to learn that Rayborn was in talks with other brokerage firms, and on January 24, Meyer—who was out of town at the time—called Rayborn to confront him about what he had overheard.  *See* PSOF ¶ 39.   Rayborn admitted that he was considering options from other brokerage firms.  *See* PSOF ¶ 40.   Meyer informed Rayborn that he was terminated effective immediately, and instructed him to delete all TMG documents and leave all TMG documents and property—including the Canvass Cards—at TMG's office.  *See* PSOF ¶ 40.   Meyer also instructed his staff to disable Rayborn's TMG email access, which they did, and—to the extent possible—to prevent Rayborn from leaving with the Canvass Cards.  *See* PSOF ¶ 40.   Nonetheless, Rayborn successfully walked out of TMG's office with the Canvass Cards and the Access Database in tow, texting a friend, "Bill terminated me"—but explaining that he had "***[c]leared the office out***" and had taken "***everything [he] needed***."  *See* PSOF ¶ 41.  Haze McCrary, Rayborn's colleague at Broad Street, testified that Rayborn brought at least three "bread-boxed-sized containers"—i.e, ***thousand***s of Canvass Cards—with him to Broad Street.  *See* PSOF ¶ 42.

On January 28—four days after leaving TMG—Rayborn joined Broad Street.  *See* PSOF ¶ 38.   Rayborn lost no time in attempting to poach TMG's clients.  For example, the very day that Rayborn started at Broad Street, a representative of a longstanding TMG client—on behalf of whom TMG was in the process of negotiating a significant lease—emailed Meyer to tell him that she had "just received a call from Jim saying he's still [the broker] on the case" and noting her confusion; Meyer had to explain that Rayborn was no longer working at TMG.  *See* PSOF ¶ 43.

On several occasions, Rayborn *explicitly instructed* TMG's clients to terminate their agreements with TMG.   *See* PSOF ¶ 44.

Rayborn also began telling TMG's clients that Rayborn had either "retired" or was about to retire—even though he knew that to be false.  *See* PSOF ¶ 45 (Rayborn stating that Meyer was "winding down to retire," Rayborn stating that Meyer is "no longer in the business," Rayborn stating he heard Meyer had "retired," Rayborn stating, "I am with a new firm and Bill is basically retired").  And in at least one instance, Rayborn even pretended that he still worked at TMG.  *See* PSOF ¶ 46 (March 17, 2019 email from Catherine Bertram—a longtime TMG client—to Meyer, stating that Rayborn "called [their] office" to set up a meeting and "said he was with the Meyer Group.").

## VI.   Defendants Knowingly Use TMG's Client Information To Poach Clients

Michael Jacoby, Broad Street's CEO, knew from outset that Rayborn was bringing TMG's client information with him to Broad Street against TMG's express wishes.  *See* PSOF ¶ 47 (testifying that when Rayborn joined Broad Street, Rayborn had told him he had "contact cards" containing "general information about prospects" that would be bringing with him from TMG, and that Rayborn had a "difference of opinion" with Meyer about the cards).  Less than two weeks after Rayborn joined Broad Street, Meyer emailed Jacoby, asking for a meeting to discuss Rayborn's contract with TMG.  Jacoby forwarded Meyer's email to Rayborn and McCrary, stating, "[l]ittle offense guys.  Jim, please send me your old contract."  *See* PSOF ¶ 48.  Rayborn sent Jacoby the ICA, and Jacoby promptly informed Rayborn that, in his opinion, TMG "did not [have] a right" to the Canvass Cards—though Jacoby admitted at his deposition that he had not consulted with an attorney before opining on the ICA.  *See* PSOF ¶ 49.  Over the next few weeks, Broad

Street and Rayborn continued in their efforts to poach as many TMG clients as possible, blatantly ignoring Meyer's request and the ICA.

On April 26, 2019, TMG sent a cease-and-desist letter to both Broad Street and Rayborn, demanding that Broad Street cease using TMG's Confidential Information and soliciting TMG's clients and potential clients. *See* PSOF ¶ 50. Broad Street refused to comply with TMG's request, claiming that it was unable to refrain from using TMG's Confidential Information unless TMG provided an entire list of all TMG's clients and potential clients. *See* PSOF ¶ 51.

By summer 2019, TMG was aware of at least four tenants that Rayborn and Broad Street had poached from TMG, and on July 2, 2019, TMG filed this lawsuit, identifying those tenants in its original Complaint. *See generally* Complaint, ECF No. 2. In retaliation, Rayborn sued TMG in D.C. Superior Court for allegedly unpaid commissions under the ICA; the D.C. Superior Court, however, has since granted summary judgment in TMG's favor on all claims. *See* PSOF ¶ 52; Jan. 22, 2021 Order Granting Summary Judgment, *Rayborn v. The Meyer Group*, 2019 CA 006492 B.

Defendants have fought tooth-and-nail to conceal the full list of clients they have poached from TMG. During his July 13, 2020 deposition in the D.C. Superior Court case, Rayborn ***denied taking any Canvass Cards at all***. *See* PSOF ¶ 53 (in response to a question asking whether Rayborn took index cards with him when he left TMG, testifying "I left them on my desk" and that "Sarah Religa [a TMG assistant] took them."). Once Defendants turned over relevant discovery in this case—including hundreds of Canvass Cards with TMG's name and logo—TMG learned of an additional twelve tenants who Defendants have poached from TMG. *See* PSOF ¶ 54. As of the close of discovery, Defendants have received well over $800,000 in commissions to date in connection with their representation of those tenants. *See id*.

**ARGUMENT**

I.    **TMG IS ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY ON ITS BREACH OF CONTRACT CLAIM**

TMG respectfully requests that the Court enter summary judgment in its favor as to liability on its breach-of-contract claim (Count I) against Rayborn.  TMG's breach-of-contract claim is straightforward, and a ruling on liability will truncate the issues for trial.

Under D.C. law, a breach-of-contract claim has four elements: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach."  *Africare, Inc. v. Xerox Complete Document Solutions Maryland, LLC*, 436 F. Supp. 3d 17, 33 (D.D.C. 2020).

Rayborn concedes (i) that the ICA is a valid agreement, and (ii) that he took the Canvass Cards at issue when he left TMG.  *See* DSOF ¶ 42.  Thus, the only issues before the Court are whether the ICA prohibits Rayborn from taking and using the Canvass Cards, and whether Rayborn's use of the Canvass Cards at Broad Street caused TMG to suffer some amount of damages.  There is no genuine dispute of fact that both are true, and Rayborn's various attempts to gin up disputes about each of these elements do not withstand scrutiny.

A.    **Because There Is No Genuine Dispute of Material Fact That Rayborn Breached The ICA, TMG Is Entitled To Summary Judgment**

The standard of review is well-settled and familiar to the Court.  A party is entitled to summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  A genuine dispute about material facts exists 'if the evidence is such that a ***reasonable*** jury could return a verdict for the nonmoving party.'"  *Farmland Indus., Inc. v. Grain Bd. of Iraq*, 904 F.2d 732, 736 (D.C. Cir. 1990) (quoting *Andersen v. Liberty Lobby*, 477 U.S. 242, 248 (1986)) (emphasis added).  A party opposing summary

judgment "'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'"  *Internet Fin. Servs, LLC v. Law Firm of Larson-Jackson, P.C.*, 310 F. Supp. 2d 1, 2 (D.D.C. 2004) (quoting *Andersen*, 477 U.S. at 248).  Importantly, "[a]rguments of counsel do not substitute for evidence that establishes a genuine issue of material fact."  *Id.* at 4.

### B.  Rayborn Breached The Plain Language of the ICA by Taking And Using the Canvass Cards

Contract interpretation is a "question of law, and therefore appropriate for resolution on a motion for summary judgment where the contract language is plain and unambiguous."  *United States ex rel. Raggio v. Jacintoport Int'l, LLC*, Civil Action No. 10-01908, 2015 WL 13708607, at *2 (D.D.C. 2015).  There is no ambiguity in the ICA.  Section 6 of the ICA (the "Confidentiality Provision") first defines "Confidential Information" to include "canvas[s] cards," and then prohibits Rayborn from "disclos[ing] the Confidential Information" or "us[ing] the Confidential information for his own advantage or the advantage of others."  DSOF ¶ 35.  The Confidentiality Provision further states that "upon termination of Contractor's services," the Contractor must "turn over to TMG" all of TMG's property, including the "Confidential Information."  PSOF ¶ 55.  Rayborn thus breached this clear language by (i) taking the Canvass Cards from TMG and (ii) using the Canvass Cards to bring clients to Broad Street.

Rayborn concedes that he took the Canvass Cards with him when he left TMG—and he cannot seriously dispute that he uses the Canvass Cards in his work at Broad Street.  Broad Street's CEO testified that Rayborn "uses index cards to record names, phone numbers, and general information about prospects," his supervisor at Broad Street testified Rayborn was "wrapped around an axle about these cards" because "they're super important to him," and Broad Street's office manager testified that the Canvass Cards were "his baby."  PSOF ¶ 56.

For his part, Rayborn has not only testified that he uses the Canvass Cards to note "information" that he learns from phone calls with tenants, PSOF ¶ 57, he has also declared—on multiple occasions—that he *cannot canvass without them.* *See* PSOF ¶ 59 ("IF I RUN OUT OF CANCASS [SIC] CARDS THE COMPANY SHUTS DOWN AND NO ONE MAKES ANY MONEY!!!!!!!"); PSOF ¶ 60 (Rayborn says he "needs more canvass cards (keeps the lights on)"); PSOF ¶ 61 (Rayborn says if he doesn't have canvass cards, "I can't and won't work next week [. . .] I have nothing to write on and need them to canvas [. . .] the company is shut down"); PSOF ¶ 62 (Rayborn tells TMG assistant "canvass cards pay your salary and keep the company running"); PSOF ¶ 63 (Rayborn describes canvass cards as "what keeps the doors open"). By Rayborn's own words, then, he is unable to do his chief job—bringing in business—without using the Canvass Cards. Because there is no genuine dispute of fact that Rayborn has breached the plain language of the ICA by taking and using the Canvass, the only remaining issue for the Court to decide is whether Rayborn's use of the Canvass Cards caused TMG to suffer *some amount* of damages.

