**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE MEYER GROUP, LTD. *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No. 19-cv-1945 |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES M. RAYBORN *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

Plaintiffs hereby provide the following supplemental statement of material facts for which there is no genuine dispute in support of the simultaneously-filed Opposition and Cross-Motion for Partial Summary Judgment:

**I.   Background**

1.   TMG has never had more than seven or agents licensed agents at a time but has managed to successfully compete against brokerage firms several times its size.  *See* Affidavit of William Meyer, Pls.' Ex. 1 ("Meyer Aff.") at ¶ 2.

2.   TMG's success can be attributed to the quality of its tenant information, which, much like targeted advertising, allows TMG to approach clients with the right proposals at the right time. TMG has spent many years compiling this valuable and confidential tenant information.  *See* Meyer Aff. at ¶ 3.

**a.   Tenant Information is Highly Valuable to Brokers**

3.   Tenant-side commercial lease brokers represent tenants—businesses, non-profits, and other organizations—in identifying, negotiating, and securing short and long-term leases of

commercial space, which can often be complex and expensive.  *See* Defs.' Ex. 86-Gill Report at ¶ 7.

4.  Though prospective tenants hire commercial lease brokers directly to represent them in connection with these transactions, in the D.C. metropolitan area, commercial lease brokers are not paid by the tenants for this service, but by the tenants' landlords in the event a lease agreement is consummated.  *See* Defs.' Ex. 86-Gill Report at ¶ 7.

5.  Brokers and tenants often sign brokerage agreements—referred to in the industry as "exclusive representation agreements"—which require tenants to identify brokers as the "procuring cause" of any leasing transaction consummated for a particular space identified by the broker to the tenant.  *See* Fletcher Gill's Expert Rebuttal Report, Pls.' Ex. 2 ("Gill Rebuttal Report") at ¶ 3.

6.  By design, procuring cause provisions protect brokers in the event that lease transaction occurs after a broker is terminated by the tenant, to ensure that brokers get paid for the work that they do.  *See* Gill Rebuttal Report at ¶ 4.

7.  Tenant-side commercial lease brokers generate business both by cold-calling new clients, and also by contacting tenants who they have represented in the past.  *See* Defs.' Ex. 86-Gill Report at ¶ 8.

8.  A broker's ability to compete in the highly competitive D.C. real estate market is the direct result of the quality and breadth of their tenant information.  *See* Defs.' Ex. 86-Gill Report at ¶ 13.

9.  Information about, for example, a tenant's desired lease term, growth plans, key decision-makers, line of business, annual revenue or number of employees enables brokers to build relationships with key tenant representatives, understand their space needs, and better market

themselves to prospective tenants.  It also allows brokers to be better advocates for tenants once leasing negotiations begin.  *See* Defs.' Ex. 86-Gill Report at ¶ 10.

10. A tenant's current lease also contains highly valuable information.  The duration, square footage and price of a tenant's current lease, as well as information about concessions and early termination, expansion, and renewal options allows brokers to better pitch to clients through targeted market analyses. Knowing a lease's early termination, expansion, and renewal options is critical information for brokers, because these options typically must be exercised during a specific period of time, creating a window of opportunity for marketing purposes.  Therefore, "the more thorough and accurate a broker's tenant information is, the better able a broker is to compete with other brokers." *See* Defs.' Ex. 86-Gill Report at ¶¶ 8, 9, 14a.

11. One of the most valuable pieces of information for a broker to know about a prospective tenant is the date of the expiration of its current lease. The expiration date of a tenant's current lease tells the broker when to reach out to a prospective tenant to inquire about whether it wants to renew its current lease, extend its duration, or seek a different space altogether.  *See* Defs.' Ex. 86-Gill Report at ¶ 8.

12. The timing of a broker's outreach is critical: if a broker approaches a tenant too early, the tenant's current lease expiration will be too remote for the tenant to be in a position to make decisions about its long-term space needs. On the other hand, if the outreach comes too late, the tenant may have already engaged another broker.  *See* Defs.' Ex. 86-Gill Report at ¶ 8.

13. Because identifying space and negotiating a lease is a time-intensive process, beginning the search for space between twelve and eighteen months before the expiration of a tenant's current lease allows enough time for the tenant to tour, evaluate, and compare potential

properties, consider different options, negotiate a non-binding letter of intent, negotiate a lease, and perform any necessary renovations or repairs before move-in.  *See* Defs.' Ex. 86-Gill Report at ¶ 8.

**b. <u>The Meyer Group's Client Information Is The Core Of Its Business</u>**

14. The Meyer Group's client information took years to compile.  *See* Meyer Aff. at ¶ 3; Defs.' Ex. 4-Rayborn Depo. Tr. at 213:8-11 (Rayborn testified he considered the cards his "work product" because it "took [him] many years to develop the cards.").

15. Brokerage firms hire agents to cold-call prospective tenants for the express purpose of acquiring and compiling this type of tenant information and, in turn, generating clients for the firm.  It often takes agents several years to develop the necessary relationships and compile the necessary information to bring a significant number of clients to the firm.  *See* Defs.' Ex. 86-Gill Report at ¶ 11.

16. In recent years, TMG has used a secure Microsoft Access Database to compile its clients' lease information once a deal is completed.  It is not always kept up to date by TMG's administrative personnel and does not include information about prospective clients.  *See* Meyer Aff. at ¶ 14.

17. Throughout his tenure at TMG, Rayborn's primary job function was to generate potential leads for TMG, which he did through cold-calling clients and compiling their information.  *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 17:6-12 (Rayborn testifying that his job responsibilities at both TMG and Broad Street "are to canvass and to secure leads of tenant[s] . . . to win business.").

18. Though Rayborn would occasionally participate in office tours and accompany William Meyer to pitch meetings, Rayborn's client involvement generally ended there: once a tenant

4

hired TMG as its broker, William Meyer became the tenant's exclusive point of contact at TMG, and handled all leasing negotiations.  *See* Meyer Aff. ¶ 6; Defs.' Ex. 4-Rayborn Depo. Tr. at 17:6-12 (Rayborn testifying that he "very rarely" handles leasing negotiations).

