**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE MEYER GROUP, LTD. *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No. 19-cv-1945 |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES M. RAYBORN *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
JOINT STATEMENT OF MATERIAL FACTS**

Plaintiffs hereby provide their response to Defendants' Joint Statement of Material Facts

("DSOF").  Plaintiffs' additional Statement of Material Facts ("PSOF") is filed separately.

| Defendants' Statement | Plaintiffs' Response |
|---|---|
| I. Mr. Rayborn Did Not Have Access to, and Did Not Take a Copy of, the Database. | Section heading to which no response is required |
| 1. Plaintiffs The Meyer Group, Ltd. ("TMG") and William Meyer originally asserted that that "Rayborn also absconded with a printout of client information directly procured from TMG's Microsoft database, client lists, and client-related emails and documents from Rayborn's TMG email account and files." Amended Complaint, dated April 19, 2021 ("AC"), ¶ 24 [Dkt. #39]. | **Agreed.** |
| 2. Plaintiffs later clarified that they were alleging that Mr. Rayborn merely "absconded" with a paper printout of the database, not that he accessed the database itself to obtain the paper printout. *See* Plaintiffs' Amended Responses to Broad Street's First Set of Interrogatories, dated March 1, 2021, at 12 ("Plaintiffs' Amended Answers"), a true and correct copy of which is attached hereto as Exhibit 1. | **Agreed.** |

| | |
|---|---|
| 3. During the discovery dispute conference call with the Court on June 3, 2021, before your Honor, counsel for Plaintiffs represented to the Court that Mr. Rayborn had supposedly taken the printout of the database directly from Mr. Meyer's office. *See generally* June 4, 2021 Minute Order ("Min. Or.") | Citation to the docket rather than evidence; no response required. |
| 4. When deposed, Mr. Meyer then testified under oath that Mr. Rayborn took a printout of the database that Mr. Meyer had previously provided to Mr. Rayborn. *See* Deposition of William Meyer, dated July 8, 2021 ("Meyer Depo."), a true and correct copy of which is attached hereto as Exhibit 2, at 232:18; 254:2-256:6. | **Agreed**. |
| 5. Mr. Rayborn did not have access to the database and was only once provided a paper printout of the Database prior to his termination. *See* Deposition of James Rayborn, dated June 22, 2021 ("Rayborn Depo."), a true and correct copy of which is attached hereto as Exhibit 47, at 80:5-9; Meyer Depo. at 38:15-18. | **Agreed** Rayborn did not have electronic access to the database, but **denied** that he only received a printout once.  Meyer testified he gave the printout to Rayborn "at least once, maybe two or three times because it was updated."  *See* Defs.' Ex. 2, Meyer Depo. Tr. 39:14-20.  Rayborn also testified he may have |

| | |
|---|---|
| | been given a printout twice.  *See* Defs.' Ex. 47, 80:5-22.<br><br>Note Rayborn's deposition transcript is Defs.' Ex. 4, not 47. |
| 6. Mr. Rayborn threw out the paper printout of the database that was provided to him prior to his termination and did not take it with him when he left TMG. *See* Rayborn Depo. at 81:20-22; 82:3-4. | **Denied**.  In the months leading up to his departure, Meyer gave Rayborn a copy of the database to use for cold-calling.  Meyer Depo. Tr. at 122.  Rayborn admits receiving the printout, and Meyer observed the printout in Rayborn's office "within the last month or two" of Rayborn's departure.  Rayborn Depo. Tr. at 80:5-6; Meyer Depo. Tr. at 128:9-12.  *See also* PSOF ¶ 41 (The day Rayborn was terminated, he texted a friend that he "cleared the office out" and "had everything [he] needed" when he left TMG.). |
| 7. Mr. Meyer does not know whether Mr. Rayborn simply threw out the printout when cleaning his office, and merely asserts that it was gone upon Mr. Meyer's return. *See* Meyer Depo. at 228:2-3. | **Denied**.  *See* Response to Defs.' St. No. 6. |

| | |
|---|---|
| 8. Plaintiffs assert that only Mr. Meyer and Mr. Rayborn have knowledge of him supposedly taking the printout of the Microsoft database. *See* Ex. 1, at No. 9. | **Denied.**  The cited interrogatory response does not relate to this topic. |
| 9. Mr. Meyer was not present when Mr. Rayborn cleared out his office and supposedly took the document. *See* TMG_0026320-21, a true and correct copy of which is attached as Exhibit 6. | **Agreed**. |
| 10. Mr. Meyer does not recall Mrs. McGunnigle, who was in the office when Mr. Rayborn left, informing him that she witnessed Mr. Rayborn leave with a paper printout of the database. *See* Meyer Depo. at 123:1-4. | **Agreed**. |
| 11. On January 29, 2019, Mr. Meyer sent Mr. Rayborn a video file of Mr. Meyer taking inventory of Mr. Rayborn's office. *See* Exhibit Rayborn020823, Rayborn020824, a true and correct copy of which is attached as Exhibits 7, 8. | **Agreed**. |

| | |
|---|---|
| 12. On the video, Mr. Meyer states that Mr. Rayborn took copies of the Haines directory. *See* Ex. 8. | **Agreed**. |
| 13. Mr. Meyer did not claim that Mr. Rayborn took any printout of the Database when he emailed Mr. Rayborn the video. *See id*. | **Agreed**. |
| 14. On February 4, 2019, Mr. Rayborn returned the Haines directory. *See* Rayborn020803, a true and correct copy of which is attached as Exhibit 9. | **Agreed**. |
| II. Work at TMG | Section heading that does not require a response. |
| 15. Mr. Meyer started TMG in or around 1994. *See* Deposition of William Meyer, dated October 14, 2020 ("Meyer Wage & Hour Depo."), a true and correct copy of which is attached as Exhibit 10, at 6:21. | **Agreed**. |
| 16. TMG is a real estate brokerage firm that serves commercial tenants. *See* Meyer Wage & Hour Depo. at 7:3-9. | **Agreed**. |
| 17. Mr. Rayborn joined TMG in 1994. *See* Rayborn Depo. at 13:1-2. | **Agreed**. |

| | |
|---|---|
| 18. Mr. Rayborn's primary responsibilities at TMG were to develop leads for potential business. *See* Rayborn Wage & Hour Depo. at 84:1-5. | **Agreed**. |
| 19. When Rayborn came to work at TMG, he brought with him a set of index cards that he had created to track his leads while at his prior firm. *See* Dkt. #9-5, ¶ 11. | **Agreed**, though Meyer did not know he did so.  *See* ECF No. 13-3 (Meyer Aff.) at ¶¶ 8-9. |
| 20. While at TMG, Mr. Rayborn continued to create index cards made in the course of cold-calling leads and gathering information from public databases about potential leads. *See* Dkt. #13-3, ¶¶ 12, 14; Rayborn Depo. at 296:19-297:7. | **Agreed** Rayborn created cards made in the course of cold-calling at TMG, but **denied** that meaningful information came from public databases.  The information on the cards primarily came from cold calls.  *See* PSOF ¶¶ 57, 58-63, 77; ECF No. 13-3 (Meyer Aff.) at ¶ 17 ("Rayborn would update the index cards with notes of his conversations . . . This information was not publicly available."). |
| 21. Since joining Broad Street in late January 2019, Mr. Rayborn has created 10,000 new cards. *See* Deposition of Haze McCrary, dated June 29, 2021 ("McCrary Depo."), a true and correct copy of which is attached as Exhibit 11, at 45: 4-18. | **Denied**.  In the cited portion of his deposition transcript, McCrary testified Broad Street "printed 10,000 since [Rayborn] joined" but there is no testimony about how many cards Rayborn "created" or filled out since joining Broad Street. |

