**THE UNITED STATE DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE MEYER GROUP, LTD., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-cv-1945-ABJ |
| | ) | |
| JAMES M. RAYBORN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' REPLY MEMORANDUM TO PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants JAMES M. RAYBORN ("**Rayborn**") and BROAD STREET REALTY, LLC

("**Broad Street**") (collectively, "**Defendants**") hereby (1) reply to Plaintiffs WILLIAM MEYER

("**Meyer**") and THE MEYER GROUP, LTD. ("**TMG**") (collectively, "**Plaintiffs**") Opposition to

Defendants' Motion for Summary Judgment ("**Opposition**" or "**Opp.**"), and (2) oppose Plaintiffs'

Cross-Motion for Partial Summary Judgment ("**Plaintiffs' Cross-Motion**") filed on January 14,

2022, and, in support thereof states as follows:

**I.      INTRODUCTION**

Plaintiffs' Opposition fails to generate a genuine dispute of material fact warranting trial

that (a) Rayborn did not breach his contract, (b) Defendants did not misappropriate trade secrets,

(c) Defendants did not tortiously interfere with any of Plaintiffs' contracts or prospective

relationships, (d) Rayborn did not make defamatory statements about Meyer causing any damage,

and/or (e) Fletcher Gill does not qualify as an expert and/or that the bases for his opinion are

insufficient and/or improper.  Additionally, Plaintiffs' Cross-Motion fails to establish that Rayborn

breached his Contract with TMG.  This transparent attempt to delay the inevitable should be

rejected.  Because there are no genuine issues of material fact in dispute, Defendants' Motion for

Summary should be granted as to the entirety of Plaintiffs' claims, and Plaintiffs' Cross-Motion

for Partial Summary Judgment should be denied.

## II.    ARGUMENT

### A.    Rayborn Did Not Breach His Contractual Obligations to TMG.

#### 1.    The Plain and Unambiguous Language of Paragraph (a) Does Not Apply to Prior Cards or Publicly Available Information.

Plaintiffs' primary assertion is that Mr. Rayborn breached Paragraph 6(a), the

confidentiality provision in the Independent Contractor Agreement ("**ICA**").   In particular,

Plaintiffs rely upon the following language:

> ***Contractor recognizes and acknowledges that in the course of Contractor's performance hereunder, Contractor may acquire information*** which could include, in whole or in part, information concerning TMG's clients and prospective clients, the identity of clients and prospective customers, identity of key purchasing personnel in the employ of customers and prospective clients, TMG's manuals, client lists, canvas cards, formulae, processes, methods, ideas, improvement, inventions ***or other confidential or proprietary information belonging to TMG or relating to TMG's business or affairs*** (collectively referred to herein as the "Confidential Information").   Contractor agrees that (i) the Confidential Information is the property of TMG; (ii) the use, misappropriation or disclosure of the Confidential Information would constitute a breach of trust and could cause irreparable injury to TMG; and (iii) it is essential to the protection of TMG's goodwill and to the maintenance of TMG's competitive position that the Confidential Information be kept secret and Contractor agrees not to disclose the Confidential Information to others or use the Confidential Information to his own advantage or the advantage of others.

Defendants' JSOF ¶ 35 (Ex. 12) (emphases added).  In its September 28, 2020, Memorandum

Opinion ("**Mem. Op.**"), this Court already ruled that the non-solicitation language[1] contained in

---

[1]  Section 6(b) of the ICA provides:

> Contractor further recognizes and acknowledges that it is essential for the proper protection of the business of TMG that Contractor be restrained (i) from soliciting or inducing any employee, contractor or agent of TMG to leave the employ of TMG;

the ICA was an unenforceable restraint of trade (Dkt. #17 at 15-22); it, therefore, follows that the remaining provisions can only be enforced if the non-solicitation language can be eliminated without impairing the symmetry of the contract.  *EDM & Associates, Inc. v. GEM Cellular*, 597 A.2d 384 (D.C. 1991).  Furthermore, as explained herein below, the plain and unambiguous[2] language of the above section does not provide what Plaintiffs claim it provides.

To prevail on this claim of breach of contract, Plaintiffs must establish: (1) a valid agreement between the parties; (2) an obligation or duty arising out of the agreement; (3) a breach of that duty; and (4) damages caused by the breach.  *See Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).  Paragraphs (a) and (b) of Section 6 contain interchangeable undefined terms: ("potential clients" and "prospective clients").  As the Court is aware, "clients" has remained an undefined term.  The fact is that even where TMG secured an exclusive, the client could leave TMG as its broker by simply providing notice.   In its brief, Plaintiffs has not demonstrated that Defendant Rayborn has done anything more than solicit business - something which the Court has already determined he is permitted to do.

The confidentiality language is limited in scope to "Confidential Information" and cannot apply to publicly available contact information of third parties gathered by Rayborn and written

---

(ii) from hiring or attempting to hire any employee, contractor or agent of TMG and/or
(iii) from soliciting any client or potential client of TMG.
Defendants' JSOF ¶ 35 (Ex. 12).

[2] "Where the four corners of a contract are clear and unambiguous, however, there is no need to inquire as to the after-the-fact views of the parties as to what they originally intended or what they 'understood' the document to mean.  Furthermore, where the 'understanding' of the parties is at odds with the terms of the contract itself, the contract controls." *Curaflex Health Servs. v. Bruni, P.C.*, 877 F. Supp. 30, 35 (D.D.C. 1995) (citing *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1578 (Fed. Cir. 1993)).  *See also United States v. Winstar Corp.*, 518 U.S. 839, 907 (1996) (avoiding interpretation of contract that "would be absurd"); *Am. First Inv. Corp. v. Goland*, 925 F.2d 1518, 1521, 288 U.S. App. D.C. 298 (D.C. Cir. 1991) (avoiding interpretation that would "produce an absurd result").

onto the index cards he created prior to or even after its execution.  Critical to this Court's read of this paragraph is the following language:

> ***Contractor recognizes and acknowledges that in the course of Contractor's performance hereunder, Contractor may acquire information*** which could include, in whole or in part, information concerning TMG's clients and prospective clients, the identity of clients and prospective customers, identity of key purchasing personnel in the employ of customers and prospective clients, TMG's manuals, client lists, canvas cards, formulae, processes, methods, ideas, improvement, inventions ***or other confidential or proprietary information belonging to TMG or relating to TMG's business or affairs*** (collectively referred to herein as the "Confidential Information").

(Emphases added.)  The defined term "Confidential Information" is not just a defined term or short-cite.  It specifically means and is defined to include "confidential or proprietary information belonging to TMG or relating to TMG's business or affairs".  Furthermore, this provision and definition are expressly limited by Confidential Information the "Contractor . . . may acquire . . . in the Contractor's performance hereunder[.]"  If TMG, as the drafter[3] of the ICA, intended for this language to mean to apply to publicly available information that may be gathered by the Contractor OR intended for this paragraph to apply to canvas cards that the Contractor had already acquired or created, TMG could have simply stated such language in this provision.  Contrary to TMG's assertions, the plain language of this section simply does not state that canvas cards that James Rayborn generated over the course of two decades, that he had clearly already acquired prior to the execution and performance of the ICA, and/or that include various pieces of publicly available information, fall within this language.

