**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE MEYER GROUP, LTD. *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No. 19-cv-1945 |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES M. RAYBORN *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS'**
**JOINT STATEMENT OF MATERIAL FACTS**

Defendants James Rayborn ("**Rayborn**") and Broad Street Realty, LLC ("**Broad Street**")

(collectively, "**Defendants**") hereby provide their response to the Joint Statement of Material Facts

("**PSOF**") of Plaintiff The Meyer Group ("**TMG**") and William Meyer.

| Plaintiffs' Statement | Defendants' Response |
|---|---|
| **I. Background** | Section heading to which no response is required. |
| **1.** TMG has never had more than seven or [sic] agents licensed agents at a time but has managed to successfully compete against brokerage firms several times its size. *See* Affidavit of William Meyer, Pls.' Ex. 1 ("Meyer Aff.") at ¶ 2. | **Agreed as to the number of agents. Denied** as to the remainder. |
| **2.** TMG's success can be attributed to the quality of its tenant information, which, much like targeted advertising, allows TMG to approach clients with the right proposals at the right time. TMG has spent many years compiling this valuable and confidential tenant information. *See* Meyer Aff. at ¶ 3. | **Denied.** |
| **a. Tenant Information is Highly Valuable to Brokers** | **Denied** as written to the extent that it is vague. |
| **3.** Tenant-side commercial lease brokers represent tenants—businesses, non-profits, and other organizations—in identifying, negotiating, and securing short and long-term leases of commercial space, which can often be complex and expensive. *See* Defs.' Ex. 86-Gill Report at ¶ 7. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact.<br><br>In this Circuit, a party cannot create a fact issue to avoid summary judgment by offering an expert opinion that is not |

supported by a proper foundation. *Rardon v. Holland*, 279 F. Supp. 3d 93, 97 (D.D.C. 2017) (citing Fed. R. Evid. 702(b); *Martin v. Omni Hotels Mgmt. Corp.*, 321 F.R.D. 35 (D.D.C. 2017) (quoting *New York State Ophthalmological Soc'y v. Bowen*, 854 F.2d 1379, 1391 (D.C. Cir. 1988) ("[A] party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations."))).

"The Plaintiff cannot rely on his own, unverified assertions to oppose the Defendant's motion; the suggestion that expert testimony might refute the Defendant's argument, without any evidence from a purported expert, is insufficient to create a

| | |
|---|---|
| | genuine dispute." *William v. Shinseki*, 967 F. Supp. 2d 95, 106 (D.D.C. 2013). |
| **4.**     Though prospective tenants hire commercial lease brokers directly to represent them in connection with these transactions, in the D.C. metropolitan area, commercial lease brokers are not paid by the tenants for this service, but by the tenants' landlords in the event a lease agreement is consummated. *See* Defs.' Ex. 86-Gill Report at ¶ 7 | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| **5.**  Brokers and tenants often sign brokerage agreements—referred to in the industry as "exclusive representation agreements"—which require tenants to identify brokers as the "procuring cause" of any leasing transaction consummated for a particular space identified by the broker to the tenant. *See* Fletcher Gill's Expert Rebuttal Report, Pls.' Ex. 2 ("Gill Rebuttal Report") at ¶ 3. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| **6.**  By design, procuring cause provisions protect brokers in the event that lease transaction occurs after a broker is terminated by the tenant, to ensure that brokers get paid for the work that they do. *See* Gill Rebuttal Report at ¶ 4. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| **7.**  Tenant-side commercial lease brokers generate business both by cold-calling new clients, and also by contacting tenants who they have represented in the past. *See* Defs.' Ex. 86-Gill Report at ¶ 8. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |

| | |
|---|---|
| **8.** A broker's ability to compete in the highly competitive D.C. real estate market is the direct result of the quality and breadth of their tenant information. *See* Defs.' Ex. 86-Gill Report at ¶ 13. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| **9.** Information about, for example, a tenant's desired lease term, growth plans, key decision-makers, line of business, annual revenue or number of employees enables brokers to build relationships with key tenant representatives, understand their space needs, and better market themselves to prospective tenants. It also allows brokers to be better advocates for tenants once leasing negotiations begin. *See* Defs.' Ex. 86-Gill Report at ¶ 10. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| **10.** A tenant's current lease also contains highly valuable information. The duration, square footage and price of a tenant's current lease, as well as information about concessions and early termination, expansion, and renewal options allows brokers to better pitch to clients through targeted market analyses. Knowing a lease's early termination, expansion, and renewal options is critical information for brokers, because these options typically must be exercised during a specific period of time, creating a window of opportunity for marketing purposes. Therefore, "the more thorough and accurate a broker's tenant information is, the better able a broker is to compete with other brokers." *See* Defs.' Ex. 86-Gill Report at ¶¶ 8, 9, 14a. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |

| | |
|---|---|
| **11.** One of the most valuable pieces of information for a broker to know about a prospective tenant is the date of the expiration of its current lease. The expiration date of a tenant's current lease tells the broker when to reach out to a prospective tenant to inquire about whether it wants to renew its current lease, extend its duration, or seek a different space altogether. *See* Defs.' Ex. 86-Gill Report at ¶ 8. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| **12.** The timing of a broker's outreach is critical: if a broker approaches a tenant too early, the tenant's current lease expiration will be too remote for the tenant to be in a position to make decisions about its long-term space needs. On the other hand, if the outreach comes too late, the tenant may have already engaged another broker. *See* Defs.' Ex. 86-Gill Report at ¶ 8. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| **13.**     Because identifying space and negotiating a lease is a time-intensive process, beginning the search for space between twelve and eighteen months before the expiration of a tenant's current lease allows enough time for the tenant to tour, evaluate, and compare potential properties, consider different options, negotiate a non-binding letter of intent, negotiate a lease, and perform any necessary renovations or repairs before move-in. *See* Defs.' Ex. 86-Gill Report at ¶ 8. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| **b. <u>The Meyer Group's Client Information Is The Core Of Its Business</u>** | **Denied**. Relationships with clients are the core of any commercial leasing business. |

| | |
|---|---|
| **14.** The Meyer Group's client information took years to compile. *See* Meyer Aff. at ¶ 3; Defs.' Ex. 4-Rayborn Depo. Tr. at 213:8-11 (Rayborn testified he considered the cards his "work product" because it "took [him] many years to develop the cards."). | **Denied** that the information took TMG years to compile. According to Meyer's Deposition Testimony, he had interns enter the information at various times after 2015, when TMG acquired the Microsoft 365 Access Database. *See* Defendants' Exhibit 2 (Meyer Deposition Testimony at 213-15); *see also* Kirks Rep. at 5. **Agreed** to the fact that Rayborn said that he took many years compiling his work product. *See also* Defendants' Ex. 4 (Rayborn Depo. Tr. at 46:7-12, 47:9-12, 49:22-50:5, 52:17-53:2, 110: 3-6, 212:19-21, 213:8-11, 221:5-9, 224:10-13, and 227:2-7). |

| | |
|---|---|
| **15.** Brokerage firms hire agents to cold-call prospective tenants for the express purpose of acquiring and compiling this type of tenant information and, in turn, generating clients for the firm.  It often takes agents several years to develop the necessary relationships and compile the necessary information to bring a significant number of clients to the firm. *See* Defs.' Ex. 86-Gill Report at ¶ 11. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. Furthermore, some of these statements are not event reflected in Gill's Report. |
| **16.** In recent years, TMG has used a secure Microsoft Access Database to compile its clients' lease information once a deal is completed. It is not always kept up to date by TMG's administrative personnel and does not include information about prospective clients. *See* Meyer Aff. at ¶ 14. | **Denied** to the extent that TMG's Microsoft Access Database is largely a list with public contact information and very little lease information**.** *See also* Defendants' Exhibit 2 (Meyer Deposition Testimony at 213-215) Furthermore, this fact contradicts Plaintiffs' argument that the canvas cards were used to generate the Client List reflected in the Microsoft Access Database. |

