IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE MEYER GROUP, LTD., and WILLIAM J. MEYER, ) ) ) | |
| *Plaintiffs*, ) ) | Case No. 19-cv-1945-ABJ |
| v. ) ) | |
| JAMES RAYBORN and BROAD STREET REALTY, LLC, ) ) ) | |
| *Defendants*. ) ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Unlike the other, fact-intensive issues and claims before the Court, there are no genuine disputes of material fact about Defendant Rayborn's liability for breach of the ICA. Rayborn admits he signed the ICA in May 2018, which plainly provides that "***canvas[s] cards***" are the "***property of TMG***," must be **"*turn[ed] over*"** to TMG upon Rayborn's termination, and cannot be used "***to his own advantage***." DSOF ¶ 35; PSOF ¶ 55 (emphasis added). Rayborn also admits that—in defiance of the ICA—he absconded with hundreds of Canvass Cards containing TMG's client information, and that he used those cards to pursue clients at Broad Street. *See* DSOF ¶¶ 42, 44; PSOF ¶ 56 (Rayborn admitting that he "uses the Canvass Cards in his work at Broad Street"). Finally, Rayborn admits that he and Broad Street together received over $800,000 in commissions from former TMG clients and prospective clients that Rayborn referred to Broad Street. *See* PSOF ¶¶ 54, 65-67. Rather than point to any genuine dispute of material fact, Rayborn instead tries to avoid summary judgment by raising strained legal arguments and immaterial factual issues—all of which fail.

***First***, Rayborn distorts the plain language of the ICA by arguing that it only applies to Canvass Cards acquired after the ICA was signed in May 2018—an interpretation the Court rejected as "strained" in its Order on Motion to Dismiss.  *See* Sept. 28, 2020 Order at *17, ECF No. 17.  Even if the Court were to now credit this strained interpretation of the ICA, however, summary judgment is still warranted, because there is no genuine dispute of fact that Rayborn "acquired" the Canvass Cards after May 2018.

***Second***, Rayborn asks the Court to nullify the ICA's Confidentiality Provision because the Court previously held the Non-Solicitation Provision to be unenforceable.  This argument has no basis in law or logic.  The two provisions are entirely independent, and there is simply no reason to jettison the Confidentiality Provision.

***Third***, Rayborn confuses the elements of breach-of-contract and theft of trade secrets in arguing that TMG must prove the Canvass Cards were actually confidential and not derived from public sources, despite the ICA's plain language defining the Canvass Cards as TMG's "Confidential Information."

***Fourth***, Rayborn disputes that he took a copy of TMG's Access Database.  This factual dispute, however, is immaterial to Rayborn's liability for breach of contract: Rayborn admits he took the Canvass Cards, which is a breach of the ICA by itself.

***Fifth***, Rayborn tries to hand wave away the undisputed record evidence showing TMG suffered damages, despite his own admissions that (i) he always uses the Canvass Cards to bring in new clients and (ii) he received substantial commissions for bringing at least eleven TMG clients and prospective clients identified on the Canvass Cards to Broad Street.  These admissions are more than sufficient for the Court to grant summary judgment in favor of TMG on Rayborn's liability for breach of contract, while reserving the issue of the amount of damages for trial.

None of the above arguments raise a *genuine* dispute of material fact. *See Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 174 F. Supp. 3d 146, 152 (D.D.C. 2016), *aff'd*, 857 F.3d 939 (D.C. Cir. 2017) ("A dispute is 'genuine' only if a reasonable fact-finder could find for the non-moving party; a fact is 'material' only if it is capable of affecting the outcome of the litigation." (citations omitted)).  Indeed, there is no serious dispute about what really happened here: Rayborn signed an agreement which prohibited him from taking and using the Canvass Cards—yet he did so anyway.  The Court should therefore grant summary judgment in TMG's favor as to Rayborn's liability for breach of the ICA.

### 1. The ICA Unambiguously Covers All Canvass Cards Without Exception

Rayborn first attempts to avoid summary judgment by repeating a facially implausible interpretation of the ICA: that it only applies to Canvass Cards "acquired" after the parties signed the agreement in May 2018.  As the Court explained in its Order on the Motion to Dismiss, the clause Rayborn cites "is not a part of the definition of the term 'Confidential Information,' and there is nothing in the definition that limits that category of information based upon when the information was first gathered by TMG or one of its employees."  Sept. 28, 2020 Order at *17. The ICA unambiguously applies to all Canvass Cards without exception, and the Court need not look to extrinsic evidence to interpret this straightforward clause as a matter of law.  *See Am. First Inv. Corp. v. Goland*, 925 F.2d 1518, 1520 (D.C. Cir. 1991) ("If the contract is unambiguous, the court can interpret it as a matter of law.").

