# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE MEYER GROUP, LTD., and WILLIAM J. MEYER, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 19-1945 (ABJ) **\*\*\*UNDER SEAL\*\*\*** |
| JAMES M. RAYBORN, *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff The Meyer Group Ltd. ("TMG") is a commercial real estate brokerage firm founded in 1994 by plaintiff William Meyer. Defs.' Joint Statement of Material Facts Not in Genuine Dispute [Dkt. # 56-1] ("Defs.' SOF") ¶¶ 15, 16; Pls.' Resp. to Defs.' SOF [Dkt. # 60-2] ("Pls.' Resp. SOF") ¶¶ 15, 16. Defendant James M. Rayborn is a real estate salesperson and a former employee of TMG. Defs.' SOF ¶¶ 17–18; Pls.' Resp. SOF ¶¶ 17–18. At TMG, Rayborn's primary responsibilities were to "develop leads for potential business." Defs.' SOF ¶ 18; Pls.' Resp. SOF ¶ 18. In May of 2018, Rayborn's status changed from that of employee to independent contractor under the terms of a written agreement. Defs.' SOF ¶¶ 29–30; Pls.' Resp. SOF ¶¶ 29–30.

In January of 2019, TMG terminated Rayborn's contract, and he began working for Broad Street Realty, another real estate brokerage firm. Pls.' Statement of Material Facts [Dkt. # 60-1] ("Pls.' SOF") ¶ 35; Defs.' Resp. to Pls.' SOF [Dkt. # 66-1] ("Defs.' Resp. SOF") ¶ 35; Am. Compl. [Dkt. # 39] ¶ 11. Plaintiffs allege that Rayborn misappropriated TMG's confidential client

information, disclosed it to Broad Street Realty, and persuaded TMG's clients to terminate their contracts with TMG and move to Broad Street.  Am. Compl. ¶ 24.

On June 28, 2019, plaintiff TMG filed a complaint in this Court against Rayborn and Broad Street, alleging violations of the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* and the D.C. Uniform Trade Secrets Act, D.C. Code § 36–403 and § 36–404.  Compl. [Dkt. # 1] ¶¶ 34–49.  It also alleged that defendants tortiously interfered with TMG's contracts with its clients, and that Rayborn breached his employment agreement.  Compl. ¶¶ 24–33.  In response to defense motions, the Court allowed Count I, the breach of contract claim, to move forward to the extent that it was based on the provision prohibiting the misappropriation and disclosure of confidential information, *Meyer Grp., Ltd. v. Rayborn*, 2020 WL 5763631, at *8 (D.D.C. Sept. 28, 2020) [Dkt. # 17].  Count II, the tortious interference claim, was dismissed without prejudice, while Counts III and IV, the trade secret claims, survived.  *Id.* at *4, *7.  A lengthy and contentious period of discovery ensued.

On April 19, 2021, plaintiffs filed an amended complaint bringing the same four counts, adding Meyer as a plaintiff, and amending the tortious interference claim.  Am. Compl. ¶¶ 1, 40–49.  Plaintiffs also added a defamation claim against Rayborn for his alleged statements to clients that Meyer was retiring when he in fact had no plans to do so.  Am. Compl. ¶ 66–73.  On November 30, 2021, defendants filed a joint motion for summary judgment.  Defs'. Joint Mot. for Summ. J. [Dkt. # 56] ("Mot.").  On January 13, 2022, plaintiffs opposed the motion, and filed a cross-motion for partial summary judgment as to liability on Count I, the breach of contract claim against Rayborn.  Pls.' Opp. to Mot. and Cross-Mot. for Partial Summ. J. [Dkt. # 61] ("Opp.").  The matter is fully briefed.  *See* Defs.' Reply Mem. to Opp. and Opp. to Pls.' Cross-Mot. for Partial Summ. J.

[Dkt. # 65] ("Defs.' Reply"); Pls.' Reply in Supp. of Pls.' Cross-Mot. for Partial Summ. J. [Dkt. # 68].

The question before the Court now is whether, after engaging in extensive discovery, the plaintiffs have come forward with undisputed evidence to support the particular legal claims they have advanced. Because plaintiffs have met their burden of showing that there is no genuine issue of material fact on the question of whether Rayborn breached his Independent Contractor Agreement with TMG in connection with the eleven former TMG clients for which Rayborn produced canvas cards in discovery, plaintiffs are entitled to partial summary judgment as to liability on their breach of contract claim. And while defendants' motion for summary judgment with respect to the defamation claim will be granted, numerous issues of fact preclude summary judgment on the remaining counts. Therefore, for the reasons to be detailed below, the Court will grant plaintiffs' motion for partial summary judgment on Count I with respect to the eleven former TMG clients for which Rayborn produced canvas cards in discovery; deny defendants' motion for summary judgment on Counts I, II, III, and IV; and grant defendants' motion for summary judgment as to Count V.

## BACKGROUND

Rayborn joined TMG in 1994 as a real estate salesperson specializing in tenant representation. Defs.' SOF ¶ 17; Pls.' Resp. SOF ¶ 17; Am. Compl. ¶ 9. His responsibilities included cold-calling prospective clients. Pls.' SOF ¶ 20; Defs.' Resp. SOF ¶ 20.

Rayborn arrived at TMG with a set of index cards that he had created to track his leads at a prior firm. Defs.' SOF ¶ 19; Pls.' Resp. SOF ¶ 19. He continued to maintain and organize TMG's client information on a set of handwritten index cards, which he and Meyer referred to as "canvas cards." Pls.' SOF ¶ 20; Defs.' Resp. SOF ¶ 20.

Meyer was aware of the cards and what information they contained. Defs.' SOF ¶ 22; Pls.' Resp. SOF ¶ 22. Indeed, TMG custom-ordered blank index cards imprinted with TMG's name and logo specifically for Rayborn to use for this purpose. Pls.' SOF ¶¶ 25–26, Defs.' Resp. SOF ¶¶ 25–26. The cards also contained fields to record information such as names, titles, and phone numbers of company contacts, lease expiration dates, and a tenant's square footage. Pls.' SOF ¶ 26, citing Ex. 4 to Opp. [Dkt. # 59-4] (sealed); Defs.' Resp. SOF ¶ 26; *see, e.g.*, Ex. 36 to Opp. [Dkt. # 59-36] (sealed). Rayborn used the canvas cards to record information collected when cold calling "both potential and past TMG clients." Pls.' SOF ¶ 20; Defs.' Resp. SOF ¶ 20.

The cold calls were not Rayborn's only means of gathering information: Rayborn also obtained information about tenants from Costar (a subscription database), the Haines directory, and client business cards. Defs.' SOF ¶¶ 45, 87, 88; Pls.' Resp. SOF ¶¶ 45, 87, 88. But Rayborn's own emails to other TMG employees reflect the importance of the cards:

> On July 14, 2015, Rayborn sent an email to Jessica D'Abbraccio, a TMG assistant, stating that he "needs more canvass [sic] cards (keeps the lights on)"

> On August 3, 2015, Rayborn sent an email to D'Abbraccio with the subject line, "highest importance ever," stating, "I am almost out of canvas [sic] cards . . . I obviously use them to cold call. . . 1. If I don't have them 2. I can't cold call. 3. The company Bill and I don't make money 4. We are f***** !!!!!!!!!!!!!!!!!!!!!!!"

> On May 12, 2016, Rayborn sent an email to D'Abbraccio stating, "IF I RUN OUT OF CANCASS [SIC] CARDS THE COMPANY SHUTS DOWN AND NO ONE MAKES ANY MONEY!!!!!!!"

> On May 13, 2016, Rayborn sent an email to both to D'Abbraccio and Meyer, stating that without canvas cards, "I can't and won't work next week . . . I have nothing to write on and need them to canvas . . . the company is shut down."

> On May 16, 2016, Rayborn sent an email to D'Abbraccio stating that the canvas cards "pay your salary and keep the company running."

4

On December 13, 2016, Rayborn sent an email to D'Abbraccio describing the canvas cards as "what keeps the doors open."

*See* Pls.' SOF ¶¶ 58–63; Defs.' Resp. SOF ¶¶ 58–63; Ex. 28 to Opp. [Dkt. # 59-28] (sealed); Ex. 29 to Opp. [Dkt. # 59-29] (sealed); Ex. 30 to Opp. [Dkt. # 59-30] (sealed); Ex. 31 to Opp. [Dkt. # 59-31] (sealed); Ex. 32 to Opp. [Dkt. # 59-32] (sealed); Ex. 33 to Opp. [Dkt. # 59-33] (sealed).

In May 2018, Meyer terminated Rayborn's employment with TMG. Defs.' SOF ¶ 25; Pls.' Resp. SOF ¶ 25.[1] "About a week later," Meyer invited Rayborn back to return to TMG under a different arrangement. Defs.' SOF ¶ 27; Pls.' Resp. SOF ¶ 27. On May 29, 2018, Rayborn signed an Independent Contractor Agreement ("ICA") with TMG. Defs.' SOF ¶ 30; Pls.' Resp. SOF ¶ 30; *see also* ICA, Ex. B to Pl. TMG's Mem. in Opp. to Defs.' Mot. to Dismiss [Dkt. # 13-4] ("ICA").

Section 6 of the ICA was entitled, "Confidentiality." ICA ¶ 6. The first paragraph of that section expressly recognized that in the course of the contractual relationship, Rayborn could acquire:

> information which could include, in whole or in part, information concerning TMG's clients and prospective clients, the identity of clients and prospective customers, identity of key purchasing personnel in the employ of customers and prospective clients, TMG's manuals, client lists, **canvas cards**, formulae, processes, methods, ideas, improvement, inventions or other confidential or proprietary information belonging to TMG or relating to TMG's business or affairs (collectively referred to herein as the "<u>Confidential Information</u>").