## C. Rayborn's Breach of the ICA Caused TMG To Lose Clients

The harm caused by Rayborn's breach is obvious: by taking and using the Canvass Cards, Rayborn was able to successfully poach numerous TMG clients—causing TMG to lose hundreds of thousands of dollars of commissions that it would have otherwise received from representing those clients in connection with their leases. *See Roebuck & Co. v. Goudie*, 290 A.2d 826, 832 (D.C. 1972) (damages for breach of contract are those damages "as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it").

To date, TMG has identified at least eleven TMG clients for which Rayborn took TMG Canvass Cards who Defendants have represented since Rayborn joined Broad Street. *See* PSOF ¶

- 13 -

64.  Of those eleven, TMG has previously represented all but two (and of the two tenants who TMG had not previously represented, TMG had actively been pitching them).[1]  *See* PSOF ¶ 65; Pls.' Response DSOF ¶ 155 (National Minority Quality Form and Quality Education for Minorities Network).  Before Rayborn brought these eleven tenants to Broad Street, Broad Street had not represented any of them.  *See* PSOF ¶ 67.  Broad Street and Rayborn have received hundreds of thousands in commissions from representing these tenants.  *See* PSOF ¶ 66.

It is thus undisputed that Rayborn (i) uses the Canvass Cards to bring in clients, (*see* Section I.B), (ii) that Rayborn brought numerous clients with him from TMG to Broad Street for which he and Broad Street received substantial commissions (*see* PSOF ¶¶ 66, 67), and (iii) that Rayborn possesses TMG Canvass Cards—with TMG's name and logo—for some, if not all, of these clients.  *See* PSOF ¶ 64.  It is also virtually certain that—but for Rayborn's breach—at least some clients would have used TMG as their broker, as the vast majority were previously TMG's clients.  *See* PSOF ¶¶ 65, 118.  "[I]n order to survive a motion for summary judgment based on the asserted insufficiency of proof of damages, a plaintiff need not, at this stage, show the amount of damages; he is obligated only to show that they exist and are not entirely speculative." *Parr v. Ebrahimian*, 70 F. Supp. 3d 123, 133 (D.D.C. 2014) (granting summary judgment in plaintiff's favor "albeit for what appears to be a minimal recovery") (citations and quotations omitted).   TMG has shown that

---

[1] There are additional tends for which TMG intends to seek damages at trial for whom Rayborn has never produced Canvass Cards—even though they are on the Access Database, *see* PSOF ¶ 121, are prior TMG clients, *see* PSOF ¶ 68, and were brought to Broad Street by Rayborn, *see* PSOF ¶¶ 66, 67.  Rayborn created a Canvass Card for every TMG client, *see* PSOF ¶ 20, 24, and testified that he keeps Canvass Cards for clients whose deals are completed.  *See* PSOF ¶ 69.  In light of the fact that two of Rayborn's colleagues at Broad Street threw away or shredded Canvass Cards given to them by Rayborn during this litigation, *see* PSOF ¶ 70, TMG intends to seek an adverse inference at trial that these cards were either inadvertently not produced or destroyed.

its damages "exist" and are not "speculative."  It has thus established Rayborn's liability on its

breach-of-contract claim, and partial summary judgment should be granted in TMG's favor.

### D.  Rayborn's Attempts To Avoid Liability for His Breach Are Meritless

In the face of his clear breach, Rayborn attempts to escape liability through a series of

strained arguments that ignore the plain language of the ICA.  *First*, Rayborn posits that the

Confidentiality Provision is not enforceable, though he cites no law at all in support of that

argument.  *Second*, Rayborn asks the Court to limit his damages to proven clients of TMG—

ignoring that the ICA explicitly refers to both "clients" and "***prospective clients.***"  *Third*, Rayborn

advances an unreasonable interpretation of the ICA to argue that the Confidentiality Provision only

applies to Canvass Cards created after May 29, 2018—the day the ICA was signed—even though

both the plain language of the ICA and extrinsic evidence in the record contradicts Rayborn's

strained reading.

*Fourth*, Rayborn argues that he breached no duty under the ICA because the information

on the Canvass Cards is not "Confidential," even though the ICA defines "Confidential

Information" to include the Canvass Cards.  *Fifth*, Rayborn suggests that the ICA does not apply

to the Canvass Cards at all because it does specifically mention Rayborn's "work product"—an

argument that contradicts both the plain language of the ICA and Rayborn's own position in this

case.  *Sixth*, Rayborn contends that TMG has not shown "causation," but as explained above, there

is no genuine dispute of fact that Rayborn's breach of the ICA has caused TMG to suffer damages

in the form of lost commissions.

### 1.  Rayborn's Various Arguments About the Purported Unenforceability of the Confidentiality Provision Have No Support In Case Law

Rayborn first posits that because the Court found the Non-Solicitation Provision of the ICA

to be enforceable, the Confidentiality Provision of the ICA must also be unenforceable because

- 15 -

the removal of the Non-Solicitation Provision would "impair[] the symmetry of [Section 6] overall." *See* Defs. Mem. 4.  That argument is meritless.  Rayborn cites no law in support of his extreme position that a contractual provision must be stricken for lack of "symmetry."  Nor can it be argued that the absence of the Non-Solicitation provision renders the Confidentiality Provision unclear in any way; these two provisions are entirely distinct and nothing about the construction or interpretation of the Confidentiality Provision depends on the Non-Solicitation Provision. If, instead, what Rayborn means to suggest is that the Confidentiality Provision somehow lacks consideration because the Court invalidated the Non-Solicitation Provision, that, too, would be an incorrect supposition—and one that it is directly contradicted by the very case Rayborn cites here. *See EDM & Associates, Inc. v. GEM Cellular*, 597 A.2d 384, 390 (D.C. 1991) ("A lawful promise made for a lawful consideration ***is not invalid*** by reason only of an unlawful promise made at the same time and for the same consideration." (emphasis added) (citations and quotations omitted)).

Next, Rayborn advances the equally meritless argument that because the term "clients" is purportedly ambiguous (it is not), the Court should decline to enforce the Confidentiality Provision.  That argument suffers from at least two independent flaws.  **_First,_** the provision that TMG seeks to enforce with respect to the Canvass Cards neither contains or depends on the definition of the word "clients"; the ICA simply states that Rayborn must "turn over"—and cannot "disclose" or "use"—the Canvass Cards.  *See* DSOF ¶ 35; PSOF ¶ 55.  Thus, irrespective of what the word "clients" means, Rayborn breached the plain language of the ICA.

**_Second_**, Rayborn conflates case law about contracts containing ***ambiguous*** with case law about contracts containing ***indefinite material terms***—two entirely different concepts.  *See* Defs. Mem. 5.  *See Rosenthal v. National Produce Co., Inc.*, 573 A.2d 365, 370 (D.C. 1990) (concluding that no contract had been formed because "[t]here was no stated agreement as to price, quantity,

quality, or duration"). Rayborn's assertion that courts "decline to enforce contracts" with "ambiguous" terms is incorrect. Rather, if a term is ambiguous, courts look to "extrinsic evidence on the intent of the parties." *District of Columbia v. D.C. Pub. Serv. Comm'n,* 963 A.2d 1144, 1155-56 (D.C. 2009). Here, the ICA lacks no material terms, and Rayborn has never claimed that the ICA is unenforceable—nor can he, having sued TMG under the very same agreement—so case law about the enforceability of contracts with "indefinite material terms" is not applicable.

### 2. The Court Should Not Preemptively Limit TMG's Damages At Summary Judgment Where, As Here, There Are Disputed Factual Issues

Rayborn next asks the Court to limit TMG's recoverable damages to tenants who are "proven" clients of TMG—and identifies several entities who, he contends, did not "retain" TMG and are therefore not subject to the Confidentiality Provision. *See* Defs. Mem. 5-6. That argument is a red herring. The Confidentiality Provision prohibits Rayborn from taking and using (i) the Canvass Cards and (ii) information about TMG's "clients and ***prospective*** clients." *See* DSOF ¶ 35. Thus, the information covered by the ICA provisions need not relate to clients previously retained by TMG in order to be the basis for recoverable damages.

Regardless, Rayborn's contention that the entities in question do not constitute "actual clients" of TMG is demonstrably false. Of the sixteen entities for which TMG currently seeks damages, all but three have previously hired TMG as their broker. *See* PSOF ¶ 65. Of the three that have not, TMG was actively pursuing those tenants throughout 2018—setting pitch meetings and compiling Canvas Cards with their information—clearly making these entities ***prospective*** TMG clients. *See* PSOF ¶ 64; Pls.' Response DSOF ¶ 92. Nor is the fact that the Access Database omits certain tenants dispositive or even remarkable, as the Access Database was not always kept up-to-date by TMG's administrative personnel, and it did not include information about prospective clients—though it does list many of the clients at issue. *See* PSOF ¶ 16; *see also* ¶

- 17 -

121.  Defendants are putting words in TMG's mouth by trying to pretend that the Access Database is a comprehensive list of all of TMG's clients, when it is not and never has been.  Thus, to the extent Rayborn asks the Court to limit TMG's recoverable damages to actual or prospective clients of TMG, there is a clear factual dispute as to which entities constitute actual or prospective "TMG clients," precluding summary judgment.

### 3.  Rayborn's Strained Interpretation of the ICA is a *Post-Hoc* Invention That Is Unsupported By Any Evidence

Rayborn next advances a wildly implausible interpretation of the Confidentiality Provision, arguing that it necessarily excludes any "Canvas Cards" created before the parties signed the ICA in May 2018.  Rayborn's only basis for this argument is that the Confidentiality Provision opens with the phrase "[i]n the course of Contractor's work hereunder . . . ."  The Court has already rejected this interpretation of the ICA—calling it "strained" in its order on the motion to dismiss— and correctly noting that the phrase does not limit the types of "Canvass Cards" covered by the ICA.  *See* Sept. 28, 2020 Order at *10, ECF No. 17 ("The clause at issue introduces the confidentiality provision, but it is not a part of the definition of the term 'Confidential Information,' and there is nothing in the definition that limits that category of information based upon when the information was first gathered by TMG or one of its employees.").