19. By the time Rayborn left TMG in 2019, he was earning a 75% commission split for any tenant he brought to TMG—amounting to an income of more than $800,000 in his last full year at TMG.  *See* Meyer Aff. at ¶ 7.

   **c.  TMG's Canvass Cards Contained Key Client Information**

20. Rayborn maintained and organized TMG's client information on a set of handwritten index cards, which he and Meyer often referred to as "canvass cards."  Rayborn used the Canvass Cards to record information had collected from cold-calling both potential and past TMG clients.  *See* Meyer Aff. at ¶ 8; *see also* Defs.' Ex. 4-Rayborn Depo. Tr. at 172:3-10, 183, 186.

21. The Canvass Cards compiled everything from information about a tenant's key decision makers—for example, noting that a key decision maker at a particular tenant was a "Republican"—to notes about tenants' businesses, the type of space they were searching for, information about their current leases, and, notably, their lease expiration dates.  *See* Meyer Aff. at ¶ 9; *see also*, *e.g.*, Pls.' Ex. 3-Rayborn's Responses to Plaintiffs' Interrogatories at Rog. No. 8 (typed out version of handwriting for cards for Integral, NENA, Capital Performance Group, and Barnes Vanze Architects) ("Republican" on p. 14).

22. For example, the canvass cards for Barnes Vanze Architects listed the names of key decision-makers, their individual phone numbers, the tenant's lease expiration date and square footage, and notes about client priorities and issues of concern (e.g., "HVAC," "rent reduction").  *See* Pls.' Ex. 3 at 10-11.  The canvass card for Capital Performance Group

likewise contained the names of several contacts, client concerns, key dates, and square footage. *Id.* at 19-20. Canvass cards for Integral had the same types of information, plus the personal cell numbers and extensions of important contacts. *Id.* at 11-13. Cards for NENA provided even more granular detail about client preferences, such as that the tenant needed "ports for IT" and one contact was a "Republican." *Id.* at 13-19.

23. As another example, canvass cards for Tata Sons—another former TMG client—listed the tenant's square footage at their Arlington location ("1700 N. Moore") with notes that they wanted a "bigger" space and would consider "moving [to] DC"—in addition to personal contact information for decisionmakers and details regarding their lease. *See* Pls.' Ex. 4 (a true and correct copy of canvass cards for Tata Sons produced by Defendant Rayborn at Rayborn020470, Rayborn020571-72).

24. When he ran out of space on one card, Rayborn would use additional cards to record tenant information, sometimes resulting in multiple cards for one client. *See* Meyer Aff. at ¶ 9.

25.  TMG custom-ordered the Canvass Cards specifically for Rayborn's use; no other agent used Canvass Cards extensively to record client information, and there was never any dispute the cards belonged to The Meyer Group since TMG provided them to Rayborn for his work in generating leads for TMG. *See* Meyer Aff. at ¶¶ 13, 17.

26. Each card contained on the bottom-right hand corner a field specifically for recording lease expiration dates, on the bottom left-hand corner a field specifically for recording a tenant's square footage, and was imprinted with the The Meyer Group's name and logo. *See, e.g.*, Pls.' Ex. 4.

27. Rayborn organized the Canvass Cards by lease expiration date, which would tell him when to follow up with tenants about leasing a new space or renewing or extending their existing

lease.  *See* Meyer Aff. at ¶ 11; Defs.' Ex. 4-Rayborn Depo. Tr. 167:9-14 (Rayborn testifying that "the two main ways I would sort the cards" was by "when their leases were coming up or when they told me to call them back.").

**d.  Rayborn's Signed the ICA Knowing It Stated The Canvass Cards Belonged to TMG**

28. In May 2018—after several clients complained of Rayborn's inappropriately aggressive tone and various other instances of unprofessional conduct—Meyer decided to terminate Rayborn from TMG.  A few weeks later, however, Rayborn approached Meyer, asked for his job back, and promised to improve his demeanor with clients.  *See* Meyer Aff. at ¶ 15.

29. Concerned that Rayborn was seeking reinstatement for the express purpose of accessing TMG's client information—the Canvass Cards had remained with TMG after Rayborn's departure—Meyer asked Rayborn, as a condition of his reinstatement, to sign an updated Independent Contractor Agreement.  On May 23, 2018, Meyer emailed Rayborn a draft.  *See* Meyer Aff. at ¶ 16.

30. Meyer explicitly informed Rayborn that the scope of the ICA's confidentiality provision included the Canvass Cards containing Rayborn's notes on clients and prospective clients. *See* Meyer Aff. at ¶ 17, 18.

31. Upon receiving the draft ICA, Rayborn consulted two different attorneys—both of whom, Rayborn has testified, advised him "against signing [the] agreement"—and also sought the advice of a colleague at TMG.  *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 110-11.

32. At his deposition, Rayborn confirmed that when he signed the ICA, he understood "that the named items [in the ICA] were confidential in nature"—including the Canvass Cards.  *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 108:17-18.

33. In a February 11, 2019 email, Rayborn told Michael Jacoby—Defendant Broad Street's CEO—that Meyer "added to the new agreement . . . that the canvass cards belonged to him" but that Rayborn signed the ICA nonetheless, because he "felt it was better" to "fight for the issues in court."  Pls.' Ex. 5 at 2-3 (a true and correct copy of an email produced by Defendant Broad Street at BSR0073570 *et seq*.).

34. Unbeknownst to Meyer, by January 2019, Rayborn was actively job hunting.  *See* Defs.' Ex. 4-Rayborn Depo. Tr. 153; Pls.' Ex. 6 (a true and correct copy of a text message produced by Defendant Rayborn at Rayborn020714; redactions were done by Defendant Rayborn).

**e.  Rayborn Misappropriated TMG's Client Information and Brought It to Broad Street**

35. In mid-January, Rayborn interviewed with Broad Street, and on January 21, Michael Jacoby—Broad Street's CEO—sent Rayborn an email attaching Broad Street's standard Independent Contractor Agreement.  *See* Pls.' Ex. 7 (a true and correct copy of an email produced by Defendant Broad Street at BSR0073999 *et seq*.).