| | |
|---|---|
| 22. Mr. Meyer was aware of the cards' existence and what they contained. *See* Dkt. #13-3, ¶ 12. | **Agreed**. |
| 23. Broad Street was not even aware of Mr. Rayborn's notecards until well after Mr. Rayborn was on-boarded for employment. *See* McCrary Depo. at 56:1-6. | **Denied**.  Broad Street was aware of the cards from the outset of Rayborn's employment because Rayborn negotiated language regarding the cards into his contract with Broad Street; Rayborn emailed Broad Street's CEO saying the "cards belonged to" Meyer on February 11, 2019 (two weeks after joining Broad Street); and Meyer sent a letter to Broad Street demanding the return of the cards on February 13, 2019, which Broad Street rebuffed.  *See* PSOF ¶¶ 33, 37, 47-51. |
| III. Independent Contractor Agreements | Section heading that does not require a response. |
| 24. For approximately twenty-four years, Mr. Rayborn worked at TMG without any written contract. *See* Rayborn Depo. at 99:22-100:2. | **Denied**.  Rayborn signed an independent contractor agreement in 2013.  *See* Pls.' Ex. 50-May 2013 ICA (a true and correct copy of a document produced by TMG at TMG_0000037 *et seq.*); PSOF ¶ 33 (Rayborn referring to 2018 ICA as his "new |

| | |
|---|---|
| | agreement); *see also* ECF No. 13-3 (Meyer Aff.) at ¶¶ 25-26. |
| 25. In May 2018, Mr. Meyer terminated Mr. Rayborn while they were at the restaurant Barcode in Washington, D.C. *See* Rayborn Depo. at 60:1-7; 302:15-19. | **Agreed**. |
| 26. When Mr. Rayborn was terminated, he retained his personal laptop with TMG emails. *See* Rayborn Depo. at 71:16-72:2. | **Agreed**. |
| 27. About a week later, Mr. Meyer invited Mr. Rayborn back to work with him. *See* Rayborn Depo. at 303:2-19. | **Agreed**. |
| 28. When Mr. Meyer rehired Mr. Rayborn, Mr. Meyer did not present Mr. Rayborn with any agreement for him to sign. *See* Rayborn Depo. at 303:20-304:1. | **Denied**.  According to the cited testimony, Meyer presented Rayborn with the draft ICA when Rayborn "returned to working at The Meyer Group." Rayborn Depo. Tr. 304:5-7. |
| 29. Sometime after Mr. Rayborn returned to work at TMG he was given an Independent Contractor Agreement ("ICA") for him to sign. *See* Rayborn Depo. at 304:5-7. | **Agreed**, though see response to No. 28 above. Specifically, Meyer sent the ICA to Rayborn on May 23, 2018, agreement to which was a condition of Rayborn working at The Meyer Group.  *See* Meyer Aff. ¶ 16; PSOF ¶¶ 29, 33. |
| 30. On May 29, 2018, Mr. Rayborn signed the ICA. *See* 2018 ICA, TMG_0000009- 12, a | **Agreed**. |

| | |
|---|---|
| true and correct copy of which is attached at Exhibit 12. | |
| 31. This was the first and only written agreement executed by Mr. Rayborn during the course of his work at TMG. *See* Rayborn Depo. at 99:22-100:2. | **Denied**.  See response to No. 24. |
| 32. Other salespersons who worked for TMG also use index or canvas cards to take notes of their cold calls. *See* Deposition of William Schwartz, dated July 2, 2021 ("Schwartz Depo."), a true and correct copy of which is attached as Exhibit 13, at 14:3-11. | **Agreed** in part and **denied** in part.  Schwartz testified his use of note cards was "not extensive."  Defs.' Ex. 13 (Schwartz Dep. Tr.) at 14:3-6.  Other salesperson did not use canvass cards.  *See* PSOF ¶ 103. |
| 33. TMG Salesperson William Schwartz keeps his notes of his cold calls in both his office and at his home. *See* Schwartz Depo. at 14:12-17. | **Agreed**. |
| 34. Mr. Rayborn was the only person to have an agreement with TMG that allegedly listed index cards or "canvass cards" as property of TMG. *See* Meyer Depo. at 47:20-48:1. | **Agreed** other agreements did not "list[]" canvas cards, though all such agreements covered TMG client information.  *See* PSOF ¶ 102 (agreement covering "information concerning TMG's and prospective clients, the identity of clients and prospective customers, identity of key purchasing |

| | |
|---|---|
| | personnel in the employ of customers and prospective clients, . . . or other confidential or proprietary information belonging to TMG or relating to TMG's business or affairs"). |
| 35. The Rayborn ICA speaks for itself and includes the following language: (6) Confidentiality: a) Contractor recognizes and acknowledges that in the course of Contractor's performance hereunder, Contractor may acquire information which could include, in whole or in part, information concerning TMG's clients and prospective clients, the identity of clients and prospective customers, identity of key purchasing personnel in the employ of customers and prospective clients, TMG's manuals, client lists, canvas cards, formulae, processes, methods, ideas, improvement, inventions or other confidential or proprietary information belonging to TMG or relating to TMG's business or affairs (collectively referred to herein as the Confidential Information"). Contractor agrees that (i) the Confidential | **Agreed**. |

| | |
|---|---|
| Information is the property of TMG; (ii) the use, misappropriation or disclosure of the Confidential Information would constitute a breach of trust and could cause irreparable injury to TMG; and (iii) it is essential to the protection of TMG's goodwill and to the maintenance of TMG's competitive position that the Confidential Information be kept secret and Contractor agrees not to disclose the Confidential Information to others or use the Confidential Information to his own advantage or the advantage of others. Ex. 12 at ¶ 6(a) (emphasis added). | |
| 36. There is no work product or intellectual property clause contained in Rayborn's ICA with TMG. *See id.* | **Denied**.  Section 6 of the ICA speaks for itself and covers work product (e.g., "canvas cards") and intellectual property.  *See* Defs.' Ex. 12 at § 6. |
| 37. The "Real Estate Agreement" between TMG and real estate salesperson Edward Flenner, contains no "Confidentiality Section" that is similar to Mr. Rayborn's ICA. Compare Ex. 12 ¶ 6, with Ex. 32 ¶ I. | **Denied**.  The 2009 agreement speaks for itself and says Flenner "agrees not to disclose any client lists or other proprietary material or information pertaining to The Meyer Group, Ltd. during the term of this agreement or after termination."  Defs.' Ex. 32 at § I. |

| | |
|---|---|
| 38. Mr. Flenner's agreement only provides that he should not disclose client lists or other (undefined) proprietary material or information related to TMG. Ex. 32 ¶ I. | **Agreed**, though the agreement speaks for itself. *See* Response to No. 37. |
| 39. The "Real Estate Broker Assistant Agreement" with Jessica McGunnigle (née D'Abbraccio) does not include a "Confidentiality Section." Ex. 85. | **Denied.** The section labeled "Restrictions on Subsequent Activity" concerns confidentiality obligations. Defs.' Ex. 85 at § 7. |
| 40. Ms. McGunnigle's agreement only provides that Ms. McGunnigle should not disclose confidential information, which is an undefined term, but is connected to a later sentence describing TMG's "real estate system, its method of operation and its distinguishing characteristics, including but not limited to, service marks, trademarks, trade names, copyrights, certification marks, designs, slogans, logos, names, or other advertising copy[.]" Ex. 85 ¶ 7 | **Denied** that the quote language is the "only" thing the agreement provides relating to confidentiality. The agreement speaks for itself and says, among other things, McGunnigle "has obtained knowledge of confidential matters, trade secrets, techniques, account procedures and other methods developed by The Meyer Group . . . . Assistant further acknowledges that such confidential information was unknown to her prior to execution of this Agreement . . . . Assistant agrees that she will take all necessary steps to protect such confidential information and she will not divulge same, |