Further, Plaintiffs' assertion that Section 6(c), the "turn over" paragraph, does not depend on the word "clients" is simply incorrect.  Section 6(c) relates back to the 6(a) paragraph, the

---

[3] Notably, Plaintiffs have not denied that they drafted the ICA or that they told Rayborn that he had to accept the terms as written.

paragraph at issue, to define "Confidential Information".  Paragraph (a) cannot survive due to the same problem that the non-solicitation language suffered, the lack of clarity surrounding "clients." Thus, Plaintiffs' argument that Mr. Rayborn simply had to "turn over" the "cards" according to the ICA is a strained conclusion where there is no definition of client or canvas cards, particularly when Paragraph (a) was modified by the phrase: "Contractor . . . may acquire . . . in the Contractor's performance hereunder[.]"  Again, if Plaintiffs wanted this provision to apply to cards that Rayborn created for two decades prior to the execution of the ICA or to apply to publicly available information, the ICA could have been drafted to include such information.  It did not. Thus, the Confidentiality Provision should be held unenforceable as a whole because the entirety of the section is so heavily intertwined.  Alternatively, it should be interpreted as written and not apply to cards Rayborn had already acquired prior to its execution or those that contain publicly available information.  Accordingly, Rayborn could not have breached the ICA, because the Confidentiality Provision in the ICA is unenforceable and/or does not plainly mean or state what Plaintiffs now contend.

## 2.      The 2018 ICA Has No Retroactivity Provision.

For approximately twenty-four years, Rayborn worked at TMG without any written contract.  *See* Docket 56-1 p. 4.[4]  As the sole drafter of the 2018 ICA, Meyer could have expressly stated that information that Rayborn had gathered over his tenure with the company fell within the definition of Confidential Information, but he did not.  There is no contemporaneous extrinsic evidence[5] that Plaintiffs can point to that demonstrates that he and Rayborn agree that the ICA

---

[4] Plaintiffs do not attempt to challenge Defendant Rayborn's handwriting expert who concludes that the alleged signature on an earlier ICA is not Rayborn's signature.  Therefore, the Court should conclude that the only history of contracts between the TMG and Rayborn is the 2018 ICA.

[5] The language is plain and unambiguous.  The Court should not look to parole evidence to inform Plaintiffs' after-the-fact interpretation.  Notwithstanding that fact, to the extent the Court looks to

would be interpreted as including Rayborn's cards that were developed before May 2018.  As noted in his affidavit, Rayborn had been using cards to note his research and cold calls of potential clients going back to when he and William Meyer worked as sales persons with Barrueta & Associates.  *See* Defendants' Response to Plaintiffs' Joint Statement of Material Facts ("**DRPJSOMF**"), filed concurrently herewith (Affidavit of James Rayborn, dated February 17, 2022, a true and correct copy of which is attached hereto as ***Exhibit 96***).  These cards were Rayborn's work product, as he testified.  *See* DRPJSOMF at (Defendants' Ex. 4, Rayborn Depo. Tr. at 46:7-12, 47:9-12, 49:22-50:5, 52:17-53:2, 110: 3-6, 212:19-21, 213:8-11, 221:5-9, 224:10-13, and 227:2-7).  The cards were the tool that allowed him to focus on his job. *See* Ex. 96.  Indeed, based upon the testimony of other sales persons, no one else used canvas cards.

Notably, Meyer does not testify or claim in his affidavit accompanying Plaintiff's Cross-Motion, that he used cards, and he does not name another sales person who used index cards in his or her work.  These cards contained notes about entities and people gathered from public sources or phone calls. Absent extrinsic evidence to demonstrate that all of the cards retroactive to the beginning of Rayborn's tenure with TMG were included, the Court should use the canon of *contra proferentem* to construe the agreement terms against the drafter and since the term is not explicit find that the ICA's retroactive effect is limited to cards containing confidential information of TMG acquired during or under the performance of the ICA, after its execution.

Plaintiffs argue that Rayborn's canvas cards are TMG's property.  However, Rayborn never considered the canvas cards he was creating to be TMG's canvas cards.  There is also nothing in the ICA to make Rayborn's prior work product the property of TMG.  Rayborn considered the

---

the February 11, 2019 email (Pls.' Ex. 5), it is addressed further herein below and in the Affidavit of James Rayborn, and which on its face confirms that Rayborn already had returned to TMG and had access to his cards before executing the ICA.

cards he was preparing to be his note cards, his work product. *See* Ex. 96. The cards had been Rayborn's property for 24 years and at no time did Meyer indicate the cards were TMG property. The failure to be explicit about what the time period the confidentiality provision addressed should be construed against the drafter.

The plain language of the confidentiality provision of the ICA defines confidential information to be TMG's canvas cards. It does not expressly say that canvas cards Rayborn creates are TMG's property. TMG and/or Meyer, as the sole drafter of the ICA, could have been explicit about both definitions, but were not. When Plaintiffs drafted the ICA, they could have ensured that they captured all canvas cards by drafting language that would have included them. Given their history with each other, one can conclude that it was not addressed because he was not concerned about those canvas cards.

### 3. Plaintiffs Have Nothing More than Speculation and Conjecture that Rayborn Took a Copy of the Access Database.

Plaintiffs again reassert that Rayborn supposedly absconded with a printout of the Access Database. *See* Pls.' Cross-Motion at 22. Plaintiffs provide no sufficient evidence, direct or circumstantial, that supports this claim. They have asserted that Meyer and Rayborn are the only ones with supposed knowledge of Rayborn taking the Database printout. *See* DJSOF ¶ 12. However, Mr. Meyer was not at TMG on the day of Rayborn's departure, nor did he ever see Rayborn take the printout out of the office. *See* DJSOF ¶ 13. Further, Meyer admitted that he does not actually know whether Rayborn simply threw out the printout when clearing out his office. *See* DJSOF ¶ 11. The evidence that Plaintiffs do reference at best suggests that the printout was in Rayborn's office "within the last month or two" before his departure. *See* Pls.' Response to DJSOF ¶ 6. However, Plaintiffs do not address the obvious point that Rayborn could have easily thrown away the Database during this period or that someone else could have taken it from his

office.  Rayborn has testified that he did not take the Access Database printout.  *See* DJSOF ¶ 6.

Conjecture and speculation are not evidence.  Thus, judgment should be entered in Rayborn's favor

regarding his supposed "absconding" with the Access Database printout.

<strong>4.   Plaintiffs Have Not Demonstrated Damages Resulting from this Alleged Breach.</strong>

Plaintiffs have asserted that their damages stem from a loss of clients due to Rayborn's

alleged breach of contract, allowing for the alleged poaching of numerous clients.  *See* Pls.' Cross-

Motion at 13.  They have not demonstrated or produced any evidence to suggest that these entities

would have retained TMG in the near future, so as to move the alleged damages from pure

speculation into something more concrete.  *See Red Lake Band of Chippewa Indians v. U.S. Dep't

of Interior*, 624 F. Supp. 2d 1 (D.D.C. 2009)("This court has long held that in contract cases, where

plaintiff has alleged a breach of contract, the plaintiff must shoulder the burden of establishing the

fundamental facts of liability, causation, and resultant injury.") (quoting *Malissa Co., Inc. v.