| | |
|---|---|
| **17.** Throughout his tenure at TMG, Rayborn's primary job function was to generate potential leads for TMG, which he did through cold-calling clients and compiling their information. *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 17:6-12 (Rayborn testifying that his job responsibilities at both TMG and Broad Street "are to canvass [sic] and to secure leads of tenant[s] . . . to win business."). | **Denied** to the extent that Rayborn was an independent contractor and his primary "job" function was to generate leads for himself as well as TMG. |
| **18.** Though Rayborn would occasionally participate in office tours and accompany William Meyer to pitch meetings, Rayborn's client involvement generally ended there: once a tenant hired TMG as its broker, William Meyer became the tenant's exclusive point of contact at TMG, and handled all leasing negotiations. *See* Meyer Aff. ¶ 6; Defs.' Ex. 4-Rayborn Depo. Tr. at 17:6-12 (Rayborn testifying that he "very rarely" handles leasing negotiations). | **Denied** to the extent that there was not an exclusive point of contact and lease negotiations were not the only purpose for a point of contact. |
| **19.** By the time Rayborn left TMG in 2019, he was earning a 75% commission split for any tenant he brought to TMG—amounting to an income of more than $800,000 in his last full year at TMG. *See* Meyer Aff. at ¶ 7 | **Agreed** in 2019 Rayborn was earning a 75% commission but **Denied** that Rayborn's income was more than $800,000 in his last full year at TMG. *See* Rayborn Dep. 35-37.  TMG failed to pay him the full amount he earned and was owed. |

| | |
|---|---|
| **c. TMG's Canvass [sic] Cards Contained Key Client Information** | **Denied.** The Canvas Cards were property of Jim Rayborn and were largely illegible. |
| **20.** Rayborn maintained and organized TMG's client information on a set of handwritten index cards, which he and Meyer often referred to as "canvass [sic] cards." Rayborn used the Canvass [sic] Cards to record information had collected from cold-calling both potential and past TMG clients. *See* Meyer Aff. at ¶ 8; *see also* Defs.' Ex. 4-Rayborn Depo. Tr. at 172:3-10, 183, 186. | **Agreed.** |
| **21.** The Canvass [sic] Cards compiled everything from information about a tenant's key decision makers—for example, noting that a key decision maker at a particular tenant was a "Republican"—to notes about tenants' businesses, the type of space they were searching for, information about their current leases, and, notably, their lease expiration dates. *See* Meyer Aff. at ¶ 9; *see also*, *e.g.*, Pls.' Ex. 3-Rayborn's Responses to Plaintiffs' Interrogatories at Rog. No. 8 (typed out version of handwriting for cards for Integral, NENA, Capital Performance Group, and Barnes Vanze Architects) ("Republican" on p. 14). | **Denied.** A simple review of the cards reveals they are largely stream of conscience notes taken during phone calls largely covered over with scribbling. Notably, Plaintiffs asked Defendant Rayborn to transcribe the cards because they could not even read them – contradicting their position they used them to create the Microsoft Access Database and/or that they have "value" for purposes of their claims. |

| | |
|---|---|
| **22.** For example, the canvass [sic] cards for Barnes Vanze Architects listed the names of key decision-makers, their individual phone numbers, the tenant's lease expiration date and square footage, and notes about client priorities and issues of concern (e.g., "HVAC," "rent reduction"). *See* Pls.' Ex. 3 at 10-11. The canvass [sic] card for Capital Performance Group likewise contained the names of several contacts, client concerns, key dates, and square footage. *Id.* at 19-20. Canvass [sic] cards for Integral had the same types of information, plus the personal cell numbers and extensions of important contacts. *Id.* at 11-13. Cards for NENA provided even more granular detail about client preferences, such as that the tenant needed "ports for IT" and one contact was a "Republican." *Id.* at 13-19. | **Denied** to the extent Plaintiffs are interpreting this information or claiming any of it is on the Microsoft Access Database. |
| **23.** As another example, canvass [sic] cards for Tata Sons—another former TMG client—listed the tenant's square footage at their Arlington location ("1700 N. Moore") with notes that they wanted a "bigger" space and would consider "moving [to] DC"—in addition to personal contact information for decision makers and details regarding their lease. *See* Pls.' Ex. 4 (a true and correct copy of canvass [sic] cards for Tata Sons produced by Defendant Rayborn at Rayborn020470, Rayborn020571-72). | **Denied** to the extent Plaintiffs are interpreting this information or claiming any of it is on the Microsoft Access Database. |
| **24.** When he ran out of space on one card, Rayborn would use additional cards to record tenant information, sometimes resulting in multiple cards for one client. *See* Meyer Aff. at ¶ 9. | **Agreed** that Rayborn would occasionally create multiple cards for the same client. *See* Rayborn Dep. 178:4-11. |

| | |
|---|---|
| 25. TMG custom-ordered the Canvass [sic] Cards specifically for Rayborn's use; no other agent used Canvass [sic] Cards extensively to record client information, and there was never any dispute the cards belonged to The Meyer Group since TMG provided them to Rayborn for his work in generating leads for TMG. *See* Meyer Aff. at ¶¶ 13, 17. | **Agreed** that TMG ordered blank Canvas Cards for Rayborn but **Denied** that there was never any dispute that the cards belonged to TMG. *See e.g.,* Rayborn Depo. Tr. at 46:7-12, 47:9-12, 49:22-50:5, 52:17-53:2, 110: 3-6, 212:19-21, 213:8-11, 221:5-9, 224:10-13, and 227:2-7. |
| 26. Each card contained on the bottom-right hand corner a field specifically for recording lease expiration dates, on the bottom left-hand corner a field specifically for recording a tenant's square footage, and was imprinted with the Meyer Group's name and logo. *See, e.g.*, Pls.' Ex. 4. | **Agreed.** |
| 27. Rayborn organized the Canvass [sic] Cards by lease expiration date, which would tell him when to follow up with tenants about leasing a new space or renewing or extending their existing lease. *See* Meyer Aff. at ¶ 11; Defs.' Ex. 4-Rayborn Depo. Tr. 167:9-14 (Rayborn testifying that "the two main ways I would sort the cards" was by "when their leases were coming up or when they told me to call them back."). | **Denied** to the extent Rayborn testified they were organized in two ways. |
| **d. Rayborn's Signed the ICA Knowing It Stated The Canvass [sic] Cards Belonged to TMG** | Section heading to which no response is required. |

| | |
|---|---|
| **28.** In May 2018—after several clients complained of Rayborn's inappropriately aggressive tone and various other instances of unprofessional conduct—Meyer decided to terminate Rayborn from TMG. A few weeks later, however, Rayborn approached Meyer, asked for his job back, and promised to improve his demeanor with clients. *See* Meyer Aff. at ¶ 15. | **Agreed** that Rayborn was terminated from TMG in or around May 2018 but **Denied** as to the circumstances under which he was terminated and **Denied** as to Rayborn asking Meyer to reinstate his employment. *See* Rayborn Dep. 60:1-7; 302:15-19; 303:2-19. |
| **29.** Concerned that Rayborn was seeking reinstatement for the express purpose of accessing TMG's client information—the Canvass [sic] Cards had remained with TMG after Rayborn's departure—Meyer asked Rayborn, as a condition of his reinstatement, to sign an updated Independent Contractor Agreement. On May 23, 2018, Meyer emailed Rayborn a draft. *See* Meyer Aff. at ¶ 16. | **Denied.** When Meyer rehired Rayborn, he did not present Rayborn with an agreement to sign. Rayborn signed the Independent Contractor Agreement on May 29, 2018 after Rayborn returned to work at TMG. *See* Rayborn Dep. 303:20-304:1, 5-7. |
| **30.** Meyer explicitly informed Rayborn that the scope of the ICA's confidentiality provision included the Canvass [sic] Cards containing | **Agreed** that the Independent Contracting Agreement had a Confidentiality provision that |

| | |
|---|---|
| Rayborn's notes on clients and prospective clients. *See* Meyer Aff. at ¶ 17, 18. | included canvas cards but **Denied** that the Confidentiality provision included Rayborn's notes on clients. *See* Independent Contract Agreement. Furthermore, Meyer's after-the-fact position about the meaning of the Independent Contractor Agreement did not bind Rayborn retroactively or change the plain language of the agreement. |
| **31.** Upon receiving the draft ICA, Rayborn consulted two different attorneys—both of whom, Rayborn has testified, advised him "against signing [the] agreement"—and also sought the advice of a colleague at TMG. *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 110-11. | **Agreed.** Furthermore, that was because it had a poorly written non-compete that was unlawful and found to be so by this Court. |
| **32.** At his deposition, Rayborn confirmed that when he signed the ICA, he understood "that the named items [in the ICA] were confidential in nature"—including the Canvass [sic] Cards. *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 108:17-18. | **Agreed.** However, Rayborn and Meyer obviously disagree as to what the "named items" are or mean. |