Even if the Court were to look to extrinsic evidence, however, Rayborn offers no effective rebuttal to the evidence introduced by TMG showing that Rayborn—by his own admission—did not possess *any* Canvass Cards at the time he signed the ICA (because he had been terminated), and that he signed the ICA only for the express purpose of *reacquiring* the Canvass Cards.  *See*

Pls.' Cross-Mot. Summ. J 19-20, ECF No. 60.  For example, on February 11, 2019, Rayborn emailed Michael Jacoby—Broad Street's CEO—explaining that he signed the ICA "because *I needed a job and my cards*" and that he believed that if he did not sign it, Meyer would "seal my office and take all of my work product."  PSOF ¶ 71 (emphasis added).  Rayborn thus decided "it was better" to sign the ICA and then "fight the issues in court."  PSOF ¶ 33.  Rayborn also testified at his deposition that he found the Confidentiality Provision "objectionable," and explained that he was advised by his counsel not to sign ICA because he believed the Canvass Cards "belonged to me."  Plaintiffs' Supplemental Statement of Facts ("PSSOF") ¶ 1;[1]  PSOF ¶ 31.  If Rayborn signed the ICA because he "needed [his] cards," then Rayborn understood from the outset that the ICA applied to the Canvass Cards that already existed.  *See* PSOF ¶ 72 (Rayborn confirming that his Feb. 11, 2019 email referred to Canvass Cards that already existed).  It also means that TMG—not Rayborn—necessarily had the Canvass Cards in its possession at the time the ICA was signed, and Rayborn therefore "acquired" any Canvass Cards after re-joining TMG in May 2018.

The only "evidence" Rayborn points to in support of his position is his own newly-created affidavit, which states—for the first time—that he read the ICA to apply only to "future" Canvass Cards.  Defs.' Ex. 96.  Rayborn is not a credible witness: as Defendants concede, Rayborn testified in a prior sworn deposition in D.C. Superior Court that he did not take *any* Canvass Cards from TMG, which is an unequivocally false statement.  *Compare* PSOF ¶ 53 *with* DSOF ¶ 42.  Moreover, his conclusory affidavit is nothing but a *post-hoc* invention to avoid liability, and flatly

---

[1] TMG attaches hereto a Supplemental Statement of Facts solely to refer the Court to Rayborn's deposition testimony (a full transcript of which was already provided by Defendants as Exhibit 4) which contradicts his new Affidavit.  TMG notes that Defendants cite to portions of the Affidavit not mentioned in the parties' statement of facts, *see* Defs.' Opp. and Reply 6, n.5, 10, in violation of the Court's Scheduling Order.  If Defendants had cited those portions of the Affidavit in a statement of facts, in accordance with the Scheduling Order, TMG would have responded to that statement of facts rather than filing a supplemental statement of facts.

contradicted by significant contemporaneous evidence that, at the time the ICA was signed, Rayborn understood perfectly well that it applied to **all** Canvass Cards.  *See* Pls.' Cross-Mot. Summ. J. 19-20.  Rayborn's assertion he read the ICA to cover "future" Canvass Cards he created also blatantly contradicts the argument in Defendants' opening brief that "the ICA does not cover Rayborn's work product."  Defs.' Mot. Summ. J. 11, ECF No. 56-2.  Rayborn's "self-serving and uncorroborated" affidavit cannot defeat summary judgment.  *Gen. Elec. Co. v. Jackson*, 595 F. Supp. 2d 8, 36 (D.D.C. 2009), *aff'd*, 610 F.3d 110 (D.C. Cir. 2010); *see Moran v. United States Capitol Police*, 82 F. Supp. 3d 117, 131 (D.D.C. 2015) ("self-serving testimony is particularly suspect" and cannot defeat summary judgment when it was "contradicted by the notes taken at the time" and "flatly contradicted by a sworn" statement "on another occasion").