ICA ¶ 6(a) (emphasis added). Paragraph 6(a) goes on to state:

---

1    Plaintiffs state that Meyer decided to terminate Rayborn "after several clients complained of Rayborn's inappropriately aggressive tone and various other instances of unprofessional conduct," Pls.' SOF ¶ 28, but defendants take issue with that explanation. Defs.' Resp. SOF ¶ 28. This dispute is not germane to the issues presented in the motions for summary judgment.

> Contractor agrees that (i) the Confidential Information is the property of TMG; (ii) the use, misappropriation or disclosure of the Confidential Information would constitute a breach of trust and could cause irreparable injury to TMG; and (iii) it is essential to the protection of TMG's goodwill and to the maintenance of TMG's competitive position that the Confidential Information be kept secret and Contractor agrees not to disclose the Confidential Information to others or use the Confidential Information to his own advantage or the advantage of others.

ICA ¶ 6(a); Defs.' SOF ¶ 35; Pls.' Resp. SOF ¶ 35.

In January 2019, Rayborn interviewed for a position with Broad Street Realty, another commercial real estate firm. Pls.' SOF ¶ 35, Defs.' Resp. SOF ¶ 35; Am. Compl. ¶ 11. When TMG became aware that Rayborn was looking for a new firm, it terminated Rayborn's contractor relationship on January 24, 2019. Pls.' SOF ¶ 40, Defs.' Resp. SOF ¶ 40; Defs.' SOF ¶ 41; Pls.' Resp. SOF ¶ 41. It is undisputed that Rayborn's ICA with TMG stated that upon "termination of Contractor's services," the contractor must "turn over to TMG" all of TMG's property, including any "Confidential Information." Pls.' SOF ¶ 30, Defs.' Resp. SOF ¶ 30; ICA ¶ 6(c) ("Upon the expiration of the term of this Agreement, or termination of Contractor's services for whatever reason . . . Contractor agrees to turn over to TMG all of TMG's properties and records of every kind . . . including but not limited to . . . Confidential Information . . . Contractor further agrees that on Termination of this Agreement, he will not retain copies of any or all of the above. . . .").

Upon his departure, Rayborn took some number of the canvas cards with him, although the exact number is disputed. Pls.' SOF ¶ 42 (citing testimony that Rayborn brought three "bread-boxed-sized containers"—i.e., thousands of Canvass [sic] Cards—with him to Broad Street"); Defs.' SOF ¶ 42 (stating that Rayborn "took with him a box of about 255 index cards that he had while working at TMG). The parties agree that Rayborn "intended to use his index cards" in the

future. Defs.' SOF ¶ 41; Pls.' Resp. SOF ¶ 41.[2]  Rayborn texted a friend, "Bill terminated me," and added that he had "[c]leared the office out" and had taken "everything [he] needed."  Pls.' SOF ¶ 41; Defs.' Resp. SOF ¶ 41.  The parties dispute whether this included Rayborn's taking a "secure Microsoft Access Database"[3] from TMG's offices.  Pls.' SOF ¶ 41 (stating that Rayborn took the canvas cards and the access database from TMG's offices and citing the text messages); Defs.' Resp. SOF ¶ 41 (agreeing as to the contents of the text message but denying that Rayborn took the access database from TMG's office).

Rayborn joined Broad Street in late January 2019.  Pls.' SOF ¶¶ 35–38; Defs.' Resp. SOF ¶¶ 35–38.  On January 28, 2019, Rayborn signed a modified version of Broad Street's ICA, which included the following clause that had been proposed by Rayborn:

> Broad Street and Contractor expressly agree that contact cards developed or created by Contractor based on Contractor's independent work, prior to or during Contractor's employment by Broad Street covered by this Agreement, will remain the sole and exclusive property of Contractor both during the term of this Agreement and after termination of this Agreement, and said contact cards shall be specifically excluded from the scope or definition of Broad Street's proprietary information, Confidential Information, records, files and/or documents.

Pls.' SOF ¶¶ 35–38; Defs.' Resp. SOF ¶¶ 35–38.

On February 9, 2019, Meyer emailed Broad Street's CEO, Michael Jacoby, requesting a meeting to discuss Rayborn's contract with TMG.  Pls.' SOF ¶ 48; Defs.' Resp. SOF ¶ 48.  On

---

2    Defendants state that Rayborn "intended to use his index cards to use in the future if tenants chose to engage him," Defs.' SOF ¶ 44, while plaintiffs deny that his intended use was limited to this purpose. Pls.' Resp. SOF ¶ 41.

3    The parties also dispute what information the access database contained.  Plaintiffs states that TMG used this database to "compile its clients' lease information once a deal is completed," that it is not always kept up to date, and that it does not include information about prospective clients.  Pls.' SOF ¶ 16.  Defendants deny this, stating the database is "largely a list with public contact information and very little information."  Defs.' Resp. SOF ¶ 16.

February 11, Jacoby forwarded the email to Rayborn and another Broad Street employee stating, "[l]ittle offense guys. Jim, please send me your old contract."  Pls.' SOF ¶ 48, citing Ex. 22 to Opp. [Dkt. # 59-22] (sealed); Defs.' Resp. SOF ¶ 48.  Rayborn responded that "Offense is good…Bill doesn't play fair and is trying to get me fired as you know."  Ex. 22 to Opp.  Rayborn sent Jacoby a copy of the ICA that day, explaining that he'd signed the agreement at the time because "I needed a job and my cards which belonged to me…he added to the new agreement… this one …that the canvass [sic] cards belonged to him….knowing that they were very important to me."  Ex. 5 to Opp. [Dkt. # 59-5] (sealed) at 2. (ellipses in original).  Jacoby responded, "I see the words 'canvass [sic] cards.' But those are TMG's canvass cards, I don't see where he has a right to 'your' canvass cards. You are an independent contractor. . . I see where you can't retain TMG's work product, I don't see where he has a right to yours."  *Id.*

The parties agree that Rayborn continues to use the canvas cards in his work at Broad Street.  Pls.' SOF ¶ 56; Defs.' Resp. SOF ¶ 56.  His supervisor at Broad Street testified that he was "wrapped around an axle about these cards," because "they're super important to him," and the office manager testified that they were "his baby."  *Id.*

It is also undisputed that after Rayborn joined Broad Street, Broad Street started representing thirteen entities with which TMG had representation agreements, including: Advanced Sciences & Technology, American Academy of HIV Medicine, Arms Control Association, Barnes Vanze Architects,[4] Brazilian Mission to the OAS, Capital Performance Group

---

[4]     Barnes Vanze both terminated its agreement with TMG and retained Broad Street on February 25, 2019, in a contract signed by Rayborn.  Ex. 46 to Mot. [Dkt. # 55-11] (sealed); Ex. 68 to Mot. [Dkt. # 55-30] (sealed); Defs.' SOF ¶¶ 135–136; Pls.' Resp. SOF ¶¶ 135–136.

("CPG"),[5] Georgia Tech Research Institute, Integral,[6] National Emergency Number Association

("NENA"),[7] Tata Sons, Video Action, Sonecon, and Voorthuis Opticians.  Pls.' SOF ¶¶ 65–67;

Defs.' Resp. SOF ¶¶ 65–67.  The parties dispute, though, whether Rayborn "instructed" TMG

clients to terminate the agreements following his departure.  Pls.' SOF ¶ 44; Defs.' Resp. SOF

¶ 44.

The parties agree that TMG's exclusive agreements with these entities were "terminable

upon written notice, at will, and/or for a set duration of time."  Defs.' SOF ¶ 105; Pls.' Resp. SOF

¶ 105.  While at TMG, Rayborn had received commissions for twelve of these thirteen clients.

Pls.' SOF ¶ 68; Defs.' Resp. SOF ¶ 68.  As of the close of discovery, Broad Street had gained

$814,326.31 in gross commission from its representation of these thirteen entities, along with

Business Council for International Understanding ("BCIU"), National Minority Quality Forum

("NMQF"), and Quality Education for Minorities Network ("QEMN"), for a total of sixteen

entities.  Pls.' SOF ¶ 66; Defs.' Resp. SOF ¶ 66.  The parties are in agreement that NMQF and

---

5       CPG terminated its month-to-month agreement with TMG sometime after Rayborn joined
Broad Street and retained Broad Street on February 13, 2019, in a contract signed by Rayborn.
Ex. 45 to Mot. [Dkt. # 55-37] (sealed); Defs.' SOF ¶ 154; Pls.' Resp. SOF ¶ 154.

6       Integral notified TMG that it was terminating its month-to-month agreement with TMG
on January 30, 2019 and retained Broad Street on February 1, 2019, in a contract signed by
Rayborn.  Ex. 66 to Mot. [Dkt. # 55-28] (sealed); Ex. 67 to Mot. [Dkt. # 55-29] (sealed); Defs.'
SOF ¶¶ 131–132; Pls.' Resp. SOF ¶¶ 131–132.

7       NENA terminated its month-to-month agreement with TMG on March 17, 2019 and
retained Broad Street on March 18, 2019.  Ex. 63 to Mot. [Dkt. # 55-26] (sealed); Defs.' SOF
¶¶ 126–127; Pls.' Resp. SOF ¶¶ 126–127.