In interpreting contractual provisions, District of Columbia law requires courts to look at "the face of the language itself, giving that language its plain meaning, without reference to any rules of construction."  *Capital City Mortg. Corp. v. Habana Village Art & Folklore, Inc.*, 747 A.2d 564, 567 (D.C. 2000).  "Contracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction," *Lee v. Jones*, 632 A.2d 113, 116 (D.C. 1993) (citation omitted), and courts should reject attempts by parties to "create ambiguity where none exists."  *Eaton v. D'Amato*, 581 F. Supp. 743, 749 (D.D.C. 1980).  There is no ambiguity here: the

ICA contains no limitation on the types of "canvass cards" it covers, and thus—by its plain meaning—covers *all* Canvass Cards.

Even if the straightforward reading of the ICA could be said to be ambiguous—thus requiring an examination of extrinsic evidence to examine the parties' intent—there is not a shred of evidence to support Rayborn's after-the-fact contention that the ICA applies only to post-May 2018 Canvass Cards. *See Farmland Industries, Inc. v. Grain Bd. of Iraq*, 904 F.2d 732, 736 (D.C. Cir. 1990) (even if there is a facial ambiguity, "if the evidence demonstrates that only one view is reasonable . . . the court must decide the contract interpretation question as a matter of law").  On the other hand, there is ample evidence evidencing the parties' contemporaneous understanding that the ICA refers to *all* Canvass Cards, without exception—including Rayborn's own statements about the ICA.

***First,*** the Canvass Cards represent years' worth of information about TMG clients.   It would make no sense for TMG to insist upon the inclusion of a provision prohibiting Rayborn from taking the Canvass Cards—only to limit that provision to Canvass Cards created after a certain date.

***Second,*** when Rayborn was fired from TMG in 2018, he did not take the Canvass Cards— and, as TMG now knows, sought reinstatement at TMG for the express purpose of reacquiring them.   *See* PSOF ¶ 71 (Feb. 11, 2019 email from Rayborn to Michael Jacoby, stating that he signed the ICA "because ***I needed a job and my cards***") (emphasis added).   Thus, Rayborn possessed no Canvass Cards when he signed the ICA—and re-acquired *all* of them after May 2018.

***Third,*** in a February 2019 email to Michael Jacoby, Rayborn explained that Meyer "added to the ICA . . . that the canvass cards belonged to him, knowing that ***they were important to me***"— describing cards that he had ***already*** created.   PSOF ¶ 33 (emphasis added).   Rayborn goes on to

tell Jacoby that he "felt it was better to sign [the ICA] and fight for the issues in court."  *Id.*  In his

deposition, Rayborn confirmed that here, he was referring to canvass cards he had already created

while at The Meyer Group—not some hypothetical future canvass cards.  *See* PSOF ¶ 72 ("And

so you're telling Mr. Jacoby that the canvass cards you created ***while you were at The Meyer***

***Group*** are very important to you? A. I am telling that to Mr. Jacoby, yes.").

      In sum, Rayborn's argument that the ICA is limited to post-May 2018 Canvass Cards is

nothing but an "argument[] of counsel" that is insufficient to create a genuine issue of material

fact.  *Internet Financial Services, LLC*, 310 F. Supp. 2d at 2.  Even if the Court were to credit

Rayborn's implausible interpretation, however, the Court should still grant TMG's motion for

summary judgment, because the provision would still cover all the Canvass Cards created after

May 29, 2018—and thus Rayborn has at least breached the ICA with respect to those cards.

### 4.   The Plain Language of The ICA Prohibits Rayborn from Taking the Canvass Cards, Regardless of Whether They Are Actually Confidential

      In yet another attempt to disregard the plain language of the ICA, Rayborn argues that the

Canvass Cards do not contain actually contain "confidential information," and so he breached no

contractual duty by taking them.  *See* Defs. Mem. 8, 11 *et seq.*  Rayborn is mistaken: whether the

Canvass Cards meet the definition of "Confidential Information" in the ICA depends only on the

definition of "Confidential Information" used in the ICA.   And because the ICA defines

Confidential Information to include the Canvass Cards, the Court need look no further than the

language ICA itself to determine whether the Canvass Cards are covered by the agreement.

      Indeed, in this Court's own ruling on Defendants' Motion to Dismiss, the Court looked to

statutory definitions of "trade secrets" for the misappropriation claims, but then looked to the

contractual definition of "Confidential Information" in the ICA to analyze TMG's breach-of-

contract claim.  *See* Sept. 28, 2020 Order at *8, ECF No. 17 ("The complaint plausibly alleges that

Rayborn misappropriated information that was 'confidential' *as **that term is defined in the Agreement***" (emphasis added)).  Other courts in this Circuit have followed this same approach.  *See CopyWatch, Inc. v. Am. Natl. Red Cross*, 299 F. Supp. 3d 189, 197 (D.D.C. 2018) (rejecting argument that an audit report was not proprietary because it "does not constitute confidential information protected by the NDA" and looking instead to the definition of "Confidential Information" in the NDA); *Hirecounsel D.C., LLC v. Kilian Connolly*, CV 20-3337 (EGS), 2021 WL 5998365, at *4 (D.D.C. Dec. 20, 2021) (looking to contractual definition of "Confidential Information" for purposes of breach of contract claim).[2]

Thus, the plain language of the ICA prohibits Rayborn from taking the Canvass Cards—regardless of whether or not they actually contain "confidential information."  However: Rayborn's assertion that the Canvass Cards contain no "confidential information" is just not true.  As explained below, the Canvass Cards contain a wealth of non-public tenant information.

### 5.  The ICA Does Not Need to Use the Term "Work Product"

Finally, Rayborn speculates that the Confidentiality Provision does not apply to the Canvass Cards because the Canvass Cards are Rayborn's "work product," and the Confidentiality Provision does not specifically use that term.  Rayborn brazenly contradicts his own previously-articulated position that the Confidentiality Provision *only* applies to the Canvass Cards created by Rayborn after May 2018.  Rayborn cannot seek summary judgment while advancing two

---

[2] *See also Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 742 F.3d 845, 850-51 (8th Cir. 2014) (for breach of contract claim,"[i]nstead of applying the test for the tort of misappropriation of trade secrets and confidential information, the district court should have interpreted and applied the terms of the NDA"); *Quintel Tech. Ltd. v. Huawei Techs., Inc.*, 4:15CV307, 2017 WL 9250307, at *13 (E.D. Tex. Dec. 4, 2017), *report and recommendation adopted sub nom. Quintel Tech., Ltd. v. Huawei Techs. USA, Inc.*, 4:15CV307, 2018 WL 271957 (E.D. Tex. Jan. 3, 2018) ("When a party to a non-disclosure agreement, without permission, discloses or uses information that falls within the agreement's definition of 'confidential information,' it has committed a breach of contract as a matter of law.").

directly contradictory—though both equally meritless—interpretations of the ICA, and this about-face only highlights that Rayborn does not have *any* evidentiary support whatsoever for either of his interpretations of the ICA.

In any event, this farfetched reading of the ICA should be rejected as another attempt to create an ambiguity where none exists.  Once again, the ICA is clear on its face: the Confidential Provision applies to all Canvass Cards, without exclusion.  There is no colorable argument—and certainly no evidence in the record—that the ICA refers to anything *other* than the Canvass Cards created by Rayborn, and his attempt to suggest otherwise is nothing short of disingenuous. Rayborn's cited cases are also irrelevant, as they both concern the ownership of an employee's work product in the *absence* of a governing contract.

### 6.  Circumstantial Evidence Suggests Rayborn Took The Access Database Printout

Rayborn asks the Court to grant summary judgment on the portion of TMG's breach-of-contract claim alleging that Rayborn absconded with the a printout of the Access Database—a plainly disputed factual issue for which resolution on summary judgment is not appropriate.  Defs. Mem. 16.  Rayborn denies taking the Access Database and contends that because there are no eyewitnesses to his theft, there is "no evidence" that he stole it—ignoring the well-established principle that "a plaintiff may prove his case by direct *or* circumstantial evidence."  *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983); *see also Doe v. U.S. Postal Serv.*, 317 F.3d 339, 343 (D.C. Cir. 2003) ("[W]e generally draw no distinction between the probative value of direct and circumstantial evidence.").

Despite Rayborn's denial, there is significant circumstantial evidence that Rayborn took the Access Database with him when he left TMG.  In the months leading up to his departure, Meyer gave Rayborn a copy of the database to use for cold-calling.  Pls.' Reply DSOF ¶ 6.  Rayborn

admits receiving the printout, and thereafter, Meyer observed the printout in Rayborn's office "within the last month or two" of Rayborn's departure.  Pls.' Reply DSOF ¶ 6.  The day Rayborn was terminated, he cleared out his office—and later that same day, he texted a friend that he **"*cleared the office out*"** and "***had everything [he] needed***" when he left TMG.  PSOF ¶ 41 (emphasis added).  The evidence thus supports the unmistakable inference that Rayborn took ***both*** the Access Database and the Canvass Cards when he left TMG.  Moreover—given that Rayborn has previously denied taking the Canvass Cards in a deposition, which we now know to be a patently untrue statement—Rayborn's denial that he took the printout with client information simply lacks credibility.

## II.   NUMEROUS ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON TMG'S TRADE SECRETS CLAIMS

The Canvass Cards are a highly valuable compilation of extensive details about TMG's clients and prospective clients.  Together with the Access Database, they are a roadmap to everything a broker would need to know about TMG's clients.  That is why they are so valuable to TMG—and that is why Rayborn took them.