36. Broad Street's ICA also contained a confidentiality provision prohibiting the contractor from divulging or using the "names of clients and customers or prospective customers and clients, public relations matters, or any other aspect of Broad Street's business."  *See* Pls.' Ex. 8 (a true and correct copy of a document attached to the above email produced by Defendant Broad Street at BSR0074001 *et seq*.).

37. Rayborn added the following clause to the draft Broad Street ICA:

> Broad Street and Contractor expressly agree that contact cards developed or created by Contractor based on Contractor's independent work, prior to or during Contractor's employment by Broad Street covered by this Agreement, will remain the sole and exclusive property of Contractor both during the term of this Agreement and after termination of this Agreement, and said contact cards shall be specifically excluded from the scope or definition of Broad Street's proprietary information, Confidential Information, records, files and/or documents.

*See* Pls.' Ex. 9 (a true and correct copy of an email and attachment produced by Defendant Broad Street at BSR0073575 et seq. and marked as Rayborn deposition exhibit 0017); Defs.' Ex. 4-Rayborn Depo. Tr. 208-09.

38. Broad Street accepted Rayborn's proposed revision and the agreement was signed on January 28, 2019.  *See* Pls.' Ex. 10 ("BSR-Rayborn ICA") (a true and correct copy of a document produced by Defendant Broad Street at BSR_0000025 et seq. and marked as Rayborn deposition exhibit 0018); Defs.' Ex. 4-Rayborn Depo. Tr. 209-13.

39. Meyer came to learn that Rayborn was in talks with other brokerage firms. On January 24, Meyer—who was out of town at the time—called Rayborn to confront him about what he had overhear.  *See* Meyer Aff. at ¶ 21.

40. Rayborn admitted that he was considering options from other brokerage firms.  Meyer informed Rayborn that he was terminated effective immediately, and instructed him to delete all TMG documents and leave all TMG documents and property—including the Canvass Cards—at TMG's office.  Meyer also instructed his staff to disable Rayborn's TMG email access, which they did, and—to the extent possible—to prevent Rayborn from leaving with the Canvass Cards.  *See* Meyer Aff. at ¶ 22; *see also* Defs.' Ex. 2-Meyer Depo. Tr. 109:12-20 (Meyer testifies he told Rayborn "to leave everything that's not his personal belongings at the office, he needs to delete his e-mails" and he told others at the office that "Jim's not to take anything with him except obviously his personal belongings."); Pls.' Ex. 11 (a true and correct copy of an email produced by TMG at TMG_0026294 *et seq.*) (Meyer instructing staff to turn off Rayborn's emails).

41. Rayborn took the Canvass Cards and the Access Database from TMG's offices, texting a friend, "Bill terminated me"—but explaining that he had "[c]leared the office out" and had

taken "everything [he] needed." Pls' Ex. 12 (a true and correct copy of a text message produced by Defendant Rayborn at Rayborn020690, with redactions made by Defendant Rayborn); *see* Meyer Aff. at ¶ 23.

42. Haze McCrary, Rayborn's colleague at Broad Street, testified that Rayborn brought three "bread-boxed-sized containers"—i.e, thousands of Canvass Cards—with him to Broad Street. *See* Defs.' Ex. 11-McCrary Depo. Tr. at 46:6-21.

43. The very day that Rayborn started at Broad Street, a representative of a longstanding TMG client—on behalf of whom TMG was in the process of negotiating a significant lease— emailed Meyer to tell him that she had "just received a call from Jim saying he's still [the broker] on the case" and noting her confusion; Meyer explained that Rayborn was no longer working at TMG. *See* Pls.' Ex. 13 (a true and correct copy of an email produced by TMG at TMG_0026369 *et seq*.).

44. On several occasions, Rayborn explicitly instructed TMG's clients to terminate their agreements with TMG. *See* Pls.' Ex. 14 (a true and correct copy of an email produced by TMG at TMG_0008920 *et seq*.); Pls.' Ex. 15 (a true and correct copy of an email produced by TMG at TMG_0022657 *et seq*.).

45. Rayborn also began telling TMG's clients that Rayborn had either "retired" or was about to retire. *See* Pls.' Ex. 16 (a true and correct copy of an email produced by Broad Street at BSR0006264 *et seq*.) (Rayborn stating to NENA that Meyer was "winding down to retire"); Pls.' Ex. 17 (a true and correct copy of an email produced by Broad Street at BSR0028322) (Rayborn stating that Meyer is "no longer in the business"); Pls.' Ex. 18 (a true and correct copy of an email produced by Broad Street at BSR0009265 *et seq*.) (Rayborn heard  Meyer

had "retired"); Pls.' Ex. 19 (a true and correct copy of an email produced by Broad Street at BSR0052803) (Rayborn stating, "I am with a new firm and Bill is basically retired").

46. In at least one instance, Rayborn pretended that he still worked at TMG.  *See* Pls.' Ex. 20 (a true and correct copy of an email produced by TMG at TMG_0001429 *et seq*.) (March 17, 2019 email from Catherine Bertram—a longtime TMG client—to William Meyer, stating that Rayborn "called [their] office" to set up a meeting and "said he was with the Meyer Group.").

**f.**  **Broad Street's Knew Rayborn Misappropriated TMG's Trade Secrets**

47. Michael Jacoby, Broad Street's CEO, knew from outset that Rayborn was bringing TMG's client information with him to Broad Street against TMG's express wishes.  *See* Pls' Ex. 21-Jacoby Depo. Tr. at 21:22-22:17 (a true and correct copy of the deposition transcript of Michael Jacoby) (testifying that Rayborn had told him he had "contact cards" containing "general information about prospects" that would be bringing with him from TMG, and that Rayborn had a "difference of opinion" with Meyer about the ownership of the cards).