| | |
|---|---|
| | either during or upon termination of this Agreement." Defs.' Ex. 85 ¶ 7. |
| IV. Mr. Rayborn's Termination in January 2019 | Section heading that does not require a response. |
| 41. Mr. Rayborn was terminated from working with TMG on January 24, 2019. *See* AC ¶ 22; Answer ¶ 22. | **Agreed**. |
| 42. Mr. Rayborn took with him a box of about 255 index cards that he had while working at TMG. *See* Rayborn Depo. at 48:7-8. | **Agreed** Rayborn took cards with him, but **denied** that he only took 255 cards. Rayborn's supervisor at Broad Street estimated that Rayborn started at Broad Street with three "bread-boxed-sized containers"— i.e., containing thousands of cards. *See* PSOF ¶ 42. Others at Broad Street testified to throwing away or shredding cards from Rayborn and not providing them to counsel. *See* PSOF ¶ 70. |
| 43. Mr. Rayborn took these cards upon his termination because they were his personal notes and he considered them his property. *See* Rayborn Depo., at 46:7-12. | **Denied**. The cards were the property of The Meyer Group. *See* Defs.' Ex. 12 (TMG-Rayborn ICA) at ¶ 6. Rayborn knew they belonged to TMG. *See* PSOF ¶ 33 (In a February 11, 2019 email, Rayborn told Michael Jacoby—Defendant Broad Street's |

| | |
|---|---|
| | CEO—that Meyer "added to the new agreement . . . that the canvass cards belonged to him" but that Rayborn signed the ICA nonetheless, because he "felt it was better" to "fight for the issues in court."). |
| 44. Mr. Rayborn intended to use his index cards to use in the future if tenants chose to engage him. *See* Rayborn Depo. at 51:2-10. | **Agreed** Rayborn intended to use the cards, but **denied** his intended use was limited to "if tenants chose to engage him."  The cited deposition testimony does not support that statement.  Rayborn testified he took cards "for clients we could . . . work with if that client chose to work with us"—not that he would only use a card if that client already chose to work with Broad Street.  *See* Rayborn Depo. at 51:2-10. |
| 45. While working at Broad Street, Mr. Rayborn utilizes Costar and the Haines directory, among other things, such as but not limited to the internet, to create new cards, as the originals were largely outdated and illegible. *See* Rayborn Depo. at 222:1-5; Deposition of Chloe Batsch, dated June 25, 2021 ("Batsch Depo."), a true and correct | **Agreed** Rayborn uses CoStar and Haines but **denied** to the extent Defendants imply they were primary source of information on TMG's cards—the primary source was cold calling.  *See* Response to No. 20.  **Denied** the originals were "largely outdated and illegible."  The cited deposition transcript portions show a former assistant at Broad |

| | |
|---|---|
| copy of which is attached as Exhibit 14, at 57:9-22 - 58:1-5. | Street struggled to read his handwriting (though she said she could read the numbers he wrote), but that does not support the conclusion that the cards were "largely outdated and illegible."  The cards were legible to Rayborn, Meyer, and Plaintiffs' expert, Mr. Gill.   *See* Pls.' Ex. 1-Meyer Aff. at ¶ 12; Defs.' Ex. 86-Gill Report 8-9 (stating he reviewed the cards and describing their contents). |
| V. TMG "Client Information" Is Not Confidential: TMG Even Shares Its Information with Potential Clients without Confidentiality Agreements. | Section heading that does not require a response |
| 46. TMG maintains a Master Client Reference List. *See* Deposition of Jessica McGunnigle, dated May 27, 2021 ("McGunnigle Depo."), a true and correct copy of which is attached hereto as Exhibit 3, at 48:9-15. | **Agreed**. |
| 47. The Master Client Reference List is a list of all potential client references who have previously engaged TMG. *See* McGunnigle Depo. at 48:12-15. | **Agreed**, though to clarify the confusing language, the Master Client Reference List is "not every single client" but only those |

| | selected "as references."  McGunnigle Depo. Tr. 59:16-22. |
|---|---|
| 48. TMG provides its Master Client Reference List to potential clients so that they can know who previously engaged TMG and can speak with the former clients about TMG. *See* McGunnigle Depo. at 14:16-15:1; *see also* Plaintiffs' Objections and Answers to Defendant Rayborn's First Set of Requests for Admissions, dated June 16, 2021 ("Plaintiff's Responses to Rayborn Admissions"), at No. 3, a true and correct copy of which is attached hereto as Exhibit 5. | **Denied**.  The cited deposition testimony says The Meyer Group typically sent out "five or six references" that were "curated" from the master list to potential clients—not the entire Master Client Reference List.  *See* McGunnigle Depo. at 14:16-15:1. Defendants' citation to Plaintiffs' Responses to Rayborn's Requests for Admissions has nothing to do with this issue. |
| 49. TMG has provided its Master Client Reference List to prospective clients, such as CPB Law Group, American Telemedicine Association, National Environmental Strategies, and American Academy of Dermatology. *See, e.g.*, Ex. 15, Ex. 16, Ex. 17, Ex. 18, 000225. | **Denied**.  The cited exhibits only show *Rayborn* did so. |
| 50. TMG also uses limited selections of clients from the Master Client Reference List in pitch materials given to prospective clients | **Agreed**. |

| | |
|---|---|
| such as the American Academy of Dermatology, Michelle Day of the Monk Institute, Eckert Seamens, and Roberta Combs of the Christian Coalition. *See* McGunnigle Depo. at 44:2-8; Ex. 18; Ex. 19; Ex. 20, Rayborn000530; Ex, 21, Rayborn000939. | |
| 51. These excerpts of the TMG Master Client Reference List would list the entity, the address, and the contact person for that entity. *See* McGunnigle Depo. at 68:17-19. | **Agreed**. |
| 52. These excerpts of the TMG Master Client Reference List were regularly either printed out to be placed in marketing materials for prospective clients, or, after being given to brokers, were emailed directly to those prospective clients. *See* McGunnigle Depo. at 17:4-8 and 67:3-10; Ex. 17, Ex. 19. | **Agreed**. |
| 53. After a pitch meeting was concluded, potential clients were able to keep the materials provided. *See* Deposition of Crosman, dated May 17, 2021 ("Crosman | **Agreed**. |

| | |
|---|---|
| Depo."), true and correct copy of which are attached as Exhibit 22, at 45:10. | |
| 54. Potential clients did not sign confidentiality agreements before, during or after a pitch meeting. *See* Crosman Depo. at 43:19-20. | **Agreed**. |
| 55. Potential clients were not asked to keep information discussed during a pitch meeting confidential. *See* McGunnigle Depo. at 23:10-12; *see* Crosman Depo. at 45:17-18. | **Agreed**. |
| 56. The information on the TMG Master Client Reference List is largely publicly available and outdated in light of the pandemic. *See* Expert Report of Jeff Kirks, dated August 19, 2021, a true and correct copy of which is attached as Exhibit 23, at 4, and Rebuttal Report of Jeff Kirks, dated September 10, 2021, a true and correct copy of which is attached as Exhibit 24, at 3. | **Denied** that the information is "largely publicly available" and denied that the information is "outdated in light of the pandemic," though certain individual pieces of information may be publicly available or may have changed over time.  The cited portion of Kirks' initial report does not discuss this issue, and the cited portion of Kirsk' rebuttal report only concerns "lease end date[s]" or "renewal date[s]", which are not on the Master Client Reference List.  *See* Defs.' Ex. 15.  The same information remains |

| | valuable since the pandemic began.  *See* PSOF ¶ 75. |
|---|---|
| 57. TMG did not consider the name of client, contact information, or lead to be confidential, or other information contained in the pitch booklet confidential. *See* McGunnigle Depo. at 23:7-8, 59:1-9. | **Denied**.  Defendants' only cite the deposition of Ms. McGunnigle, a former TMG assistant; she did not state what *TMG* considered to be confidential or not. |
| VI. TMG "Client Information" Is Not Confidential: TMG Also Sends Its Information to Its Competitors. | Section heading that does not require a response |
| 58. TMG maintains an electronically-stored Microsoft Open Access Database ("Database") that contains some or all of the following information for a limited list of clients: Lease Number, Client Name, Contact Name, Contact Phone Number, Contact Email Address, Contact Fax number, Property Name, Address 1, Address 2, City, State, Zip Code, Rentable Square Footage, Initial Annual Base Rent, Initial Base Rent Per Square Foot, Lease Commencement Date, Lease Expiration Date, Proposed/Actual, and Lease Type regarding TMG clients, and to | **Agreed**. |