United States*, 18 Cl.Ct. 672, 674 (Cl.Ct. 1989)*; see also Roseburg Lumber Co. v. Madigan*, 978

F.2d 660, 667 (Fed.Cir.1992) ("Absent tangible proof of damages, appellant may not recover for

an alleged injury" under contract law.)  No facts or evidence have even been proffered that

demonstrate that Plaintiffs would even be entitled to the commissions obtained by Defendants

instead of them.  Plaintiffs have offered no testimony or affidavits from any witnesses that any of

the sixteen tenants for which they claim damages would have worked with TMG but for the alleged

breach by Rayborn.  Thus, Plaintiffs have not demonstrated any alleged harm resulting from the

alleged breach of contract.  Plaintiffs look to commissions that Defendants obtained as a result of

Rayborn's permitted and lawful solicitation and competition, and thus have failed to satisfy the

last element of a breach of contract claim.

B.      **Defendants Did Not Misappropriate TMG's Trade Secrets.**

1.      **The Index Cards and the Microsoft Access Database Did Not Contain Confidential Information.**

Plaintiffs allege that the index cards and the Microsoft Access Database contain valuable confidential information.  However, this conclusion is unsupported by evidence on the record. This Court clearly laid out the following six factors used to determine whether client information qualifies as a trade secret:

> (1)[T]he extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and to his competitors; (5) the amount of effort or money expended by [the employer] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Mem. Op. at 10 (quoting *Ruesch v. Ruesch Int'l Monetary Servs., Inc.*, 479 A.2d 295, 296 (D.C. 1984) (quoting 4 *Restatement of Torts* § 757 (cmt. b) (1939))) (Dkt. #17).  The index cards and Microsoft Access Database do not constitute trade secrets based on the Court's analysis in *Ruesch*.

As a preliminary matter, the vast majority of the information on the index cards is not objectively valuable, because the writing on the cards is largely illegible.  *See* Defs. Mot. at 27; *see also, e.g.*, DRPJSOMF ¶ 74 (True and correct copies of Rayborn's index cards for American Academy of HIV Medicine, Barnes Vanze, Capital Performance Group, Integral, National Minority Quality Forum, and NENA, attached as ***Sealed Defendants' Exhibits 89-94***, respectively, and Pls.' Exs. 4, 34-39).  Plaintiffs conveniently assert that Meyer and their expert, Fletcher Gill ("**Gill**"), can read the index cards.  *See* Opp. at 25.  Interestingly, however, in Gill's deposition, he was unable to identify ***any*** of the "dozens and dozens of cards" he allegedly looked at in either providing his opinion or in preparing for his testimony.  *See* Defendants' JSOF ¶ 178 at 25.  Furthermore, Plaintiffs' counsel actually asked that Defendant Rayborn transcribe cards,

because they were incapable of reading many of them.  *See* DRPJSOMF *¶* 124 (Email String, dated June 3, 2021, a true and correct copy of which is attached as ***Exhibit 95***).  Plaintiffs rely almost entirely upon Rayborn's deposition testimony, where he says his cards are valuable.  *See* Opp. at 25.  However, Rayborn's subjective opinion about the value of his own work product is not conclusive as to whether the cards contain objectively valuable information to the employer or to competitors. *See* DRPJSOMF *¶* 56.   Indeed, as explained in the attached Affidavit of James Rayborn, dated February 17, 2022 (Ex. 96), Defendant Rayborn used the cards as a coping mechanism to be a highly functioning successful employee with mental disorders that he has had for decades, disorders that were well-known to Meyer. *Id.*  Defendant Rayborn has suffered from bipolar disorder, anxiety, depression and accompanying obsessive compulsive behavior – as reflected in his compulsion to call clients and take notes on cards, generating thousands of cards that were largely illegible scribbles.  *See id.* (Plf.'s Exs. 4, 34-39, Defs.' Exs. 89-94).

Plaintiffs also assert that the index cards and Microsoft Access are valuable because this information is allegedly not publicly available.  *See* Plaintiffs' Opp. at 26.  To the contrary, the information on the index cards and Microsoft Access Database is publicly available and/or only a phone call or Google search away.  *See* Defendants JSOF *¶* 45.  The Supreme Court has stated that information that is public knowledge, meaning publicly available, or that is generally known in an industry cannot be a trade secret.  *See Ruckelshaus v. Monsanto Co.* 467 U.S. 986, 1002 (1984) (citing *Restatement of Torts* § 757 (1939)).  Information, like the officers or key decision-makers, a publicly available street address or phone number of a company, that is "generally known or readily ascertainable to the public" cannot constitute a trade secret.  *Catalyst & Chem. Servs. v. Global Ground Support*, 350 F. Supp. 2d 1, 8-9 (2004) (citing *State ex rel. the Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661, 675 (Ohio 1997); *Microbix Biosys., Inc. v. Biowhittaker, Inc.*,

172 F. Supp. 2d 665, 674 (D. Md. 2000); *IBM Corp. v. Seagate Tech., Inc.*, 941 F. Supp. 98, 100 (D. Minn. 1992)).  The information on the index cards and Microsoft Access Database can be easily found by a cursory internet search or using one of the subscription-based services that Plaintiffs or Defendants pay for, like CoStar and/or the Haines Directory. *See* DRPJSOMF ¶ 81 (*see also* Affidavit of Haze McCrary dated November 30, 2021, a true and correct copy of which is attached hereto as ***Exhibit 97***).  Plaintiffs argue that some of the information on the index cards comes from Rayborn's cold calling and therefore the information is non-public; however, that information was freely given to Rayborn in a cold-call with a prospective client. *See* Defendants JSOF ¶ 87.  As set forth in Defendants' Motion for Summary Judgment ("**Defs. Mot.**"), another agent's administrative assistant could easily re-compile this information. *See* Defs. Mot. at 27.

Plaintiffs argue that the information on the index cards and the Microsoft Access Databases take years to compile because agents have to develop the necessary relationship with the company to collect the information. *See* Opposition at 26-27.  However, in Meyer's deposition taken on July 18, 2021, Meyer testified that TMG only downloaded Microsoft 365 in 2015. *See* DRPJSOMF ¶ 14 (Defs.' Ex. 2 (Meyer Depo. at 214:7-15)).  Additionally, Meyer stated that he had an intern create the Database and that the intern set it up without his supervision. *See id.* (Meyer Depo. at 35:10-22).