| | |
|---|---|
| **33.** In a February 11, 2019 email, Rayborn told Michael Jacoby—Defendant Broad Street's CEO—that Meyer "added to the new agreement . . . that the canvass [sic] cards belonged to him" but that Rayborn signed the ICA nonetheless, because he "felt it was better" to "fight for the issues in court." Pls.' Ex. 5 at 2-3 (a true and correct copy of an email produced by Defendant Broad Street at BSR0073570 *et seq.*). | **Agreed.** However, that was what Meyer argued after the fact not what Rayborn believe when he signed it. |
| **34.** Unbeknownst to Meyer, by January 2019, Rayborn was actively job hunting. *See* Defs.' Ex. 4-Rayborn Depo. Tr. 153; Pls.' Ex. 6 (a true and correct copy of a text message produced by Defendant Rayborn at Rayborn020714; redactions were done by Defendant Rayborn). | **Agreed** that Rayborn was actively job hunting in January 2019 but **Denied** as to Meyer's lack of knowledge. |
| **e. Rayborn Misappropriated TMG's Client Information and Brought It to Broad Street.** | **Denied.** |
| **35.** In mid-January, Rayborn interviewed with Broad Street, and on January 21, Michael Jacoby—Broad Street's CEO—sent Rayborn an email attaching Broad Street's standard Independent Contractor Agreement. *See* Pls.' Ex. 7 (a true and correct copy of an email produced by Defendant Broad Street at BSR0073999 *et seq.*). | **Agreed.** |

| | |
|---|---|
| **36.** Broad Street's ICA also contained a confidentiality provision prohibiting the contractor from divulging or using the "names of clients and customers or prospective customers and clients, public relations matters, or any other aspect of Broad Street's business." *See* Pls.' Ex. 8 (a true and correct copy of a document attached to the above email produced by Defendant Broad Street at BSR0074001 *et seq*.). | **Agreed.** |
| **37.** Rayborn added the following clause to the draft Broad Street ICA: Broad Street and Contractor expressly agree that contact cards developed or created by Contractor based on Contractor's independent work, prior to or during Contractor's employment by Broad Street covered by this Agreement, will remain the sole and exclusive property of Contractor both during the term of this Agreement and after termination of this Agreement, and said contact cards shall be specifically excluded from the scope or definition of Broad Street's proprietary information, Confidential Information, records, files and/or documents. <br><br> *See* Pls.' Ex. 9 (a true and correct copy of an email and attachment produced by Defendant Broad Street at BSR0073575 et seq. and marked as Rayborn deposition exhibit 0017); Defs.' Ex. 4-Rayborn Depo. Tr. 208-09. | **Agreed.** |
| **38.** Broad Street accepted Rayborn's proposed revision and the agreement was signed on January 28, 2019. *See* Pls.' Ex. 10 ("BSR-Rayborn ICA") (a true and correct copy of a document produced by Defendant Broad Street at BSR_0000025 et seq. and marked as Rayborn deposition exhibit 0018); Defs.' Ex. 4-Rayborn Depo. Tr. 209-13. | **Agreed.** |

| | |
|---|---|
| **39.** Meyer came to learn that Rayborn was in talks with other brokerage firms. On January 24, Meyer—who was out of town at the time—called Rayborn to confront him about what he had overheard. *See* Meyer Aff. at ¶ 21. | **Denied.** |
| **40.** Rayborn admitted that he was considering options from other brokerage firms. Meyer informed Rayborn that he was terminated effective immediately, and instructed him to delete all TMG documents and leave all TMG documents and property—including the Canvass [sic] Cards—at TMG's office. Meyer also instructed his staff to disable Rayborn's TMG email access, which they did, and—to the extent possible—to prevent Rayborn from leaving with the Canvass [sic] Cards. *See* Meyer Aff. at ¶ 22; *see also* Defs.' Ex. 2-Meyer Depo. Tr. 109:1220 (Meyer testifies he told Rayborn "to leave everything that's not his personal belongings at the office, he needs to delete his e-mails" and he told others at the office that "Jim's not to take anything with him except obviously his personal belongings."); Pls.' Ex. 11 (a true and correct copy of an email produced by TMG at TMG_0026294 *et seq.*) (Meyer instructing staff to turn off Rayborn's emails). | **Agreed** as to the fact that Rayborn shared that he was looking for a new firm to work with but denied as to the rest. |
| **41.** Rayborn took the Canvass [sic] Cards and the Access Database from TMG's offices, texting a friend, "Bill terminated me"—but explaining that he had "[c]leared the office out" and had taken "everything [he] needed." Pls' Ex. 12 (a true and correct copy of a text message produced | **Agreed** as to the contents of the text message but **Denied** that Rayborn took the Access Database from TMG's office. *See* Rayborn Dep. 81:10-18. |

| | |
|---|---|
| by Defendant Rayborn at Rayborn020690, with redactions made by Defendant Rayborn); *see* Meyer Aff. at ¶ 23. | |
| **42.** Haze McCrary, Rayborn's colleague at Broad Street, testified that Rayborn brought three "bread-boxed-sized containers"—i.e., thousands of Canvass [sic] Cards—with him to Broad Street. *See* Defs.' Ex. 11-McCrary Depo. Tr. at 46:6-21. | **Agreed.** |
| **43.** The very day that Rayborn started at Broad Street, a representative of a longstanding TMG client—on behalf of whom TMG was in the process of negotiating a significant lease— emailed Meyer to tell him that she had "just received a call from Jim saying he's still [the broker] on the case" and noting her confusion; Meyer explained that Rayborn was no longer working at TMG. *See* Pls.' Ex. 13 (a true and correct copy of an email produced by TMG at TMG_0026369 *et seq.*). | **Denied** that Rayborn called himself a broker but admitted as to the rest. |
| **44.** On several occasions, Rayborn explicitly instructed TMG's clients to terminate their agreements with TMG. *See* Pls.' Ex. 14 (a true and correct copy of an email produced by TMG at TMG_0008920 *et seq.*); Pls' Ex. 15 (a true and correct copy of an email produced by TMG at TMG_0022657 *et seq.*). | **Denied.** Rayborn did not instruct TMG clients to terminate their agreements with TMG. *See* Pls.' Ex. 15. |
| **45.** Rayborn also began telling TMG's clients that Rayborn had either "retired" or was about to retire. *See* Pls.' Ex. 16 (a true and correct copy of an email produced by Broad Street at BSR0006264 *et seq.*) (Rayborn stating to NENA that Meyer was "winding down to retire"); Pls.' Ex. 17 (a true and correct copy of an email produced by Broad Street at | **Denied.** Rayborn did not tell TMG clients that Rayborn was retired or about to retire. Rayborn stated "Bill Meyer is no longer in the business" in |

| | |
|---|---|
| BSR0028322) (Rayborn stating that Meyer is "no longer in the business"); Pls.' Ex. 18 (a true and correct copy of an email produced by Broad Street at BSR0009265 *et seq.*) (Rayborn heard Meyer had "retired"); Pls.' Ex. 19 (a true and correct copy of an email produced by Broad Street at BSR0052803) (Rayborn stating, "I am with a new firm and Bill is basically retired"). | the email produced by Broad Street. *See* Pls.' Ex. 17. **Agreed** that in an email to Roy Ayers that Rayborn said he heard Meyer retired. *See* Pls.' Ex. 16. **Agreed** that in an email to NHP Foundation that Rayborn said "I am with a new firm and Bill is basically retired". *See* Pls.' Ex. 18. |
| **46.** In at least one instance, Rayborn pretended that he still worked at TMG. *See* Pls.' Ex. 20 (a true and correct copy of an email produced by TMG at TMG_0001429 *et seq.*) (March 17, 2019 email from Catherine Bertram—a longtime TMG client—to William Meyer, stating that Rayborn "called [their] office" to set up a meeting and "said he was with the Meyer Group."). | **Denied** as to Bertram and TMG's characterization. The email speaks for itself. It says "was" not "am". Bertram and Meyer are friends and her commission complaint against Rayborn was dismissed. |
| **f. Broad Street's Knew Rayborn Misappropriated TMG's Trade Secrets** | **Denied.** |