Lastly—even if the Court were to credit Rayborn's far-fetched interpretation of the ICA—the Court should still grant summary judgment in TMG's favor because there is no genuine dispute of material fact that Rayborn misappropriated Canvass Cards which were created **after** May 2018.  It is undisputed that after Rayborn signed the ICA in May 2018, he had eight months to create new Canvass Cards before being terminated again in January 2019.  *See* DSOF ¶¶ 30, 41.  At his deposition, Rayborn testified he prioritized taking 255 "working cards" for "meetings that had not been set up" when he left TMG.  PSSOF ¶ 2; *see also* DSOF ¶ 42.  He explained that the Canvass Cards he left behind were for "meetings that we may have had in the past."  PSSOF ¶ 2.  Thus, Rayborn's "working cards"—for clients he was actively pursuing at the time of his departure from TMG—were **necessarily** created after Rayborn rejoined TMG in May 2018.  Even in his new self-serving affidavit, Rayborn never once asserts that the hundreds of Canvass Cards he took were only—or even primarily—those created before May 2018.

## 2. The Confidentiality and Non-Solicitation Provisions Are Entirely Independent

Rayborn also asks the Court to nullify the ICA's Confidentiality Provision (Section 6a) for no other reason than that the Court previously found the Non-Solicitation Provision (6b) to be an unenforceable restraint on trade.  But those two provisions are independent, and the fate of one does not rise or fall with the other.  To be sure, the only case Rayborn cites in support of this spurious argument specifically stated just that: a "lawful promise made for a lawful consideration is not invalid by reason only of an unlawful promise made at the same time and for the same consideration." *EDM & Assocs., Inc. v. GEM Cellular*, 597 A.2d 384, 390 (D.C. 1991) (quotation omitted).

Rayborn contends that because both provisions use the word "client," and that term is not defined, the Confidentiality Provision should not be enforced.  But "client" may be given its plain meaning; not every contractual term requires a definition.[2]  *See Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C. 2009) (contract language to be given "plain meaning").  "Canvas[s] cards" are also separately listed in the ICA as TMG's "Confidential Information," so the definition of Canvass Cards in no way depends on the meaning of the word "client."  There is simply no reason for the Court to decline to enforce the Confidentiality Provision on this basis.

## 3. TMG Need Not Prove the Elements of Trade Secrets to Prove Breach of Contract

Next, Rayborn attempts to impute the elements of a trade secrets claim to TMG's breach of contract claim.  Rayborn is mistaken: because the ICA's plain language defines the Canvass

---

[2] Defendants incorrectly suggest that the phrases "prospective clients" (used in the Confidentiality Provision) and "potential clients" (used in the Non-Solicitation Provision) are "interchangeable." Defs.' Opp. and Reply 3.  In fact, "prospective" has a much narrower meaning than "potential." *Compare* Prospective (2b: "likely to be or become"), Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/prospective *with* Potential (1a: "existing in possibility"), Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/potential, last visited February 23, 2022.

Cards as TMG's "Confidential Information," the Court need look no further than the face of the ICA to ascertain what types of documents are considered TMG's "Confidential Information." *See* DSOF ¶ 35.

Further, the ICA prohibits Rayborn from taking and using "***other*** confidential or proprietary information belonging to TMG"—in ***addition*** to the Canvass Cards. DSOF ¶ 35 (emphasis added). If the Canvass Cards were required to be kept "confidential" to be protected from disclosure under the ICA, such an interpretation would render the use of the phrase "Canvass Cards" wholly redundant, defying the obvious intent of the parties. *See Proriver, Inc. v. Red River Grill, LLC*, 83 F. Supp. 2d 42, 49 (D.D.C. 1999) ("principal objective" in interpreting contract is to "give effect to the intent of the parties to the agreement."). This unsubstantiated "argument of counsel" has no support in the record, and "does not substitute for evidence that establishes a genuine issue of material fact." *Internet Fin. Servs., LLC v. L. Firm of Larson-Jackson, P.C.*, 310 F. Supp. 2d 1, 4 (D.D.C. 2004) (cleaned up).

4. **The Access Database is Immaterial to Liability for Breach of Contract**

Rayborn raises but one genuine factual dispute: whether he took a copy of the Access Database. While there is certainly more than enough evidence for that issue to go before a jury, *see* Pls.' Cross-Mot. Summ. J. 22-23, it is unnecessary to resolve that question in order to determine Rayborn's liability for breach of contract, because—simply put—Rayborn admits that he took the Canvass Cards. *See* DSOF ¶ 42. Rayborn's theft of the Canvass Cards is sufficient to establish a breach of the ICA on its own.