QEMN were not former TMG clients, but that Rayborn had scheduled pitch meetings with them while at TMG.  Pls.' SOF ¶ 67; Defs.' Resp. SOF ¶ 67; Opp. at 14.[8]

During the course of discovery, Rayborn produced canvas cards for eleven of the sixteen entities, including: Advanced Sciences & Technology, Barnes Vanze Architects, Brazilian Mission to the OAS, BCIU, CPG, Integral, NENA, QEMN, Tata Sons, Sonecon, and Voorthuis Opticians.  Pls.' SOF ¶ 64; Defs.' Resp. SOF ¶ 64.[9]

The parties also disagree about statements Rayborn allegedly made to TMG's clients about Meyer's retiring.  Pls.' SOF ¶ 45; Defs.' Resp. SOF ¶ 45.  Defendants took issue with TMG's proposed Statement of Fact that Rayborn told TMG clients that Meyer "was retired or about to retire," but they agree that Rayborn transmitted emails to TMG clients saying that "he heard Meyer retired," "Bill Meyer is no longer in the business," and "I am with a new firm and Bill is basically

---

8    Defendants state that plaintiffs "have not produced any evidence about BCIU."  Mot. at 6. Plaintiffs state that Rayborn produced canvas cards for Business BCIU and QEMN.  Pls.' SOF ¶ 64. The canvas card for BCIU contains TMG's insignia and lists an expiration date of "late 2020."  Ex. 36 to Opp. [Dkt. # 59-36] (sealed).

9    Defendants appear to deny plaintiffs' proposed Statement of Fact that Rayborn produced "TMG" canvas cards to the extent it referred to them as TMG's, stating that "Rayborn produced canvas cards that he generated as his work product over many years."  Defs.' Resp. SOF ¶ 64.  A review of the record indicates that the canvas cards produced for seven of these entities bear the "TMG" insignia: Advanced Sciences & Technology Canvas Card, Ex. 34 to Opp. [Dkt. # 59-34] (sealed); Brazilian Mission to the OAS, Ex. 35 to Opp. [Dkt. # 59-35] (sealed); BCIU,  Ex. 36 to Opp. [Dkt. # 59-36] (sealed); QEMN, Ex. 37 to Opp. [Dkt. # 59-37] (sealed); Tata Sons, Ex. 4 to Opp. [Dkt. # 59-4] (sealed); Sonecon, Ex. 38 to Opp. [Dkt. # 59-38] (sealed); and Voorthuis Opticians, Ex. 39 to Opp. [Dkt. # 59-39] (sealed).  The canvas cards for the other four entities were not submitted to the Court as exhibits, but are identified as "clients/former clients" for which Rayborn had index cards in his possession.  *See* Def. Rayborn's January 22, 2021 Resp. to Pls.' First Set of Interrogs., No. 8, Ex. 3 to Opp. [Dkt. # 59-3] (sealed) ("Rayborn's Interrogs.") at 9– 19.  Defendant's responses identify "all of the handwritten content" on the cards, including client names, points of contact, phone numbers, tenant square footage, lease expiration dates, and other notes about the clients, including comments such as "Republican," "[l]ike location," and "attorneys."  *Id.*

retired." Pls.' SOF ¶ 45; Defs.' Resp. SOF ¶ 45. Plaintiffs also cite a March 17, 2019 email where

Rayborn told NENA:

> According to the landlord we are going to need a new letter of representation
> from NENA to work with you. I am sure that Meyer is going to try to make
> a claim . . . . You will also have to send a termination letter to Meyer. He is
> winding things down to retire and has one employee left. I am glad that I
> left when I did :)  Jim

Ex. 16 to Opp. [Dkt. # 59-16] (sealed).

On April 26, 2019, TMG sent Broad Street Realty and Rayborn a cease-and-desist letter

demanding that they stop using TMG's confidential information and soliciting TMG's clients and

potential clients. Pls.' SOF ¶ 50; Defs.' Resp. SOF ¶ 50. The original complaint in this case was

filed two months later, on June 28. *See* Compl.

On April 19, 2021, plaintiffs filed an amended complaint consisting of five counts:

> Count I – Rayborn breached the ICA by misappropriating and disclosing
> confidential information. Am. Compl. ¶¶ 37–39;
>
> Count II – Rayborn and Broad Street tortiously interfered with the contracts
> and/or prospective economic advantages between TMG and its clients by
> actively soliciting TMG's clients and encouraging them to terminate their
> contracts with TMG. Am. Compl. ¶¶ 41–49;
>
> Count III – Rayborn and Broad Street violated the D.C. Uniform Trade
> Secrets Act, D.C. Code § 36-403, when they misappropriated TMG's
> confidential information. Am. Compl. ¶¶ 51–56;
>
> Count IV – Rayborn and Broad Street violated the Defend Trade Secrets
> Act, 18 U.S.C. § 1836, when they willfully acquired, misappropriated, and
> disclosed TMG's confidential information for their own economic benefit.
> Am. Compl. ¶¶ 58–65; and
>
> Count V – Rayborn made false and defamatory statements to TMG's current
> and potential clients that Meyer had retired or was about to retire. Am.
> Compl. ¶¶ 67–73.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable factfinder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). "The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989), citing *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982). In assessing each party's motion, "[a]ll underlying facts and inferences

are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## ANALYSIS

### I.    Count I: Breach of Contract

Count I against defendant Rayborn alleges that Rayborn breached the terms of the ICA by "using, misappropriating, and disclosing confidential and proprietary information concerning TMG's clients and prospective clients." Am. Compl. ¶ 39. To prevail on a breach of contract claim in the District of Columbia, "a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009), citing *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *see also Jia Di Feng v. See–Lee Lim*, 786 F. Supp. 2d 96, 104 (D.D.C. 2011) (citations omitted).

The parties agree that a valid contract existed between TMG and Rayborn – the Independent Contractor Agreement. Defs.' SOF ¶¶ 29–30; Pls.' Resp. SOF ¶¶ 29–30. But their positions diverge with respect to all other aspects of Count I.

Plaintiffs argue they are entitled to summary judgment as to liability on this count because there is no genuine dispute of material fact that would preclude a ruling as a matter of law that Rayborn breached paragraph 6(a) of the ICA's confidentiality provision by taking the canvas cards and using them and the information they contained to bring TMG's clients to Broad Street, and that the breach caused TMG to suffer some amount of damages due to the lost clients. Opp. at 11–13.

Defendants oppose plaintiffs' motion, Defs.' Reply, and seek summary judgment in their favor on this count. Mot. at 1. They argue that paragraph 6(a) of the ICA Confidentiality provision is not enforceable, relying on the Court's previous ruling striking down the non-solicitation

language in paragraph 6(b) as an unenforceable restraint of trade.  Mot. at 3, citing *Meyer Grp.,*

*Ltd.*, 2020 WL 5763631 at *9–10.  Alternatively, they contend that the breach of contract claim

fails because: (1) information about ten of the sixteen tenants cannot be confidential because TMG

did not consider them to be clients in March 2021; (2) information Rayborn learned before the

ICA was executed in May 2018 does not fall within the scope of the ICA; (3) the information

Rayborn retained was not actually confidential; and (4) the ICA does not cover Rayborn's work

product.  Mot. at 6–11.  For similar reasons, defendants argue that Rayborn did not breach any

duty in the Confidentiality section of the ICA.  *Id.* at 11–17.  Finally, defendants argue that TMG

has failed to produce any evidence of specific proof of damages.  *Id.* at 17.

The Court finds that paragraph 6(a) of the ICA is not comparable to paragraph 6(b) and

does not suffer from the same deficiencies, and therefore, it is enforceable.   Furthermore,

defendants' other attempts to limit the scope of the provision are neither persuasive nor supported

by the evidence.   Because the ICA's confidentiality provision clearly prohibits Rayborn's taking

and using the canvas cards for his own advantage or the advantage of others and the undisputed

facts establish that Rayborn did so to TMG's actual, quantifiable detriment, defendants' motion

for summary judgment will be denied, and plaintiffs' cross-motion for partial summary judgment

as to liability on Count I will be granted.  The amount of damages, however, has yet to be

determined.

### A.  The ICA's confidentiality provision is enforceable.

In Count I of the original complaint, TMG alleged that Rayborn breached the terms of the

ICA by "misappropriating and disclosing confidential and proprietary information concerning

TMG's clients and prospective clients" – which would have been a violation of paragraph 6(a) of

the ICA, and by "actively soliciting clients and potential clients" – which would have been in

violation of paragraph 6(b). Compl. ¶ 27. Defendant Rayborn moved to dismiss the portion of the

claim regarding "solicitation" on the grounds that it was an unenforceable restraint of trade. Def.

Rayborn's Mot. to Dismiss [Dkt. # 8]. The Court agreed with defendant and found the non-

solicitation provision in paragraph 6(b) to be an unreasonable restraint of trade, applying the

principles set forth in *Ellis v. James V. Hurson Assocs., Inc.*, 565 A.2d 615, 618 (D.C. 1989), and

the Restatement (Second) of Contracts § 188:

> The extent of the restraint is a critical factor in determining its
> reasonableness. The extent may be limited in three ways: by type of activity,
> by geographical area, and by time." Restatement (Second) Contracts § 188
> cmt. d. Where "the restraint is too broad to be justified by the promisee's
> need, a court may hold it to be unreasonable without the necessity of
> weighing the countervailing interests of the promisor and the public. What
> limits as to activity, geographical area, and time are appropriate in a
> particular case depends on all the circumstances.

*Meyer Grp., Ltd.*, 2020 WL 5763631 at *9. It was not a close call. The Court found:

> The non-solicitation provision of the ICA states: "Contractor further
> recognizes and acknowledges that it is essential for the proper protection of
> the business of TMG that Contractor be restrained ... (iii) from soliciting
> any client or potential client of TMG." ICA ¶ 6(b). It goes on to state that
> the provision "shall survive the termination or expiration of this
> Agreement." *Id.* ¶ 6. The provision does not specify a geographical location,
> a time period, or type of activity, and it restrains solicitation to all "potential
> clients" of TMG without defining that term. The plain language of the
> provision would effectively lock Rayborn out of the real estate business
> indefinitely.