"Under both the federal and D.C. laws, a 'trade secret' is defined as information that 'derives independent economic value . . . from not being generally known' when 'the owner . . . has taken reasonable measures to keep such information secret.'" Sept. 28, 2020 Order at *8-9, ECF No. 17 (citations omitted).  Whether client information constitutes a trade secret "is an inherently fact dependent question."  *Id.* at 9-10 (citing factors from *Ruesch v. Ruesch Int'l Monetary Servs., Inc.*, 479 A.2d 295, 296 (D.C. 1984)).  Importantly, even if isolated pieces of information are publicly available, the "compilation" of public information can still warrant trade secret protection.  18 U.S.C. § 1839(3); D.C. Code § 36-401(4); *see AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 972 (8th Cir. 2011).

- 23 -

Given the extensive record evidence that TMG's Canvass Cards and Access Database were valuable compilations of non-public information—and further, that TMG took reasonable measures to keep them confidential—the Court should deny Defendants' motion for summary judgment on TMG's trade secrets claims (Counts III and IV).

## A. The Meyer Group's Most Valuable Client Information Is Contained on The Canvas Cards and the Access Database

The extensive tenant information contained on the Canvass Cards and Database gives a broker a significant competitive advantage.  Accurate lease termination information allows a broker to time their outreach to the tenant, and brokers can use lease terms and client preferences "to better pitch clients through targeted market analyses."  PSOF ¶ 10.  Thus, "the more thorough and accurate a broker's tenant information is, the better able a broker is to compete with other brokers."  *Id*.  As TMG's expert explained in his report, "[a] brokerage firm with access to a list of The Meyer Group's clients and their corresponding lease and relevant business information would be able to easily outcompete other brokers, because it would be able to very efficiently target prospective tenants with information directly relevant to the tenants' space needs."  PSOF ¶ 73.

Defendants' tactical argument that the Canvass Cards are not "valuable" despite the wealth of information they contain is belied by Rayborn's own words.  When asked at his deposition whether the Cards are "valuable to you," Rayborn responded—without qualification—"***Yes, they are.***"  PSOF ¶ 74 (emphasis added).  Rayborn repeatedly trumpets the Canvass Cards' importance—once telling a TMG assistant:

> I am almost out of canvass cards . . . . there are none in the back!!!!!! I obviously use them to cold call. . . 1. If I don't have them  2. I can't cold call.  3. The company Bill and I don't make money 4. We are fucked!!!!!!!!!!!!!!!!!!!!!!

PSOF ¶ 58.

- 24 -

Defendants raise three unconvincing arguments in support of their assertion that the Canvass Cards are not valuable.  ***First,*** their argument that the Canvass Cards are "illegible to largely everyone except Rayborn" is spurious.  Defs. Mem. 27.  Meyer worked with Rayborn for over two decades and can read his handwriting.  *See* Pls.' Response to DSOF ¶ 45.  So can Plaintiffs' expert, Mr. Gill.  *See id.*  For someone with industry knowledge, it is not difficult to decipher the bulk of the information on the cards.

***Second***, Defendants' argument that the lease termination dates on the cards "largely became useless during the pandemic," because tenants wanted to terminate their leases is fundamentally incorrect—and, since Rayborn's misappropriation was fourteen months before the pandemic began, irrelevant.  Defs. Mem. 22.  Though many tenants attempted to renegotiate leases early in the pandemic, landlords generally refused to let them do so.  *See* PSOF ¶ 75.  As a result, lease termination dates are just as valuable now as they ever have been.  *See id.*  But even assuming *arguendo* that lease termination dates have since become irrelevant—which they have not—the Canvass Cards still contain a plethora of other valuable client information, and so the usefulness of lease termination dates is not dispositive of whether the Canvass Cards as a whole are valuable.

***Third,*** Defendants' assertion that the Canvass Cards are not valuable because "Rayborn likely has all of the info in his head or cell phone" defies logic and has no support in the record.  Defs. Mem. 22.  Rayborn absconded with thousands of cards containing tens of thousands of data points; no person could possibly memorize all that information.  And, during his deposition, Rayborn repeatedly had difficulty remembering lease termination dates and other key client information; for one client, he could not even remember the name of the company beyond "Hispanic whatever."  *See* PSOF ¶ 76.  If Rayborn had actually memorized the information on the Canvass Cards, he would not have created them, used them, or taken them to Broad Street.

### B.  The Meyer Group's Client Information Is Not Publicly Available

TMG's information about tenants' leases, preferences, and key decisionmakers is not publicly available.  Instead, it was meticulously collected over many years from cold calls and the representation of tenants in their leasing negotiations.  Though Defendants pretend the Canvass Cards and the Access Database just contain names and contact information, the most valuable information there—and also the most difficult to glean from public sources—is information about key lease terms, notes on tenants' preferences, and private information about tenants' key decision makers.

### 1.  The Canvass Cards Contain Data from Cold Calls—Not Public Sources

The information on the Canvass Cards was primarily compiled through years of cold calls—not public sources.  Everyone deposed on the topic—including Rayborn—confirmed that he recorded client information from calls on the canvass cards.  *See* PSOF ¶ 77 (Rayborn deposition, Q: "How would you use your canvass cards to cold-call? A: I would pick up the phone . . . and gain information from the phonecall and put it on my canvass card.").

Even in their summary judgment brief, Defendants admit that Rayborn "created canvas cards based on information gathered from . . . cold calls"—though they bizarrely characterize cold calls as a "publicly available source."  Defs. Mem. 7; *see also* Defs.' Mem. 15 (admitting "tenant's leasing information such as their leasing end dates, present square footage, [and] desired square footage" came from cold calls).  Private phone calls are, of course, not public sources, and Defendants' argument that tenants "freely" give out their leasing information and private contact information of key decision-makers has no evidentiary support whatsoever.  Defs. Mem. 14. Defendants cite only Mr. Gill's expert report—but he said nothing of the sort. Quite the opposite: he explained that it "takes new agents several years to develop the necessary relationships" to compile significant client information through cold calling, in part because "[t]he person at a

company in possession of the company's lease information, as well as the authority to dispense it" typically has "limited time and availability."  *See* PSOF ¶ 78.

It is impossible to square Defendants' contention that the information can be "easily duplicated" with Rayborn's own words and conduct.  Defs. Mem. 21.  Rayborn has made clear in no uncertain terms that the cards are incredibly important—without them, he "can't cold call" can't "make money," and "the company is shut down."  PSOF ¶ 58, 61.  If the cards just contain information that can be "easily duplicated" through public sources, there is no explanation for the enormous value Rayborn places on the cards, nor the efforts Rayborn went through to take the cards and fight to retain them in this litigation.  *See Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1090 (E.D. Cal. 2012) ("[D]efendant's argument that all of the information . . . is readily available to the public is undercut by his own actions in this case.  If the information is truly that readily available to the public, it raises the question of why it was necessary for defendant to surreptitiously download, retain, and funnel [it] to his new employer in the first place.").

### 2.   Compilations of Data from Publicly Available Sources Can Be Trade Secrets

Compilations of data are trade secrets, and "the fact that some or even most of the information was publicly available is not dispositive." *AvidAir Helicopter Supply*, 663 F.3d at 972 ("Compilations are specifically contemplated in the UTSA definition of a trade secret"); *see also United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016 ("It is well recognized that 'it is the secrecy of the claimed trade secret as a whole that is determinative,'" and "'the fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements.'" (quoting Restatement (Third) of Unfair Competition § 39 (1995)).

As this Court explained in its order on the motion to dismiss, "while client contact information, such as the information printed on business cards, may not be confidential by itself, 'a **collection** of business cards might, in some circumstances, capture the same information contained in a confidential customer list.'"  Sept. 28, 2020 Order at *10, ECF No. 17 (emphasis added) (quoting *Hedgeye Risk Mgmt.*, 412 F. Supp. 3d at 29).   "For example, the customer information 'might reflect information that is confidential and difficult to find, such as information about the identity of key decisionmakers at a firm or those persons' private email addresses.'" *Id.* (quoting *Hedgeye Risk Mgmt.*, 412 F. Supp. 3d at 29-30).   That is precisely the case here.  *See* PSOF ¶¶ 21, 22, and 23.

The Canvass Cards and Database's compilation of "non-secret and secret information" constitutes a trade secret because "the expenditure of time, effort, and expense involved in its compilation" provides "a competitive advantage."  *AvidAir Helicopter Suppl*, 663 F.3d at 972.[3] The Canvass Cards are—in Defendants' own words—the "product of . . . many years of work[.]" Rayborn's Mot. Dismiss at 10, ECF No. 9-3; *see also* PSOF ¶ 14 (Rayborn testified he considered the cards his "work product" because "it took [him] many years to develop the cards.").   Rayborn admitted at his deposition that it might take him a year working 60-hour weeks to come close to

---

[3] *See Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 898 (N.D. Ill. 2019) (finding trade secret based on compiled information that took "40 hours every 18-36 months to compile" and included "spreadsheets contain[ing] many thousands of data points"); *Bodemer v. Swanel Beverage, Inc.*, 884 F. Supp. 2d 717, 725 (N.D. Ind. 2012) (denying motion for summary judgment on trade secret protection of customer list because "[a] reasonable jury could conclude that it would take a substantial investment of time, expense, or effort to identify Swanel's customers by attending trade shows, advertising in trade publications, and making cold calls."); *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1089 (E.D. Cal. 2012) (customer list constituted trade secret even though "individual pieces of information" were public because the compilation "provides a virtual encyclopedia . . . at a competitor's fingertips, allowing the competitor to solicit both more selectively and more effectively without having to expend the effort to compile the data.").

recreating the information on the cards he took.  *See* PSOF ¶ 79.  The thousands of hours of work

that went into creating the Canvass Cards and Database saved Broad Street and Rayborn a huge

amount of time, energy, and money, and the Cards and Database therefore warrant trade secret

protection.  *See Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 147 F. Supp. 2d 1057,

1066 (D. Kan. 2001) (customer list constituted trade secret when "Plaintiffs invested a great

amount of time, effort, and expense in developing their customer information—including hundreds

of hours of 'cold-calling.'").