48. On February 9, 2019, Meyer emailed Jacoby, asking for a meeting to discuss Rayborn's contract with TMG.  Jacoby forwarded Meyer's email to Rayborn and McCrary, stating, "[l]ittle offense guys. Jim, please send me your old contract."  Pls' Ex. 22 (a true and correct copy of an email produced by Broad Street at BSR0023679).

49. Rayborn sent Jacoby the ICA, and Jacoby informed Rayborn that, in his opinion, TMG "did not [have] a right" to the Canvass Cards—though Jacoby admitted at his deposition that he had not consulted with an attorney before opining on the ICA.  Pls.' Ex. 5; *see also* Jacoby Depo. Tr. at 17:21-18:2.

50. On April 26, 2019, TMG, through its then-counsel, sent a cease-and-desist letter to both Broad Street and Rayborn, demanding that Broad Street cease using TMG's Confidential Information and soliciting TMG's clients and potential clients.  *See* Pls.' Ex. 23 (a true and correct copy of a document produced by Rayborn at Rayborn000078).

51. Broad Street refused to comply with TMG's request, claiming that it was unable to refrain from using TMG's Confidential Information unless TMG provided an entire list of all TMG's clients and potential clients.  *See* Pls.' Ex. 24 (a true and correct copy of an email produced by TMG at TMG_0026619 *et seq*.).

**g.  The Litigation**

52. Rayborn sued TMG in D.C. Superior Court for purportedly unpaid commissions; the D.C. Superior Court, however, has since granted summary judgment in TMG's favor on all claims. *See* Jan. 22, 2021 Order Granting Summary Judgment, *Rayborn v. The Meyer Group*, Civil Action No. 2019 CA 006492 B. (D.C. Sup.).

53. During his July 13, 2020 deposition in the D.C. Superior Court case, Rayborn testified, in response to a question from attorney Howard Hoffman asking whether Rayborn took index cards with him when he left TMG, "I left them on my desk" and that "Sarah Religa [a TMG assistant] took them.".  *See* Pls.' Ex. 25-Rayborn D.C. Sup. Depo. Tr. at 358-359 (a true and correct copy of the deposition transcript of Rayborn in D.C. Superior Court).

54.  As of the close of discovery, Defendants have received well over $800,000 in commissions to date in connection with their representation of tenants that were TMG clients or prospective clients. *See* Pls.' Ex. 26-BSR Commission Schedule (a true and correct copy of a pdf printout of an excel spreadsheet produced by Broad Street at BSR0074019).

**II.  Rayborn Breached His TMG Contract**

55. Rayborn's ICA with TMG says, among other things, "upon termination of Contractor's services," the Contract must "turn over to TMG" all of TMG's property, including the "Confidential Information."  *See* Defs.' Ex. 12-ICA at ¶ 7(c).

56. Rayborn uses the Canvass Cards in his work at Broad Street: Broad Street's CEO testified that Rayborn "uses index cards to record names, phone numbers, and general information about prospects," Pls.' Ex. 21-Jacoby Depo. Tr. at 14:16-19; his supervisor at Broad Street testified Rayborn was "wrapped around an axle about these cards" because "they're super important to him," Defs.' Ex. 11-McCrary Depo. Tr. at 60:20-61:1, and Broad Street's office manager testified that the Canvass Cards were "his baby."  Pls.' Ex. 27-Campbell Depo. Tr. at Tr. 61:2 (a true and correct copy of the deposition transcript of Telita Campbell).

57. Rayborn has testified that he uses the Canvass Cards to note "information" he learns from cold calls with tenants.  *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 183:6-10.

58. On August 3, 2015, Rayborn sent an email saying "I am almost out of canvass cards . . . . there are none in the back!!!!!! I obviously use them to cold call. . .  1. If I don't have them 2.  I can't cold call.   3.  The company Bill and I don't make money 4.  We are fucked!!!!!!!!!!!!!!!!!!!!!"  Pls.' Ex. 28 (a true and correct copy of an email produced by TMG at TMG_0035398 and marked as Rayborn deposition exhibit 0012); *see* Defs.' Ex. 4-Rayborn Depo. Tr. at 182-83 (testifying regarding deposition exhibit 0012).

59. On May 12, 2016, Rayborn sent an email saying "IF I RUN OUT OF CANCASS [SIC] CARDS THE COMPANY SHUTS DOWN AND NO ONE MAKES ANY MONEY!!!!!!!"  Pls.' Ex. 29 (a true and correct copy of an email produced by TMG at TMG_0035405 and marked as Rayborn deposition exhibit 0013); *see* Defs.' Ex. 4-Rayborn Depo. Tr. at 184-85 (testifying regarding deposition exhibit 0013).

60. On July 14, 2015, Rayborn sent an email saying he "needs more canvass cards (keeps the lights on)".  Pls.' Ex. 30 (a true and correct copy of an email produced by TMG at TMG_0035409).

61. On May 13, 2016, Rayborn sent an email saying if he doesn't have canvass cards, "I can't and won't work next week [. . .] I have nothing to write on and need them to canvas [. . .] the company is shut down".  *See* Pls.' Ex. 31 (a true and correct copy of an email produced by TMG at TMG_0035400).

62. On May 16, 2016, Rayborn sent an email telling a TMG assistant "canvass cards pay your salary and keep the company running."  Pls.' Ex. 32 (a true and correct copy of an email produced by TMG at TMG_0035406).

63. On Dec. 13, 2016, Rayborn sent an email describing canvass cards as "what keeps the doors open."   Pls.' Ex. 33 (a true and correct copy of an email produced by TMG at TMG_0035408).