| | |
|---|---|
| which limited TMG personnel have access, including McGunnigle, other administrative assistants, and Meyer. *See* Static Copy of Access Database dated March 21, 2019, TMG_0004779-4855, a true and correct copy of which is attached as Exhibit 25; McGunnigle Depo. at 26:10-12. | |
| 59. TMG does not have any written policies or procedures regarding the treatment of allegedly confidential information used while a person works at TMG. *See* Ex. 1, at No. 5; McGunnigle Depo. at 11:21-12:1; 16:9-13. | **Denied**.  TMG's independent contractor agreements govern the treatment of confidential information.  *See* PSOF ¶¶ 101, 102. |
| 60. TMG had no data retention policy or procedure. *See* Deposition of Lauren Freligh, dated April 12, 2021 ("Freligh Depo."), a true and correct copy of which is attached as Exhibit 26, at 17:20-22. | **Agreed**. |
| 61. On March 21, 2019, Jessica McGunnigle emailed a copy of the Database to Ned Goodwin of Cushman & Wakefield without a confidentiality agreement and without any limitations on its use. *See* Ex. 25 at 1. | **Agreed** McGunnigle sent a copy of the database to Cushman & Wakefield but **denied** that it was "without a confidentiality agreement and without any limitations on its use."  The Meyer Group and Cushman & Wakefield have a Co-Broker Agreement that |

includes a non-publicity provision and other limitations on the use of information shared pursuant to the agreement.  *See* Defs.' Ex. 28 (Co-Broker Agreement) at, *e.g.*, at § 11 (""Each party agrees that there shall be no public statement, or other publicity, with respect to any matters concerning the Transactions, without Client's prior written approval.").

McGunnigle's email to Goodwin also imposed limitations on the use of the information transmitted.  *See* Defs.' Ex. 25 ("CONFIDENTIALITY NOTICE: This Electronic Mail contains confidential and privileged information intended only for the use of the individual or entity to which it is sent.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distributed, or copying of this

| | communication is STRICTLY PROHIBITED."). |
|---|---|
| 62. Ms. McGunnigle emailed the Database to Ned Goodwin at Mr. Meyer's instruction. *See* Meyer Depo. at 65:20-21. | **Agreed**. |
| 63. Mr. Meyer intended that the Database sent to Mr. Goodwin contain information regarding all TMG clients. *See* Meyer Depo. at 66:12-67:6. | **Denied**.  The cited testimony does not concern Meyer's intent in sending the database to Goodwin; Meyer testified the database was incomplete because "there was some that we missed or forgot to put in" and "we may have not had every Meyer Group client on that database list."  *See* Meyer Depo. Tr. 66:4-11; 68:19-21. |
| 64. Cushman & Wakefield is a commercial real estate brokerage services company. *See* Deposition of Ned Goodwin, dated June 15, 2021 ("Goodwin Depo."), a true and correct copy of which is attached as Exhibit 27, at 14:4-5. | **Agreed**. |
| 65. Cushman & Wakefield represents both tenants and landlords in the commercial real estate industry. *See* Goodwin Depo. at 14:4-5; 22:9-10. | **Agreed**. |

| | |
|---|---|
| 66. Cushman & Wakefield's tenant representative practice is a competitor of TMG. *See* McGunnigle Depo. at 71:14-15. | **Denied**.  Cushman has a business partnership with TMG.  *See* Defs.' Ex. 28. |
| 67. On March 21, 2019, Cushman & Wakefield signed a co-broker agreement. *See* TMG_0026622-0026623, a true and correct copy of which is attached as Exhibit 28. | **Agreed**. |
| 68. This co-broker agreement contained no written confidentiality provisions regarding data or information communicated between the two signatories and did not define the term "client". *See id.* | **Agreed** that it did not define "client" but **denied** that it "contained no written confidentiality provision".  *See* Defs.' Ex. 28 (Co-Broker Agreement) at § 11 ("Each party agrees that there shall be no public statement, or other publicity, with respect to any matters concerning the Transactions, without Client's prior written approval."). |
| 69. There have been no written amendments or modifications to the co-broker agreement that address the confidentiality of the client(s)' information shared between them. *See* Goodwin Depo. at 27:2-9. | **Agreed**. |
| 70. The information from the Database was placed in a database on Cushman & | **Agreed**. |

| | |
|---|---|
| Wakefield servers. *See* Goodwin Depo. at 32:4-11. | |
| 71. Mr. Goodwin works with a "team" of seven people at Cushman & Wakefield. Mr. Goodwin did not instruct that team to treat any of the information provided by TMG as confidential. *See* Goodwin Depo. at 31:22-32:3; 32:14-17; 33:1-8. | **Denied.**  In the cited portion of his deposition testimony, Goodwin said he ***did*** tell his team to keep the information confidential.  *See* Defs.' Ex. 27 (Goodwin Dep. Tr.) at 31:11-21 ("I told them we'd like to keep that information confidential."). |
| 72. The information from the Database that was placed in a database on Cushman & Wakefield servers has no indication that the information is subject to a co-brokerage agreement with TMG or that they are clients of TMG. *See* Goodwin Depo. at 39:3-10; 45:2-7; 47:21-15. | **Denied.**  Goodwin testified only his team has access to the information.  *See* Defs.' Ex. 27 (Goodwin Dep. Tr.) at 32:14-19 ("[T]here's only certain people that will have access to the folders particularly pertain to my team."); *see also* PSOF ¶ 115. |
| 73. The Master Client Reference List provided by TMG to Ned Goodwin, containing 290 entities, is a fraction of the list that TMG produced to Broad Street, containing 581 entities, pursuant to the | **Agreed**, though note that the Database list—not the Master Client Reference List—was provided to Goodwin.  *See* DSOF ¶ 62. |

| | |
|---|---|
| Court's April 19, 2021 Minute Order, which was used by Broad Street to search for and produce allegedly relevant documents in this case. *See* Apr. 19, 2021 Min, Or; compare Ex. 25, with TMG Client List produced April 20, 2021, a true and correct copy of which is attached as Exhibit 29 (submitted under seal). | |
| VII. TMG "Client Information" Is Not Confidential: TMG Does Not Secure It From Departing Salespersons. | Section heading that does not require a response |
| 74. Edward Flenner is a former real estate salesperson who worked at TMG. *See* Deposition of Edward Flenner, dated June 24, 2021 ("Flenner Depo."), a true and correct copy of which is attached as Exhibit 30, at 9:9-20. | **Agreed**. |
| 75. Mr. Flenner left TMG in or around January 2019, the exact same time Mr. Rayborn left. *See* Flenner Depo. at 47:20. | **Agreed** it was the same month Rayborn left. |
| 76. Mr. Flenner left TMG to work at the commercial real estate brokerage firm MGA. *See* Flenner Depo. at 9:4-9. | **Agreed**. |

26

| | |
|---|---|
| 77. MGA is also a tenant-side commercial real estate broker. *See* Deposition of Edward Flenner, dated October 20, 2020 ("Flenner Wage & Hour Deposition") at 5:12-13, a true and correct copy of which is attached as Exhibit 31. | **Agreed**. |
| 78. While at TMG, Mr. Flenner communicated TMG client information and leasing information through his TMG email account. *See* Flenner Depo. at 52:3-7. | **Agreed**. |
| 79. Upon leaving, Mr. Flenner was not asked to delete TMG emails or contact information from his personal cell phone. *See* Flenner Depo. at 51:21-52:10. | **Agreed**. |
| 80. Mr. Flenner did not delete those TMG emails or contact information from his personal cell phone. *See* Flenner Depo. at 53:8-10. | **Agreed**. |
| 81. Upon leaving, Mr. Flenner was also not asked to delete TMG emails from his personal laptop. *See* Flenner Depo. at 52:20-22. | **Agreed**. |