According to Plaintiffs, after Rayborn completed his cold calling, Meyer became the client's exclusive point of contact at TMG. *See* Plaintiffs' Opp. at 5.  As a result, Plaintiffs cite that the compilation of "non-secret and secret information" on the index cards and Microsoft Access Database qualifies as a trade secret. *See* Opp. at 28.  While the combination of publicly available information can be considered a trade secret, the combination must be unique and add value to the information. *See Penalty Kick Mgmt. Ltd. v. Coca Cola Co.,* 318 F.3d 1284, 1291

(11th Cir. 2003). In fact, Courts have denied trade secret protection for information that had merely changed form but not substance. *Nationwide Mut. Ins. Co. v. Mortensen*, 606 F.3d 22, 29 (2d Cir. 2010). The small amount of legible information compiled on the index cards and the Microsoft Access Database is information regurgitated primarily from public sources. The combination of the publicly available information on the index cards and the Microsoft Access Database is not unique and adds no value to the information, therefore, the information is not a trade secret. Although Plaintiffs claim that the source of the Microsoft Access Database is the index cards, a simple review and comparison of the index cards shows that not to be the case as the information contained on each is not the same or even largely similar. *See* Plaintiffs' Cross-Motion at 26-27. Furthermore, the data point of the lease expiration is available publicly or could be guess-timated from the original leasing date, which is publicly available, and/or could be obtained and often was obtained, in a simple call to the tenant. *See* Defendants JSOF ¶ 4-5.

Even if Plaintiffs could convince the Court that Defendants took trade secrets, Plaintiffs have not offered sufficient admissible evidence to show that TMG safeguarded these so-called trade secrets. "The hallmark of a trade secret is not its novelty but its secrecy." *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 575 (4th Cir. 1994). TMG did not take proper steps to ensure the security of the allegedly confidential information. TMG has no data retention policy with its employees or independent contractors. *See* Defendants JSOF ¶¶ 47, 48, 50, 53, 54, 55, 57, 59 and 60. "If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Ruckelshaus,* 467 U.S. at 1002; *see also A.F.A. Tours, Inc. v. Whitechurch*, 937 F.2d 82, 89 (2d Cir. 1991). An employer must take precautions to alert employees of the need to

maintain the claimed confidentiality. *Id.* Otherwise, the information loses its value as a trade secret. *See Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1110 (D.C. Cir. 2011).

It is also a part of TMG's regular practice to distribute representative portions of the same information to prospective clients without any limitation on its use or even asking for its return. *See* Defs. Mot. at 28. Plaintiffs admit that they did not ask potential clients to keep confidential information that was disseminated in pitch meetings. *See* Plaintiffs' Response to Defendants' Joint Statement of Material Facts, ¶ 53. Further, TMG disclosed such trade secret information to their competition. Although TMG and Cushman & Wakefield agreed to work together, their agreement includes no confidentiality agreement concerning the information in the Microsoft Access Database. *See* Defs. Mot. at 15. Plaintiffs allege that Cushman & Wakefield agreed to keep such information confidential; however, there is no reference to the Microsoft Access Database anywhere in the Co-Broker Agreement, and Cushman & Wakefield uploaded TMG's Microsoft Access Database information into their own company-wide database without including any particular reference to TMG. *See* Defs. Mot. at 15-16. Additionally, there is no language in the Co-Broker Agreement that addresses confidentiality or specific TMG clients at all. *See* Defendants' JSOF at 67-68. Because TMG regularly discloses client information to others, who are under no obligation to protect the confidentiality of the materials, the Microsoft Access Database cannot constitute a trade secret. *See* Defendants JSOF ¶¶ 47, 48, 50, 53, 54, 55, 57, 59 and 60.

For the foregoing reasons, Plaintiffs have not proved the existence of a trade secret and, therefore, this claim cannot survive summary judgment, and the Court should grant Defendants' Motion for Summary Judgment on Counts III and IV of the Complaint.

**2.      Defendants Have Not Proved Causation on Any Level.**

Even assuming *arguendo* that index cards and the Microsoft Access Database are trade secrets, Plaintiffs fail to show that Defendants used trade secret information to compete with TMG and close deals with any particular customer.  Plaintiffs' only offer assumption and speculation. Plaintiffs argue that because former TMG clients took their business to Broad Street, that Defendants must have used misappropriated trade secret information to acquire those clients. *See* Opp. at 40.

Plaintiffs have not connected harm that they allegedly suffered to any allegedly unlawful conduct of Defendants.  In Plaintiffs' Opposition, they vaguely reference that they have lost clients due to Defendants' conduct but have not presented any specific evidence that Defendants used the information to acquire the clients.  However, Plaintiffs admit that Defendant Rayborn obsessively and incessantly called customers.  The only admissible evidence before the Court is that Defendant Rayborn reached out to prior and/or prospective customers to obtain their business – something he did based on his prior relationships with them and based on information he had readily available to him on his phone and through a simple internet search.  *See* Defendants' JSOF ¶ 45 (Rayborn Depo. at 222:1-5).  Likewise, the complained of conduct is nothing more that lawful and healthy competition in an extremely competitive commercial leasing industry.

Plaintiffs' allegations in this regard are nothing more than conjecture and cannot survive summary judgment.   It is well-settled that conclusory statements lacking any admissible evidentiary support cannot withstand summary judgment. *See William J. Davis, Inc. v. Tuxedo LLC*, 124 A.3d 612 (D.C. 2015) (recognizing that party's declaration in support of motion for summary judgment was "conclusory" and, thus, lacked specificity to withstand summary judgment); *Logan v. LaSalle Bank Nat. Ass'n*, 80 A.3d 1014, 1019 (D.C. 2013) (recognizing that party must respond to a summary judgment motion "by providing material facts under oath which

raise genuine issues of fact for trial.").  As there is no genuine dispute of material fact, Defendants

are entitled to summary judgment on Plaintiffs' Trade Secret claims.

### C.    Plaintiffs Cannot Maintain Their Tortious Interference with Contract Claim.

Plaintiffs have alleged that Rayborn and Broad Street have tortiously interfered with their

contracts and/or prospective economic advantage.  These claims are nothing more than an attempt

to harass Defendants and use Defendants as scapegoats for unfruitful business ventures.

### 1.    Plaintiffs Have Not Met Their Burden Of Proof.

This claim fails because, beyond conclusory statements of prior contracts or

communications, Plaintiffs have not set forth admissible evidence that (1) Plaintiffs had valid

contracts; (2) Defendants had knowledge of such contracts; (3) Defendants intentionally interfered

with those contracts causing a breach, and (4) damages resulted from that breach. *Banneker*

*Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 (D.C. Cir. 2015); *Lannan Found. v. Gingold*, 300

F. Supp. 3d 1, 29 (D.D.C. 2017); *Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 592 F.

Supp. 2d 86 (D.D.C. 2009).

Out of the sixteen tenants, Plaintiffs have only produced written executed agreements for

ten of the entities with which they claim Defendants interfered, many of which were executed

years ago: AAHIVM; AST; ACA; Barnes Vanze; CPG; Integral; GTRI; NENA; Tata and Video

Action.  *See* Defendants JSOF ¶ 105.  The Court correctly noted in dismissing Plaintiff's original

claim of tortious interference with contract the following:

> Critically, what is missing from plaintiff's complaint is any allegation that Rayborn
> induced any client to not perform a term of a contract with TMG or to breach an
> existing contract with TMG. Plaintiff does not specify the terms of any of the
> contracts at issue – they could have been terminable at will. Nor does it allege that
> at the time any client terminated its agreement or retained Broad Street Realty, it
> was in breach of or failing to perform a pre-existing obligation.