| | |
|---|---|
| **47.** Michael Jacoby, Broad Street's CEO, knew from outset that Rayborn was bringing TMG's client information with him to Broad Street against TMG's express wishes. *See* Pls' Ex. 21-Jacoby Depo. Tr. at 21:22-22:17 (a true and correct copy of the deposition transcript of Michael Jacoby) (testifying that Rayborn had told him he had "contact cards" containing "general information about prospects" that would be bringing with him from TMG, and that Rayborn had a "difference of opinion" with Meyer about the ownership of the cards). | **Denied** as to TMG's characterization. Jacoby's testimony and email regarding the same speak for themselves. *See also* Affidavit of Michael Jacoby concurrently submitted herewith. |
| **48.** On February 9, 2019, Meyer emailed Jacoby, asking for a meeting to discuss Rayborn's contract with TMG. Jacoby forwarded Meyer's email to Rayborn and McCrary, stating, "[l]ittle offense guys. Jim, please send me your old contract." Pls' Ex. 22 (a true and correct copy of an email produced by Broad Street at BSR0023679). | **Agreed.** |
| **49.** Rayborn sent Jacoby the ICA, and Jacoby informed Rayborn that, in his opinion, TMG "did not [have] a right" to the Canvass [sic] Cards—though Jacoby admitted at his deposition that he had not consulted with an attorney before opining on the ICA. Pls.' Ex. 5; *see also* Jacoby Depo. Tr. at 17:21-18:2. | **Agreed.** |
| **50.** On April 26, 2019, TMG, through its then-counsel, sent a cease-and-desist letter to both Broad Street and Rayborn, demanding that Broad Street cease using TMG's Confidential Information and soliciting TMG's clients and potential clients. *See* Pls.' Ex. 23 (a true and correct copy of a document produced by Rayborn at Rayborn000078). | **Agreed** as to the description of what TMG demanded but **Denied** that Broad Street was using TMG's confidential information and/or that Broad |

| | |
|---|---|
| | Street was soliciting TMG's clients or potential clients. |
| **51.**   Broad Street refused to comply with TMG's request, claiming that it was unable to refrain from using TMG's Confidential Information unless TMG provided an entire list of all TMG's clients and potential clients. *See* Pls.' Ex. 24 (a true and correct copy of an email produced by TMG at TMG_0026619 *et seq.*). | **Denied.**  Broad Street explained that it could not consider TMG's bald assertions without seeing the list they claimed was taken. |
| **g. The Litigation** | Section heading to which no response is required. |
| **52.**   Rayborn sued TMG in D.C. Superior Court for purportedly unpaid commissions; the D.C. Superior Court, however, has since granted summary judgment in TMG's favor on all claims. *See* Jan. 22, 2021 Order Granting Summary Judgment, *Rayborn v. The Meyer Group*, Civil Action No. 2019 CA 006492 B. (D.C. Sup.). | Admitted and further state that the case is on appeal. |
| **53.**   During his July 13, 2020 deposition in the D.C. Superior Court case, Rayborn testified, in response to a question from attorney Howard Hoffman asking whether Rayborn took index cards with him when he left TMG, "I left them on my desk" and that "Sarah Religa [a TMG assistant] took them.". *See* Pls.' Ex. 25-Rayborn D.C. Sup. Depo. Tr. at 358-359 (a true and correct copy of the deposition transcript of Rayborn in D.C. Superior Court). | **Agreed.** |

| | |
|---|---|
| **54.**    As of the close of discovery, Defendants have received well over $800,000 in commissions to date in connection with their representation of tenants that were TMG clients or prospective clients. *See* Pls.' Ex. 26-BSR Commission Schedule (a true and correct copy of a pdf printout of an excel spreadsheet produced by Broad Street at BSR0074019). | **Denied.**  Defendants received $800,000 in commissions in connection with the representation of certain former TMG clients and other entities. |
| **II. Rayborn Breached His TMG Contract** | **Denied.** |
| **55.** Rayborn's ICA with TMG says, among other things, "upon termination of Contractor's services," the Contract must "turn over to TMG" all of TMG's property, including the "Confidential Information." *See* Defs.' Ex. 12-ICA at ¶ 7(c). | **Agreed.** |
| **56.** Rayborn uses the Canvass [sic] Cards in his work at Broad Street: Broad Street's CEO testified that Rayborn "uses index cards to record names, phone numbers, and general information about prospects," Pls.' Ex. 21-Jacoby Depo. Tr. at 14:16-19; his supervisor at Broad Street testified Rayborn was "wrapped around an axle about these cards" because "they're super important to him," Defs.' Ex. 11-McCrary Depo. Tr. at 60:20-61:1, and Broad Street's office manager testified that the Canvass [sic] Cards were "his baby." Pls.' Ex. 27-Campbell Depo. Tr. at Tr. 61:2 (a true and correct copy of the deposition transcript of Telita Campbell). | **Agreed.** *See also* Affidavit of James Rayborn concurrently submitted herewith. |
| **57.** Rayborn has testified that he uses the Canvass [sic] Cards to note "information" he learns from cold calls with tenants. *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 183:6-10. | **Agreed.** *See also* the Affidavit of James Rayborn. attached hereto as ***Exhibit 96***. |

| | |
|---|---|
| **58.** On August 3, 2015, Rayborn sent an email saying "I am almost out of canvass [sic] cards . . . . there are none in the back!!!!!! I obviously use them to cold call. . . 1. If I don't have them 2. I can't cold call. 3. The company Bill and I don't make money 4. We are fucked!!!!!!!!!!!!!!!!!!!!!!!!" Pls.' Ex. 28 (a true and correct copy of an email produced by TMG at TMG_0035398 and marked as Rayborn deposition exhibit 0012); *see* Defs.' Ex. 4-Rayborn Depo. Tr. at 182-83 (testifying regarding deposition exhibit 0012). | **Agreed.** *See also* the Affidavit of James Rayborn. |
| **59.** On May 12, 2016, Rayborn sent an email saying "IF I RUN OUT OF CANCASS [SIC] CARDS THE COMPANY SHUTS DOWN AND NO ONE MAKES ANY MONEY!!!!!!!" Pls.' Ex. 29 (a true and correct copy of an email produced by TMG at TMG_0035405 and marked as Rayborn deposition exhibit 0013); *see* Defs.' Ex. 4-Rayborn Depo. Tr. at 184-85 (testifying regarding deposition exhibit 0013). | **Agreed** that Rayborn sent an email on May 12, 2016.  The email speaks for itself. *See also* the Affidavit of James Rayborn. |
| **60.** On July 14, 2015, Rayborn sent an email saying he "needs more canvass [sic] cards (keeps the lights on)". Pls.' Ex. 30 (a true and correct copy of an email produced by TMG at TMG_0035409). | **Agreed** that Rayborn sent an email on July 14, 2015.  The email speaks for itself. *See also* the Affidavit of James Rayborn. |

| | |
|---|---|
| **61.**  On May 13, 2016, Rayborn sent an email saying if he doesn't have canvass [sic] cards, "I can't and won't work next week [. . .] I have nothing to write on and need them to canvas [. . .] the company is shut down". *See* Pls.' Ex. 31 (a true and correct copy of an email produced by TMG at TMG_0035400). | **Agreed** that Rayborn sent an email on May 13, 2016.  The email speaks for itself. *See also* the Affidavit of James Rayborn. |
| **62.**  On May 16, 2016, Rayborn sent an email telling a TMG assistant "canvass [sic] cards pay your salary and keep the company running." Pls.' Ex. 32 (a true and correct copy of an email produced by TMG at TMG_0035406). | **Agreed** that Rayborn sent an email on May 16, 2016.  The email speaks for itself. *See also* the Affidavit of James Rayborn. |
| **63.**  On Dec. 13, 2016, Rayborn sent an email describing canvass [sic] cards as "what keeps the doors open." Pls.' Ex. 33 (a true and correct copy of an email produced by TMG at TMG_0035408). | **Agreed** that Rayborn sent an email on Dec. 13, 2016.  The email speaks for itself. *See also* the Affidavit of James Rayborn. |
| **a. Rayborn Used TMG's Client Information to Win Business for Broad Street** | **Denied**. |