5. **There is No Genuine Dispute That TMG Suffered Damages**

Lastly, Rayborn insists that TMG has "not demonstrated any harm resulting from the alleged breach of contract." Defs.' Opp. and Reply 8, ECF No. 66. That is demonstrably false:

there is no genuine dispute of fact that (i) Rayborn *always* uses Canvass Cards to win new business, and (ii) Rayborn and Broad Street together received over $800,000 in commissions from former TMG clients and prospective clients that Rayborn referred to Broad Street.  *See* PSOF ¶ 55 (admitting he "uses the Canvass Cards in his work at Broad Street"), ¶ 60 (admitting he needs the Canvass Cards to "keep the lights on"), ¶¶ 65-67 (admitting to over $800,000 in commissions from former TMG clients Rayborn referred to Broad Street).  Thus, TMG has amply shown that Rayborn's breach caused, at a minimum, some clients to leave TMG for Broad Street—which is sufficient to establish Rayborn's *liability* for breach of the ICA, with a determination of the *amount* of damages reserved for trial.

No reasonable jury could conclude from the uncontested record evidence that TMG suffered no damages at all from Rayborn's breach.  At least eleven TMG clients and prospective clients for which Rayborn took corresponding Canvass Cards were subsequently represented by Broad Street in the years following Rayborn's departure.  *See* PSOF ¶¶ 64, 65.  Defendants do not dispute that Rayborn and Broad Street received hundreds of thousands of dollars in commissions from representing these clients, and that Broad Street *had never represented any of them* before Rayborn referred them to Broad Street.  *See* PSOF ¶¶ 66, 67.  It is also undisputed that Rayborn uses Canvass Cards to pursue clients: as detailed extensively in TMG's Rayborn's opening brief, Rayborn has declared on many occasions that he can't "make money" without the Canvass Cards, and his coworkers at Broad Street all confirmed Rayborn's continued use of the Canvass Cards there.  *See* Pls.' Cross-Mot. Summ. J. 13; *see also* PSOF ¶¶ 56, 58-63.  Moreover, the "large majority" of TMG's clients are repeat clients, PSOF ¶ 117,[3] so there can be no serious doubt that

---

[3] Defendants "denied" this well-supported statement of fact (and others) without any evidence or explanation whatsoever, so it should be considered admitted.  *See Baylor v. Mitchell Rubenstein & Assocs., P.C.,* 174 F. Supp. 3d 146, 152 (D.D.C. 2016), *aff'd*, 857 F.3d 939 (D.C. Cir. 2017)

at the very least, some of those eleven clients would have retained TMG but for Rayborn's breach. The only reasonable inference that can be drawn from this cumulative evidence is that Rayborn's breach caused ***at least some*** clients to use Broad Street instead of TMG.

To create a genuine dispute of fact in order to defeat summary judgment, Rayborn must do more than simply "show that there is some metaphysical doubt" as to whether TMG suffered damages. *Plummer v. D.C.*, 596 F. Supp. 2d 70, 73 (D.D.C. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Rather, he "must present ***specific facts*** that would enable a reasonable juror to find in [his] favor" on damages. *Plummer,* 596 F. Supp. 2d at 73 (emphasis added) (citing *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999)). Rayborn has not done so. But in his Opposition, Rayborn fails to cite to a single, specific fact which could defeat TMG's motion for summary judgment as to liability. *See Trudel v. SunTrust Bank*, 288 F. Supp. 3d 239, 246 (D.D.C. 2018) ("To defeat summary judgment . . . an opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.").

In sum, TMG's damages "exist and are not entirely speculative"—which is all that is needed to grant summary judgment in TMG's favor as to liability on its breach-of-contract claim. *Parr v. Ebrahimian*, 70 F. Supp. 3d 123, 133 (D.D.C. 2014). The only "genuine dispute" here is the specific quantum of damages that TMG has suffered, which can be determined by the factfinder at trial.

---

("To defeat summary judgment, the non-moving party must designate specific facts showing that there is a genuine issue for trial." (citation and quotation omitted)).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant TMG's Cross Motion for Partial Summary Judgment as to liability on its breach of contract claim (Count I).

Dated: March 4, 2022

Respectfully submitted,

**AEGIS LAW GROUP LLP**

By: /s/ *Serine R. Consolino*
Serine R. Consolino (D.C. Bar No. 1033847)
Branden Lewiston (D.C. Bar No. 252550)
801 Pennsylvania Ave., N.W. – Ste. 740
Washington, D.C. 20004
Tel: (202) 737-3500
Fax: (202) 735-5071

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2022, the foregoing document was filed electronically with the Clerk of Court, to be served by operation of the Court's electronic notification system upon all counsel of record.

By:   /s/ *Serine R. Consolino*