*Id.* The ruling turned on more than the fact that the provision included the vague term "potential"

clients; it was the breadth of the provision in all respects, including the fact that it covered "all"

potential clients, that led to its unenforceability. *Id.*

Now, in resisting plaintiffs' motion for summary judgment with respect to the alleged

misappropriation of confidential information, defendants seize on the Court's previous ruling to

contend that paragraph 6(a) is unenforceable too. Mot. at 3–4. First, defendants cite the principle

that "[w]here an agreement contains unenforceable provisions, the remaining provisions will only be enforced [i]f the obnoxious feature of a contract can be eliminated, without impairing its symmetry as a whole. . ." and therefore, the Court's prior ruling rendered the entire section to be unenforceable. *Id.* at 3. (internal quotation marks and citations omitted). But as defendants noted in their motion, "a court may nevertheless enforce the rest of the agreement . . . if performance as to which the agreement is unenforceable is not an essential part of the agreed exchange." *Id.* at 3– 4, quoting Restatement (Second) of Contracts § 184 (Am. L. Inst. 1981). Here, since paragraph 6(b) can be easily excised from the contract without impairing the rest of section 6, which does not involve the solicitation of clients, this is not a basis to find paragraph 6(a) to be unenforceable.

Defendants also maintain that because paragraph 6(a) contains the terms "prospective clients" and "prospective customers," which are similar to the undefined term "potential client" found in 6(b), the provision "could apply to any tenant in the real estate business as a prospective client or prospective customer," Mot. at 4, and therefore, the Court's prior ruling controls. But the Court's decision is not as helpful to defendants as they make it out to be, as it was not simply predicated on the use of the word "potential."

Section 6 of the Independent Contractor Agreement – "Confidentiality" – has several subparts. Paragraph 6(a) recognizes that "in the course of Contractor's performance hereunder," Rayborn would acquire information which could include "information concerning TMG's clients and prospective clients, the identity of clients and prospective customers, identity of key purchasing personnel in the employ of customers and prospective clients . . . client lists, canvas cards," among others, collectively referred to as the "Confidential Information." ICA ¶ 6(a). And in paragraph 6(a), Rayborn agreed, among other things, "not to disclose the Confidential Information to others or use the Confidential Information to his own advantage or the advantage

of others."  ICA ¶ 6(a).  Under paragraph 6(c), "upon the expiration of the term of this Agreement, or termination of Contractor's services for whatever reason, whichever is earlier," Rayborn was required to turn over all Confidential Information to TMG.  ICA ¶ 6(c).

Paragraph 6(a)'s confidentiality provision is therefore limited in ways that paragraph 6(b) was not.  First, paragraph 6(a) does not restrain Rayborn's ability to do business with *anyone*; it restrains his *use of information*.  And the set of prospective clients or customers whose information is covered by paragraph 6(a) is limited to those whose information Rayborn acquired "*in the course of [his] performance hereunder. . ."* the ICA.  ICA ¶ 6(a) (emphasis added).  Paragraph 6(a) could not, as Rayborn suggests, "apply to any tenant in the real estate business," Mot. at 4; it is limited to a defined set of entities whose information was acquired by Rayborn during a particular period of time.

Because the ICA's confidentiality provision is enforceable, the Court will assess whether there is a genuine dispute of material fact as to whether Rayborn breached its terms.

**B.  There is no genuine dispute of material fact that Rayborn breached the ICA.**

Plaintiffs allege that Rayborn breached the terms of the ICA by "using, misappropriating, and disclosing confidential and proprietary information concerning TMG's clients and prospective clients."  Am. Compl. ¶ 39.  The only provision at issue, then, is the confidentiality clause in paragraph 6(a), and the Court must determine whether there is a genuine dispute of material fact as to whether defendant Rayborn took and used confidential information.  While the complaint identifies several forms of confidential information, plaintiffs' motion for partial summary judgments seeks a ruling on liability based on the canvas cards only.  Opp. at 11, 22.

1.   **The canvas cards are confidential information under the ICA.**

Paragraph 6(a) sets forth the definition of "Confidential Information" that Rayborn could acquire "in the course of [his] performance," and it specifically includes "canvas cards" in the list of covered items. ICA ¶ 6(a). While defendants posit that the sort of information stored on the cards was not actually confidential, Mot. at 8–9, and they submit that Rayborn's own work product could not qualify as "confidential," *id.* at 10, they ignore that the issue before the Court is whether the information was "confidential" *as that term is defined in the agreement*.

Defendants also argue that any information that Rayborn learned through his previous employment – before the ICA was executed in May 2018 – does not fall within the scope of the ICA. *Id.* at 7. The problem with this is that the ICA does not limit confidential information to information "learned" in the course of Rayborn's performance as a contractor; it applies to information that he may "*acquire*" during his performance under the contract. ICA ¶ 6(a). The record contains evidence that the cards had remained at TMG after Rayborn's departure,[10] and that Rayborn later told Broad Street's CEO he signed the ICA in May 2018 because he needed a job and the cards, which he described as his. Ex. 5 to Opp. at 2. Also, it is undisputed that at least some of the canvas cards Rayborn produced in discovery were for former TMG clients and bore the TMG insignia. Pls.' SOF ¶ 64; Defs.' Resp. SOF ¶ 64. These undisputed facts show that

---

10   Plaintiffs' Statement of Facts indicates that the canvas cards "had remained with TMG after Rayborn's departure," and that Meyer, "[c]oncerned that Rayborn was seeking reinstatement for the express purpose of accessing TMG's client information . . . asked Rayborn, as a condition of his reinstatement," to sign the ICA. Pls.' SOF ¶ 29. Defendants' denial of this statement appears to be in response to plaintiffs' describing this as a "condition of his reinstatement," and defendants state, "[w]hen Meyer rehired Rayborn, he did not present Rayborn with an agreement to sign. Rayborn signed the [ICA]. . . after Rayborn returned to work at TMG." Defs.' Resp. SOF ¶ 29. Thus, even given defendants' qualifications within this Statement of Fact, the assertion that the cards "had remained with TMG after Rayborn's departure" is not disputed.

18

Rayborn "acquired" the canvas cards he'd previously left behind "in the course of his performance," under the contract after he returned to TMG, and the disposition of the canvas cards was therefore subject to the plain terms of the confidentiality provision in the ICA.

### 2.  Rayborn took and used confidential information to his advantage in breach of the ICA.

The parties agree that Rayborn took some number of the canvas cards with him.  Pls.' SOF ¶ 42; Defs.' Resp. SOF ¶ 42.  Plaintiffs emphasize that paragraph 6(c) of the ICA provides that upon "termination of Contractor's services . . . Contractor agrees to turn over to TMG all of TMG's properties," including "Confidential Information."  Opp. at 12.; ICA ¶6(c).  Since it is undisputed, then, that Rayborn took the canvas cards, there is no genuine dispute as to whether Rayborn breached the terms of the ICA by taking the canvas cards instead of returning them upon his termination.  But plaintiffs also allege that Rayborn breached the terms of the ICA by "using, misappropriating, and disclosing" this confidential information, Am. Compl. ¶ 39, and there is no genuine of a material fact as to this, either.

The parties agree that Rayborn continues to "use" the canvas cards in his work at Broad Street.  Pls.' SOF ¶ 56; Defs.' Resp. SOF ¶ 56.   His supervisor at Broad Street testified that the cards were "super important to him," and that he was "wrapped around an axle about these cards," while the office manager referred to them as "his baby."  *Id.*  While the parties dispute whether Rayborn "instructed" TMG clients to terminate their agreements following his departure, Pls.' SOF ¶ 44; Defs.' Resp. SOF ¶ 44, there is undisputed evidence of Rayborn's communicating with former TMG clients about ending their relationship with TMG and retaining Broad Street.  For example, on March 17, 2019, Rayborn emailed Brian Fontes, whose name was on the canvas card for NENA.  *See* Rayborn's Interrogs. at 9.  Rayborn told Fontes that Broad Street "need[ed] a new

letter of representation from NENA to work with you. I am sure that Meyer is going to try to make a claim. . . . You will also have to send a termination letter to Meyer." Ex. 16 to Opp. at 2. Rayborn stated that Meyer was "winding things down to retire and has one employee left. I am glad that I left when I did." *Id.* The next day, NENA terminated its agreement with TMG and retained Broad Street. Ex. 63 to Mot. [Dkt. # 55-9] (sealed); Defs.' SOF ¶¶ 126–127; Pls.' Resp. SOF ¶¶ 126–127.

The undisputed evidence also shows that Broad Street gained $814,326.31 in gross commission from its representation of sixteen entities, thirteen of which had agreements with TMG before Rayborn joined Broad Street, and two of which the parties agree Rayborn had scheduled pitch meetings with while serving as a contractor for TMG. Pls.' SOF ¶¶ 65–67; Defs.' Resp. SOF ¶¶ 65–67. Of these sixteen entities, Rayborn produced canvas cards for eleven, at least seven of which bear TMG's logo:[11] Advanced Sciences & Technology, Barnes Vanze Architects, Brazilian Mission to the OAS, BCIU, CPG, Integral, NENA, QEMN, Tata Sons, Sonecon, and Voorthuis Opticians. Pls.' SOF ¶ 64; Defs.' Resp. SOF ¶ 64. Three of these entities entered into new contracts with Broad Street signed by Rayborn within days of terminating their relationships with TMG. *See* Ex. 68 to Mot. [Dkt. # 55-30] (Barnes Vanze); Ex. 45 to Mot. [Dkt. # 55-37] (CPG); Ex. 67 to Mot. [Dkt. # 55-29] (Integral). Therefore, for at least these eleven entities with

---

11      As discussed above, the canvas cards for Barnes Vanze, CPG, Integral, and NENA were not submitted to the Court as exhibits but are identified as "clients/former clients" for which he had index cards in his possession. *See* Rayborn's Interrogs. at 9–19.

canvas cards,[12] there is no genuine dispute of material fact that Rayborn took and used confidential information to his advantage and/or for the advantage of Broad Street and breached his duties under the ICA, and defendants have not pointed to evidence that creates a triable question for the jury on this issue.