### 3.   Only The Most Basic Information—Not Valuable Details—Is Available on CoStar and Haines

Defendants next attempt to challenge the confidentiality of the Canvass Cards by claiming

that that the information on the Canvass Cards can be found on CoStar, a subscription-based

service used for real estate listings, or Haines, a listing of tenant names.  Though Co-Star often

includes a tenant's name and corporate contact information, when it comes to the valuable tenant

information found on the Canvass Cards and Access Database—such as lease terminations, square

footage, key points of contact, rent, and other factors that influence a tenant's space needs—

"CoStar is incomplete, frequently inaccurate, and, therefore, has limited usefulness in assisting

commercial real estate brokers with identifying prospective tenants."  PSOF ¶ 80; *see also* PSOF

¶ 81 (agent testifying CoStar "isn't perfect. It isn't completed. It's not always reliable.").  Even

Defendants admit that CoStar only "***sometimes***" contains "lease expiration date[s] or square

footage."  Defs. Mem. 21 (emphasis added).

Unlike property sale records, commercial leases are not publicly available.  *See* PSOF ¶

82.  Thus, CoStar could only have information about a tenant's lease if it shared by the tenant, the

tenant's broker, or the landlord—none of whom have any incentive to share it.  *See id*.  Brokers

"have a strong disincentive" from sharing tenant information with CoStar because they do not want

their competitors to have it, and landlords do generally share tenant information with CoStar because "it would compromise their negotiating ability with current and future tenants."  *See* PSOF ¶ 83.  Similarly, tenants are also "uncomfortable sharing their lease information with CoStar representatives" because they can be commercially sensitive.  *See id.*  Indeed, one of **Broad Street's own employees** testified that Broad Street's clients specifically instruct Broad Street not to publish their lease information on CoStar.  *See* PSOF ¶ 84; *see also* PSOF ¶ 85 (Rayborn admits the extent of information on CoStar "depends on the tenant.").

Thus, CoStar rarely contains the types of private lease and client information that is most valuable to brokers—and "any brokerage firm which relies exclusively on CoStar for tenant information would quickly go out of business."  *See* PSOF ¶ 86.

### a. CoStar Does Not Contain Information About Meyer Group Clients—And the Information It Has Is Often Inaccurate

Even if CoStar contained valuable tenant information generally, it does not have leasing information about **The Meyer Group's** clients.  Meyer—like many principal brokers—"directed everybody in [the] office . . . not to talk to CoStar."  PSOF ¶ 87; PSOF ¶ 88 (former TMG agent testifying that TMG's agents "ignore[d]" calls from CoStar and were not aware of anyone at TMG ever providing tenant information to CoStar); *see also* PSOF ¶ 89 (expert's firm does not share tenant information with CoStar).

The CoStar reports cited by Defendants in their summary judgment brief (which were mostly updated **after** this litigation began) are littered with inaccuracies and omit the vast bulk of the types of valuable information found on the Canvass Cards and Access Database.  *See* PSOF ¶ 90 (expert reviewing all reports produced by Broad Street and concluding "[v]ery few of these reports contain lease terminations dates or other lease information").  As just one example, the first CoStar report that Defendants cite—for Integral LLC—does not have the lease expiration date

(one of the most valuable pieces of data), information on the key decisionmakers, or client preferences.  *See* PSOF ¶ 91.  By contrast, the Canvass Cards for Integral contain the lease expiration date, contact names not listed on CoStar, cell phone numbers for key contacts (rather than just the main corporate line), the desired amount of square footage (3000 to 3800, compared to the 2285 listed on CoStar), and much more.  *See* Pls.' Response DSOF ¶ 92 (comparing information on CoStar Report with Canvass Cards).

Not only is Integral's CoStar report incomplete—the little information it does purport to have is utterly wrong.  The report lists Integral's address as 1203-1205 19th St.—but Integral's actual address is 1350 Connecticut Ave.  *See* Pls.' Response DSOF ¶ 92.  It states that Integral has twelve employees; their website names almost twice as many.  *See* PSOF ¶ 92.  The CoStar report also identifies Kevin Moran as Integral's contact person—when, in actuality, the key decisionmaker and point-of-contact for Integral's most recent lease was Chris Barrett.  *See* Pls.' Response DSOF ¶ 92.

The other CoStar reports Defendants cite are similarly useless.  The Barnes Vanze and Capital Performance Group reports, for example, do not provide lease expiration dates.  *See* PSOF ¶ 93.  Capital Performance Group's report does not provide square footage or estimated rent.  *See* PSOF ¶ 93.  And, as with Integral's report, much of the information listed on the Barnze Vanze, CPG, and NENA reports is completely wrong—such the identity of the relevant contacts and estimated rent.  *See* Pls.' Response to DSOF ¶¶ 94, 96, 98.  Most importantly, none of these reports contain the type of detailed information about key contacts and client preferences found on the Canvass Cards.  *See* PSOF ¶ 94.

### b.   The CoStar Reports Defendants Produced Were Updated After Rayborn Left TMG

Further undermining Defendants' position that CoStar contains TMG's client information, most of the CoStar reports Defendants cite were updated **after** Rayborn left TMG, and therefore say nothing about whether TMG's client information was available on CoStar as of January 2019—when Rayborn took the Canvass Cards to Broad Street.   Some were even "updated recently—during this very litigation—to include data points about recent lease agreements for which Broad Street served as the broker."  PSOF ¶ 95.  For instance, the Barnes Vanze and Capital Performance Group reports were updated in June 2020—one and one-half years after those tenants retained Broad Street in February 2019, and a year after this litigation began.  *See* PSOF ¶ 96.  The NENA report (the only report Defendants cite that has a lease expiration date) was also updated during this litigation after the client signed with Broad Street.  *See* PSOF ¶ 97.  Thus, any information on the reports "could not have been provided to CoStar by The Meyer Group," and the reports "do not reflect whether The Meyer Group (or another broker) shared information about these leases with CoStar prior to Broad Street's involvement."  PSOF ¶ 95.

Since the CoStar reports produced by Broad Street are just snapshots updated after this litigation began, Plaintiffs' expert, Mr. Gill, used his firm's CoStar subscription to review the transaction **history** on CoStar for the tenants at issue. Mr. Gill concluded the "vast majority" of reports "contain no lease expiration dates for leases executed prior to Mr. Rayborn's departure from The Meyer Group in January 2019."  PSOF ¶ 98.  Simply put, TMG's client information was not on CoStar.

### c.   The Haines Directory Is a Glorified Phone Book

Lastly, Defendants cite the Haines Directory as another purported source of public information.  But Haines is just a "reverse directory where you can look up numbers in sequential

orders that are associated with telephone numbers"—basically a reverse phone book.  PSOF ¶ 99.
It does not contain "any information about the real estate – the actual leases, or the space that is
being occupied by the individuals at those phone numbers."  PSOF ¶ 99.  Even according to
Defendants, Haines just "contains lists of tenants of commercial buildings"—not any detailed
information about the tenants.  Defs. Mem. 21.  The Haines Directory thus does not have the
valuable information about TMG's clients found on the Canvass Cards or in the Access Database.

## C.  The Meyer Group Took Great Pains to Keep Its Trade Secrets Confidential

TMG took substantial measures to keep the Canvass Cards and Access Database
confidential: it required its personnel to sign agreements protecting its client information, stored
hard copy documents under lock and key, and used password protection and access restrictions to
protect its electronic files.  According to even Rayborn himself, Meyer was "***hypersensitive***" about
protecting TMG's client information.  PSOF ¶ 100.  TMG's efforts were more than sufficient to
warrant trade secret protection.

### 1.  The Meyer Group's Contracts All Protected Its Confidential Information

TMG required all personnel—from agents to administrative assistants to interns—to sign
agreements protecting TMG's client information.  *See* PSOF ¶ 101.  This alone shows "reasonable
efforts" to maintain the information's confidentiality.  *See N. Atl. Instruments, Inc. v. Haber*, 188
F.3d 38, 45 (2d Cir. 1999).  As the Court acknowledged in its order on the motion to dismiss, "the
existence of the ICA is a significant allegation" because "courts have identified the confidentiality
agreement as a method for preserving secrecy that is consistent with trade secret protection."  Sept.
28, 2020 Order at *12, ECF No. 17.  Since the record now shows that TMG took "reasonable
efforts, such as implementing confidentiality agreements" to protect its client information,
summary judgment is not appropriate.  *See id.* (quoting *Catalyst & Chem. Servs., Inc. v. Glob.
Ground Support*, 350 F. Supp. 2d 1, 11 (D.D.C. 2004))).

Defendants argue that TMG's confidentiality agreements are insufficient to protect its client information because they sometimes used "inconsistent" language to describe a contractor's confidentiality obligations. *See* Defs. Mem. 11-12. That argument is meritless, and has no support in either case law or common sense. Every TMG agreement protected its confidential information from disclosure. *See* PSOF ¶¶ 101, 102.

Next, Defendants resort to semantics, asserting that TMG's agreement with one former TMG independent contractor—Jessica McGunnigle—"fails to include a 'Confidentiality Section.'" Defs. Mem. 12. Not so: the agreement ***does*** contain a confidentiality section—just under the heading "Restrictions on Subsequent Activity" rather than "Confidentiality." *See* Pls.' Response DSOF ¶¶ 39, 40.

Finally, Defendants argue that because only Rayborn's agreement specifically mentions Canvass Cards, the agreements do not protect TMG's client information. But TMG's agreements with other salespeople cover any "information concerning TMG's clients and prospective clients, the identity of clients and prospective customers, identity of key purchasing personnel in the employ of customers and prospective clients . . . [and] other confidential or proprietary information belonging to TMG or relating to TMG's business or affairs"—which undoubtedly includes the Canvass Cards. *See* PSOF ¶ 102. Rayborn was the only agent who used canvass cards as his primary method of recording client information, so TMG specifically referenced "Canvass Cards" in its agreement with Rayborn to ensure there would be no doubt that even Canvass Cards created by Rayborn belonged to The Meyer Group. *See* PSOF ¶ 103.