**a.  <u>Rayborn Used TMG's Client Information to Win Business for Broad Street</u>**

64. Rayborn produced TMG Canvass Cards for, among others, Advanced Sciences & Technology, *see* Pls.' Ex. 34 (a true and correct copy of a canvass card produced by Rayborn with no discernible Bates number); Barnes Vanze Architects, *see* Pls.' Ex. 3 at Rog. 8; Brazilian Mission to the OAS, *see* Pls.' Ex. 35 (a true and correct copy of a canvass card produced by Rayborn at Rayborn020972); Business Council for International Understanding, *see* Pls.' Ex. 36 (a true and correct copy of a canvass card produced by Rayborn at Rayborn020361); Capital Performance Group, *see* Pls.' Ex. 3 at Rog. 8; Integral, *see* Pls.' Ex. 3 at Rog. 8; National Emergency Number Association, *see* Pls.' Ex. 3 at Rog. 8; Quality Education for Minorities Network, *see* Pls.' Ex. 37 (a true and correct copy of a

canvass card produced by Rayborn at Rayborn020508); Sonecon, *see* Pls.' Ex. 38 (a true and copy of canvass cards produced by Rayborn at Rayborn021063-64); Tata Sons, *see* Pls.' Ex. 4; and Voorthuis Opticians, *see* Pls' Ex. 39 (a true and correct copy of canvass cards produced by Rayborn at Rayborn0210542).

65. TMG has represented Advanced Sciences & Technology, American Academy of HIV Medicine, Arms Control Association, Barnes Vanze Architects, Brazilian Mission to the OAS, Capital Performance Group, Georgia Tech Research Institute, Integral, National Emergency Number Association, Tata Sons, Video Action, *see* DSOF ¶ 111; Brazilian Mission, *see* DSOF ¶ 156; Sonecon, *see* DSOF ¶ 156; and Voorthuis Opticians, *see* DSOF ¶ 158.

66. As of the close of discovery, Broad Street has gained $814,326.31 from its representation of Advanced Sciences & Technology, American Academy of HIV Medicine, Arms Control Association, Barnes Vanze Architects, Brazilian Mission to the OAS, Business Council for International Understanding, Capital Performance Group, Georgia Tech Research Institute, Integral, National Emergency Number Association, National Minority Quality Forum, Quality Education for Minorities Network, Sonecon, Tata Sons, Video Action, and Voorthuis Opticians. *See* Pls.' Ex. 26-BSR Commission Schedule.

67. Broad Street had not represented TMG's former clients or prospective clients until Rayborn referred them to Broad Street. *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 290:6-10 (Advanced Sciences & Technology); 289:13-17 (Arms Control Association); 288:16-21 (Business Council for International Understanding); 292:9-11 (National Minority Quality Forum); 282:16-18 (Quality Education for Minorities Network); 289:1-5 (Video Action); McCrary Depo. Tr. at 143:14-144:2 (Brazilian Mission); Pls.' Ex. 40-Schiesl Depo. Tr. (a true and

correct copy of the deposition transcript of Ben Schiesl) at 27:21-28:16 (American Academy of HIV Medicine); 30-32 (Georgia Tech Research Institute); DSOF ¶ 127 (NENA); DSOF ¶ 132 (Integral); DSOF ¶ 117 (Video Action); DSOF ¶ 136 (Barnes Vanze); DSOF ¶ 145 (Tata Sons); DSOF ¶ 154 (Capital Performance Group).

68. While at TMG, Rayborn received commissions for American Academy of HIV Medicine, Arms Control Association, Barnes Vanze Architects, Brazilian Mission to the OAS, Capital Performance Group, Georgia Tech Research Institute, Integral, National Emergency Number Association, Sonecon, Tata Sons, Video Action, and Voorthuis Opticians.  *See* Pls.' Ex. 41 & 42 (Rayborn's TMG commission schedule) (true and correct copies of documents produced by TMG at TMG_0035445 *et seq*. and TMG_0035425 *et seq*.).

69. Rayborn testified that he keeps Canvass Cards for deals that are complete.  *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 172:3-6.

70. Ben Schiesl, a salesperson at Broad Street, and Chloe Batsch, Rayborn's former administrative assistant at Broad Street, testified that Rayborn sometimes gave them Canvass Cards with client information, which Schiesl threw away and Batsch shredded without giving them to counsel for production.  *See* Pls.' Ex. 40-Schiesl Depo. Tr. at 26:4-12; Defs.' Ex. 14-Batsch Depo. Tr. at 64:15-17 (testifying she shredded 300-500 cards).

71. In a February 11, 2019 email, Rayborn told Jacoby that he only signed the ICA with TMG "because I needed a job and my cards which belonged me."  Pls.' Ex. 5 at 2.

72. In his deposition, Rayborn confirmed he was referring to canvass cards he had already created while at The Meyer Group—not some hypothetical future canvass cards.  *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 223:6-9 ("And so you're telling Mr. Jacoby that the canvass cards

16

you created while you were at The Meyer Group are very important to you? A. I am telling

that to Mr. Jacoby, yes.").

### III.   TMG's Client Information Constitutes a Trade Secret

73.  Mr. Gill explained in his expert report, "[a] brokerage firm with access to a list of The Meyer

Group's clients and their corresponding lease and relevant business information would be

able to easily outcompete other brokers, because it would be able to very efficiently target

prospective tenants with information directly relevant to the tenants' space needs."  Defs.'

Ex. 86-Gill Report at ¶ 34.

74.  When asked at his deposition whether the Canvass Cards are "valuable to you," Rayborn

responded "Yes, they are."  Defs.' Ex. 4-Rayborn Depo. Tr. at 213:12-13.

75.  Though many tenants attempted to renegotiate leases early in the pandemic, landlords

generally refused to let them do so.  As a result, lease termination dates are just as valuable

now as they ever have been.  *See* Meyer Aff. ¶ 24.

76.  During Rayborn's deposition, he repeatedly failed to remember lease expiration dates and

details about clients—including client names—that he had recently done work for at Broad

Street.  *See, e.g.*, Defs.' Ex. 4-Rayborn Depo. Tr. at 274:20-275:7 (testifying he could not

remember when he represented Georgia Tech Research Institute at Broad Street and could

not remember their lease date); 290:12-17 (testifying he could not remember when the lease

expires for Advanced Sciences & Technology because he did not "have the lease in front of

me."); 150:9-151:3 (testifying that he could not remember the full name of a tenant he

referred to as "Hispanic," saying "There's a lot of Hispanic organizations in Washington,

D.C. I can't remember every single Hispanic organization that exists. . . Hispanic medicals.