| | |
|---|---|
| 82. Mr. Flenner did not delete those TMG emails from his personal laptop. *See* Flenner Depo. at 54:1-3. | **Agreed**. |
| 83. Mr. Flenner still retains and uses the personal laptop with TMG emails and their attachments in the course of his work with MGA. *See* Flenner Depo. at 71:18-20; 58:7; 77:18. | **Agreed** that he still retains and uses the same laptop but **denied** to the extent Defendants intend to imply that he uses TMG emails in the course of his work at MGA.  In the cited deposition transcript, Flenner testified just that he still has and uses the laptop, not that he uses TMG emails.  *See* Flenner Depo. at 71:18-21. |
| 84. Similarly, upon being terminated, Mr. Rayborn was not asked to return any property of TMG when he left the office on the day of his termination. *See* Ex. 6. | **Denied**.  In the cited exhibit, Meyer terminated Rayborn and instructed him "not to enter the office or premises without consent by me."  Defs.' Ex. 6.  Meyer asked Rayborn to return all TMG property immediately when Meyer terminated him.  *See* PSOF ¶ 40. Rayborn was again asked to return TMG property by letter on February 13, 2019.  *See* PSOF ¶ 50. |
| 85. Likewise, Mr. Rayborn was not asked to delete any emails he retained in his possession. *See* Ex. 6. | **Denied.**  Meyer instructed him to delete all TMG emails.  *See* PSOF ¶ 40. |

| | |
|---|---|
| 86. TMG had no written policies or procedures to secure allegedly confidential information from electronic devices when employees leave the company. *See* Ex. 1 at No. 5; McGunnigle Depo. at 11:21-12:1; 16:9-13. | **Denied**.  The cited interrogatory response states "TMG included provisions in its agreements with employees and independent contractors protecting against disclosure of confidential information, such as the provisions included in the 2018 Independent Contractor Agreement with Rayborn," and "Upon Rayborn's termination in 2019, TMG immediately terminated Rayborn's email access."  Defs.' Ex. 1 at Rog. No. 5. |
| VIII. TMG "Client Information" Is Not Confidential: Tenant Information Is Readily Ascertainable. | Section heading that does not require a response |
| 87. While at TMG, Mr. Rayborn obtained information about tenants from the Haines Directory, Costar, business cards, and/or cold-calling and speaking with the tenant representatives directly. *See* Rayborn Depo. at 46:22-47:1; 297:8-16. | **Agreed**. |
| 88. Costar is a subscription database that contains information about real estate tenants and properties. *See* Rayborn Depo. at 118:17-18. | **Agreed**. |

| | |
|---|---|
| 89. Information on Costar includes a real estate tenant's name, contact information, and usually their lease expiration date and square footage, and additional tenant information can be found on third-party websites such as Zoominfo, or on a tenant's own website. *See* Rayborn Depo. at 83: 1-3; 83:8-10; 84:17-10; 191: 16-20; Ex. 35, 37, 39, 41. | **Agreed** that CoStar and other websites often lists a tenant's name and corporate contact information but **denied** as to lease expiration dates, square footage, or contact information of decisionmakers.  CoStar does not often contain that information.  *See* Gill Report at 7-9, 11 (explaining how CoStar is "incomplete and frequently inaccurate;" reviewing CoStar reports for TMG clients and concluding that for "the vast majority" there are "no lease expiration dates"); Rayborn Depo. at 84:5-85:12 (admitting the extent of information on CoStar "depends on the tenant"); Meyer Depo. Tr. 178:18-179 (explaining there is "really not a lot of information" on CoStar about TMG clients). |
| 90. The Haines directory contains lists of tenants of commercial buildings, with office tenants marked in dark bold letters, and residential tenants marked in light, non- bold letters. *See* Deposition of James Rayborn, dated July 13, 2020 ("Rayborn Wage & Hour | **Agreed**. |

| | |
|---|---|
| Depo."), a true and correct copy of which is attached as Exhibit 33, at 91:20-92:2. | |
| 91. TMG's Amended Complaint alleges that Mr. Rayborn misappropriated supposedly confidential information about Integral, LLC, Barnes Vanze Architects, Inc., the National Emergency Number Association ("NENA"), and Capital Performance Group ("CPG"). *See* AC ¶ 24(a)-(d). | **Agreed**. |
| 92. The Costar report for Integral, LLC lists the company's primary contact person, phone numbers, fax numbers, physical address, square footage occupied, and lease commencement dates. *See* BSR0074058, a true and correct copy of which is attached as Exhibit 34. | **Agreed** it lists a contact person (Kevin Moran) but **denied** that Moran was the "primary" contact person for leasing.   *See* Rayborn's Response to Interrogatory No. 8 (typing out canvass cards for Integral listing other names—notably Chris Barrett—besides Moran as contacts and the cell phone numbers for those contacts; listing 3000 to 3800 as desired square footage); Defs.' Ex. 65 (Barrett rather than Moran as contact).  **Agreed** it lists a corporate phone and fax number for the company.  **Agreed** it lists a physical address, square footage, and lease commencement but **denied** that information is accurate—the |

| | |
|---|---|
| | report says Integral's address is on 19th Street when it is in fact on Connecticut Ave, and none of the information about its lease is correct. *See* Pls.' Ex. 51 (Integral Lease) (a true and correct copy of a document produced by Broad Street at BSR0073940). |
| 93. The website for Integral, LLC, lists the major contacts for the company, as well as the physical address and phone number. *See* Ex. 35. | **Agreed** except to the characterization that it lists "major contacts"—it appears to list all company employees without identifying who is the relevant contact for leasing. |
| 94. The Costar report for Barnes Vanze Architects, Inc. lists the company's primary contact person, their phone number, the entity phone and fax number, physical addresses, square footage, estimated rent per square foot, and lease commencement date. *See* BSR0074051, a true and correct copy of which is attached as Exhibit 36. | **Agreed** it lists a contact person but **denied** that "Anthony Barnes" or "Cameisha Murphy" was the "primary" contact person and **denied** it lists "their" phone numbers—it just lists the company phone number multiple times. *See* Rayborn's Response to Interrogatory No. 8 (listing several other names as contacts and providing their contact information). **Agreed** it lists "estimated rent per square foot" but denied that it is accurate. *See* Pls.' Ex. 52 (Barnes Vanze Lease) at 2 (a true and correct copy of a document produced by Broad Street at BSR0000927) (listing rent |

| | |
|---|---|
| | per square foot as nearly 50% more than the estimated amount on the CoStar report). **Agreed** as to company phone and fax number, physical address, square footage, and lease commencement date, though **denied** to the extent Defendants intend to imply this information was available in January 2019—the CoStar report indicates it was updated in June 2020, during this litigation. *See* Defs.' Ex. 36. |
| 95. The website for Barnes Vanze lists the major contacts for the company, as well as the physical address and phone number. *See* Ex. 37. | **Agreed** except to the characterization that it lists "major contacts"—it appears to list all company employees without identifying who is the relevant contact for leasing. |
| 96. The Costar report for NENA lists the company's points of contact, their phone numbers and email address, fax number, building address, square footage, lease commencement date, lease expiration date, and estimated paid rent per square foot. *See* BSR0074059, a true and correct copy of which is attached as Exhibit 38. | **Agreed** it lists a contact person but **denied** it lists "their phone numbers" (for Brian Fontes, it lists the main corporate line) and **denied** those are the only contact persons. *See* Rayborn's Response to Interrogatory No. 8 (listing several other names as contacts and providing their contact information). **Agreed** it lists building address, square footage, lease commencement date, lease expiration date, |

| | and estimated paid rent per square foot but **denied** that information (except for the address) is accurate, was on CoStar as of January 2019 (the CoStar report cited by Defendants says it was updated in July 2019, during this litigation), or remains on CoStar. *See also* Pls.' Ex. 43-Ex. A to Gill Report at 21 (more recent NENA CoStar report that no longer contains lease expiration date). |
|---|---|
| 97. The website for NENA lists the major contact for the company, as well as the company's physical address and phone number. *See* Ex. 39. | **Agreed** except to the characterization that it lists "major contacts"—it names the CEO but no one else. |
| 98. The Costar report for CPG lists points of contact, their phone numbers, fax number, building address, lease commencement date, and building configuration. *See* BSR0074053, a true and correct copy of which is attached as Exhibit 40. | **Agreed** it lists contact persons and **denied** those are the only contact persons.  *See* Rayborn's Response to Interrogatory No. 8 (listing several other names as contacts). **Agreed** it lists a building address, lease commencement date, and building configuration but **denied** to the extent Defendants imply this information was available in January 2019—the report says it |