Dkt. #17 at 14.  Each of the exclusive representation agreements for these 10 tenants are terminable at-will.  Accordingly, Defendants could not have induced any of these entities to breach their contracts — as there was no breach.  The contract term for these tenants had expired, and the tenants decided not to continue working with TMG.  *See* Defendants JSOF ¶ 105.  In their Opposition, Plaintiffs do not cite to a single contract with which they allege Defendants interfered to cause a breach.  Plaintiffs must point to specific admissible evidence to oppose Defendants' Motion.  Instead, Plaintiffs' Opposition focuses mainly on the terminable at will issue (addressed further below).  *See* Opposition at 42.  In its Memorandum Opinion, this Court stated:

> [w]ithout any factual allegations regarding a breach or failure of performance, plaintiff has not alleged the third element of the claim. See *Econ. Research Servs., Inc.*, 208 F. Supp. 3d at 229-30 & n.9 (dismissing tortious interference claim where plaintiff failed to allege breach or failure of performance of the contract). Thus, TMG has failed to state a claim for tortious interference with a contract, and the Court will dismiss it without prejudice.

Dkt. #17 at 21.  The same is still true now.  Plaintiffs' have not made factual allegations regarding the third element of their tortious interference with contract claim.  Therefore, to the extent that Plaintiffs allege that Defendants tortiously interfered with Plaintiff's contract with any of these entities, the claim must fail.

Defendants must act intentionally <u>and</u> by some wrongful means to induce a breach of the contract. *Banneker Ventures, LLC*, 798 F.3d at 1134.  Even if a plaintiff makes its *prima facie* case, a defendant can nevertheless demonstrate that his actions were justified or privileged. *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285, 290 (D.C. 1989). Here, Plaintiffs argument tries to deny Defendants' right to work and compete in the real estate industry in an effort to enforce the previously voided non-solicitation provision of Rayborn's ICA with TMG.  Because Plaintiffs present no genuine issue of material fact, Defendants are entitled to summary judgment on this claim.

**D.     Plaintiffs Cannot Maintain Their Tortious Interference With Prospective Economic Advantage Claim.**

A tortious interference with prospective economic advantage claim has identical elements to a tortious interference with contract claim, except that the plaintiff must demonstrate the existence, knowledge, and intentional procurement of a breach of a prospective advantageous business transaction instead of meeting those elements as to a contract. *Teltschik v. Williams & Jensen, PLLC*, 683 F.Supp.2d 33, 56 (D.D.C. 2010).

**1.     Plaintiffs Had No Reasonable Expectancy in Retaining TMG Clients.**

Plaintiffs assert that "reasonable expectancy" is not an element of the claim for tortious interference with contract. *See* Opposition at 42.  That is true for tortious breach of contract, but not tortious interference with prospective business advantage.  A legally recognizable business expectancy must be "commercially reasonable to anticipate." *Whelan v. Abell*, 953 F.2d 663, 673 (D.C. Cir. 1992).  "A valid business expectancy requires a probability of future contractual or economic relationship and not a mere possibility." *Robertson*, 867 F.Supp.2d at 60 (internal quotation marks omitted); *see also Nat'l R.R. Passenger Corp.*, 791 F.Supp.2d at 56 (D.D.C. 2011) ("reasonable likelihood" required, "mere speculative contractual expectations or hope are insufficient") (internal quotation marks omitted).

Plaintiffs attempt to manufacture an expectancy related to the tenants with exclusive representation agreements.  Plaintiffs' claim that if the tenants' contracts have provisions that automatically renew on a month-to-month basis until a party issues a notice of termination, that creates a reasonable business expectancy.  *See* Opp. at 41.  However, these kinds of evergreen provisions continuing a brokerage relationship in perpetuity expressly violate District law, which *requires* a brokerage agreement to include a *definitive* termination date, or else the relationship is limited to 90 days.  D.C. Code § 42-1704(g)(2) ("if a brokerage relationship does not specify a

17

definite termination date, the brokerage relationship shall terminate 90 days after the date the brokerage relationship was entered into.").  Each of the exclusive representation agreements for these 10 tenants are terminable at-will.  *See* Defendants' JSOF ¶ 105.

A legally recognizable business expectancy must be "commercially reasonable to anticipate." *Whelan v. Abell*, 953 F.2d 663, 673 (D.C. Cir. 1992). "A valid business expectancy requires a probability of future contractual or economic relationship and not a mere possibility." *Robertson*, 867 F.Supp.2d at 60 (internal quotation marks omitted); *see also Nat'l R.R. Passenger Corp.*, 791 F.Supp.2d at 56 (D.D.C. 2011) ("reasonable likelihood" required, "mere speculative contractual expectations or hope are insufficient") (internal quotation marks omitted).  At-will relationships are generally not recognized as a reasonable expectancy to occur indefinitely or to secure future contracts.  *Herron v. Fannie Mae*, 861 F. 3d 160, 171 (D.C. Cir. 2017).  Even a routinely renewed at-will relationship will not create an actionable expectancy.  *Id.*  Accordingly, Plaintiffs' reliance on such perpetual evergreen provisions contrary to District law is not reasonable.

We expect TMG to cite to and rely upon the *Meyer Grp., Ltd. v. Rayborn,* 121 Fed. Cl. 105 (Fed. Cl. 2015); however, that case applied federal contracting law to make its determination regarding the continued applicability of TMG's exclusive representation agreement.  The Court specifically mentioned *in dicta* that they did not conduct a full analysis of the D.C. Code to reach their conclusion. *Id.* at n.15.  Accordingly, TMG's misplaced reliance on this case does control the Court's decision here.

In addition to the terminable at-will nature of the agreements, it was simply unreasonable for TMG to expect to represent these tenants in perpetuity.  Indeed, this is contrary to Meyer's

statement that if TMG secures a lease for a tenant, there is no obligation for the client to continue to work with TMG and that the client "is free to do whatever they want." *See* Defs. Mot. at 32.

### 2.   Defendants Did Not Know of Such Indefinite Business Expectancies.

Plaintiffs have not submitted evidence that shows that Defendants knew that TMG reasonably believed it could represent these tenants in perpetuity.  In *McManus v. MCI Communs. Corp.,* the Court stated that although the business expectancies do not have to be grounded in present contractual relationships, they do have to be commercially reasonable to anticipate.  748 A.2d 949, 957 (D.C. 2000).  The *McManus* Court found an at-will employee did not have a contractual relationship with her employer that she could use as the basis for her tortious interference claim.  "This court has never held that an employee can maintain a suit for interference with prospective advantage where her expectancy was based on an at-will relationship, and we do not do so now." *Id.* at 957.   Also, in *Teltschik v. Williams & Jensen, PLLC*, the Court found that the Plaintiff failed to support his claim for tortious interference, because he did not present evidence or even allege that a contract existed, that defendants knew about any **existing** contract, that a breach of contract occurred, or that damages resulted from a breach of contract. 683 F.Supp.2d 33, 56 (D.D.C. 2010).  Here, Plaintiffs suffer the same fate. Plaintiffs rely upon former at-will contracts for some of the relationships and others where there was no contract at all.