| | |
|---|---|
| **64.** Rayborn produced TMG Canvass [sic] Cards for, among others, Advanced Sciences & Technology, *see* Pls.' Ex. 34 (a true and correct copy of a canvass [sic] card produced by Rayborn with no discernible Bates number); Barnes Vanze Architects, *see* Pls.' Ex. 3 at Rog. 8; Brazilian Mission to the OAS, *see* Pls.' Ex. 35 (a true and correct copy of a canvass [sic] card produced by Rayborn at Rayborn020972); Business Council for International Understanding, *see* Pls.' Ex. 36 (a true and correct copy of a canvass [sic] card produced by Rayborn at Rayborn020361); Capital Performance Group, *see* Pls.' Ex. 3 at Rog. 8; Integral, *see* Pls.' Ex. 3 at Rog. 8; National Emergency Number Association, *see* Pls.' Ex. 3 at Rog. 8; Quality Education for Minorities Network, *see* Pls.' Ex. 37 (a true and correct copy of a canvass [sic] card produced by Rayborn at Rayborn020508); Sonecon, *see* Pls.' Ex. 38 (a true and copy of canvass [sic] cards produced by Rayborn at Rayborn021063-64); Tata Sons, *see* Pls.' Ex. 4; and Voorthuis Opticians, *see* Pls' Ex. 39 (a true and correct copy of canvass [sic] cards produced by Rayborn at Rayborn0210542). | **Denied.** Rayborn produced canvas cards that he generated as his work product over many years. |
| **65.** TMG has represented Advanced Sciences & Technology, American Academy of HIV Medicine, Arms Control Association, Barnes Vanze Architects, Brazilian Mission to the OAS, Capital Performance Group, Georgia Tech Research Institute, Integral, National Emergency Number Association, Tata Sons, Video Action, *see* DSOF ¶ 111; Brazilian Mission, *see* DSOF ¶ 156; Sonecon, *see* DSOF ¶ 156; and Voorthuis Opticians, *see* DSOF ¶ 158. | **Agreed** to the extent that signing a representation agreement means TMG "represented: certain entities who signed such agreements. The agreements speak for |

| | themselves and do not reflect actual work performed. |
|---|---|
| **66.** As of the close of discovery, Broad Street has gained $814,326.31 from its representation of Advanced Sciences & Technology, American Academy of HIV Medicine, Arms Control Association, Barnes Vanze Architects, Brazilian Mission to the OAS, Business Council for International Understanding, Capital Performance Group, Georgia Tech Research Institute, Integral, National Emergency Number Association, National Minority Quality Forum, Quality Education for Minorities Network, Sonecon, Tata Sons, Video Action, and Voorthuis Opticians. *See* Pls.' Ex. 26-BSR Commission Schedule. | **Agreed** however, such amount is a gross commission number and does not reflect overhead for the team and facility earning the same, including salaries, benefits and physical office costs. |
| **67.** Broad Street had not represented TMG's former clients or prospective clients until Rayborn referred them to Broad Street. *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 290:6-10 (Advanced Sciences & Technology); 289:13-17 (Arms Control Association); 288:16-21 (Business Council for International Understanding); 292:9-11 (National Minority Quality Forum); 282:16-18 (Quality Education for Minorities Network); 289:1-5 (Video Action); McCrary Depo. Tr. at 143:14-144:2 (Brazilian Mission); Pls.' Ex. 40-Schiesl Depo. Tr. (a true and correct copy of the deposition transcript of Ben Schiesl) at 27:21-28:16 (American Academy of HIV Medicine); 30-32 (Georgia Tech Research Institute); DSOF ¶ 127 (NENA); DSOF ¶ 132 (Integral); DSOF ¶ 117 (Video Action); DSOF ¶ | **Denied** to the extent "referred them" is unclear. Furthermore, National Minority Quality Forum and Quality Education for Minorities Network were not TMG former clients; Mr. Rayborn only scheduled pitch meetings for them while at TMG. *See* Rayborn017891-893. |

| | |
|---|---|
| 136 (Barnes Vanze); DSOF ¶ 145 (Tata Sons); DSOF ¶ 154 (Capital Performance Group). | |
| **68.** While at TMG, Rayborn received commissions for American Academy of HIV Medicine, Arms Control Association, Barnes Vanze Architects, Brazilian Mission to the OAS, Capital Performance Group, Georgia Tech Research Institute, Integral, National Emergency Number Association, Sonecon, Tata Sons, Video Action, and Voorthuis Opticians. *See* Pls.' Ex. 41 & 42 (Rayborn's TMG commission schedule) (true and correct copies of documents produced by TMG at TMG_0035445 *et seq.* and TMG_0035425 *et seq.*). | **Agreed.** |
| **69.** Rayborn testified that he keeps Canvass [sic] Cards for deals that are complete. *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 172:3-6. | **Agreed** to the extent that Rayborn keeps his Canvas Cards that he has created over many years while taking notes during client calls. |
| **70.** Ben Schiesl, a salesperson at Broad Street, and Chloe Batsch, Rayborn's former administrative assistant at Broad Street, testified that Rayborn sometimes gave them Canvass [sic] Cards with client information, which Schiesl threw away and Batsch shredded without giving them to counsel for production. *See* Pls.' Ex. 40-Schiesl Depo. Tr. at 26:4-12; Defs.' Ex. 14-Batsch Depo. Tr. at 64:15-17 (testifying she shredded 300-500 cards). | **Denied** as to TMG's characterization. Both testified that Jim gave them "dead end" cards and/or duplicate cards that they shredded once they researched the card to gain current information on the |

| | particular prospective client and without reference as to time. |
|---|---|
| **71.** In a February 11, 2019 email, Rayborn told Jacoby that he only signed the ICA with TMG "because I needed a job and my cards which belonged me." Pls.' Ex. 5 at 2. | **Denied.** The email speaks for itself and clearly says "if I didn't he would seal my office and take all of my work product." |
| **72.** In his deposition, Rayborn confirmed he was referring to canvass [sic] cards he had already created while at The Meyer Group—not some hypothetical future canvass [sic] cards. *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 223:6-9 ("And so you're telling Mr. Jacoby that the canvass [sic] cards you created while you were at The Meyer Group are very important to you? A. I am telling that to Mr. Jacoby, yes."). | **Agreed** as to the statement actually made and **Denied** as to the characterization of it**.** |
| **III. TMG's Client Information Constitutes a Trade Secret** | **Denied.** |
| **73.** Mr. Gill explained in his expert report, "[a] brokerage firm with access to a list of The Meyer Group's clients and their corresponding lease and relevant business information would be able to easily outcompete other brokers, because it would be able to very efficiently target prospective tenants with information directly relevant to the tenants' space needs." Defs.' Ex. 86-Gill Report at ¶ 34. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |

| | |
|---|---|
| **74.**      When asked at his deposition whether the Canvass [sic] Cards are "valuable to you," Rayborn responded "Yes, they are." Defs.' Ex. 4- Rayborn Depo. Tr. at 213:12-13. | **Agreed.** Rayborn said that the cards are valuable to him because they are his work product. *See e.g.* Rayborn Depo. Tr. at 213:5-19. *See also* the Affidavit of James Rayborn. |
| **75.**      Though many tenants attempted to renegotiate leases early in the pandemic, landlords generally refused to let them do so. As a result, lease termination dates are just as valuable now as they ever have been. *See* Meyer Aff. ¶ 24. | **Denied.** *See* Kirks Report at 3. *See also* Rayborn Affidavit. |
| **76.**      During Rayborn's deposition, he repeatedly failed to remember lease expiration dates and details about clients—including client names— that he had recently done work for at Broad Street. *See, e.g.*, Defs.' Ex. 4- Rayborn Depo. Tr. at 274:20-275:7 (testifying he could not remember when he represented Georgia Tech Research Institute at Broad Street and could not remember their lease date); 290:12-17 (testifying he could not remember when the lease expires for Advanced Sciences & Technology because he did not "have the lease in front of me."); 150:9-151:3 (testifying that he could not remember the full name of a tenant he referred to as "Hispanic," saying "There's a lot of Hispanic organizations in Washington, D.C. I can't remember every single Hispanic organization that exists. . . Hispanic medicals. Hispanic whatever."). | **Agreed** that at the time of Rayborn's deposition, after an entire day in a deposition, he did not recall the exact lease date for Georgia Tech Research Institute or the lease expiration of Advanced Sciences & Technology. **Denied** as to the rest. |