### C. There is no genuine dispute of material fact that Rayborn's breach caused some harm to plaintiffs.

Defendants argue that plaintiffs "have not presented any specific proof of damages arising from Rayborn's alleged breach of contract," and that they have therefore failed to meet the final required element of this claim. Mot. at 17. Plaintiffs contend that because it is undisputed that Broad Street received substantial commissions from TMG's prior clients, they have shown that their damages "exist" and are not "speculative," so they have established Rayborn's liability on their breach of contract claim and are entitled to partial summary judgment. Opp. at 14–15. The

---

12      For the five remaining entities without canvas cards, plaintiffs allege that the client access database contains information for three of them: American Academy of HIV Medicine, Georgia Tech Research Institute, and Video Action, Pls.' SOF ¶ 120, and they seek damages for Arms Control Association, which had prior agreements with TMG before Rayborn joined Broad Street, Pls.' SOF ¶ 67; Defs.' Resp. SOF ¶ 67, and NMQF, which the parties agree Rayborn had scheduled a pitch meeting with while at TMG. *Id.*

As to the database, in their motion for summary judgment, defendants argue that plaintiffs have "failed to present any evidence that Rayborn took this printout" when he left TMG, and that they are entitled to summary judgment on this aspect of Count I. Mot. at 16. Plaintiffs rely on circumstantial evidence suggesting that Rayborn must have taken the access database from TMG's offices because Meyer gave him the printout at some point; Meyer observed the printout in Rayborn's office "within the last month or two" of Rayborn's departure; and the day Rayborn left TMG, he texted a friend that he had "[c]leared the office out" and had taken "everything [he] needed." Opp. at 23, citing Pls.' SOF ¶ 41; Defs.' Resp. SOF ¶ 41. While this is quite thin, drawing reasonable inferences in the light most favorable to plaintiffs for purposes of defendants' motion, the Court finds that there are genuine issues of material fact as to whether Rayborn took the access client database, as well as whether the list even contained confidential information, *see* Pls.' SOF ¶ 16; Defs.' Resp. SOF ¶ 16, and it will deny defendants' motion for summary judgment as to that portion of Count I predicated on the database.

Court agrees that plaintiffs have come forward with sufficient undisputed evidence of the fact that they were harmed to satisfy their burden to establish the element of liability, while the precise amount of damages remains to be resolved.

To prevail on a breach of contract claim, a party must establish a breach of a duty arising out of a contract and "damages caused by breach." *Logan v. LaSalle Bank Nat'l Ass'n*, 80 A.3d 1014, 1023 (D.C. 2013), quoting *Mendez*, 984 A.2d at 187. "It is clear in contract law that a plaintiff is not required to prove the amount of his damages precisely; however, the fact of damage and a reasonable estimate must be established." *Cahn v. Antioch Univ.*, 482 A.2d 120, 130 (D.C. 1984) (citations omitted); *see also Romer v. District of Columbia*, 449 A.2d 1097, 1100 (D.C. 1982) ("While damages are not required to be proven with mathematical certainty, there must be some reasonable basis on which to estimate damages.") (citations omitted). "Where a plaintiff proves a breach of contractual duty he is entitled to damages; however, when he offers no proof of actual damages or the proof is vague and speculative, he is entitled to no more than nominal damages." *Roth v. Speck*, 126 A.2d 153, 155 (D.C. 1956).

It is undisputed that as of the close of discovery, Broad Street had gained $814,326.31 in gross commission from its representation of the sixteen entities described above. Pls.' SOF ¶ 66; Defs.' Resp. SOF ¶ 66. Broad Street had not represented any of these TMG clients or prospective clients until Rayborn arrived. Pls.' SOF ¶ 67; Defs.' Resp. SOF ¶ 67. For at least eleven of these entities, the undisputed evidence shows that Rayborn took the canvas cards from TMG and used them while at Broad Street, and that Broad Street earned commissions based on transactions for some of those TMG clients which it had never represented before. Pls.' SOF ¶¶ 65–67; Defs.' Resp. SOF ¶¶ 65–67. And for at least three of these entities, the client terminated its agreement with TMG and retained Broad Street within a matter of days, in contracts signed by Rayborn:

(1) Barnes Vanze both terminated its agreement with TMG and retained Broad Street on February 25, 2019.  Ex. 46 to Mot. [Dkt. # 55-11] (sealed); Ex. 68 to Mot. [Dkt. # 55-30] (sealed); Defs.' SOF ¶¶ 135–136; Pls.' Resp. SOF ¶¶ 135–136; (2)  Integral terminated its agreement with TMG on January 30, 2019 and retained Broad Street on February 1, 2019.  Ex. 66 to Mot. [Dkt. # 55-28 (sealed); Ex. 67 to Mot. [Dkt. # 55-29] (sealed); Defs.' SOF ¶¶ 131–132; Pls.' Resp. SOF ¶¶ 131–132; and (3) NENA terminated its agreement with TMG on March 17, 2019 and retained Broad Street on March 18, 2019.  Ex. 63 to Mot. [Dkt. # 55-26] (sealed); Defs.' SOF ¶¶ 126–127; Pls.' Resp. SOF ¶¶ 126–127.

Rayborn's breach of the ICA – taking and using the canvas cards – caused plaintiffs to suffer some demonstrable harm, and this harm is neither vague nor speculative, but reasonably estimated to be the amount Broad Street gained in commissions from these clients.  Based on this, plaintiffs have satisfied their burden of demonstrating a "fact of damage" and a "reasonable estimate," *Cahn*, 482 A.2d at 130 (citations omitted), and they have established liability on their breach of contract claim for partial summary judgment on this count.

The issue of the amount of the damages has yet to be determined, and plaintiffs will bear the burden of proving the specific number at trial.  At this stage, because there is no genuine dispute of material fact that Rayborn breached the ICA and caused TMG to lose some significant client commissions, defendants' motion for summary judgment will be denied, and plaintiffs' cross-motion for partial summary judgment as to liability on Count I will be granted.[13]

---

13     The Court is entering summary judgment on liability in plaintiffs' favor with respect to the eleven former TMG clients for which Rayborn produced canvas cards in discovery.  And the court will deny defendants' motion for summary judgment on the count as a whole.  This means that as there are facts in dispute, breach of contract claims with respect to the five other entities without canvas cards, including the three in the database, will proceed, but liability has not yet been established.

II.    **Count II: Tortious Interference with Contract and/or Prospective Economic Advantage**

Count II against both defendants is entitled, "tortious interference with contract and/or prospective economic advantage." *See* Am. Compl. at 16. Plaintiff TMG alleges that "TMG had exclusive representation agreements with Integral, Barnes Vanze, NENA, and CPG." Am. Compl. ¶ 41.[14] It further alleges that "TMG had a reasonable expectation of entering into commission agreements with the landlords of Integral, Barnes Vanze, NENA, and CPG because of TMG's exclusive representation agreements with these clients and/or TMG's longstanding relationships with them, as well as TMG's active involvement securing their respective upcoming lease agreements." Am. Compl. ¶ 42. Plaintiff then asserts that Rayborn was aware of both the relationships and TMG's expectation of future business when the leases expired. *See* Am. Compl. ¶ 43. The count includes alternative theories of liability:

> Rayborn and Broad Street intentionally interfered with TMG's exclusive representation agreements with Integral, Barnes Vanze, NENA, and CPG for the purpose of securing for themselves the commission agreements that would have otherwise gone to TMG.
>
> As a direct result of Rayborn and Broad Street's interference, Integral, Barnes Vanze, NENA, and CPG breached their exclusive representation agreements with TMG, and failed to perform their obligations under those agreements, by entering into agreements with Broad Street and Rayborn.

Am. Compl. ¶¶ 44–45, and

> Rayborn and Broad Street intentionally interfered with TMG's business expectancies with respect to Integral, Barnes Vanze, NENA, and CPG for

---

14    The parties' summary judgment briefs refer to the "sixteen tenants at issue," Opp. at 43; Mot. at 31, but the amended complaint only names these four entities in Count Two. Am. Compl. ¶¶ 41–49. For purposes of the motion for summary judgment, the Court will only examine the evidence with respect to the four clients identified in Count II. Because plaintiffs have shown that there is a triable issue at least with respect to these clients, Count II will proceed.

> the purpose of securing for themselves the commission agreements that
> would have otherwise gone to TMG.
>
> As a result of Rayborn and Broad Street's interference, Integral, Barnes
> Vanze, NENA, and CPG terminated their expected business with TMG by
> entering into agreements with Broad Street and Rayborn.

Am. Compl. ¶¶ 46–47; *see also* Opp. at 41 ("TMG's tortious interference with contract claim is

based on its pre-existing brokerage agreements, and its tortious interference with prospective

economic advantage is based on its expectation of representing certain tenants with respect to

leasing transactions and receiving commissions from landlords for those transactions.").

As the Court of Appeals in D.C. explained in *Newmyer v. Sidwell Friends Sch*., 128 A.3d

1023, 1038 (D.C. 2015),  the law in the District of Columbia with respect to tortious interference

with business or contractual relationships is based on the Restatement (Second) of Torts (Am. L.

Inst. 1965):

> To establish a prima facie case of tortious interference and survive
> summary judgment, [the plaintiff] must demonstrate: (1) existence
> of a valid contractual or other business relationship; (2)
> [defendant's] knowledge of the relationship; (3) intentional
> interference with that relationship by [the defendant] and (4)
> resulting damages.