### 2. The Meyer Group Took Additional Precautions to Protect Its Information

Beyond its contractor agreements, TMG also took additional steps to protect the confidentiality of its client information: securely storing hard copies of its confidential documents,

password-protecting and restricting access to electronic files, and regularly including confidentiality notices on emails. *See MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004) ("Restricting access to information, implementing confidentiality agreements, and providing physical barriers to access are all reasonable efforts."). TMG stored physical copies of confidential information—including its canvass cards—at its offices, which had "electronic locks on the front door" and "cameras in the office." PSOF ¶ 104. Rayborn testified TMG kept files "locked up in locked file cabinets" and did not give Rayborn keys to those cabinets. PSOF ¶ 105. Similarly, TMG's electronic files—including the Access Database—were password protected, and access to the Access Database was limited to only a small number of key personnel. *See* PSOF ¶ 106; *see also ATS Grp., LLC v. Legacy Tank & Indus. Servs. LLC*, 407 F. Supp. 3d 1186, 1199 (W.D. Okla. 2019) (password protection and access restrictions are reasonable efforts to maintain secrecy). Additionally, TMG included confidentiality notices in its emails outside the firm. *See* PSOF ¶ 107. TMG thus took reasonable efforts to maintain confidentiality.

### 3.  A Former Contractor Not Deleting Old Emails Does Not Matter

Defendants next attempt to play gotcha, arguing that because a former TMG agent—Ed Flenner—did not delete TMG emails on his personal laptop when he left TMG, TMG did not take reasonable efforts to protect the confidentiality of its client information. *See* Defs. Mem. 12-13. Flenner's incidental retention of TMG emails is irrelevant, for several reasons. There is no evidence that Flenner retained—let alone had access to—copies of the Canvass Cards or the Access Database, so his retention of TMG emails says nothing about whether TMG took reasonable steps to maintain the confidentiality of the trade secrets at issue in this case. Because Flenner worked with an entirely different set of clients on a complete different aspect of the

brokerage business—sales, rather than leases—any emails Flenner may have retained are overwhelmingly unlikely to contain *any* information about the clients at issue.  *See* PSOF ¶ 108.

Further, there is no evidence that Flenner disclosed any of those emails to a third party or used the emails to compete with TMG for clients.  Flenner testified that he did not "take anything with [him] from The Meyer Group" except for "personal stuff," he would not "ever intentionally take Meyer Group leases with [him] to another job," and he considered TMG client documents to be covered by confidentiality agreements.   PSOF ¶ 109.

Finally, Flenner's retention of TMG emails does not undermine TMG's *efforts* to maintain the confidentiality of its client information.  TMG required Flenner to sign a non-disclosure agreement protecting TMG's client information, and disabled Flenner's access to his email account upon his departure.  *See* Pls.' Response to DSOF ¶ 37; PSOF ¶ 110.  Practically speaking, it is virtually impossible for employers—especially small companies—to ensure that former employees completely wipe their personal laptops upon departure.  Given this context, TMG's efforts to maintain the confidentiality of its client information were more than reasonable.  *See AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 974 (8th Cir. 2011) ("Reasonable efforts to maintain secrecy need not be overly extravagant, and absolute secrecy is not required. . . . Misplaced trust in a third party who breaches a duty of confidentiality does not necessarily negate efforts to maintain secrecy.").

### 4.   TMG Only Disclosed the Access Database to Its Business Partner Pursuant to a Co-Broker Agreement

Defendants also make much of the fact that on one occasion, Meyer provided a copy of the Access Database to his business partner Ned Goodwin, a broker at Cushman & Wakefield, pursuant to a Co-Broker Agreement between the two firms.  Under that Agreement, TMG and

Cushman agreed to "cooperate" in serving clients and "share any real estate commission paid to either party with respect to Clients on a national basis that TMG refers to" Cushman.  PSOF ¶ 111.

As a threshold matter, even if sharing a copy of the Access Database with Cushman somehow forfeited its trade secret protection, Meyer never shared copies of the ***Canvass Cards*** with Cushman—or anyone else outside of TMG, for that matter.  The Canvass Cards contain much more detailed client information (such as notes on key decisionmakers and client preferences) than even the Database and also include additional clients—particularly prospective clients—not on the Database.  *See* Defs. Mem. 6 (noting the database did not include information on some TMG clients at issue); PSOF ¶ 16 (database is incomplete and does not include prospective clients).  Thus, TMG's limited disclosure of the Access Database to Cushman has no bearing on TMG's efforts to protect the confidentiality of the Canvass Cards.

In any event, TMG's provision of a copy of the database to Goodwin pursuant to the Co-Broker Agreement does not repudiate TMG's efforts to maintain the confidentiality of its client information.  Courts have consistently held that "the owner of a trade secret may, without losing protection, disclose it to a licensee, an employee, or a stranger, if the disclosure is made in confidence, express or implied."  *Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*, 350 F. Supp. 2d 1, 11 (D.D.C. 2004) (citations and quotations omitted); *see also Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 177 (7th Cir. 1991) ("The mere fact that [plaintiff] disclosed its trade secrets to 'a limited number of outsiders for a particular purpose'—did not forfeit trade secret protection. . . . On the contrary, such disclosure, which is often necessary to the efficient exploitation of a trade secret, imposes a duty of confidentiality on the part of the person to whom the disclosure is made." (citation omitted)).

TMG's disclosure of the Access Database to Cushman was made in both "express" *and* implied" confidence. *Catalyst & Chem. Servs.*, 350 F. Supp. 2d at 11 (confidential disclosure as part of "sales or joint ventures" does not pose a "risk of destroying the trade secrets"). TMG did not share the Access Database with Goodwin until a signed Co-Broker Agreement was in place, which expressly required the parties to avoid public disclosure of information shared with Cushman: "Each party agrees that there shall be no public statement, or other publicity, with respect to any matters concerning the Transactions, without Client's prior written approval." PSOF ¶ 112. That restriction is, by itself, enough to demonstrate a reasonable effort to maintain the confidentiality of TMG's client information. *See Phillips v. Frey*, 20 F.3d 623, 630–31 (5th Cir. 1994) ("[A] voluntary disclosure made within the periphery of a confidential relationship eliminates the need to take further precautions to secure the trade secret."). The email transmitting the Database also contained a "Confidentiality Notice" prohibiting the "dissemination, distribution, or copying" of the "confidential information." PSOF ¶ 107. Cushman was thus "on notice that the enclosed information was not suitable for public disclosure." *Catalyst & Chem. Servs.*, 350 F. Supp. 2d at 11 (reasonable efforts to maintain confidentiality despite disclosure via fax because the fax "was marked as confidential").

Meyer also knew and trusted that Cushman would keep the information confidential (as it in fact did). Meyer testified that Goodwin "told me he would keep it confidential." PSOF ¶ 113. Goodwin said the same thing at his deposition: "we have a general business agreement between the two that . . . we wouldn't want to share any of the information with anyone else." *Id*. Oral or implied agreements are sufficient to maintain the secrecy of trade secrets. *See MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 422 (E.D. Va. 2004) ("It is not necessary that there have been a written agreement memorializing the confidentiality of the disclosure."); *Penalty Kick*

*Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1291 (11th Cir. 2003) ("oral insistence on confidentiality" sufficient).  Finally, Meyer also trusted that Cushman would not publicly disclose the client information because he knew it would be against Cushman's financial interest to do so. *See* PSOF ¶ 114 (Meyer testifying "there's no reason Ned wouldn't keep it confidential because if he didn't, ***he'd be hurting himself***") (emphasis added); (Goodwin testifying "anytime you're working on a transaction you don't want people knowing about it . . . It's the nature of our business."); *see also PepsiCo, Inc. v. Redmond*, No. 94 C 6838, 1996 WL 3965, at *17 (N.D. Ill. Jan. 2, 1996) (sharing trade secret without non-disclosure agreement did not forfeit trade secret protection when other party "ha[d] the same incentives as PepsiCo to keep that information confidential").

Defendants also misconstrue Goodwin's deposition testimony in arguing "any Cushman & Wakefield employee could view the information" provided by TMG.  Defs. Mem. 15.  In fact, Goodwin testified that ***only*** the "people on [his] team" had access to the information.  PSOF ¶ 115. Goodwin further testified that if a Cushman employee outside of his team "approached one of The Meyer Group clients and tried to do a deal with them," they "would be subject to customary action by management ***up to termination***."  *Id.*  Finally, there is no evidence any Cushman employee publicly disclosed TMG's trade secrets, so Defendants' argument is irrelevant.  *See MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 412 (E.D. Va. 2004) (reasonable efforts to maintain confidentiality despite disclosure to third party company when "[t]here is no evidence that the [third party] distributed this document outside of the company.").

### 5.  TMG's Reference Lists Contain Only Names and Phone Numbers

As a last-ditch effort to tar TMG's efforts to maintain the confidentiality of its client information, Defendants argue that TMG failed to keep its information confidential because it

provided references—containing some names and phone numbers of past clients—to prospective clients. But these reference lists contain none of the detailed and highly valuable information about lease terms, client preferences, or personal contact information found on the Canvass Cards or in the Access Database. *See* PSOF ¶ 116. The reference lists were also only shared with prospective clients—not competing brokers. *See* PSOF ¶ 117. Thus, providing references to prospective clients has no relevance to whether TMG took reasonable steps to protect the confidentiality of its Canvass Cards and Access Database. *See Tom James Co. v. Hudgins*, 261 F. Supp. 2d 636, 642 (S.D. Miss. 2003) ("The Court is not convinced by defendant's argument that the policy of sharing the names of some of James's clients in order to solicit sales compromised the confidentiality of the list.").

### D. Broad Street Knew That Rayborn Breached the ICA By Taking The Cards

Defendants' contention that "Broad Street was not even aware of Rayborn's index cards until well after Rayborn was on-boarded," Defs.' Mot. 25, is demonstrably false: from the outset, Rayborn ***told*** Broad Street his TMG contract covered the Canvass Cards. *See* PSOF ¶¶ 37, 47-51. Since Broad Street knew Rayborn "owed a duty to" TMG "to maintain the secrecy of the trade secret," 18 U.S. Code § 1839(5)(B); *see* D.C. Code § 36-401(2)(B), the misappropriation element is met. The element is similarly met for Rayborn because he breached the ICA's "duty to maintain secrecy." 18 U.S. Code § 1839(6); *see Ass'n of Am. Med. Colleges v. Princeton Rev., Inc.*, 332 F. Supp. 2d 11, 24 (D.D.C. 2004) (breach of agreement sufficient).