Hispanic whatever.").

a.  **TMG's Client Information is Not Publicly Available**

77. Deponents confirmed Rayborn recorded client information from cold calls on the Canvas Cards.  *See* Defs.' Ex. 4-Rayborn Depo. Tr. 183:4-10 (Rayborn deposition, Q: "How would you use your canvass cards to cold-call? A: I would pick up the phone . . . and gain information from the phonecall and put it on my canvass card."); Pls.' Ex. 27-Campbell Depo. Tr. 56:16-57:4 (describing how Rayborn "jots down important information from those calls" on the cards, such as "contact name, their lease term date, square footage."); McCrary Depo. Tr. 45:16-18 (describing the cards as "a product of [Rayborn's] calling.").

78. Mr. Gill explained that it "takes new agents several years to develop the necessary relationships" to compile significant client information through cold calling, in part because "[t]he person at a company in possession of the company's lease information, as well as the authority to dispense it" typically has "limited time and availability."  Defs.' Ex. 86-Gill Report at ¶¶ 11, 22.

79. Rayborn admitted at his deposition that it might take him a year working 60-hour weeks to come close to recreating the information on the cards he took.  *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 192:6-8.

b.  **CoStar Is Incomplete and Inaccurate**

80. Though CoStar often includes a tenant's name and corporate contact information, when it comes to tenant information such as lease terminations, square footage, key points of contact, rent, and other factors that influence a tenant's space needs, "CoStar is incomplete, frequently inaccurate, and, therefore, has limited usefulness in assisting commercial real estate brokers with identifying prospective tenants."  Defs.' Ex. 86-Gill Report at ¶ 18.

81. William Schwartz, a TMG agent, testified CoStar "isn't perfect. It isn't completed. It's not always reliable." Defs.' Ex. 13-Schwartz Depo. Tr. at 53:19-20.

82. Unlike property sale records, commercial leases are not publicly available. Thus, CoStar could only have information about a tenant's lease if it shared by the tenant, the tenant's broker, or the landlord. *See* Defs.' Ex. 86-Gill Report at ¶ 19, 22.

83. Mr. Gill explained in his report that brokers "have a strong disincentive" from sharing tenant information with CoStar because they do not want their competitors to have it, and landlords do generally share tenant information with CoStar because "it would compromise their negotiating ability with current and future tenants." Similarly, tenants are also "uncomfortable sharing their lease information with CoStar representatives" because they can be commercially sensitive. *See* Defs.' Ex. 86-Gill Report at ¶ 19, 22.

84. Chloe Batsch, a former Broad Street employee, testified that some of Broad Street's clients specifically instruct Broad Street not to publish their lease information on CoStar. *See* Defs.' Ex. 14-Batsch Depo. Tr. 52:21-53:3.

85. Rayborn admitted at his deposition that the extent of information on CoStar "depends on the tenant." Defs.' Ex. 4-Rayborn Depo. Tr. at 84:5-85:12.

86. Mr. Gill concluded that "any brokerage firm which relies exclusively on CoStar for tenant information would quickly go out of business." Defs.' Ex. 86-Gill Report at ¶ 23.

87. Meyer "directed everybody in [TMG's] office . . . not to talk to CoStar." Defs.' Ex. 2-Meyer Depo. Tr. 178:18-179:1.

88. Former TMG agent Jessica McGunnigle testified that TMG's agents "ignore[d]" calls from CoStar and were not aware of anyone at TMG ever providing tenant information to CoStar. Defs.' Ex. 3-McGunnigle Depo. Tr. 54:16-55:21; 56:10-19.

89. Mr. Gill's firm does not share tenant information with CoStar.  *See* Defs.' Ex. 86-Gill Report at ¶ 21.

c. **Defendants' CoStar Reports Are Incomplete, Inaccurate, and Were Updated During this Litigation**

90. Mr. Gill reviewed all CoStar reports produced by Broad Street and concluded "[v]ery few of these reports contain lease terminations dates or other lease information." Defs.' Ex. 86-Gill Report at ¶ 27.

91. The Integral CoStar report Defendants cite does not have the lease expiration date, information on the key decisionmakers, or client preferences.  *See* Defs.' Ex. 34.

92. Integral's website lists twice as many employees as the CoStar report.  *Compare* Defs.' Ex. 34 *with* Defs.' Ex. 35.

93. The Barnes Vanze and Capital Performance Group reports do not provide lease expiration dates, and Capital Performance Group's report does not provide square footage or estimated rent.  *See* Defs.' Exs. 36, 40.

94. None of the CoStar reports cited by Defendants contain information about client preferences, personal contact information about key decisionmakers, granular details about lease terms, or other information reflected on the Canvass Cards for those clients. *Compare* Defs.' Exs.' 36, 38, 40 (CoStar reports) *with* Rayborn Response to Interrogatory No. 8 (typed out information from handwriting on Barnes Vanze, CPG, and NENA canvass cards).

95. Many of the CoStar reports Defendants produced were "updated recently—during this very litigation—to include data points about recent lease agreements for which Broad Street served as the broker."  Thus, any information on the reports "could not have been provided to CoStar by The Meyer Group," and the reports "do not reflect whether The Meyer Group

(or another broker) shared information about these leases with CoStar prior to Broad Street's involvement."  Defs.' Ex. 86-Gill Report ¶ 27.

96. The Barnes Vanze and Capital Performance Group reports were updated in June 2020—one and one-half years after those tenants retained Broad Street in February 2019, and a year after this litigation began.  *Compare* DSOF ¶¶ 135, 154 *with* Defs.' Exs. 36, 40.

97. The NENA report was updated on July 10, 2019—three months after NENA signed with Broad Street and several weeks after this litigation began.  *Compare* DSOF ¶¶127 *with* Defs.' Ex. 38.