| | |
|---|---|
| | was updated in June 2020, during this litigation. |
| 99. The website for CPG lists the major contacts for the company, as well as the physical address and phone number. *See* Ex. 41. | **Agreed** except to the characterization that it lists "major contacts"—Ex. 41 just contains pictures of employees. |
| IX. Once A Lease Is Completed, A Tenant Is No One's Client. | Section heading that does not require a response |
| 100. Mr. Meyer has admitted that a tenant that signs an exclusive representation agreement with the firm is not a TMG client forever even if they do not affirmatively end their relationship. *See* Meyer Wage & Hour Depo. at 78:13-19. | **Denied**.  In the cited deposition testimony, Meyer said "not necessarily" and "that's not how it works" when asked about this topic. Meyer then explained that a client has contractual duties to The Meyer Group.  *See* Ex. 10 (Meyer Wage & Hour Depo.) at 78:13-79:8. |
| 101. Mr. Meyer has admitted that after "a couple of years" with the tenant, the business relationship falls apart. *See* Meyer Wage & Hour Depo. at 79:13-80:13. | **Denied**.  Meyer never said anything about a business relationship "fall[ing] apart."  He testified as to his understanding of whether a procuring cause provision in an exclusive relationship agreement would be legally enforceable after "a couple of years."  *See* Ex. 10 (Meyer Wage & Hour Depo.) at 79:1- |

| | |
|---|---|
| | 81:16.  He said that the tenant must "conform to the agreement that was signed."  *Id.* |
| 102. Mr. Meyer has admitted that if a tenant has already completed its lease and wants to find new space, the tenant has no obligation to retain TMG. *See* Meyer Wage & Hour Depo. at 81:13-16. | **Agreed** subject to his immediately preceding testimony that the tenant must "conform to the agreement that was signed," including a procuring cause provision. |
| 103. Mr. Meyer has admitted that: "If the tenant's lease has been signed and paid, and then, you know, five years later they want to go work with somebody else and The Meyer Group hasn't done any work with that group, they're free to do whatever they want." Meyer Wage & Hour Depo. at 84:6-10; Meyer Depo. at 139:1-141:5. | **Denied.**  Defense counsel's question that prompted the quoted language was about an "instance where somebody ***doesn't*** sign an exclusive with you".  *See* Ex. 10 (Meyer Wage & Hour Depo.) at 82:19-20 (emphasis added); *see also* 85:10-11 (defense counsel: "my example said they didn't sign the exclusive").  Meyer said the quoted language immediately after explaining "it's a case-by-case basis depending on . . . if there's . . . procuring cause requirements in the agreement with the tenant."  *Id.* at 84:2-10. |
| 104. When entering a transaction with a real estate broker, District of Columbia law requires that a written engagement letter or exclusive representation agreement[1] be signed | This is a legal conclusion, not a statement of fact; no response is required. |

| | |
|---|---|
| with the potential tenant. *See* Meyer Wage & Hour Depo. at 82:5-8.<br><br><br>[1] These terms are used interchangeably. *See* Rayborn Depo. at 21:11-13. | |
| 105. TMG's exclusive agreements are terminable upon written notice, at will, and/or for a set duration of time. *See* Meyer Wage & Hour Depo. at 87:4-10; *see also* Ex. 42, Japan Science and Technology Agency Exclusive; Ex. 43, Advanced Sciences and Technologies Exclusive; Ex. 44, NENA Exclusive; Ex. 45, Integral Exclusive; Ex. 46, Barnes Vanze Exclusive; Ex. 47, Arms Control Association Exclusive; Ex. 48, Georgia Tech Research Institute Exclusive; Ex. 49, TATA Sons Exclusive; Ex. 50, Environmental Integrity Project Exclusive; Ex. 51, American Academy of HIV Medicine; Ex. 52, Steel Manufacturer's Association Exclusive; Ex. 53, Video Action Exclusive; Ex. 54, American Osteopathic Association Exclusive; Ex. 55, amfAR, The Foundation for Aids | **Agreed**. |

| | |
|---|---|
| Research Exclusive; Ex. 57, The NHP Foundation Exclusive; and Ex. 75, CPG Exclusive. | |
| 106. District of Columbia law dictates that "brokerage relationships shall have a definite termination date; however, if a brokerage relationship does not specify a definite termination date, the brokerage relationship **shall** terminate 90 days after the date the brokerage relationship was entered." D.C. Code § 47-2853.196(a) (emphasis added). | This is a legal conclusion, not a statement of fact; no response is required. |
| 107. Once a client terminates their exclusive agreement, they are considered to be no one's client. *See* Meyer Wage & Hour Depo. at 81:13-16; Kirks Expert Report at 6; Flenner Depo. at 61:14-16 and Flenner Wage & Hour Depo. at 27:8-27:11 ("But when you do a transaction and somebody has whatever time on their lease, they're nobody's client. The deal is done."). | **Denied.**  They may be subject to a procuring cause obligation.  *See* Pls.' Responses to DSOF ¶¶ 100, 101. |
| 108. Commercial real estate is an incredibly competitive space where clients and brokers often move to different firms and retain client | **Agreed** commercial real estate is competitive and brokers move to different firms but **denied** that brokers "retain client information |

| | |
|---|---|
| information in their cell phone. *See* Kirks Expert Report at 5. | in their cell phones." The cited portion of Kirks' report does not mention brokers retaining client information on their cell phones; in any event, it would depend on the broker, client, and type of information. |
| X. Plaintiffs Have a Limited Number of Exclusive Representation Agreements. | Section heading that does not require a response |
| 109. Pursuant to the Court's April 19, 2021 Minute Order, Plaintiffs produced a list of 581 entities that it asserts are its clients. *See* Ex. 29. | **Agreed** that Plaintiffs' produced the list but **denied** that Plaintiffs asserts all the entities are its current clients. |
| 110. Based upon discussions with counsel, Plaintiffs produced a revised report that included domain names to make the search parameters more productive. *See* Ex. 84. | **Agreed**. |
| 111. Of these 581 entities, TMG has only produced signed exclusive representation agreements for sixteen (16) entities: (1) American Academy of HIV Medicine; (2) Video Action; (3) Japan Society for the Promotion of Science; (4) Advanced Sciences and Technologies; (5) NENA; (6) Integral, LLC; (7) Barnes Vanze Inc.; (8) Arms | **Agreed** TMG produced only the listed agreements (rather than all of TMG's exclusive agreements) pursuant to the Court's June 4, 2021 Minute Order ("With respect to Rayborn's request for exclusive representation agreements between The Meyer Group and 'any entity' listed on plaintiffs' client list, plaintiff need only produce the agreements |

| | |
|---|---|
| Control Association; (9) Georgia Tech Research Institute; (10) TATA Sons; (11) Environmental Integrity Project; (12) Steel Manufacturer's Association; (13) CPG, (14) American Osteopathic Association, (15) amfAR, The Foundation for Aids Research, and (16) The NHP Foundation. *See* Ex. 39 to 57. | underlying the interference claims, that is, the agreements with clients at issue in the case."). |
| A. American Academy of HIV Medicine | Section heading that does not require a response |
| 112. American Academy of HIV Medicine issued an exclusive agreement with TMG on July 17, 2013. Ex. 51 | **Agreed**. |
| 113. The period of the exclusive agreement between American Academy of HIV Medicine and TMG was for a period of twelve (12) months, i.e., until July 17, 2014, and would then continue on a calendar month-to-month basis thereafter. *Id.* | **Agreed**. |
| 114. American Academy of HIV Medicine did not retain Broad Street until January 29, 2020. *See* BSR0056578, a true and correct copy of which is attached as Exhibit 58. | **Agreed**. |