### 3.   Plaintiffs Have No Evidence of Intent to Interfere.

Even assuming for argument's sake that Plaintiffs had reasonable business expectancies with former TMG clients, tortious interference requires that the alleged interference be intentional. *See Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 202 (D.C. 2017).  A plaintiff must "prove intent by showing that a defendant knew that his actions were certain or substantially certain to interfere with the plaintiff's business." *Id.* (citing *Restatement (Second) of Torts* §§ 8A, 766 (cmt.

j)).  Plaintiffs have failed to present any evidence of Rayborn's intent beyond pursuing his own economic interests by solicitation, which the Court has already concluded Rayborn could perform. Accordingly, Plaintiffs cannot sustain their claim.  Plaintiffs' claim of tortious interference is a blatant attempt to revive the non-solicitation provisions of Rayborn's contract that this Court has already invalidated.  Plaintiffs' attempt to circumvent the Court's ruling should be rejected.

*Nat'l R.R. Passenger Corp.* details the threshold requirement to establish an intentional interference claim as follows:

> The third element of a claim of tortious interference is an "intentional interference inducing or causing a breach or termination of the relationship or expectancy." *Amtrak I,* 592 F.Supp.2d at 98 (quoting *Browning,* 292 F.3d at 242). "[A] general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability," but rather a "strong showing of intent to disrupt ongoing business relationships" is necessary. *Bennett,* 45 F.3d at 499 (quoting *Genetic Sys. Corp. v. Abbott Labs.,* 691 F.Supp. 407, 423 (D.D.C.1988)) (internal quotation marks omitted). "[T]he conduct at issue must involve egregious conduct such as libel, slander, physical coercion, fraud, misrepresentation, or disparagement." *PM Servs. Co. v. Odoi Assocs., Inc.,* No. Civ. A. 03–1810(CKK), 2006 WL 20382, at *35 (D.D.C. Jan. 4, 2006) (quoting *Sheppard v. Dickstein, Shapiro, Morin & Oshinsky,* 59 F.Supp.2d 27, 34 (D.D.C.1999)) (internal quotation marks omitted). Because this element requires demonstrating both an "intentional interference" and that this interference "induc[ed] or caus[ed] a breach or termination," *Browning,* 292 F.3d at 242, the Court must assess whether there is evidence in the record of both intent and causation.

791 F. Supp. 2d 33, 59–60 (D.D.C. 2011).  Plaintiffs do not meet these threshold requirements. Plaintiffs merely assert that by working with former TMG clients that Defendants had knowledge that TMG had reasonable business expectancies with those clients.  *See* Opposition at 45.  Yet, Plaintiffs agree that the commercial real estate industry is extremely competitive.  *See* Opposition at 38.  As explained below, lawful competition is not a tort.  Because Plaintiffs have not shown that Defendants knew of TMG business expectancies in perpetuity, their claim must fail.

Plaintiffs allege that because Defendants knew that by pursuing former TMG clients that Defendants intentionally interfered with TMG business expectancies.  Plaintiffs and Defendants

are competitors.  Lawful competition is not a tort.  "[T]he process known as competition, which though painful, fierce, frequently ruthless, sometimes Darwinian in its pitilessness, is the cornerstone of our highly successful economic system. Competition is not a tort." *Speakers of Sport, Inc. v. ProServ, Inc*., 178 F.3d 862, 865 (7th Cir. 1999).  In *Modis, Inc. v. Infotran Sys., Inc,* the Court granted defendants' motion for summary judgment on plaintiffs' tortious interference claim because plaintiffs only alleged that defendants contacted plaintiffs' prospective contractor, and participating in competition does not amount to interference. 893 F. Supp. 2d 237, 242 (2012) (citing *Compak Cos., LLC v. Johnson,* 2011 U.S. Dist. LEXIS 45677 (N.D. Ill. Apr. 28, 2011) (recognizing that the Court entered judgment for defendant on plaintiff's tortious interference claim because competition is not an improper activity)).  In that case, the defendant contacted plaintiff's customers and persuaded the prospective contractor to do business with the defendant's company instead.  That is lawful.  Further, in *Mercer Mgmt. Consulting v. Wilde*, the Court concluded that the former employees could not be charged with interference with a business relationship because they believed that they were free to compete with their former employer after their non-compete agreement was voided. 920 F. Supp. 219, 225 (D. C. 1996).

In its September 28, 2020 Mem. Op., this Court has already ruled that the non-solicitation language contained in the ICA was an unenforceable restraint of trade.  (Dkt. #17 at 15-22). Plaintiffs' remaining arguments try to make lawful competition a tort to enforce the non-solicitation provisions in the ICA in order to punish Rayborn and Broad Street for participating in the competitive business of real estate.  Plaintiffs also attempt to shift their burden of proof on Defendants by stating Defendants have not proved that their conduct was not wrongful. *See* Opposition at 46.  However, in *Modis, Inc. v. Infotran Sys., Inc.*, the Court explained:

> To establish a claim of improper interference with contract or business relations, the plaintiff must demonstrate that the defendant engaged in conduct that is

> "egregious; for example, it must involve libel, slander, physical coercion, fraud, misrepresentation, or disparagement." *Sheppard v. Dickstein, Shapiro, Morin & Oshinsky, 59 F. Supp. 2d 27, 34 (D.D.C. 1999)* (dismissing plaintiff's tortious interference claim where the plaintiff's complaint was "silent" as to any statements made by the defendants that constituted slander, libel, or knowing misrepresentations) (internal quotation omitted). The competitive activity that forms the basis of an improper interference claim must be accomplished "by wrongful or improper means, such as fraud." *Mercer Mgmt. Consulting v. Wilde, 920 F. Supp. 219, 239 (D.D.C. 1996).*

893 F. Supp. 2d 237 (2012) (emphases added).[6]

Here, Rayborn and Broad Street simply engaged in lawful competition. Moreover, as explained above, Defendant Rayborn did not take the index cards with the purpose of breaching his agreement or harming Plaintiffs. Rayborn has suffered from bipolar disorder, anxiety, depression and obsessive compulsive behaviors that compel him to use, rely upon and need the index cards he spent decades writing and which function like a coping mechanism. Rayborn took his index cards with him because he believes they are his work product and that he cannot successfully work and secure clients without them. The index cards are nothing more than a safety blanket to Rayborn – consequently, having tremendous value to him. *See* DRPJSOMF ¶ 56 (Rayborn Affidavit). Unlike Plaintiffs' characterization of events, Rayborn taking his index cards was not a part of a vendetta against TMG but a simple by-product of his diagnosis. Furthermore,

---

[6] To the extent that the Court would even entertain Plaintiffs' argument that it is Defendants' burden to establish that Defendants' conduct was egregious, the Court in *Compak* provides clarification on this issue. The *Compak* Court explained:

> The Restatement itself expressly declines to decide who has the burden of proof. *See* Restatement (Second) of Torts § 768 cmt. a (1979) ("[T]his Section speaks of an interference that is improper or not, rather than of a specific privilege because there is no consensus that engaging in competition is an affirmative defense to be raised and proved by the defendant or is instead simply not improper conduct inconsistent with the American system of free enterprise.").

*Compak Cos., LLC v. Johnson,* 2011 U.S. Dist. LEXIS 45677 (N.D. Ill. Apr. 28, 2011). Whether the Court considers wrongful conduct an element of the *prima facie* claim of tortious interference or an affirmative defense, Plaintiffs have not shown that Defendants' actions were wrongful, and Defendants have shown that they were merely engagement in lawful competition.