| a. TMG's Client Information is Not Publicly Available | Denied. |
|---|---|
| **77.**  Deponents confirmed Rayborn recorded client information from cold calls on the Canvas Cards. *See* Defs.' Ex. 4-Rayborn Depo. Tr. 183:4-10 (Rayborn deposition, Q: "How would you use your canvass [sic] cards to cold-call? A: I would pick up the phone . . . and gain information from the phonecall and put it on my canvass [sic] card."); Pls.' Ex. 27-Campbell Depo. Tr. 56:16-57:4 (describing how Rayborn "jots down important information from those calls" on the cards, such as "contact name, their lease term date, square footage."); McCrary Depo. Tr. 45:16-18 (describing the cards as "a product of [Rayborn's] calling."). | **Denied**  as to the characterization.  The information was not described by the deponents in the same manner as described by TMG. |
| **78.**  Mr. Gill explained that it "takes new agents several years to develop the necessary relationships" to compile significant client information through cold calling, in part because "[t]he person at a company in possession of the company's lease information, as well as the authority to dispense it" typically has "limited time and availability." Defs.' Ex. 86-Gill Report at ¶¶ 11, 22. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| **79.**  Rayborn admitted at his deposition that it might take him a year working 60-hour weeks to come close to recreating the information on the cards he took. *See* Defs.' Ex. 4-Rayborn Depo. Tr. at 192:6-8. | **Denied.** Rayborn stated that if he worked 60 hours a week the recreation process would take less than a year because he had over 3,000 cards of notes. *See* Rayborn Depo. 192:6-8. |

| **b. CoStar Is Incomplete and Inaccurate** | **Denied.** |
|---|---|
| **80.** Though CoStar often includes a tenant's name and corporate contact information, when it comes to tenant information such as lease terminations, square footage, key points of contact, rent, and other factors that influence a tenant's space needs, "CoStar is incomplete, frequently inaccurate, and, therefore, has limited usefulness in assisting commercial real estate brokers with identifying prospective tenants." Defs.' Ex. 86-Gill Report at ¶ 18. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| **81.** William Schwartz, a TMG agent, testified CoStar "isn't perfect. It isn't completed. It's not always reliable." Defs.' Ex. 13-Schwartz Depo. Tr. at 53:19-20. | **Agreed** as to the testimony quoted is accurately quoted not agreed to as to the substantive opinion given. |
| **82.** Unlike property sale records, commercial leases are not publicly available. Thus, CoStar could only have information about a tenant's lease if it shared by the tenant, the tenant's broker, or the landlord. *See* Defs.' Ex. 86-Gill Report at ¶ 19, 22. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| 81. Mr. Gill explained in his report that brokers "have a strong disincentive" from sharing tenant information with CoStar because they do not want their competitors to have it, and landlords do generally share tenant information with CoStar because "it would compromise their negotiating ability with current and future tenants." Similarly, tenants are also "uncomfortable sharing their lease information with CoStar | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |

| | |
|---|---|
| representatives" because they can be commercially sensitive. *See* Defs.' Ex. 86-Gill Report at ¶ 19, 22. | |
| 82. Unlike property sale records, commercial leases are not publicly available. Thus, CoStar could only have information about a tenant's lease if it shared by the tenant, the tenant's broker, or the landlord. *See* Defs.' Ex. 86-Gill Report at ¶ 19, 22. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| 83. Mr. Gill explained in his report that brokers "have a strong disincentive" from sharing tenant information with CoStar because they do not want their competitors to have it, and landlords do generally share tenant information with CoStar because "it would compromise their negotiating ability with current and future tenants." Similarly, tenants are also "uncomfortable sharing their lease information with CoStar representatives" because they can be commercially sensitive. *See* Defs.' Ex. 86-Gill Report at ¶ 19, 22. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| 84. Chloe Batsch, a former Broad Street employee, testified that some of Broad Street's clients specifically instruct Broad Street not to publish their lease information on CoStar. *See* Defs.' Ex. 14-Batsch Depo. Tr. 52:21-53:3. | **Agreed.** |
| 85. Rayborn admitted at his deposition that the extent of information on CoStar "depends on the tenant." Defs.' Ex. 4-Rayborn Depo. Tr. at 84:5-85:12. | **Agreed.** |

| | |
|---|---|
| 86. Mr. Gill concluded that "any brokerage firm which relies exclusively on CoStar for tenant information would quickly go out of business." Defs.' Ex. 86-Gill Report at ¶ 23. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| 87. Meyer "directed everybody in [TMG's] office . . . not to talk to CoStar." Defs.' Ex. 2-Meyer Depo. Tr. 178:18-179:1. | **Agreed**.  Meyer also testified that he did not use CoStar. |
| 88. Former TMG agent Jessica McGunnigle testified that TMG's agents "ignore[d]" calls from CoStar and were not aware of anyone at TMG ever providing tenant information to CoStar. Defs.' Ex. 3-McGunnigle Depo. Tr. 54:16-55:21; 56:10-19. | **Agreed** because Meyer did not use CoStar. |
| 89. Mr. Gill's firm does not share tenant information with CoStar. *See* Defs.' Ex. 86-Gill Report at ¶ 21. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| **c.  Defendants' CoStar Reports Are Incomplete, Inaccurate, and Were Updated During  this Litigation** | **Denied**. |
| 90. Mr. Gill reviewed all CoStar reports produced by Broad Street and concluded "[v]ery few of these reports contain lease terminations dates or other lease information." Defs.' Ex. 86-Gill Report at ¶ 27. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |

| | |
|---|---|
| 91. The Integral CoStar report Defendants cite does not have the lease expiration date, information on the key decisionmakers, or client preferences. *See* Defs.' Ex. 34. | **Agreed.** |
| 92. Integral's website lists twice as many employees as the CoStar report. *Compare* Defs.' Ex. 34 *with* Defs.' Ex. 35. | **Agreed.** |
| 93. The Barnes Vanze and Capital Performance Group reports do not provide lease expiration dates, and Capital Performance Group's report does not provide square footage or estimated rent. *See* Defs.' Exs. 36, 40. | **Agreed.** |
| 94. None of the CoStar reports cited by Defendants contain information about client preferences, personal contact information about key decisionmakers, granular details about lease terms, or other information reflected on the Canvass [sic] Cards for those clients. *Compare* Defs.' Exs.' 36, 38, 40 (CoStar reports) *with* Rayborn Response to Interrogatory No. 8 (typed out information from handwriting on Barnes Vanze, CPG, and NENA canvass [sic] cards). | **Denied.** The reports speak for themselves. Some of the information is contained in CoStar and other information is publicly available on the tenant websites. |
| 95. Many of the CoStar reports Defendants produced were "updated recently—during this very litigation—to include data points about recent lease agreements for which Broad Street served as the broker." Thus, any information on the reports "could not have been provided to CoStar by The Meyer Group," and the reports "do not reflect whether The Meyer Group (or another broker) shared information about these leases with CoStar prior to Broad Street's involvement." Defs.' Ex. 86-Gill Report ¶ 27. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |

34

| | |
|---|---|
| 96. The Barnes Vanze and Capital Performance Group reports were updated in June 2020—one and one-half years after those tenants retained Broad Street in February 2019, and a year after this litigation began. *Compare* DSOF ¶¶ 135, 154 *with* Defs.' Exs. 36, 40. | **Denied.** |
| 97. The NENA report was updated on July 10, 2019—three months after NENA signed with Broad Street and several weeks after this litigation began. *Compare* DSOF ¶¶127 *with* Defs.' Ex. 38. | **Denied.** |
| 98. Mr. Gill used his firm's CoStar subscription to review the transaction history on CoStar for the tenants at issue and concluded the "vast majority" of reports "contain no lease expiration dates for leases executed prior to Mr. Rayborn's departure from The Meyer Group in January 2019." Defs.' Ex. 86-Gill Report ¶ 32 & Pls.' Ex. 43-Ex. A to Gill Report (reports with transaction history) (a true and correct copy of an exhibit attached to the Gill Report). | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. |
| 99. William Schwartz testified the Haines Directory is [sic] "reverse directory where you can look up numbers in sequential orders that are associated with telephone numbers" and that it does not contain "any information about the real estate – the actual leases, or the space that is being occupied by the individuals at those phone numbers." Defs.' Ex. 13-Schwartz Depo. Tr. at 27:7-11; 28:1-9. | **Agreed** as to the quoted testimony being accurately quoted**. Denied** as to the rest. |
| **d. TMG Took Substantial Efforts to Keep its Client Information Confidential** | **Denied.** |

| | |
|---|---|
| 100.  Rayborn testified that Meyer was "hypersensitive" about protecting TMG's client information. Defs.' Ex. 4-Rayborn Depo. Tr. 246:9-16. | **Agreed.** *See also* the Affidavit of James Rayborn. **Denied** as to what "protecting TMG's client information" means. |
| 101. TMG required all personnel—from agents to administrative assistants to interns—to sign agreements protecting TMG's client information. *See* Pls.' Ex. 44-TMG's Response to Rayborn Interrogatory No. 5 (a true and correct copy of TMG's First Interrogatory Responses); *see, e.g.*, Defs.' Exs. 12 (Rayborn ICA), 23 (Flenner ICA), & 85 (McGunnigle ICA); *see also* Pls.' Ex. 45-Crosman ICA at ¶ 7 (a true and correct copy of a contract produced by TMG at TMG_0000065 *et seq.*); Pls.' Ex. 46-Schwartz ICA at ¶ 7 (a true and correct copy of a contract produced by TMG at TMG_0000071 *et seq.*); Pls.' Ex. 47-Conning Intern Agreement at ¶ 2 (a true and correct copy of a contract produced by TMG at TMG_0000022 *et seq.*); Pls.' Ex. 48-Freligh ICA at ¶ 7 (a true and correct copy of a contract produced by TMG at TMG_0000022 *et seq.*). | **Denied** as to what "protecting TMG's client information" means and as to the interpretation of various contract terms. |

| | |
|---|---|
| 102.  TMG's agreements with other agents had language comparable to Rayborn's, including language covering "information concerning TMG's clients and prospective clients, the identity of clients and prospective customers, identity of key purchasing personnel in the employ of customers and prospective clients . . . [and] other confidential or proprietary information belonging to TMG or relating to TMG's business or affairs". *See* Pls.' Ex. 45-Crosman ICA at ¶ 7; Pls.' Ex. 46-Schwartz ICA at ¶ 7. | **Denied** as to "comparable to Rayborn's." |
| 103.  Meyer specifically referenced "Canvass [sic] Cards" in its agreement with Rayborn because he was the only agent who primarily relied on Canvass [sic] Cards and Meyer wanted to ensure there would be no doubt that even Canvass [sic] Cards created by Rayborn belonged to The Meyer Group. *See* Meyer Aff. ¶ 17. | **Denied.**  If Meyer intended to include the Canvas Cards that Rayborn had already created historically, he should have expressly said so. Rayborn's ICA specifically addresses confidential information Rayborn "may acquire" not that he ***already*** acquired over the past 2 decades. |
| 104.  TMG stored physical copies of confidential information—including its canvass [sic] cards—at its offices, which had "electronic locks on the front door" and "cameras in the office." Defs.' Ex. 2-Meyer Depo. Tr. at 72:8-73:4; Pls.' Ex. 44-TMG's Response to Rayborn Interrogatory No. 5. | **Denied** as to the statement that the canvas cards are TMG's cards or contain confidential information. |

| | |
|---|---|
| 105.   Rayborn testified TMG kept files "locked up in locked file cabinets" and did not give Rayborn keys to those cabinets. Defs.' Ex. 4-Rayborn Depo. Tr. at 246:9-16; 247:1-6. | **Agreed.** |
| 106.   TMG's electronic files—including the Access Database—were password protected, and access to the Access Database was limited to only a small number of key personnel. *See* Pls.' Ex. 44-TMG's Response to Rayborn Interrogatory No. 5 | **Agreed.** |
| 107.   TMG also included confidentiality notices in its emails outside the firm. *See* Pls.' Ex. 44-TMG's Response to Rayborn Interrogatory No. 5; *see also, e.g.*, Defs.' Ex. 25 at 1 (in email transmitting Access Database to Cushman, prohibiting the "dissemination, distribution, or copying" of the "confidential information."). | **Agreed** that TMG has a standard confidentiality notice that is included in every email sent from the company irrespective of whether the email contains confidential information.  Defendants deny the effect or application of such a notice in this case**.** |
| **e. <u>TMG Took Reasonable Steps With Respect To Ed Flenner.</u>** | **Denied.** |
| 108.   At TMG, Ed Flenner—a former TMG agent—worked with an entirely different set of clients on a complete different aspect of the brokerage business than Meyer or Rayborn— sales, rather than leases. *See* Meyer Aff. ¶ 25. | **Denied.** |

| | |
|---|---|
| 109.   Flenner testified that he did not "take anything with [him] from The Meyer Group" except for "personal stuff," he would not "ever intentionally take Meyer Group leases with [him] to another job," and he considered TMG client documents to be covered by confidentiality agreements. Defs.' Ex. 30-Flenner Depo. Tr. at 38:17-21; 75:8-76:1. | **Agreed** that he said that, however he also later admitted to having access to all of his emails and their attachments on his personal computer that he used at TMG and continued to use up until his deposition. |
| 110.   TMG disabled Flenner's access to his TMG emails upon his departure. *See* Meyer Aff. ¶ 25. | **Denied**.  TMG may have disabled Flenner's access to TMG's email server upon his departure. However, TMG never removed Flenner's access to the emails on his personal laptop and he never deleted the emails from his personal computer; TMG had no mechanism in place to remove them remotely, and it is likely that the emails he sent and received while at TMG are still on his personal |

| | laptop. *See* Flenner Dep. at 54:1-11. |
|---|---|
| **f. TMG's Disclosure to Cushman Was In Confidence** | **Denied.** |
| 111.   Under the Co-Broker Agreement between TMG and Cushman, the parties agreed to "cooperate" in serving clients and "share any real estate commission paid to either party with respect to Clients on a national basis that TMG refers to" Cushman. Defs.' Ex. 28 at 1. | **Agreed** and further states that the document speaks for itself. |
| 112.   The Agreement also stated: "Each party agrees that there shall be no public statement, or other publicity, with respect to any matters concerning the Transactions, without Client's prior written approval." Defs.' Ex. 28 at § 11. | **Agreed** that the Co-Broker Agreement contains that statement but Denied as to its meaning or application in this case.  Public statements regarding transactions typically mean statements made to the media, in publicity releases and/or on websites for marketing purposes |

| | |
|---|---|
| 113.  Meyer and Goodwin testified Cushman agreed to keep information shared by TMG confidential. *See* Defs.' Ex. 2-Meyer Depo. Tr. 187:7-8 (Meyer testified that Goodwin "told me he would keep it confidential."); Defs.' Ex. 27-Goodwin Depo. Tr. 26:1-4 (Goodwin testified "we have a general business agreement between the two that . . . we wouldn't want to share any of the information with anyone else."). | **Agreed** to the quotation of the testimony; however the Co-Broker Agreement between TMG and Cushman does not have a confidentiality provision. |
| 114.   Meyer and Goodwin testified it would be against Cushman's interest to disclose information shared by TMG. *See* Defs.' Ex. 2-Meyer Depo. Tr. 187:8-14 (Meyer testifying "there's no reason Ned wouldn't keep it confidential because if he didn't, he'd be hurting himself"); Defs.' Ex. 27-Goodwin Depo. Tr. 31:18-19 (Goodwin testifying "anytime you're working on a transaction you don't want people knowing about it . . . It's the nature of our business."). | **Agreed** to the quotation of the testimony**.** |
| 115.  Goodwin testified that only the "people on [his] team" had access to information shared by TMG, information, and if someone at Cushman besides his team "approached one of The Meyer Group clients and tried to do a deal with them," "They would be subject to customary action by management up to termination." Defs.' Ex. 27-Goodwin Depo. Tr. 45:14-15; 45:18-46:2; *see also* Goodwin Depo. Tr. at 32:12-19 (confirming server is password protected and relevant folders are limited to his team). | **Agreed** and further stating that Goodwin also testified that the entire TMG list emailed on March 21, 2019 was emailed without a confidentiality agreement or reference to the broker agreement.  Goodwin also confirmed that the entire list was inputted into Cushman's |