*Id.* (internal quotation marks and citations omitted).  The law is the same whether a plaintiff is

alleging tortious interference with contract.  *See Banneker Ventures, LLC v. Graham*, 798 F.3d

1119, 1134 (D.C. Cir. 2015) (The elements of a claim of tortious interference with contract are:

(1) existence of a contract; (2) knowledge of the contract; (3) intentional interference causing the

breach of the contract, and (4) damages), or tortious interference with prospective economic

advantage.  *See Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 84

(D.C. 2003) ("The elements of tortious interference with prospective business advantage mirror

those of interference with contract. . . however, a plaintiff obviously need not demonstrate the existence of a contract, but merely a prospective advantageous business transaction.").

Defendants argue that to the extent Count II is based on alleged interference with exclusive representation agreements – and each of the four entities named in Count II had entered into such an agreement with TMG – those agreements were terminable at-will.  Mot. at 31.  Therefore, according to defendants, there was no contract they could or did induce any of the entities to breach.  *Id*; *see also* Defs.' Reply at 16.

This theory has been explicitly rejected by the D.C. Court of Appeals.  In *Newmyer,* the court said, "[w]e have previously held that liability for tortious interference may lie where an actor interferes with an at-will employee's relationship with an employer."  128 A. 3d at 1039, citing  *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.,* 565 A.2d 285,288, 291–292 (D.C. 1989).  Also, the court emphasized that the District of Columbia derives the elements of tortious interference with a contract and/or prospective advantage from the Restatement, in particular section 766:

> In comment g to this section, the Restatement explains that a contract that is terminable at-will is "valid and subsisting" until terminated "and the defendant may not improperly interfere with it." Applying the Restatement, we conclude that an at-will employment relationship of the kind that existed between [claimant] and [his employer] is a valid and subsisting business relationship for the purposes of a tortious interference claim.

*Id.* at 1040.  Given this clear guidance, the Court finds that TMG's at-will contractual relationships with NENA, CPG, Barnes Vanze, and Integral – which were ongoing at the time Rayborn was working at TMG – are "valid and subsisting business relationship[s]" that may serve as a basis for

plaintiffs' tortious interference claim, and the first element has been established with respect to those entities at least.[15] *Id.*

Moreover, here, as in *Newmyer,* the evidence supplies ample grounds for a juror to find for plaintiffs on the second element: that Rayborn was aware of those relationships. He took the canvas cards with details of the business relationships with him to his new employer and later produced them in discovery. Pls.' SOF ¶¶ 64–67; Def. Resp. SOF ¶¶ 64–67. And up until January 16, 2019 – eight days before Rayborn left TMG – he had been emailing with a representative at Integral about setting up an appointment on January 29 to look at a space. Defs.' SOF ¶ 130, citing Ex. 65 to Mot. [Dkt # 55-27] (sealed); Pls.' Resp. SOF ¶ 130. Integral then signed an agreement with Broad Street on February 1, three days after Rayborn signed his agreement with the firm. Defs.' SOF ¶ 131; Pls.' Resp. SOF ¶ 131.

There is sufficient undisputed evidence to establish the third element too. With respect to the question of causation, a juror may also find timing to be telling: it is undisputed that Barnes

---

15    Defendants argue that plaintiffs have not produced any evidence of a reasonable expectancy on TMG's part that it would continue to retain the tenants with at-will contracts as clients years after they had first been engaged, and they point to deposition testimony by Meyer in another case to state that Meyer "has admitted that he has no expectation of retaining a client years after they first engage TMG." Mot. at 32–33, citing Defs.' SOF ¶¶ 100–103, which, in turn, cite an October 14, 2020 deposition of Meyer in another matter, attached as Exhibit 10 [Dkt. # 56–13]. Plaintiffs take issue with this characterization of Meyer's testimony, noting that Meyer said, "not necessarily" and "that's not how it works" when asked about this topic, then "explained that a client has contractual duties to [TMG]." Pls.' Resp. SOF ¶ 100. This will be a question for a jury to decide, but as plaintiffs point out, Pls.' Resp. SOF ¶¶ 100–103, the deposition testimony is not as stark as defendants would have the Court believe. In any event, the existence of a series of prior agreements over a number of years supports an inference that TMG had a reasonable expectation of representing the clients in the future. Moreover, the fact that Rayborn himself, while still acting in his capacity as a TMG contractor, was corresponding with the clients and with colleagues at TMG about new lease terms further supports that conclusion. *See, e.g.*, January 2019 Integral Email Chain, Defs.' Ex. 65 (showing Christopher Barrett, Integral's COO, stated that "Jim [Rayborn] made the arrangements and set up the tour").

Vanze, CPG, Integral, and NENA all terminated their agreements with TMG and subsequently retained Broad Street in close temporal proximity.  Defs.' SOF ¶¶ 126–136; Pls.' Resp. SOF ¶¶ 126–136.  As discussed with respect to Count I, Barnes Vanze both terminated its agreement with TMG and retained Broad Street on February 25, 2019.  Ex. 46 to Mot. [Dkt. # 55-11] (sealed); Ex. 68 to Mot. [Dkt. # 55-30] (sealed); Defs.' SOF ¶¶ 135–136; Pls.' Resp. SOF ¶¶ 135–136.  Integral terminated its agreement with TMG on January 30, 2019 and retained Broad Street on February 1, 2019.  Ex. 66 to Mot. [Dkt. # 55-28 (sealed); Ex. 67 to Mot. [Dkt. # 55-29] (sealed); Defs.' SOF ¶¶ 131–132; Pls.' Resp. SOF ¶¶ 131–132.  And NENA terminated its agreement with TMG on March 17, 2019 and retained Broad Street on March 18, 2019.  Ex. 63 to Mot. [Dkt. # 55-26] (sealed); Defs.' SOF ¶¶ 126–127; Pls.' Resp. SOF ¶¶ 126–127.

A plaintiff can prove the intent required for tortious interference "by showing that a defendant knew that his actions were certain or substantially certain to interfere with the plaintiff's business."  *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 203 (D.C. 2017), citing Restatement (Second) of Torts § 766 cmt. j (Am. L. Inst. 1965).  Plaintiffs contend that "the evidence of intent is simple" because defendants "knew that by representing TMG's former and prospective clients, they were interfering with TMG's business."  Opp. at 45.  But beyond this fair inference, because it is undisputed that Rayborn took and used confidential information as discussed in Count I, the same evidence serves as the strong showing that could enable a reasonable juror to conclude that defendants intentionally interfered with TMG's contracts.

Finally, as with the breach of contract claim in Count I, defendants argue that plaintiffs have not put forth evidence of any specific damages.  Mot. at 36.  But it is undisputed that Broad Street earned commissions from its representation of these entities with respect to the very leases Rayborn was working to extend while at TMG.  Pls.' SOF ¶ 66; Defs.' Resp. SOF ¶ 66.

Defendants contend, though, that plaintiffs have not adduced evidence of defendants' "wrongful" intent to interfere as opposed to merely acting consistent with their economic interests. *Id.* at 36–41. "Once a prima facie case has been established, it becomes the defendant's burden to prove that his . . . conduct was legally justified or proper." *Sorrells,* 565 A.2d at 289–90 (internal quotation marks omitted), quoting Restatement (Second) of Torts §766 (Am. L. Inst. 1965) ("one who intentionally and improperly interferes. . . is subject to liability. . . ."). "Thus, the 'motive' behind the interference is the key consideration in determining whether recovery under the tort is available." *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 346 (D.C. 2015). Section 767 of the Restatement sets out factors to be considered in determining whether an actor's conduct in intentionally interfering with a contract or prospective contractual relation is improper:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference, and
> (g) the relations between the parties.

*Sorrells,* 565 A. 2d. at 290. Defendants may continue to proclaim that "solicitation is not wrongful conduct," Mot. at 38, but Rayborn was still bound by the restraints on his use of confidential information. In addition, jurors may well conclude that his emails disseminating false information about Meyer's employment status bear on his motives at the time, *see* Ex. 16 to Opp. (Rayborn's email to NENA stating that Meyer was "winding things down to retire and has one employee left," and that Rayborn was "glad that [he] left when [he] did."), especially since NENA terminated its contract with TMG on the same day that Rayborn sent the emails about Meyer. Defs.' SOF ¶¶ 126–127; Pls.' Resp. SOF ¶¶ 126–127.

29

But at the end of the day, as the court observed in *Nat'l R.R. Passenger Corp. v. Veolia Transp. Serv., Inc.*, 791 F. Supp. 2d 33, 61(D.D.C. 2011), "the determination of whether [an] interference was improper or not is ordinarily left to the jury," and whether the defendants have met their burden to establish this affirmative defense will be a question of fact for the jury to determine.

Therefore, defendants' motion for summary judgment on Count II will be denied.

### III.   Counts III and IV:  D.C. Uniform Trade Secrets Act and the Defend Trade Secrets Act

Counts III and IV against both defendants allege that Rayborn and Broad Street "willfully and maliciously misappropriated TMG's Confidential Information" that TMG improperly acquired through Rayborn, who breached his confidentiality obligations under the ICA.  Am. Compl. ¶ 61.  This claim will also move forward as defendants are not entitled to judgment as a matter of law.

To bring a claim under either the Defend Trade Secrets Act or the D.C. Uniform Trade Secrets Act, a plaintiff must demonstrate the existence of a trade secret that has been misappropriated.  18 U.S.C. § 1836(b)(1); *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 77 (D.D.C. 2007), citing D.C. Code § 36–401 (to state a claim for a trade secret claim, a plaintiff must show "(1) the existence of a trade secret; and (2) acquisition of the trade secret by improper means, or improper use or disclosure by one under a duty not to disclose").

### A.   There is sufficient evidence to create a genuine dispute for the jury to resolve on the question of whether the canvas cards were trade secrets.