### E. Rayborn and Broad Street Won Commissions Using TMG'S Trade Secrets

Lastly, Defendants argue Plaintiffs cannot show "that they suffered harm from Rayborn's actions." Defs. Mem. 25. That is not an element of a trade secrets claim: TMG need only prove "unjust enrichment caused by the misappropriation"—in this case, commissions gained by

Rayborn and Broad Street using TMG's trade secrets. 18 U.S.C. § 1836(b)(3)(B); *see* D.C. Code § 36-403(a); Am. Compl. ¶¶ 56, 65 (seeking unjust enrichment); *see also RRK Holding Co. v. Sears, Roebuck & Co.*, 563 F. Supp. 2d 832, 837 (N.D. Ill. 2008) ("Total damages for trade secret misappropriation is the amount the Defendant ***gained*** from the misappropriation . . . . What is being compensated is Defendant's actual gain, not Plaintiff's actual loss." (emphasis added)).  As discussed in Section I.C, there is significant evidence that Defendants used TMG's Canvass Cards to poach TMG's clients, win their business, and earn over $800,000 in commissions.  TMG has amply shown damages here.

### III.   NUMEROUS ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON TMG'S TORTIOUS INTERFERENCE CLAIM

In asking the Court to enter summary judgment on TMG's claims for tortious interference with contact and prospective economic advantage, Defendants fail to distinguish between the elements of each of these claims.  TMG has claims for both. TMG's tortious interference with contract claim is based on its pre-existing brokerage agreements, and its tortious interference with prospective economic advantage is based on its expectation of representing certain tenants with respect to leasing transactions and receiving commissions from landlords for those transactions. *See* Am. Compl. at 16.

To establish a prima facie case of tortious interference with contract and survive summary judgment, TMG must demonstrate: "(1) existence of a valid contractual or other business relationship; (2) [Defendants'] knowledge of the relationship; (3) intentional interference with that relationship by [Defendants]; and (4) resulting damages."  *Newmyer v. Sidwell Friends School*, 128 A.3d 1023, 1038 (D.C. 2015).   On a claim for tortious interference with prospective economic advantage, "a plaintiff obviously need not demonstrate the existence of a contract, but merely a prospective advantageous business transaction."  *See Casco Marina Dev., L.L.C. v. D.C. Redev.*

*Land Agency*, 834 A.2d 77, 84 (D.C. 2003).  Because TMG has shown significant evidence of all

four elements—creating, at a minimum, genuine dispute issue of fact about each—Defendants'

request for summary sudgment on TMG's Tortious Inference with Contract and/or Prospective

Economic Advantage claims (Count II) must be denied.

**A.  The D.C. Court of Appeals Has Held That "Terminable at Will" Contracts Can Be The Basis of Tortious Interference With Contract Claims**

For those tenants with whom TMG has signed exclusive representation agreements—even

those which are terminable at will—TMG has stated a tortious interference with contract claim

with respect to those tenants.  The D.C. Court of Appeals has explicitly held that an "at-will []

relationship" is "a valid and subsisting business relationship for the purposes of a tortious

interference claim."  *Newmyer v. Sidwell Friends School*, 128 A.3d 1023, 1039-40 (D.C. 2015)

(explaining that D.C.'s "law of tortious interference with business or contractual relationship

derives from the Restatement (Second) of Torts" and that in comment *g* to Section 766, "the

Restatement provides that a contract that is terminable at-will is 'valid and subsisting' until

terminated 'and the defendant may not improperly interfere with it.'"); *see also Everson v. Cong.*

*Black Caucus Fonud., Inc.*, Civil Action No. 19-2720 (TJK), 2020 WL 6118440, at *10 (D.D.C.

2020) ("[T]he D.C. Court of Appeals clarified in *Newmyer v. Sidwell Friends School . . .* that an

employee may bring a case for tortious interference with at-will employment against a third

party[.]").  Furthermore, a "reasonably expectancy" is ***not*** an element of a claim for tortious

interference with contract.  *See Newmeyer,* 128 A.3d at 1038 (stating the elements of a claim for

tortious interference with contractual relations).[4]

---

[4]Defendants' characterization of TMG's exclusive representation agreements as "lacking definitive termination dates" and thus subject to the D.C. Code's 90-day cap on brokerage agreements, *see* D.C. Code § 42-1703(g) (2012), is simply wrong.  TMG's exclusive representation agreements are generally effective for a definite period of time—typically, twelve

B. **TMG Had a "Reasonable Expectancy" of Representing The Tenants At Issue—
Nearly All of Whom Were Former TMG Clients**

TMG ***also*** has a claim for tortious interference with prospective economic advantage for each of the sixteen tenants at issue because TMG has previously represented thirteen of them—and had actively been pursuing business with the remaining three. *See Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 745 F. Supp. 2d 343, 354 (S.D.N.Y. 2010) (plaintiff sufficiently alleged reasonable expectancy "either on the basis of [its] prior relationships with former customers or its active negotiations with prospective customers").

Defendants erroneously suggest that TMG could not have had a "reasonable expectancy" of representing the tenants (i) with whom it does not have brokerage agreements or (ii) whose brokerage agreements "lack definite termination dates" and have thus expired.   A tortious interference with prospective economic advantage, however, is expressly **"*not grounded*** on present contractual relationships." *Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 791 F. Supp. 2d 33, 56 (D.D.C. 2011).  On the other hand, the existence of a prior agreement—even if expired—is strong evidence that TMG did have a reasonable expectation of representing that client in the future.

A commercially reasonable expectancy arises "where there is a background of business experience on the basis of which it is possible to estimate . . . the likelihood that the plaintiff would have received [the contract's benefits] if the defendant had not interfered." *National R.R.*, 791 F.

---

months—and thereafter continue month-to-month unless otherwise terminated by either party. *See, e.g.*, DSOF ¶¶ 113, 125, 129.  The Federal Court of Claims has specifically addressed whether TMG's exclusive representation agreements lack definite termination dates and has held that they do not, and that therefore "the D.C. Code does not apply."  *Meyer Group, Ltd. v. United States*, 121 Fed. Cl. 105, 129 (Fed. Cl. 2015) (finding TMG's exclusive representation agreements to be enforceable), *aff'd* 642 Fed. Appx. 994 (Fed. Cir. 2016)).

Supp. 2d at 57.[5]  Both case law and common sense dictate that a prior business relationship is strong evidence of party's "reasonable expectancy" of obtaining future business.  *See, e.g.*, *Acme Plastics of NJ, Inc. v. Int'l Fixtures Ltd.*, Civ. Action No. 02-5906, 2007 WL 4300157, at *2 (D.N.J. 2007) ("prior relationship" with customer was evidence of its "reasonable expectation" business with that customer); *Oracle Am., Inc. v. TERiX Computer Co, Inc.*, No. 5:13-cv-03385-PSG, 2014 WL 31344, at *11 (N.D.Cal. 2014) (plaintiff pled "reasonable expectation of future economic benefit" where clients had "previously purchased" plaintiff's services).

Defendants mischaracterize Meyer's deposition testimony from the D.C. Superior Court case in claiming that "Meyer admits he has no expectation of continuing a relationship years after working with a client." Defs. Mem. 34.  Meyer said no such thing.  He testified only about his understanding of a tenant's contractual obligations, ***not*** about his expectations for whether a client would retain TMG for future work.  *See* Pls.' Response to DSOF ¶ 101 (Meyer testifying a client must "conform to the agreement that was signed.").  To the contrary, TMG certainly expects to do business with its prior clients; the vast majority of TMG's business has come from repeat clients. *See* PSOF ¶ 118.

### C.  The Record Abounds With Evidence of Defendants' Intent To Interfere

Defendants' next argument—that TMG cannot show Defendants' "intent" to interfere—is easily disproved.  The "interference" element requires showing both an "intentional interference" and that the interference "induc[ed] or caus[ed] a breach or termination."  *Nat'l R.R..*, 791 F. Supp. at 60.  TMG has established both.  As Defendants have themselves conceded, "a plaintiff can prove

---

[5]Defendants' citation of *Heron v. Fannie Mae*, 861 F.3d 160, 171 (D.C. Cir. 2017), for the proposition that "[a]t will relationships are generally not recognized as a reasonable expectancy" (Defs. Mem. 32) is a red herring.  Here, TMG had a "reasonable expectancy" of receiving commissions from landlords for representing tenants in connection with ***specific leases.***

intent by showing that a defendant knew that his actions were certain or substantially certain to interfere with the plaintiff's business." *Whitt v. Am. Prop. Const., P.C.*, 157 A.3d 196, 203 (D.C. 2017). Here, the evidence of intent is simple: Defendants knew that by representing TMG's former and prospective clients, they were interfering with TMG's business.

For the same reason that TMG has established causation with respect to its breach-of-contract claim, TMG has also established causation here. *See* Section I.C. Interference "need not cause an actual breach of the business relationship, but may cause merely a failure of performance by one of the parties." *Newmeyer*, 128 A.3d at 1039 (citations and quotations omitted). By interfering with TMG's client relationships, Defendants caused TMG to lose commissions it would have otherwise received "but for [Defendants] purported improper interference." *See Nat'l R.R.*, 791 F. Supp. 2d at 57.