98. Mr. Gill used his firm's CoStar subscription to review the transaction history on CoStar for the tenants at issue and concluded the "vast majority" of reports "contain no lease expiration dates for leases executed prior to Mr. Rayborn's departure from The Meyer Group in January 2019."   Defs.' Ex. 86-Gill Report ¶ 32 & Pls.' Ex. 43-Ex. A to Gill Report (reports with transaction history) (a true and correct copy of an exhibit attached to the Gill Report).

99. William Schwartz testified the Haines Directory is "reverse directory where you can look up numbers in sequential orders that are associated with telephone numbers" and that it does not contain "any information about the real estate – the actual leases, or the space that is being occupied by the individuals at those phone numbers."  Defs.' Ex. 13-Schwartz Depo. Tr. at 27:7-11; 28:1-9.

**d.  TMG Took Substantial Efforts to Keep its Client Information Confidential**

100. Rayborn testified that Meyer was "hypersensitive" about protecting TMG's client information.  Defs.' Ex. 4-Rayborn Depo. Tr.  246:9-16.

101. TMG required all personnel—from agents to administrative assistants to interns—to sign agreements protecting TMG's client information.  *See* Pls.' Ex. 44-TMG's Response to

Rayborn Interrogatory No. 5 (a true and correct copy of TMG's First Interrogatory Responses); *see, e.g.*, Defs.' Exs. 12 (Rayborn ICA), 23 (Flenner ICA), & 85 (McGunnigle ICA); *see also* Pls.' Ex. 45-Crosman ICA at ¶ 7 (a true and correct copy of a contract produced by TMG at TMG_0000065 *et seq.*); Pls.' Ex. 46-Schwartz ICA at ¶ 7 (a true and correct copy of a contract produced by TMG at TMG_0000071 *et seq.*); Pls.' Ex. 47-Conning Intern Agreement at ¶ 2 (a true and correct copy of a contract produced by TMG at TMG_0000022 *et seq.*); Pls.' Ex. 48-Freligh ICA at ¶ 7 (a true and correct copy of a contract produced by TMG at TMG_0000022 *et seq.*).

102. TMG's agreements with other agents had language comparable to Rayborn's, including language covering "information concerning TMG's clients and prospective clients, the identity of clients and prospective customers, identity of key purchasing personnel in the employ of customers and prospective clients . . . [and] other confidential or proprietary information belonging to TMG or relating to TMG's business or affairs". *See* Pls.' Ex. 45-Crosman ICA at ¶ 7; Pls.' Ex. 46-Schwartz ICA at ¶ 7.

103. Meyer specifically referenced "Canvass Cards" in its agreement with Rayborn because he was the only agent who primarily relied on Canvass Cards and Meyer wanted to ensure there would be no doubt that even Canvass Cards created by Rayborn belonged to The Meyer Group. *See* Meyer Aff. ¶ 17.

104. TMG stored physical copies of confidential information—including its canvass cards—at its offices, which had "electronic locks on the front door" and "cameras in the office." Defs.' Ex. 2-Meyer Depo. Tr. at 72:8-73:4; Pls.' Ex. 44-TMG's Response to Rayborn Interrogatory No. 5.

105.  Rayborn testified TMG kept files "locked up in locked file cabinets" and did not give Rayborn keys to those cabinets.  Defs.' Ex. 4-Rayborn Depo. Tr. at 246:9-16; 247:1-6.

106.  TMG's electronic files—including the Access Database—were password protected, and access to the Access Database was limited to only a small number of key personnel.  *See* Pls.' Ex. 44-TMG's Response to Rayborn Interrogatory No. 5

107.  TMG also included confidentiality notices in its emails outside the firm.  *See* Pls.' Ex. 44-TMG's Response to Rayborn Interrogatory No. 5; *see also, e.g.*, Defs.' Ex. 25 at 1 (in email transmitting Access Database to Cushman, prohibiting the "dissemination, distribution, or copying" of the "confidential information.").

**e.   TMG Took Reasonable Steps With Respect To Ed Flenner**

108.  At TMG, Ed Flenner—a former TMG agent—worked with an entirely different set of clients on a complete different aspect of the brokerage business than Meyer or Rayborn—sales, rather than leases.  *See* Meyer Aff. ¶ 25.

109.  Flenner testified that he did not "take anything with [him] from The Meyer Group" except for "personal stuff," he would not "ever intentionally take Meyer Group leases with [him] to another job," and he considered TMG client documents to be covered by confidentiality agreements.  Defs.' Ex. 30-Flenner Depo. Tr. at 38:17-21; 75:8-76:1.

110.  TMG disabled Flenner's access to his TMG emails upon his departure.  *See* Meyer Aff. ¶ 25.

**f.   TMG's Disclosure to Cushman Was In Confidence**

111.  Under the Co-Broker Agreement between TMG and Cushman, the parties agreed to "cooperate" in serving clients and "share any real estate commission paid to either party with respect to Clients on a national basis that TMG refers to" Cushman.  Defs.' Ex. 28 at 1.

112. The Agreement also stated: "Each party agrees that there shall be no public statement, or other publicity, with respect to any matters concerning the Transactions, without Client's prior written approval."  Defs.' Ex. 28 at § 11.

113. Meyer and Goodwin testified Cushman agreed to keep information shared by TMG confidential.  *See* Defs.' Ex. 2-Meyer Depo. Tr. 187:7-8 (Meyer testified that Goodwin "told me he would keep it confidential."); Defs.' Ex. 27-Goodwin Depo. Tr. 26:1-4 (Goodwin testified "we have a general business agreement between the two that . . . we wouldn't want to share any of the information with anyone else.").

114. Meyer and Goodwin testified it would be against Cushman's interest to disclose information shared by TMG.  *See* Defs.' Ex. 2-Meyer Depo. Tr. 187:8-14 (Meyer testifying "there's no reason Ned wouldn't keep it confidential because if he didn't, he'd be hurting himself"); Defs.' Ex. 27-Goodwin Depo. Tr. 31:18-19 (Goodwin testifying "anytime you're working on a transaction you don't want people knowing about it . . . It's the nature of our business.").