| | |
|---|---|
| B. Video/Action | Section heading that does not require a response |
| 115. Video/Action issued an exclusive agreement with TMG on April 16, 2014. *See* Ex. 53. | **Agreed**. |
| 116. The period of the exclusive agreement between Video/Action and TMG was for a period of six (6) months, i.e., until October 16, 2014. *See id*. | **Agreed**. |
| 117. Video/Action did not retain Broad Street until around October 11, 2019. *See* BSR0053415, a true and correct copy of which is attached as Exhibit 59. | **Agreed**. |
| C. Japan Society for the Promotion of Science | Section heading that does not require a response |
| 118. Japan Society for the Promotion of Science issued an exclusive agreement with TMG on April 11, 2014. Ex. 42. | **Agreed**. |
| 119. The period of the exclusive agreement between Japan Society for the Promotion of Science and TMG was for a period of twelve (12) months, i.e., until April 11, 2015. *Id.* | **Agreed**. |

| | |
|---|---|
| D. Advanced Science and Technologies, LLC | Section heading that does not require a response |
| 120. Advanced Science and Technologies, LLC issued an exclusive agreement with TMG on November 13, 2018.  Ex. 43. | **Agreed**. |
| 121. The period of the exclusive agreement between Advanced Science and Technologies, LLC and TMG was six (6) months, i.e., until May 19, 2019. *See id.* | **Agreed** that the agreement expired at that time, though the tenant's obligations to recognize The Meyer Group as the procuring cause of extensions or renewals at the same property survived the expiration of the agreement.  *See* Defs.' Ex. 43 (paragraph beginning "We shall also recognize…"). |
| 122. On July 16, 2020, Advanced Science and Technologies, LLC terminated their exclusive with TMG. *See* BSR0029953, a true and correct copy of which is attached as Exhibit 60. | **Agreed**. |
| 123. Advanced Science and Technologies, LLC did not retain Broad Street until August 4, 2020. *See* BSR0064212, a true and correct copy of which is attached as Exhibit 61. | **Agreed**. |
| E. National Emergency Number Association | Section heading that does not require a response |

| | |
|---|---|
| 124. NENA issued an exclusive agreement with TMG on October 28, 2010. Ex. 44. | **Agreed**. |
| 125. The period of the exclusive agreement between NENA and TMG was for a period of six (6) months, i.e., until April 28, 2011, and then would continue on a calendar month-to-month basis thereafter. *See id*. | **Agreed**, though the tenant's obligations to recognize The Meyer Group as the procuring cause of extensions or renewals at the same property survived the expiration of the agreement. *See* Defs.' Ex. 44 (paragraph beginning "Subsequent to the expiration or termination of this agreement…"). |
| 126. On March 17, 2019, NENA terminated its exclusive agreement with TMG. *See* TMG_0003240, a true and correct copy of which is attached as Exhibit 63. | **Agreed** NENA notified TMG of its cancellation of the agreement on that date, but **denied** termination was effective on that date—the agreement required ten days' written notice before termination. *See* Defs.' Ex. 44. |
| 127. NENA did not retain Broad Street until March 18, 2019. *See* Rayborn000031, a true and correct copy of which is attached as Exhibit 64. | **Agreed**. |
| F. Integral, LLC | Section heading that does not require a response |
| 128. Integral issued an exclusive agreement with TMG on May 2, 2011. Ex. 45. | **Agreed**. |

| | |
|---|---|
| 129. The period of the exclusive agreement between Integral and TMG was for a period of twelve (12) months, i.e., until May 2, 2012, and then would continue on a calendar month-to-month basis. *See id*. | **Agreed**, though the tenant's obligations to recognize The Meyer Group as the procuring cause for prospective locations submitted by TMG survived the expiration of the agreement.  *See* Defs.' Ex. 45 (paragraph beginning "Subsequent to the expiration or termination of this agreement…"). |
| 130. Christopher Barrett of Integral, LLC notified Mr. Meyer on January 29, 2019 that he preferred to visit a proposed space with Mr. Rayborn rather than someone from TMG since he previously arranged to visit the space with Mr. Rayborn. *See* TMG 009230-9231, a true and correct copy of which is attached as Exhibit 65. | **Agreed**. |
| 131. On January 30, 2019, Integral, LLC informed TMG that it was terminating their brokerage relationship. *See* TMG_0003043, a true and correct copy of which is attached as Exhibit 66. | **Agreed** Integral notified TMG of its cancellation of the agreement on that date, but **denied** termination was effective on that date—the agreement required ten days' written notice before termination.  *See* Defs.' Ex. 45. |
| 132. Integral did not retain Broad Street until February 1, 2019. *See* BSR0000018, a true | **Agreed**. |

| | |
|---|---|
| and correct copy of which is attached as Exhibit 67. | |
| G. Barnes Vanze | Section heading that does not require a response |
| 133. Barnes Vanze issued an exclusive agreement with TMG on January 14, 2014. Ex. 46. | **Agreed**. |
| 134. The period of the exclusive agreement between Barnes Vanze and TMG was for a period of twelve (12) months, i.e., until January 14, 2015. *See id.* | **Agreed**, though the tenant's obligations to recognize The Meyer Group as the procuring cause of extensions or renewals at the same property survived the expiration of the agreement.  *See* Defs.' Ex. 46 (paragraph beginning "We recognize that the landlord…"). |
| 135. On February 25, 2019, Barnes Vanze terminated its exclusive agreement with TMG. *See* TMG_0002488, a true and correct copy of which is attached as Exhibit 68. | **Agreed**. |
| 136. Barnes Vanze did not retain Broad Street until February 25, 2019. Ex. 68. | **Agreed**. |
| H. Arms Control Association | Section heading that does not require a response |

| | |
|---|---|
| 137. Arms Control Association issued an exclusive agreement with TMG on October 6, 2015. Ex. 47. | **Agreed**. |
| 138. The period of the exclusive agreement between Arms Control Association and TMG was for a period of twelve (12) months, i.e., until October 6, 2015. *See id*. | **Agreed**. |
| 139. Arms Control Association did not retain Broad Street until around January 13, 2020. *See* BSR0055436-0055437, a true and correct copy of which is attached as Exhibit 70. | **Agreed**. |
| I. Georgia Tech Research Institute | Section heading that does not require a response |
| 140. Georgia Tech Research Institute ("GTRI") issued an exclusive agreement with TMG on February 5, 2007. Ex. 48. | **Agreed**. |
| 141. The period of the exclusive agreement between GTRI and TMG was for a period of twelve (12) months, i.e., until February 5, 2008, and would then continue on a calendar month-to-month basis thereafter. See id. | **Agreed**. |
| 142. GTRI did not retain Broad Street until around May 20, 2020. *See* BSR0013643- | **Agreed**. |

| | |
|---|---|
| 13646, a true and correct copy of which is attached as Exhibit 71. | |
| J. TATA Sons | Section heading that does not require a response |
| 143. TATA Sons issued an exclusive agreement with TMG on June 11, 2015. Ex. 49. | **Agreed**. |
| 144. The period of the exclusive agreement between TATA Sons and TMG was for a period of six (6) months, i.e., until December 11, 2015. *See id*. | **Agreed**. |
| 145. TATA Sons did not retain Broad Street around July 30, 2019. *See* BSR0027166, a true and correct copy of which is attached as Exhibit 72. | **Agreed**. |
| K. Environmental Integrity Project | Section heading that does not require a response |
| 146. Environmental Integrity Project ("EIP") issued an exclusive agreement with TMG on December 3, 2009. Ex. 50. | **Agreed**. |
| 147. The period of the exclusive agreement between EIP and TMG was for a period of twelve (12) months, i.e., until December 3, | **Agreed**. |