Michael Jacoby confirms in his attached affidavit his understanding of the meaning of the plain language in the Independent Contractor Agreement at the time he communicated with Mr. Rayborn in February 2019 and proceeded with supporting Rayborn's continued employment at Broad Street. *See* DRPJSOMF *¶* 56 and ¶ 47 (Affidavit of Michael Jacoby, dated February 3, 2022, a true and correct copy of which is attached hereto as ***Exhibit 98***). Most respectfully, the emails (*e.g.*, Defs.' Ex. 5) relied upon by Plaintiffs speak for themselves and do not reflect the motive or meaning Plaintiffs assign to them.

### 4.    Plaintiffs Cannot Demonstrate Damages Caused by Defendants.

In a bald and conclusory fashion, Plaintiffs claimed: "Because of Defendants' intentional interference with TMG's business expectancies and exclusive representation agreements, TMG has suffered a loss of commission fees it reasonably expected to receive in connection with its clients' forthcoming leasing agreements." AC ¶ 49. Yet, Plaintiffs have not presented any specific proof of damages arising from the alleged tortious interference. Plaintiffs' proposed expert witness report regarding damages does not opine about tortious interference damages and is otherwise unsupported as explained below. Without Plaintiffs identifying, much less proving, damages resulting from Defendants alleged tortious interference, a required element of the claim, judgment should be entered in favor of Defendants.

Plaintiffs have also failed to present admissible evidence that links Rayborn's alleged tortious conduct to any resulting damage. *Lurie v. Mid-Atl. Permanente Med. Grp., P.C.*, 729 F. Supp. 2d 304 (D.D.C. 2010) ("If Gantt was unaffected by any misinformation on the part of defendant's employees, defendant did not cause plaintiff to lose her business."). The facts of this case are remarkably similar to *Gordon Document Products, Inc. v. Service Technologies, Inc.,* 308 Ga.App. 445 (2011). In *Gordon,* the plaintiff alleged that a former employee used confidential

information in order to solicit employees and customers of the plaintiff so that they would work for or hire his new employer.  The plaintiff failed to present any evidence that its employees or customers left its company because of what the defendant employee said or did, or that anything that was done was more than competition.  *Id*. at 450-451. The plaintiff also failed to present evidence of the circumstances surrounding how the customers decided to retain Defendants.  *Id*. at 452.  Accordingly, the Georgia Court of Appeals, which like the District applies the *Restatement of Torts*,[7] affirmed the entry of summary judgment against the plaintiff on its tortious interference claims. *Id*. at 451, 452.  Similarly, the Court should find that Plaintiffs cannot sustain a tortious interference claim since they cannot demonstrate that any entity left TMG to retain BSR because of any allegedly confidential information used by Rayborn or Broad Street and/or as result of any unlawful or egregious conduct.  Put plainly, lawful competition cannot support a tortious interference count.

**E.    Rayborn's Statements Were Not Defamatory and/or Did Not Cause Resulting Damage.**

Plaintiffs fail to detail how the statement by Mr. Rayborn is defamatory.  In this jurisdiction, whether a statement is defamatory includes an evaluation of whether a reasonable reader or listener *could* understand a statement as tending to injure a plaintiff's reputation. *See Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 273 (D.D.C. 2017).  The facts in this case ineluctably demonstrate that there was no injury to TMG's reputation from any statement made by Rayborn.

Small businesses rise and fall on the conduct and activity of their founders like William Meyer.  If the founder is seen in the office, engaged in the business of the firm, and actively

---

[7] *Metro Atlanta Task Force for the Homeless, Inc. v. Ichthus Cmty. Tr.*, 298 Ga. 221, 229 (2015).

recruiting employees, the business is typically viewed as fully operational.  As the founder steps away, hands off major business activities or clients to others as they move to Florida,[8] or no longer recruits to replace key employees,[9] such conduct is often viewed as the business slowing down and the founder considering retirement.

An objective view of Meyer's conduct, in particular, spending significant time in Florida, a jurisdiction where TMG has no licensed brokers and failing to replace sales persons Ed Flenner and James Rayborn would suggest that he was slowing down or retiring.  Plaintiffs state that TMG typically had approximately seven agents working.  *See* Plaintiffs' Opp. at 2.  Their departure, along with the departure of Jessica McGunnigle, who left TMG with only William Schwartz and Michael Crosman as its salespersons, admittedly handling only their own deals, likewise indicates that Meyer was personally slowing down.[10]  However, Meyer took no steps to get back to full force by replacing Flenner, Rayborn, or McGunnigle.  Objectively, Meyer's conduct would suggest he was indeed personally slowing down.

Even if true, Plaintiffs fail to explain how Rayborn stating that Meyer has retired is defamatory on its face.  Plaintiffs have merely reiterated its earlier claims, simply stating that "retired" is effectively defamatory on its face.  *See* Plaintiffs' Opp. at 48.  However, case law demonstrates that retirement, or claiming that someone has retired does not rise to the level of making Mr. Meyer appear to be "odious, infamous, or ridiculous."  *Chaloner v. Washington Post Co.*, 36 App. D.C. 231, 233 (1911), *rev'd on other grounds*, 250 U.S. 290 (1919); *see also,*

---

[8]  *See* Defendants' JSOF ¶ 4 (Meyer's Depo. at 197, Ex. 2).

[9]  *See id.* ¶ 67 (Co-Broker Agreement, retaining Cushman Wakefield to handle deals, Ex. 28).

[10]  *See id.* JSOF ¶ 32 and 53 (Schwartz Depo. at 56 – 59:1-12, Ex. 13; Crosman Depo. at 17:18-22, Ex. 22).

*Deripaska v. Assoc. Press*, 282 F. Supp. 3d 133, 141 (D.D.C 2017).[11]  The instant case differs from one in which a businessperson was denounced as insolvent or going out of business for one reason or another.  *See Farmer v. Lowe's Companies, Inc.*, 188 F. Supp. 2d 612, 616 (W.D.N.C. 2001).  Declaring a merchant insolvent, for example, effectively claims that a merchant is no longer able to do business because of financial instability, often imputing to them some level of misconduct or disgraceful action. *See id*.  While a statement that a person has retired concerns his profession, it does not impeach him in his profession. *See id*.  Choosing to retire indicates that the businessperson has reached a level of success in their profession that they are in a position to leave it, with others possibly still running the business.  Notably, Meyer never claims that Rayborn said TMG was closing its doors or going out of business for one reason or another.