| | firm-wide client relationship management tool platform. |
|---|---|
| **g. TMG's Reference Lists Do Not Have Detailed Client Information.** | **Denied.** |
| 116.   TMG's reference lists contain names and phone numbers of some past clients but do not contain information such as lease terms, client preferences, or personal contact information that are found on Canvass [sic] Cards. *Compare*, *e.g.*, Pls.' Ex. 3-Rayborn's Responses to Plaintiffs' Interrogatories at Rog. No. 8 (canvass [sic] cards) *with* Defs.' Ex. 20 (example of reference list). | **Denied**, most if not all of the canvas cards did NOT contain that information. |
| **IV. Defendants Interfered With TMG's Client Relationships** | **Denied.** |
| 117.     The large majority of TMG's clients retain it again for future business. *See* Meyer Aff. ¶ 4. | **Denied.** |
| 118.     In response to Broad Street's Interrogatory asking TMG to itemize its damages, TMG stated that it was seeking "commissions received by Broad Street and Rayborn in connection with leasing transactions identified on Broad Street's documents BSR_0000038 and BSR0073909"—commission reports for Rayborn produced by Broad Street—as well as "commissions received from transactions with Quality Education for Minorities Network." Pls.' Ex. 49 at Rog. 4 (a true and correct copy of TMG's Amended Interrogatory Responses to Defendant Broad Street); *see also* Pls.' Ex. 26-BSR Commission Schedule. | **Denied** to the extent that it is unclear what the material fact is that is being asserted here. |

| | |
|---|---|
| 119.     Mr. Gill's expert report lists commissions received by Broad Street and opines that had TMG "been able to represent these tenants in connection with the above-referenced lease transactions," it "The Meyer Group would have been paid at the same fixed commission rate that was paid to Broad Street, because that is the rate paid to all brokers by landlords in the D.C. metropolitan area." Defs.' Ex. 86-Gill Report ¶¶ 37-40. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. Furthermore, the commissions schedule provided was a gross commission schedule and does not contain any expenses, taxes or other setoffs – as they were not sought.  Moreover, even assuming what is said here is true, according to the Co-Broker Agreement with Cushman, TMG would only receive 50% of any such commission, and no claim has been filed on behalf of Cushman. |
| 120.     The Access Database contains client information for TMG clients including, among others, American Academy of HIV Medicine, Barnes Vanze, Brazilian Mission, Georgia Tech Research Institute, NENA, Tata Sons, Video Action, and Voorthius Opticians. *See* Defs.' Ex. 25. | **Denied** to the extent that they were admittedly former or past TMG clients and some clients have no or limited |

| | |
|---|---|
| | information inputted into the database. |
| **V. Rayborn Knew Meyer Had Not Retired** | **Denied.** |
| 121.   Rayborn knew Meyer had not retired, though Rayborn told others he had. *See* Rayborn Depo. Tr. 67:1-4 ("Q: So as of your conversation with Mr. Flenner in 2019, you believed that Mr. Meyer was still trying to go after business? A: I do that I do believe that."); Pls.' Ex. 53 (a true and correct copy of an email produced by Broad Street at BSR0029960) (Rayborn email to his Broad Street team: "We got another deal today! I did the NHP Foundation's last ¾ thus of the floor deal . . . about 9000 ft with TMG over 5 years ago. Mike and Haze— have to deal with Meyer yet again or risk him going after the fee. He is still operating the Meyer group . . . he is not retired."); Pls.' Ex. 19 (Rayborn email to contact at NHP Foundation saying "Bill is basically retired"); Pls.' Ex. 54 (a true and correct copy of an email produced by Broad Street at BSR0006068) (Rayborn email in March 2019 saying "Bill is trying to interfere with this deal"). | **Denied**.  The statement and citations conflate numerous conversations and dates. |
| **VI. Mr. Gill Is Qualified To Testify As An Expert** | **Denied.** |

| | |
|---|---|
| 122.      Mr. Gill reviewed the canvass [sic] cards and database and found they contain valuable, nonpublic information. He opined that both the cards and database contain "information about tenants' leases, such as lease termination dates, square footage, and rents," and that the cards also "contain a wealth of information about tenant's businesses, key decision makers, and space needs." Defs.' Ex. 86-Gill Report at ¶¶ 24, 25. | **Denied.**  Expert opinions unsupported by admissible record evidence may not be considered as material fact. Further, no list of documents relied upon by Plaintiffs' "expert" was provided or produced, and he could not describe any specific documents he reviewed. |
| 123.   Mr. Gill is the founder and principal broker at The Genau Group Realty Advisors—a commercial tenant brokerage in D.C.—has well over a decade of industry experience, and has worked on hundreds of leasing negotiations on behalf of commercial tenants in the D.C. area totaling hundreds of millions of dollars. He holds a broker's license in D.C., Maryland, and Virginia. He graduated from Pennsylvania State University in 2000 with an advanced degree in Accounting and International Business, with a minor in international studies. He manages and trains new agents at the Genau Group. Before entering commercial real estate, he worked as a business consultant at PricewaterhouseCoopers and Deloitte. *See* Defs.' Ex. 86-Gill Report at ¶¶ 1, 2. | **Denied.** Expert opinions unsupported by admissible record evidence may not be considered as material fact. Furthermore, none of these statements are facts material to the dispute in this case. |

| | |
|---|---|
| 124. Defense counsel never showed Mr. Gill a Canvass [sic] Card at his deposition, nor asked him a question about any particular card, though Mr. Gill repeatedly offered to testify about any card they put in front of him. *See* Defs.' Ex. 87-Gill. Dep. Tr. at 222:9-15 ("I reviewed dozens and dozens of cards. If you want to show me specific cards, I can tell you if I remember reviewing them."). | **Agreed** in that Counsel did not show Plaintiffs' "expert" the Canvas Cards during his deposition as Defendants' counsel could not discern from the witnesses' testimony or his report any document he review or relied upon. It is not Defendants' counsel's job to guess which documents the "expert" witness was presented for review.  In fact, the witness would not even identify even one of the entities identified on the list of entities regarding which he opined as to Plaintiffs' damages. |
| 125.      Defendants asked Mr. Gill at his deposition if he reviewed a card for Advanced Sciences & Technology; Mr. Gill asked counsel to show him the card. *See* Defs.' Ex. 87-Gill Dep. Tr. 56:2-11. Defense counsel informed Mr. Gill that they could not show him such a card | **Agreed** in that the quote is accurate **Denied** as to the rest. |

| | |
|---|---|
| because "there have not been any produced," *id.* at 56:18-20; Defendants had in fact produced such a card. *See* PSOF ¶ 64; Pls.' Ex. 34 | |

Any other statements that are not expressly agreed to are otherwise denied.

Respectfully submitted,

SHULMAN, ROGERS, GANDAL,
 PORDY & ECKER, P.A.

By: _____/s/_____

    Lane Hornfeck, Bar No. 474800
    lhornfeck@shulmanrogers.com
    Glenn C. Etelson, Esq., 426246
    getelson@shulmanrogers.com
    12505 Park Potomac Avenue
    Sixth Floor
    Potomac, Maryland 20854
    (301) 230-5200
    (301) 230-2891 (facsimile)

    *Counsel for Defendant Broad Street, LLC*


By: _____/s/_____
    Denise M. Clark (420480)
    Clark Law Group, PLLC
    1100 Connecticut Ave., Suite 920
    Washington, D.C. 20036
    Tel: (202) 293-0015
    dmclark@benefitcounsel.com

    *Counsel for Defendant James Rayborn*