"The 'threshold inquiry' in every trade secret case is 'whether or not there [is] a trade secret to be misappropriated.'"  *DSMC*, 479 F. Supp. 2d at 77, quoting *Catalyst & Chem. Servs. v. Glob. Ground Support,* 350 F. Supp. 2d 1, 8 (D.D.C. 2004).  Under both the federal and D.C. statutes, a

"trade secret" is defined as information that "derives independent economic value . . . from not being generally known" when "the owner . . . has taken reasonable measures to keep such information secret."  18 U.S.C. § 1839(3); *see* D.C. Code § 36–401(4) (defining a "trade secret" to be information that "(A) [d]erives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and (B) [i]s the subject of reasonable efforts to maintain its secrecy.").

1. **A reasonable juror could find that some of the information on the canvas cards, and/or the collection of canvas cards, was confidential and not publicly accessible.**

"Although the question of whether a piece of information is a trade secret is typically a question of fact, information is not a trade secret as a matter of law if it is 'easily ascertainable by the public or generally known within an industry.'"  *Econ. Rsch. Servs. v. Resolution Econ., LLC*, 208 F. Supp. 3d 219, 232–33 (D.D.C. 2016).  But even if individual elements are known to the public, a trade secret can exist in a unique combination of those otherwise publicly available elements.  *Catalyst,* 350 F. Supp. 2d at 9*; see also Elm City Cheese Co. v. Federico*, 752 A.2d 1037, 1047 (Conn. 1999) (finding that "plaintiff's ability to combine these elements into a successful . . . process, like the creation of a recipe from common cooking ingredients is a trade secret entitled to protection.") (internal quotation marks and citations omitted).

Client lists or customer information can be considered trade secrets, but this is an inherently fact dependent question.  *Hedgeye Risk Mgmt., LLC v. Heldman*, 412 F. Supp. 3d 15, 29–30 (D.D.C. 2019); *see Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 76 (D.D.C. 2201) (holding that customer lists of a financial-services firm deserve trade secret status and that plaintiff had a likelihood of success on the merits on its trade secrets claim).  Courts in this district that

have considered the question have relied on six factors to determine whether client information

can be considered a trade secret:

> (1) [T]he extent to which the information is known outside of [the] business;
> (2) the extent to which it is known by employees and others involved in
> [the] business; (3) the extent of measures taken by [the employer] to guard
> the secrecy of the information; (4) the value of the information to [the
> employer] and to his competitors; (5) the amount of effort or money
> expended by [the employer] in developing the information; [and] (6) the
> ease or difficulty with which the information could be properly acquired or
> duplicated by others.

*Ruesch v. Ruesch Int'l Monetary Servs.*, 479 A.2d 295, 296 (D.C. 1984), quoting 4 Restatement of

Torts § 757, cmt. b (1939).  In *Ruesch*, the D.C. Court of Appeals examined these factors, keeping

in mind the distinction between a customer list which includes "likely prospects," which may be

more difficult to find in the public domain or may take money and time to compile, and a

"wholesale" customer list that is public and shared between those in the industry, such as a trade

publication.  *Ruesch*, 479 A.2d. at 297.  The former is more likely to be a trade secret; the latter is

less likely to be a trade secret.  *Id.*

Another court in this district has observed that while client contact information, such as the

information printed on business cards, may not be confidential by itself, "a collection of business

cards might, in some circumstances, capture the same information contained in a confidential

customer list."  *Hedgeye Risk Mgmt.*, 412 F. Supp. 3d at 29.  For example, the customer

information "might reflect information that is confidential and difficult to find, such as information

about the identity of key decisionmakers at a firm or those persons' private email addresses."  *Id.*

at 29–30.

Here, a reasonable juror could conclude that the cards at the heart of the case are trade

secrets.  Even if, as defendants submit, some of the information on the cards was readily accessible

on the Internet and in databases like Costar and the Haines directory, Mot. at 20 n.12; Defs.' SOF ¶¶ 88–99, there is evidence that at least some of the canvas cards contained lease expiration dates, the individual phone numbers for key contacts at several TMG clients, and notes about specific TMG clients' preferences.  Pls.' SOF ¶ 22, citing Ex. 3 to  Opp. [Dkt. # 59-3] (sealed) at 10–11 (canvas card contained specific notes about Barnes Vanze, including that it was concerned about "HVAC" and "rent reduction").

Moreover, even if some of the information written on the canvas cards was publicly available, that alone is not dispositive.  *See Catalyst & Chem. Servs.*, 350 F. Supp. 2d at 8–9 ("[i]t is widely accepted that a trade secret can exist in a combination of characteristics . . . each of which, by itself, is in the public domain . . . .") (internal quotation marks and citations omitted). Rayborn himself referred to the cards as necessary for cold calls, "keep[ing] the doors open," and "mak[ing] money."  Pls.' SOF ¶¶ 58–63; Defs.' Resp. SOF ¶¶ 58–63.

Further, even if an individual card does not meet the test, a jury could find that the collection of many canvas cards – and the resulting aggregation of both personal and public details about TMG clients – gave TMG a "significant competitive advantage" in the competitive commercial real estate market.[16]  Opp. at 3, 24; *see Hedgeye Risk Mgmt.*, 412 F. Supp. 3d at 29.

---

16    Defendants argue that there is no value in the canvas cards because they are "illegible to largely everyone except Rayborn."  Mot. at  27.  But, plaintiffs contend that "for someone with industry knowledge, it is not difficult to decipher the bulk of the information on the cards."  Opp. at 25.  Jurors will make up their own minds about that, but there doesn't seem to be any dispute about the fact that they were meaningful to Rayborn, who wrote the information on them, collected them, extolled their virtues, and made sure he had them when he left TMG.

**2.  A reasonable juror could find that TMG took steps to keep the information on the canvas cards confidential.**

Another factor to be considered in a trade secret analysis is whether the owner of the secret took reasonable steps to ensure the secrecy of the information.  18 U.S.C. § 1839(3)(A); D.C. Code § 36–401(4)(B).  As this Court noted in its previous ruling, "courts [in this District] have identified the confidentiality agreement as a method for preserving secrecy that is consistent with trade secret protection."  *See Meyer Grp., Ltd.*, 2020 WL 5763631 at *6, citing *Catalyst*, 350 F. Supp. 2d at 10–11, *aff'd sub nom. Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*, 173 F. App'x 825 (Fed. Cir. 2006) ("Maintaining trade secret status thus requires only reasonable efforts, such as implementing confidentiality agreements.").

Thus, defendants' suggestion that TMG "took no efforts to protect the information contained on the [canvas] cards or Customer List," Mot. at 23, is unpersuasive, and the record does not support taking this claim away from the jury as a matter of law.  The ICA required that Rayborn "agree[] not to disclose the Confidential Information (including "canvas cards" and "information concerning TMG's clients and prospective clients") to others or use the Confidential Information to his own advantage or the advantage of others."  *See* ICA ¶ 6(a); Defs.' SOF ¶ 35; Pls.' Resp. SOF ¶ 35.  Plaintiffs have also presented evidence that TMG took additional steps to preserve the confidentiality of its client information, including keeping physical copies of confidential information at its offices, keeping files in locked file cabinets, password-protecting electronic files, and including confidentiality notices in its email communications.  Pls.' SOF ¶¶ 104–07; Defs.' Resp. SOF ¶¶ 104–07.

Thus, there is sufficient evidence to create a question for the jury on whether the canvas cards and other client information were "trade secrets."

**B. The evidence gives rise to a genuine dispute for the jury as to whether the canvas cards were misappropriated.**

Under the Defend Trade Secrets Act and the D.C. Uniform Trade Secrets Act, "misappropriation" means either "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person." 18 U.S.C. § 1839(5)(A)–(B); D.C. Code § 36-401(2)(A)–(B). The term "improper means" is defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A); D.C. Code § 36-401(1).

The "disclosure or use" category of misappropriation further requires that the discloser or user:

> (i) used improper means to acquire knowledge of the trade secret;
>
> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>
> > (I) derived from or through a person who had used improper means to acquire the trade secret;
> >
> > (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> >
> > (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (iii) before a material change of the position of the person, knew or had reason to know that—
>
> > (I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5)(B)(i)–(iii); *see* D.C. Code § 36-401(2)(B).  The agreement between the parties

bears on these issues.

The ICA states that "Confidential Information is the property of TMG," and that:

> "[I]t is essential to the protection of TMG's goodwill and to the maintenance
> of TMG's competitive positions that the Confidential Information be kept
> secret and [Rayborn] agrees not to disclose the Confidential Information to
> others or use the Confidential Information to his own advantage or the other
> advantage of others."

ICA ¶ 6(a).  Moreover, Rayborn was bound to return it to TMG if the contract was terminated.

ICA ¶ 6(c).  Given the plain language of the ICA, a reasonable juror could find that Rayborn's

subsequent use and disclosure of this information at Broad Street was a "breach of his duty [to

TMG] to maintain secrecy" and that Rayborn acquired TMG's trade secrets by improper means.

ICA ¶ 6(a).  *See Ass'n of Am. Med. Colls. v. Princeton Rev., Inc.*, 332 F. Supp. 2d 11, 24 (D.D.C.

2004) (finding breach of a confidentiality agreement sufficient to show misappropriation).

As for Broad Street's potential liability for misappropriating TMG's trade secrets, a

reasonable juror could find that Broad Street was aware that Rayborn's use of the canvas cards

was "without express or implied consent." 18 U.S.C. § 1839(5)(B)(ii)(I); *see* D.C. Code § 36-

401(2)(B)(ii)(I).  The emails between Jacoby and Rayborn show that Broad Street saw a copy of

the ICA, knew that Rayborn had brought canvas cards with him from TMG, and was aware that

Rayborn and Meyer disagreed about who owned the cards.  Pls.' SOF ¶¶ 47–51; Defs.' Resp. SOF

¶¶ 47–51; Ex. 5 to Opp. [Dkt. # 59-5] (sealed) at 2.