Lastly, Defendants' statement that TMG has "never identified any damages in response to any discovery request [] that it attributes to Defendants' alleged tortious interference" (Defs. Mem. 35) is just plain wrong. TMG's Amended Complaint states that Defendants' "intentional interference" caused TMG to lose "commission fees it reasonably expected to receive in connection with its clients' leasing agreements." Am. Compl. ¶ 49. In response to Broad Street's Interrogatory asking TMG to itemize its damages, TMG stated that it was seeking "commissions received by Broad Street and Rayborn in connection with leasing transactions identified on Broad Street's documents BSR_0000038 and BSR0073909"—commission reports for Rayborn produced by Broad Street in discovery. *See* PSOF ¶ 119. TMG's expert report then lists commissions received by Broad Street for these tenants, and opines that TMG "would have reasonably expected to receive $814,326.31" in commissions had it been able to represent those tenants because "that

is the rate paid to all brokers by landlords in the D.C. metropolitan area."  PSOF ¶ 120.  Thus, Defendants cannot feign ignorance about what tortious interference damages TMG is seeking here.

### D.  Defendants Have Not Shown That Their Interference Was Not Wrongful

Defendants' penultimate argument—that their interference was not "wrongful"—must fail. Under D.C. law, whether the alleged interference was "wrongful" is not an element of a prima facie claim for tortious interference; rather, it is an affirmative defense which "defendants [] bear the burden of proving . . . ." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Center, Inc.*, 957 A.2d 890, 901 (D.C. 2008).  "A determination of whether [an] interference was improper or not is ordinarily left to the jury." *Nat'l R.R.*, 791 F. Supp. 2d at 61.  "The factfinder's task is to evaluate the evidence, including the credibility of the witnesses, and to determine whether [the interference] was improper under the circumstances—that is under the particular facts of the individual case, not in terms of rules of law or generalizations." *Onyeoziri v. Spivok*, 44 A.3d 279, 291 (D.C. 2012)

The thrust of Defendants' argument is that because Rayborn is "free" to solicit TMG's clients under the ICA, their conduct *ipso facto* cannot be wrongful.  But "the privilege to protect one's own economic interests is not absolute." *NCRIC*, 957 A.2d at 901.  TMG can point to significant evidence that Defendants unlawfully misappropriated TMG's trade secrets, and that Rayborn breached the ICA repeatedly defamed TMG and Meyer.  Thus, Defendants have failed to meet their burden—especially at this stage of the case.

### E.  By Definition, A Tortious Interference With Contract Claim Involves an Underlying Contract

Finally, Defendants' argument that TMG's tortious interference claim is barred because TMG can instead bring a breach of contract action against tenants is nonsensical.  *See* Defs. Mem. 41.  A claim for tortious interference with contract is, by definition, premised on the existence of an underlying contract between two parties.  Defendants' quoted case—*Lurie v. Mid-Atl. Permante*

*Med. Grp. P.C*, F. Supp. 2d 304, 332 (D.D.C.)—refers to the unremarkable proposition that a defendants' breach of his own contract with plaintiff, standing alone, is not a basis for the tort of tortious interference with contractual relations.  In fact, the D.C. Court of Appeals has explicitly rejected Defendants' very argument.  *See Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 26 (D.C. 1991) (distinguishing instant case from situations that "did not involve a third party" and denying defendants' summary judgment motion on tortious interference claim.).

## IV.   RAYBORN'S STATEMENTS THAT MEYER HAS "RETIRED" ARE INTENTIONALLY FALSE AND DEFAMATORY

As part of his game plan to solicit TMG's clients, Rayborn routinely told clients and landlords that Meyer had "retired"—knowing full well this was false.  *See* PSOF ¶¶ 45, 122 (Rayborn deposition: "Q: So as of your conversation with Mr. Flenner in 2019, you believed that Mr. Meyer was still trying to go after business? A: I do believe that."); (Rayborn emails a contact at NHP Foundation saying "Bill is basically retired"); (Rayborn emails his team, "We got another deal today! . . . Mike and Haze—***have to deal with Meyer yet again or risk him going after the fee***. He is still operating the Meyer group . . . ***he is not retired***.").[6]  Rayborn does not dispute that he told others Meyer had retired or that he knew these statements to be false; Rayborn asserts only that his statements were not sufficiently "offensive" to be defamatory.  Defs. Mem. 42.  Under D.C. law, "[a] statement is 'defamatory' if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community."  *Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1091 (D.C. Cir. 2007) (citations and quotations omitted).

---

[6] Defendants argument that several of the defamatory statements fall outside of the statute the one-year statute of limitations for defamation is incorrect.  Because Meyer did not learn about these statements until Defendants produced these emails in discovery in 2021, D.C.'s discovery rule applies, and these statements are not time-barred.  *Bayatfshar v. ARINC, Inc.,* 961 F. Supp. 2d 206, 215 (D.D.C. 2013) (applying the discovery rule "because plaintiff filed suit within one year of discovering [defendant's] allegedly defamatory statements").

The assertion that Meyer has "retired" when he has not is both offensive and professionally ruinous, because it causes clients to take their business elsewhere—which was precisely the intended effect. Furthermore, Rayborn's defamatory statements qualify as defamation *per se*, requiring no proof of damages. *See Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 273 (D.D.C. 2017) (no showing of specific harm required where defamatory statements "imput[e] to a person a . . . matter affecting adversely a person's fitness for trade, business, or profession"). Even so, at least some of the damage from Rayborn's statements is clear: at least two clients—NENA and NHP Foundation—signed with Broad Street after Rayborn falsely told them that Meyer had retired. *Compare* PSOF ¶ 45 *with* DSOF ¶¶ 127 (NENA); *see also* PSOF ¶ 122 (NHP Foundation).

## V.   DEFENDANTS' *DAUBERT* ARGUMENTS ARE MERITLESS

TMG's expert, Mr. Fletcher Gill, offered his opinion on the types of tenant information that is valuable to brokers and the extent to which that information is publicly available. *See* PSOF ¶¶ 3-13. He explained that a tenant's current leasing information—such as the lease expiration date, price, and square footage—as well as information about key decision-makers are highly valuable to brokers such as himself, and that such information is not publicly available. *See* PSOF ¶¶ 10, 80. Applying his analysis regarding the types of tenant information valuable to brokers, Mr. Gill reviewed the Canvass Cards and Database and found they contain valuable, non-public information, such as "information about tenants' leases, such as lease termination dates, square footage, and rents," and "a wealth of information about tenant's businesses, key decision makers, and space needs." PSOF ¶ 123.

Defendants do not dispute that Mr. Gill, as the founder and principal broker of The Genau Group Realty Advisors—a commercial tenant brokerage in D.C.—is intimately familiar with the types of information valuable to brokers, and is well qualified to offer those opinions. PSOF ¶

124.  Nor do they dispute that these opinions are proper topics for expert testimony in this case. *See McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 34-35 (D.D.C. 2004) ("The twin requirements for expert testimony are relevance and reliability.").  Rather, Defendants seek to exclude Mr. Gill's testimony solely because he has not "looked at all of the notecards."  Defs. Mem. 48.  But Gill's expert report is predominately about what ***types*** of information are valuable to brokers and the extent to which that information is publicly available; whether he reviewed every single card is irrelevant to that testimony and is not a basis for exclusion.  Defendants cite no authority for their baseless assertion that Mr. Gill would have had to review every single card to offer a reliable opinion about the general types of information found on the cards.  Defendants' citations on this issue are thus inapposite, as these cases pertain to experts whose opinions were offered to verify the contents of the evidence itself and their methodology for doing so was flawed, which is not the case here.

Defendants' further assertion that "Gill could not answer basic questions about [the cards'] contents," Defs. Mem. 49, is not true: in fact, they never showed him a ***single card*** at his deposition, nor asked him a question about any particular card—despite Mr. Gill repeatedly offering to testify about any card they put in front of him.  *See* PSOF ¶ 125 (Gill testifying "I reviewed dozens and dozens of cards. If you want to show me specific cards, I can tell you if I remember reviewing them.").[7]  If Defendants believe Mr. Gill's description of the cards' contents "fails to consider important or contrary evidence, or inappropriately jumps to conclusions," then "the solution is" for Defendants to "provide competing evidence of its own or to cross-examine

---

[7] For instance, Defendants asked Mr. Gill at his deposition if he reviewed a card for Advanced Sciences & Technology; Mr. Gill asked counsel to show him the card.  *See* PSOF ¶ 125.  Defense counsel informed Mr. Gill that they could not show him such a card because "there have not been any produced"—even though Rayborn did produce that card.  *See* PSOF ¶¶ 64, 125.

[Mr. Gill] at trial, rather than seek to strike" his report.  *Paige Int'l, Inc. v. XL Specialty Ins. Co.*, No. CV 14-1244 (JEB), 2016 WL 3024008, at *5 (D.D.C. May 25, 2016); *see also McReynolds*, 349 F. Supp. at 42 ("When the factual underpinnings of an expert's opinion are in dispute, it is not the role of the court to determine the correctness of the facts underlying the expert's testimony.").

Finally, Defendants' complaint that Mr. Gill's damages calculation was "provided to him by [] counsel" (Defs. Mem. 49) wholly misunderstands the scope of Mr. Gill's report.  Mr. Gill does not opine about *causation*; he opines about TMG's damages *calculation*.  As the report explicitly states, Mr. Gill assumes causation to opine what TMGs would have been "[had] The Meyer Group been able to represent these tenants in connection with the lease transactions [at issue]," and explains that "[t]he Meyer Group would have been paid at the same fixed commission rate that was paid to Broad Street, because that is the rate paid to all brokers by landlords in the D.C. metropolitan area."  *See* PSOF ¶ 122.  That is no basis to exclude his testimony.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant TMG's Partial Motion for Summary Judgment as to liability on its breach of contract claim (Count I), and deny Defendants' Motion for Summary Judgment in its entirety.


Dated: January 13, 2022                          Respectfully submitted,

                                                 **AEGIS LAW GROUP LLP**

                                   By:   /s/ *Serine R. Consolino*
                                         Serine R. Consolino (D.C. Bar No. 1033847)
                                         Branden Lewiston (D.C. Bar No. 252550)
                                         801 Pennsylvania Ave., N.W. – Ste. 740
                                         Washington, D.C. 20004
                                         Tel: (202) 737-3500
                                         Fax: (202) 735-5071
                                         *Attorneys for Plaintiffs*