115. Goodwin testified that only the "people on [his] team" had access to information shared by TMG, information, and if someone at Cushman besides his team "approached one of The Meyer Group clients and tried to do a deal with them," "They would be subject to customary action by management up to termination."  Defs.' Ex. 27-Goodwin Depo. Tr. 45:14-15; 45:18-46:2; *see also* Goodwin Depo. Tr. at 32:12-19 (confirming server is password protected and relevant folders are limited to his team).

**g.   TMG's Reference Lists Do Not Have Detailed Client Information**

116. TMG's reference lists contain names and phone numbers of some past clients but do not contain information such as lease terms, client preferences, or personal contact information

that are found on Canvass Cards. *Compare*, *e.g.*, Pls.' Ex. 3-Rayborn's Responses to
Plaintiffs' Interrogatories at Rog. No. 8 (canvass cards) *with* Defs.' Ex. 20 (example of
reference list).

117.  TMG's reference lists were only shared with prospective clients, not competing brokers.
*See* Defs.' Exs. 15-21 (emails transmitting list to prospective clients).

## IV.  Defendants Interfered With TMG's Client Relationships

118.  The large majority of TMG's clients retain it again for future business.  *See* Meyer Aff. ¶
4.

119.  In response to Broad Street's Interrogatory asking TMG to itemize its damages, TMG
stated that it was seeking "commissions received by Broad Street and Rayborn in connection
with leasing transactions identified on Broad Street's documents BSR_0000038 and
BSR0073909"—commission reports for Rayborn produced by Broad Street—as well as
"commissions received from transactions with Quality Education for Minorities Network."
Pls.' Ex. 49 at Rog. 4 (a true and correct copy of TMG's Amended Interrogatory Responses
to Defendant Broad Street); *see also* Pls.' Ex. 26-BSR Commission Schedule.

120.  Mr. Gill's expert report lists commissions received by Broad Street and opines that had
TMG "been able to represent these tenants in connection with the above-referenced lease
transactions," it "The Meyer Group would have been paid at the same fixed commission rate
that was paid to Broad Street, because that is the rate paid to all brokers by landlords in the
D.C. metropolitan area."  Defs.' Ex. 86-Gill Report ¶¶ 37-40.

121.  The Access Database contains client information for TMG clients including, among others,
American Academy of HIV Medicine, Barnes Vanze, Brazilian Mission, Georgia Tech

Research Institute, NENA, Tata Sons, Video Action, and Voorthius Opticians.  *See* Defs.'
Ex. 25.

## V.  Rayborn Knew Meyer Had Not Retired

122.  Rayborn knew Meyer had not retired, though Rayborn told others he had.  *See* Rayborn
Depo. Tr. 67:1-4 ("Q: So as of your conversation with Mr. Flenner in 2019, you believed
that Mr. Meyer was still trying to go after business? A: I do that I do believe that."); Pls.' Ex.
53 (a true and correct copy of an email produced by Broad Street at BSR0029960) (Rayborn
email to his Broad Street team: "We got another deal today! I did the NHP Foundation's last
¾ thus of the floor deal . . . about 9000 ft with TMG over 5 years ago.  Mike and Haze—
have to deal with Meyer yet again or risk him going after the fee. He is still operating the
Meyer group . . . he is not retired."); Pls.' Ex. 19 (Rayborn email to contact at NHP
Foundation saying "Bill is basically retired"); Pls.' Ex. 54 (a true and correct copy of an
email produced by Broad Street at BSR0006068) (Rayborn email in March 2019 saying "Bill
is trying to interfere with this deal").

## VI.  Mr. Gill Is Qualified To Testify As An Expert

123.  Mr. Gill reviewed the canvass cards and database and found they contain valuable, non-
public information.  He opined that both the cards and database contain "information about
tenants' leases, such as lease termination dates, square footage, and rents," and that the cards
also "contain a wealth of information about tenant's businesses, key decision makers, and
space needs."  Defs.' Ex. 86-Gill Report at ¶¶ 24, 25.

124. Mr. Gill is the founder and principal broker at The Genau Group Realty Advisors—a
commercial tenant brokerage in D.C.—has well over a decade of industry experience, and
has worked on hundreds of leasing negotiations on behalf of commercial tenants in the D.C.

area totaling hundreds of millions of dollars.  He holds a broker's license in D.C., Maryland, and Virginia.  He graduated from Pennsylvania State University in 2000 with an advanced degree in Accounting and International Business, with a minor in international studies.  He manages and trains new agents at the Genau Group.  Before entering commercial real estate, he worked as a business consultant at PricewaterhouseCoopers and Deloitte.  *See* Defs.' Ex. 86-Gill Report at ¶¶ 1, 2.

125.  Defense counsel never showed Mr. Gill a Canvass Card at his deposition, nor asked him a question about any particular card, though Mr. Gill repeatedly offered to testify about any card they put in front of him.  *See* Defs.' Ex. 87-Gill. Dep. Tr. at 222:9-15 ("I reviewed dozens and dozens of cards. If you want to show me specific cards, I can tell you if I remember reviewing them.").

126.  Defendants asked Mr. Gill at his deposition if he reviewed a card for Advanced Sciences & Technology; Mr. Gill asked counsel to show him the card.  *See* Defs.' Ex. 87-Gill Dep. Tr. 56:2-11.  Defense counsel informed Mr. Gill that they could not show him such a card because "there have not been any produced," *id.* at 56:18-20; Defendants had in fact produced such a card.  *See* PSOF ¶ 64; Pls.' Ex. 34.

Dated: January 13, 2022                       **AEGIS LAW GROUP LLP**

                        By:     _/s/ Serine Consolino_
                                      Serine R. Consolino (D.C. Bar No. 1033847)
                                      Branden Lewiston (D.C. Bar No. 252550)
                                      801 Pennsylvania Ave., N.W.
                                      Suite 740
                                      Washington, D.C. 20004
                                      Tel: (202) 737-3500
                                      Fax: (202) 737-3330
                                      sconsolino@aegislawgroup.com
                                      blewiston@aegislawgroup.com

                                      _Counsel for Plaintiffs_