| | |
|---|---|
| 2010, and would then continue on a calendar month-to-month basis thereafter. *See id.* | |
| 148. EIP did not retain Broad Street until May 1, 2020. *See* BSR0060540, a true and correct copy of which is attached as Exhibit 73. | **Agreed**. |
| L. Steel Manufacturer's Association | Section heading that does not require a response |
| 149. Steel Manufacturer's Association issued an exclusive with TMG on September 30, 2014. Ex. 52. | **Agreed**. |
| 150. The period of the exclusive agreement between Steel Manufacturer's Association and TMG was for a period of twelve (12) months, i.e., until September 30, 2015. *See id.* | **Agreed**. |
| 151. Steel Manufacturer's Association did not retain Broad Street until February 11, 2021. *See* BSR0071373, a true and correct copy of which is attached as Exhibit 74. | **Agreed**. |
| M. Capital Performance Group | Section heading that does not require a response |
| 152. CPG issued an exclusive agreement with TMG on July 16, 2013. Ex. 75. | **Agreed**. |

| | |
|---|---|
| 153. The period of the exclusive agreement between CPG and TMG was for a period of three (3) months, i.e., until October 16, 2013, and then would continue on a calendar month-to-month basis thereafter. *See id*. | **Agreed**. |
| 154. CPG did not retain Broad Street until February 13, 2019. *See* BSR0000019, a true and correct copy of which is attached as Exhibit 76. | **Agreed**. |
| XI. Entities Without TMG Exclusives For Which Plaintiffs Assert Damages | Section heading that does not require a response. |
| 155. National Minority Quality Forum and Quality Education for Minorities Network were not TMG clients; Mr. Rayborn only scheduled pitch meetings for them while at TMG. Ex. 81, Rayborn017891-893. | **Agreed**—they were prospective clients in January 2019. *See* Defs.' Ex. 81. |
| 156. Brazilian Mission to the OAS engaged TMG in 2017 or earlier. Ex. 15 at Rayborn000043. | **Agreed**. |
| 157. Sonecon engaged TMG in 2017. Ex. 82, Rayborn014535. | **Agreed**. |
| 158. Voorthuis Opticians engaged TMG in April 2018. *See* Ex. 83, TMG 0036604. | **Agreed**. |

| | |
|---|---|
| XII. Plaintiffs' Defamation Claim | Section heading that does not require a response. |
| 159. Plaintiffs' Amended Complaint alleges that Mr. Rayborn defamed TMG and Bill Meyer by insinuating that "Meyer has retired or is about to retire and is no longer taking clients." AC ¶ 27. | **Agreed**. |
| 160. Plaintiffs filed for leave to amend their Complaint to assert a claim of defamation on April 1, 2021. [Dkt. #37]. | **Agreed**. |
| 161. Plaintiffs have alleged only three (3) instances of Mr. Rayborn supposedly defaming Plaintiffs between April 1, 2020 and April 1, 2021 to (1) David Steiner, (2) Bradly Marson, and (3) Douglas Patin. *See* AC ¶¶ 28-30. | **Agreed** those are the three instances alleged in the Amended Complaint. |
| 162. On February 8, 2019, Edward Flenner informed Mr. Rayborn that Meyer was "closing up from what I hear." *See* Rayborn020702, a true and correct copy of which is attached as Exhibit 77. | **Agreed**. |
| 163. Plaintiff alleges that in or around July 2020, Mr. Rayborn called David Steiner from | **Agreed**. |

| | |
|---|---|
| D+R International, and falsely told him that Mr. Meyer had retired. See AC ¶¶ 28- 30 | |
| 164. On January 29, 2021, David Steiner reported to Mr. Meyer that he recalled Mr. Meyer was the one who told him that he was "partially or mostly retired." *See* TMG_0006959-6960, a true and correct copy of which is attached as Exhibit 78. | **Agreed** Steiner said he "thought" that is what he recalled. *See* Defs.' Ex. 78. |
| 165. Even though Mr. Steiner thought Mr. Meyer was "partially or mostly retired," he nevertheless engaged him to assist with his company's lease. *See id.* | **Agreed.** |
| 166. Plaintiffs allege that, in or about November 2020, Mr. Rayborn called Bradley Marson from Wiencek Associates and falsely stated that Meyer had "retired" or words to that effect. *See* AC ¶ 29. | **Agreed**. |
| 167. Wiencek Associates retained Broad Street on March 27, 2020. *See* TMG_0034805, a true and correct copy of which is attached as Exhibit 79. | **Agreed**. |

| | |
|---|---|
| 168. TMG has not asserted any specific damages regarding Mr. Rayborn's allegedly defamatory statements to Mr. Steiner or Mr. Marson. *See* Ex. 1, at No. 13. | **Denied**.  TMG asserted "presumed damages in the amount of $1,000,000 or an amount to be proven at trial, together with pre- and post-judgment interest, for defamation and/or defamation per se."  Defs.' Ex. 1 at No. 13. |
| 169. Plaintiff alleges that around July of 2020, Mr. Rayborn falsely told Douglas Patin of Bradley Arant Boult Cummings, LLP that Meyer had retired. *See* AC ¶ 30. | **Agreed**. |
| 170. Plaintiff alleges that this representation resulted in Bradley Arant Boult Cummings LLP not retaining TMG's services to secure leased premises. *See* AC ¶ 30. | **Agreed**. |
| 171. Plaintiff alleges that the non-retention of Bradley Arant Boult Cummings LLP resulted in a loss of approximately $500,000 in commissions. *See* AC ¶ 30. | **Agreed**. |
| 172. In 2020, Bradley Arant Boult Cummings, LLP needed to hire a national brokerage real estate firm to represent it in all of its lease negotiations throughout the country. *See* Deposition of Douglas Patin, dated June 14, 2021 ("Patin Depo."), a true | **Denied**.  Patin testified they "engaged a national firm"—not that they "needed" to do so.  Defs' Ex. 80 at 14:7-9. |

| | |
|---|---|
| and correct copy of which is attached hereto as Exhibit 80, at 14:7-9; 28:19-22. | |
| 173. In July 2020, Bradley Arant Boult Cummings, LLP put out a request for a Request for Proposals ("RFP"). *See* Patin Depo. at 26:1. | **Agreed**. |
| 174. In September 2020, based upon submissions for the RFP, Bradley Arant Boult Cummings, LLP chose the national firm Sabills. *See* Patin Depo. at 14:11. | **Agreed**. |
| 175. Bradley Arant Boult Cummings, LLP did not choose TMG to secure premises because it needed a national mortgage firm to assist with multiple locations throughout the country, and TMG is not considered a national firm. *See* Patin Depo. at 29:3-4. | **Denied**. The cited portion of Patin's testimony just states that TMG is not a national firm—not that they did not engage TMG for that reason. |
| 176. Mr. Rayborn's representation about Mr. Meyer's possible retirement did not impact the decision to seek a national mortgage firm instead of TMG. *See* Patin Depo. 28:19-29:21. | **Agreed**. |
| 177. A true and correct copy of the Expert Report of Fletcher Gill, dated August 19, | **Agreed**. |

| | |
|---|---|
| 2021 ("Gill Report"), is attached hereto as Exhibit 86. | |
| 178. A true and correct copy of the Deposition of Fletcher Gill, dated September 28, 2021 ("Gill Depo."), is attached hereto as Exhibit 87. | **Agreed**. |
| 179. A true and correct copy of the Expert Report of Beverley East, dated August 14, 2021 ("East Report"), is attached hereto as Exhibit 88. | **Agreed**. |
| 180. For authentication of various documents referenced herein, not including pleadings, discovery materials and deposition transcripts, which are self-authenticating, see the concurrently filed Affidavits of James Rayborn and Haze McCrary. | **Denied** that Defendants filed said affidavits. |

Dated: January 13, 2022                           **AEGIS LAW GROUP LLP**

                                 By:     */s/ Serine Consolino*
                                             Serine R. Consolino (D.C. Bar No. 1033847)
                                             Branden Lewiston (D.C. Bar No. 252550)
                                             801 Pennsylvania Ave., N.W.
                                             Suite 740
                                             Washington, D.C. 20004
                                             Tel: (202) 737-3500
                                             Fax: (202) 737-3330
                                             sconsolino@aegislawgroup.com
                                             blewiston@aegislawgroup.com

                                             *Counsel for Plaintiffs*