Further, Plaintiffs have not, and nay, cannot prove any actual or legal harm resulting from the alleged statements.  A plaintiff is required to establish that it suffered actual harm or that the allegedly defamatory statement constitutes defamation *per se*. *See Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1240 (D.C. 2016) (quoting *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)).  Plaintiffs appear to concede the prior factual bases of the claim arising from statements to David Steiner, Bradly Marson, and Douglas Patin do not support their claim any longer, as none of the three are mentioned in Plaintiffs' Opposition.  *See* Plaintiffs' Opp. at 47-48.  Further, the only mention of actual harm suffered is a singular sentence in which NENA and NHP Foundation were listed as examples "of some of the damage" caused by Rayborn's allegedly defamatory statements. *See id.* at 48.  However, these references in Plaintiffs' brief do not describe or

---

[11] The average or common mind would naturally understand 'odious' to mean 'arousing or deserving hatred or loathing'; 'infamous' as 'notorious' or 'in disgrace or dishonor'; and 'ridiculous' as 'absurd' or 'deserving ridicule,' that is, 'the act of making someone or something the object of scornful laughter by joking, mocking, etc.'" *Klayman v. Segal*, 783 A.2d 607, 618 (D.C. 2001) (quoting Webster's New World Dictionary, 720, 986, 1224 (2nd coll. ed.1982)).

demonstrate with specificity what the harm was and merely alleges that Rayborn told these entities that Meyer was retiring.

To prove defamation *per se*, therefore, requiring no proof of damages, a speaker must impute "to a person a criminal offense; a loathsome disease; matter affecting adversely a person's fitness for trade, business, or profession; or serious sexual misconduct." *Carey v. Piphus*, 435 U.S. 247, 262 n.18 (1978). Criminality or immorality has not been ascribed to Meyer's character. As the *Farmer* Court found, while a person's retirement concerns his profession, it does not have any implicit adverse effect on that person's profession. *Farmer*, 188 F. Supp. 2d at 616. Thus, because Rayborn's statements are not defamatory, and because Plaintiffs' general allegations of harm do not meet the standard of proving defamation *per se* nor have they proven actual harm, Defendants should be granted summary judgment on this claim.

### F.   Gill Cannot Serve as an Expert Witness in This Case Because His Opinion Is Patently Unreliable.

Fletcher Gill's opinion is unreliable and will not assist a trier of fact; therefore, his testimony must be excluded. Courts are clear that testimony from experts who are unfamiliar with the record are insufficient to survive summary judgment. *Ambrosini v. Labarraque*, 966 F.2d 1464, 1470 (D.C. Cir. 1992). Gill's testimony in his deposition highlights his lack of knowledge of information in this record. Gill was unable to recall basic information about the documents and index cards that he supposedly reviewed in preparation of his report and his deposition. *See* Defs. Mot. at 47. When Gill was asked simple questions about the index cards he reviewed before his deposition, he constantly responded "I have reviewed dozens and dozens of notecards, and if you would like to show me the cards I can tell you if I recognize them or not." Unlike Plaintiffs' characterization of questions during the deposition, defense counsel was simply trying to ascertain the specific materials that Gill reviewed and ***relied upon*** to prepare his report, and he could not

recall any details about any of the information he reviewed or relied upon.  Defense counsel asked Gill if he reviewed particular index cards in reference to the chart he provided in his expert report regarding damages on pages 13-14, but again he was unable to answer these questions with any factual specificity – not even the names of any of the entities.  Those questions were necessary, because, although Gill's report explains that he reviewed index cards, a couple of depositions and the complaint, neither he nor Plaintiffs' counsel bothered to identify the specific cards he reviewed or relied upon to provide this opinion.  *See* Defs. Mot. at 47-49.

Gill also testified that he took no notes while reviewing information in preparation of his report and his deposition.  *See* Defs. Mot. at 47.  Courts have excluded expert witness testimony when the expert fails to identify or explain their methods.  *Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233, 250-251 (D.D.C. 2018).  As a proposed expert, Gill needs to know what he reviewed in providing his opinion or preparation for his testimony, and it is not clear that he viewed the index cards that are at the very heart of this litigation.  Defendants' counsel is entitled to know the foundation on which Gill's testimony is based.  His refusal to answer, evasiveness, and obfuscation are proper grounds to strike his testimony.  *See* DRPJSOMF ¶ 178 (Defs.' Ex. 87, Gill Testimony, 80:18-21)).

Here, Gill's testimony cannot create a genuine issue of fact.  In this Circuit, a party cannot create a fact issue to avoid summary judgment by offering an expert opinion that is not supported by a proper foundation. *See Rardon v. Holland*, 279 F. Supp. 3d 93, 97 (2017) (citing Fed. R. Evid. 702(b); *Martin v. Omni Hotels Mgmt. Corp.*, 321 F.R.D. 35 (D.D.C. 2017) (quoting *New York State Ophthalmological Soc'y v. Bowen*, 854 F.2d 1379, 1391 (D.C. Cir. 1988) ("[A] party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations.")))).  Despite this, Plaintiffs rely heavily

28

on Gill's testimony to create genuine issues of material fact.  Further, the Court has been clear that Plaintiffs cannot rely on their own, unverified assertions to oppose the Defendant's motion; the suggestion that expert testimony might refute the Defendant's argument, without any supporting evidence from the client or the purported expert, is insufficient to create a genuine dispute. *William v. Shinseki*, 967 F. Supp. 2d 95, 106 (2013).  Plaintiffs cannot rely on Gill's expert opinion to create a genuine issue of material fact, because Gill failed to provide specific facts to support his conclusory allegations regarding any specific canvas cards, commissions, or tenants.

Further, despite Gill's demonstrated unfamiliarity with the record, he draws conclusions about the value of TMG's so-called trade secret information.  It is not enough for an expert to review a selection of documents to reach a series of conclusions without articulating the principles of their methodology. *See also Chesapeake Climate Action Network v. Exp.-Imp. Bank of the U.S.*, 78 F. Supp. 3d 209 (D.D.C.).  It is also apparent that Plaintiffs' counsel "cherry-picked" information for Gill only to reference evidence that was favorable to Plaintiffs and simply dictated that the index cards contained valuable, non-public information. *See* Defs. Mot. at 48.  Gill fails to meet the standard mandated in Federal Rule of Evidence 702 and, therefore, his testimony and report must be excluded from the record.

## III.   CONCLUSION

Accordingly, because there is no dispute as to any genuine issue of material fact regarding the Plaintiffs' claims, the Court should enter judgment against Plaintiffs on all of its claims and in favor of Defendants.

WHEREFORE, Defendants request that this Honorable Court enter summary judgment in their favor and against Plaintiffs, plus reasonable attorneys' fees and costs, and that the Court grant such other and further relief as it deems just and proper.

Respectfully submitted,

SHULMAN, ROGERS, GANDAL,
 PORDY & ECKER, P.A.

By: _____ /s/ _____

    Lane Hornfeck, Bar No. 474800
    lhornfeck@shulmanrogers.com
    Glenn C. Etelson, Esq., 426246
    getelson@shulmanrogers.com
    12505 Park Potomac Avenue
    Sixth Floor
    Potomac, Maryland 20854
    (301) 230-5200
    (301) 230-2891 (facsimile)

    *Counsel for Defendant Broad Street, LLC*


By: _____ /s/ _____
    Denise M. Clark (420480)
    Clark Law Group, PLLC
    1100 Connecticut Ave., Suite 920
    Washington, D.C. 20036
    Tel: (202) 293-0015
    dmclark@benefitcounsel.com

    *Counsel for Defendant James Rayborn*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 18, 2022, a copy of the foregoing was served via the Court's electronic filing system on all counsel of record.

*/s/ Lane Hornfeck*

_____

Lane Hornfeck