Therefore, plaintiffs have produced enough evidence to create a material dispute as to whether Rayborn and Broad Street misappropriated TMG's trade secrets in violation of D.C. and federal law, and defendants' motions for summary judgment on Counts III and IV will be denied.[17]

## IV.    Plaintiffs' Defamation Claim Fails.

Count Five against defendant Rayborn alleges that he has "published and continues to publish false and defamatory statements that Meyer has 'retired' or was about to retire to TMG's current and potential clients." Am. Compl. ¶ 67. Plaintiffs allege that these statements are defamatory because they "tend to injure Plaintiffs in their trade and their reputations in their professional community." Am. Compl. ¶ 69; Opp. at 48. They also argue that the statements constitute defamation per se because they "impute to Plaintiffs a matter adversely affecting their fitness for their business." Am. Compl. ¶ 73.

Defendants have moved for summary judgment on this count. Mot. at 41. They argue that Rayborn's statements were not defamatory, and plaintiffs did not incur legal damage because of

---

17    Defendants also contend that the information in the database client list that Rayborn is alleged to have taken does not qualify as a trade secret, and that it was not acquired by improper means. Mot. at 26–29. Indeed, as the Court has previously discussed, there is a genuine dispute of material fact as to whether Rayborn took the client list at all. For the same reasons that a reasonable juror could find that the canvas cards constituted trade secrets, one could potentially find that the client list contains trade secrets. These are all factual questions that it would not be appropriate for the Court to decide. Since the trade secrets claims are moving forward, the Court need not resolve these factual questions, and it would not be appropriate for it to do so in any event. If it is plaintiffs' contention that the allegedly stolen secrets include the list, it will be up to them to carry their burden to establish what the list contained, that Rayborn in fact made off with it, whether defendants in fact misappropriated the information, and what harm, if any, flowed from those actions.

the statements made.[18] *Id.* at 41–42; Defs.' Reply at 24.  The Court find that defendants are entitled to summary judgment on this count.

At the outset, the Court notes that defendants are entitled to summary judgment on the claim in Count V filed by plaintiff TMG because Rayborn's statements relate solely to Meyer and not TMG.  *See Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1089 (D.C. Cir. 2007) ("[D]efamation is personal;  . . . [a]llegations of defamation by an organization and its members are not interchangeable.   Statements which refer to individual members of an organization do not implicate the organization.").

With respect to Meyer's claim,  to state a claim for defamation, a plaintiff must allege: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm [,] or that its publication caused the plaintiff special harm."  *Bean v. Gutierrez*, 980 A.2d 1090, 1093 n.2 (D.C. 2009).

Under District of Columbia law, an "allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous, or ridiculous.'"  *Jankovic*, 494 F.3d at 1091, quoting *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984).   A statement is defamatory "if it tends to injure the plaintiff in his trade, profession or

---

18     Defendants also argue that a number of Rayborn's statements fall outside of the one-year statute of limitations for defamation.   Mot. at 42, citing D.C. Code § 12-301(4).   However, plaintiffs are correct that the statute of limitations begins to run when a plaintiff discovers or reasonably should have discovered the facts necessary to assert their claim of defamation, which in this case occurred during discovery in 2021.  Opp. at 47 n.6; *Bayatfshar v. ARINC, Inc.*, 961 F. Supp. 2d 206, 215 (D.D.C. 2013).  In any event, whether Meyer knew about the statements before 2021 is immaterial because defendants are otherwise entitled to summary judgment on Count Five.

community standing, or lower him in the estimation of the community." *Id.*, citing *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990).

Whether a communication is capable of a defamatory meaning is a question of law reserved for the Court. *See Clampitt v. Am. Univ.*, 957 A.2d 23, 39 (D.C. 2008) (citation omitted). The inquiry "focuses only on whether a reasonable reader could understand a statement as tending to injure a plaintiff's reputation." *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1142 (D.C. Cir. 1994), *modified on other grounds*, 22 F.3d 310 (D.C. Cir. 1994). Ultimately, "[i]t is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous." *White v. Fraternal Ord. of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990), quoting *Levy v. Am. Mut. Ins. Co.*, 196 A.2d 475, 476 (D.C. 1964). Here, the Court concludes that no reasonable juror could find Rayborn's statements as being capable of defamatory meaning because they did not make Meyer appear "odious, infamous, or ridiculous." *Jankovic*, 494 F.3d at 1091.

A statement is "defamatory per se" if it is "so likely to cause degrading injury to the subject's reputation that proof of harm is not required to recover compensation." *Franklin v. Pepco Holdings*, 875 F. Supp. 2d 66, 75 (D.D.C. 2012). Defamation per se generally consists of statements that allege a criminal act, a repugnant disease, a matter adversely affecting a person's ability to work in a specific profession, or gross sexual misconduct. *See id.*

Defamation per se is actionable when the statement(s) at issue make a plaintiff unfit for their "chosen profession." *United States ex rel. Guo v. Nat'l Endowment for Democracy*, No. 1:18-cv-02986, 2022 WL 503765, at *12–13 (D.D.C. Feb. 18, 2022) (finding statements that a Chinese political dissident and writer living in the United States "was an unethical person acting illegally to make trouble," "[a] betrayer[] and squealer[]" who caused financial problems for

defendant, and that he "help[ed] the Chinese Communist Party" reflected defamation per se because those who read defendant's posts would question plaintiff's status as an opponent of the Chinese government); *see also Moldea*, 15 F.3d at 1143 (finding statements that an author was "sloppy" and that his book's portrayals of central events were incorrect or misleading actionable as defamation).

Defamation per se is also actionable when the statement(s) at issue may reasonably be capable of calling a plaintiff's professionalism into question or "lower[ing] [him] in the estimation of a substantial, respectable group." *Nyambal v. AlliedBarton Sec. Servs.*, 344 F. Supp. 3d 183, 191-92 (D.D.C. 2018), citing *Afro-Am. Publ'g Co. v. Jaffe*, 366 F.2d 649, 654 n.10 (D.C. Cir. 1966).

The record reveals that there is no dispute that Rayborn made the following statements: (1) telling client Broad Street that "Meyer is no longer in the business," Pls.' SOF ¶ 45; Defs.' Resp. SOF ¶ 45, citing Ex. 17 to Opp. [Dkt. # 59-17] (sealed); (2) emailing client NENA that Rayborn had heard that Meyer was "winding things down to retire," Pls.' SOF ¶ 45; Defs.' Resp. SOF ¶ 45; Ex. 16 to Opp. [Dkt. # 59-16] (sealed); and (3) emailing the NHP Foundation that "[Meyer] is basically retired." Pls.' SOF ¶ 45; Defs.' Resp. SOF ¶ 45; Ex. 19 to Mot. [Dkt # 59-19] (sealed).

The complained of comments do not rise to the level of defamation per se merely because they relate to Meyer's business or his availability to service his clients; they do not call his fitness into question.

Moreover, plaintiffs cannot show that Rayborn's statements concerning Meyer's retirement status have a defamatory meaning; Rayborn's statements do not rise to the level of severity of other statements that have been found to be actionable by courts in this district. *See,*

*e.g.*, *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 878 (D.C. 1998) (denying summary judgment where defendants falsely claimed that a client was dissatisfied with plaintiff's work product, among other statements that insinuated plaintiff was performing poorly at her job); *Von Kahl v. Bureau of Nat'l Affs., Inc.*, 810 F. Supp. 2d 138, 145 (D.D.C. 2011) (denying summary judgment where defendant claimed that plaintiff "showed no hint of contrition" and made certain egregious statements regarding his involvement in the murder of federal marshals).

In these cases, there was a genuine question to be resolved as to whether the statements were damaging to plaintiff's professional reputation, aptitude, or moral character. The statements either directly harmed plaintiffs' standing in their communities or increased the risk that they would be perceived by others in an "odious, infamous, or ridiculous" light. *Jankovic*, 494 F.3d at 1091. Here, while Rayborn's statements were false, they did not "suggest anything untoward" about Meyer. *See Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001) ("[F]acially innocuous statements are not themselves defamatory . . . .); *see also Coates v. L. Sch. Admissions Council*, No. Civ.A. 105CV0641JDB, 2005 WL 3213960, at *1, *3 (D.D.C. Oct. 25, 2005) (finding that plaintiff's incorrectly graded LSAT score did not subject him to "scorn, ridicule, shame, contempt or embarrassment" and was therefore not defamatory). No reasonable juror could find that calling a person "retired" is as odious as alleging that they perform poorly at their job or otherwise lack integrity in their profession. *See Farmer v. Lowe's Cos.*, 188 F. Supp. 2d 612, 616 (W.D.N.C. 2001) ("The statement that a person has retired has no [denotative and connotative] meanings or necessary implications. While it concerns her profession, it does not impeach her in that profession."); *cf. Beeck v. Fed. Express Corp.*, 81 F. Supp. 2d 48, 53 (D.D.C. 2000) (finding that the "mere suggestion that plaintiff [is considering] retiring" is "[not] derogatory" for the purposes of an ADEA discrimination claim).

41

The Court does not wish to suggest that there was anything appropriate or acceptable about these communications; they do not paint a pretty picture about how Rayborn went about building business for Broad Street, and a jury could easily find his conduct to be underhanded. But while Rayborn's spreading falsehoods about Meyer's status will bear on the question of whether his interference with TMG's contracts or business relationships was improper, the Court will grant summary judgment in defendant's favor on Count V on the basis that the statements were not defamatory.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for partial summary judgment with respect to liability for Count I [Dkt. # 61] is **GRANTED** with respect to defendant's liability in connection with the eleven former TMG clients for which Rayborn produced canvas cards in discovery; defendants' motion for summary judgment on Counts I, II, III, and IV [Dkt. # 56] is **DENIED,** and defendants' motion for summary judgment on Count V [Dkt. # 56] is **GRANTED.** A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 29, 2023